**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| A Woman's Concern, Inc. d/b/a Your Options Medical Centers, | ) ) ) ) |  |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No.: |
| Maura Healy, Governor of Massachusetts, sued in her individual and official capacities; Robert Goldstein, Commissioner of the Massachusetts Department of Public Health, sued in his individual and official capacities; Reproductive Equity Now Foundation, Inc.; Rebecca Hart Holder, Executive Director of Reproductive Equity Now Foundation, Inc., | ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

Plaintiff, A Woman's Concern, Inc. d/b/a Your Options Medical Centers (hereinafter "Your Options Medical," "YOM," or "Plaintiff"), brings this action for declaratory, compensatory, and injunctive relief to vindicate and defend its constitutional and civil rights to provide medical services without fear of retaliation and threat because of its political and religious views. Maura Healey, Governor of Massachusetts, along with Commissioner Robert Goldstein ("Defendants"), have engaged in a pattern of conduct to target YOM and other pregnancy resource centers ("PRCs") in Massachusetts, thus depriving Plaintiff of its rights to freedom of speech and free exercise of its religion as guaranteed by the First Amendment to the U.S. Constitution. In addition, Defendants have engaged in impermissible viewpoint discrimination against Plaintiff on the basis of its religious and political speech in violation of the Equal Protection clause of the Fourteenth Amendment. The Defendants' "trusted partner" Reproductive Equity Now Foundation, Inc.

("REN"), led by Director Rebecca Hart Holder ("Defendants"), have similarly acted – under color of law – to deprive Plaintiff of its rights to freedom of speech and free exercise of its religion as guaranteed by the First Amendment, and to discriminate against Plaintiff on the basis of its religious and political speech in violation of the Fourteenth Amendment.

## I.    PRELIMINARY STATEMENT

1.    Government officials can express their views; "[w]hat [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression." *NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Such conduct is "presumptively unconstitutional." *Id.* This case is necessitated by an overt viewpoint-based campaign of harassment, suppression, and threats against YOM and other PRCs. Directed by Governor Healey and the other Defendants, this campaign involves selective law enforcement prosecution, public threats, and even a state-sponsored advertising campaign with a singular goal – to deprive YOM, and groups like it, of their First Amendment rights to voice freely their religious and political viewpoints regarding the sanctity of human life in the context of the highly controversial issue of abortion.

2.    Defendants' retaliation and selective-enforcement campaign accuses YOM and other PRCs of being a public health threat, of carrying out false and misleading advertising, and of other falsehoods, while actively urging citizens to report PRCs to State law enforcement. Defendants' campaign is not isolated; in fact, it began when Governor Healey, as Attorney General, issued consumer advisories making it emphatically clear that pro-life PRCs are not welcome in Massachusetts because of their views and speech. Moreover, Defendants have knowingly targeted pro-life PRCs for repeated enforcement actions without a proper basis and based solely on REN's unwarranted complaints, in violation of their rights to equal protection under the law.

3.     Defendants' campaign of intimidation has directly contributed to the decision of one of YOM's doctors to stop practicing for YOM. His departure created significant costs for YOM, including requiring YOM to turn patients away. Plaintiff YOM has also been forced to operate in a culture of fear and harassment from the State, and continues to face unprecedented investigations, including unnecessary subpoenas, despite a prior state investigation clearing YOM of any wrongdoing.

4.     Absent relief, Defendants' blacklisting campaign will continue to damage YOM and its members, as well as endanger the free speech, free exercise, and association rights guaranteed by the Constitution. In fact, these threats are likely to have their desired effects forcing YOM to stop operating if the unwarranted intimidation tactics continue. It is well-settled that viewpoint discrimination applied through threats of legal sanctions and other means of coercion and intimidation violates the United States Constitution where, as here, such measures chill protected First Amendment activities. That very kind of selective censorship scheme is evidenced here. Moreover, the threats in this case were targeted explicitly against the religious speech of PRCs in violation of the Free Exercise Clause.

## II.     PARTIES

5.     Plaintiff, Your Options Medical, is a religious-based nonprofit organization, organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 103 Broadway, Revere, Suffolk County, Massachusetts.

6.     Defendant, Maura Healey, is the current governor of Massachusetts and the former Attorney General of Massachusetts. She is named in this action in her individual and official capacities.

7.     Defendant, Robert Goldstein, is the Massachusetts Commissioner of Public Health. He is named in this action in his individual and official capacities.

8.     Defendant Reproductive Equity Now Foundation, Inc. is a 501(c)(3) nonprofit organization with the organizational goal of "Advancing reproductive justice and eliminating barriers to safe, legal abortion care." https://reproequitynow.org/what-we-do.

9.     Defendant Rebecca Hart Holder, is and was at all times relevant to this Complaint, Executive Director and/or President of Defendant Reproductive Equity Now Foundation, Inc.

## III.    JURISDICTION AND VENUE

10.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, enforceable under the Civil Rights Act, 42 U.S.C. § 1983 et seq.

11.    This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331.

12.    This Court has authority to award the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested compensatory and injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and all the acts described in this Complaint occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### a.    Background

14.    Plaintiff was founded in 1991 by three Christian families in Boston who saw the need to offer women in unplanned pregnancies a safe place to receive help and support in choosing life.

15.     Plaintiff believes that all human life is sacred and made in the image of God.

16.     As a Christian organization, Plaintiff is committed to aiding women and couples facing unexpected pregnancies by providing ultrasounds, counseling, and meeting the practical and material needs that may otherwise cause them to consider abortion.

17.     As a life-affirming entity, Plaintiff does not perform abortions, does not refer for abortions, and does not advertise that it performs abortions.

18.     The heart of Plaintiff's ministry is to meet the emotional, relational, material, and spiritual needs of mothers and their babies.

19.     All of YOM's services for pregnant women are provided free of charge, including pregnancy testing, ultrasounds, and pregnancy options counseling, as well as the provision of baby clothes, diapers, and other supplies to mothers of newborns.

20.     Plaintiff is a medical clinic and has been licensed by the Massachusetts Department of Public Health ("DPH") since 1999.

21.     Plaintiff currently operates multiple medical pregnancy centers and a mobile medical clinic.

22.     Its medical licensure allows Plaintiff to offer lab-quality pregnancy testing and ultrasounds, which it has provided to women for the last twenty-five years.

23.     Plaintiff has renewed its licensing with the DPH every two years, as required by law.

24.     During the twenty-five years that Plaintiff has operated as a medical clinic in Massachusetts, it has received zero (0) patient complaints.

25.     Plaintiff operates a client-facing website, stating: "As a non-profit, we are able to provide our services at no cost to you because of the generosity of our donors. We do not provide

pre-natal care or abortion services so there is no financial gain or any other pressure for you to make a decision regarding your pregnancy." *Your Options Medical: Free Pregnancy Testing and Ultrasound*, https://youroptionsma.org (last visited Aug. 19, 2024) (attached as Exhibit A). This same statement also appears on every other page of the website.

26.     DPH is vested with authority to regulate medical clinics in the State, to initiate investigations and civil enforcement actions against regulated entities, and to refer potential criminal violations to the Massachusetts Attorney General for prosecution.

**b.     Violence and Vandalism Against Pro-Life Organizations and Persons (Including Plaintiff) in Recent Years**

27.     Immediately following the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, PRCs were made targets of violence and vandalism. *See* Micaiah Bilger, *New Study Shows Pro-Life Groups Have Been Attacked 22 Times More Than Pro-Abortion Groups*, LifeNews.com (Nov. 1, 2022, 5:04 PM), https://www.lifenews.com/2022/11/01/study-pro-life-groups-have-been-attacked-22-times-more-than-pro-abortion-groups/; *see also Much More Violence Against Pro-Life People Than Against Pro-Choice Since the Supreme Court Leak on May 3rd: 135 Attacks on Pro-Life People Between The Supreme Court Leak on May 3rd and September 24th, 2022, Only 6 Attacks Were Identified in the Other Direction*, Crime Research (Oct. 31, 2022), https://crimeresearch.org/2022/10/136-pro-abortion-attacks-between-the-supreme-court-leak-on-may-3rd-and-september-24th-2022/; *see also* Micaiah Bilger, *Leftists Vandalize Church and Pregnancy Center on the Same Night*, LifeNews.com (Oct. 20, 2022), https://www.lifenews.com/2022/10/20/leftists-vandalize-church-and-pregnancy-center-on-the-same-night/.

28.     Plaintiff is one of the many pro-life organizations listed in these articles that was targeted for vandalism.

29.     On June 26, 2022, two days after the *Dobbs* decision was published, Plaintiff's building was vandalized with the word "SCAM" written in spray paint. (Attached as Exhibit B).

30.     Plaintiff was again targeted for vandalism on July 21, 2022, and July 28, 2022.

31.     No one to YOM's knowledge has been prosecuted for the repeated criminal acts perpetrated against it.

**c.     The State's False Statements Against YOM**

32.     In response to these acts of vandalism, Massachusetts officials did not pursue a public awareness campaign to bring these vandals to justice.

33.     Instead, government officials took affirmative steps to contribute to, and escalate, the hostile rhetoric against pro-life organizations, such as YOM.

34.     On July 6, 2022, just weeks after YOM was first vandalized, then-Attorney General Maura Healey issued a factually baseless "advisory" stating: "While crisis pregnancy centers claim to offer reproductive healthcare services, their goal is to prevent people from accessing abortion and contraception." Press Release, AG Healey Warns Patients About Crisis Pregnancy Centers: Advisory Informs People That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care, Office of Attorney General Maura Healey (July 7, 2022), https://www.mass.gov/news/ag-healey-warns-patients-about-crisis-pregnancy-centers   (Attached as Exhibit C).

35.     The advisory also states that "while Crisis Pregnancy Centers may appear to be reproductive health care clinics, they do not provide abortion care or referrals, contraception, or other reproductive health care, **despite what they may advertise**." *Id.* (emphasis added).

36.     In that same advisory, Rebecca Hart Holder, Executive Director of Defendant REN, also without factual basis, stated: "**Crisis pregnancy centers, or fake clinics, are dangerous**

**facilities that use deceptive advertising to deceive pregnant people into believing that they provide abortion care,** when in reality, many do not even have doctors on staff to discuss the full range of health care options with clients." *Id.* (emphasis added).

37.     Just fifteen days after this consumer alert calling pro-life pregnancy centers "fake," "dangerous," and "deceptive," on July 21, 2022, one of Plaintiff's buildings was again vandalized with spray paint.

38.     Spray painted on the building were the words "IF ABORTION'S NOT SAFE NEITHER ARE YOU."

39.     Also spray painted on the building was the symbol A with a circle around it – commonly known as the "Anarchy symbol." (Attached as Exhibit D).

40.     Eight days later, on July 28, 2022, Plaintiff was targeted a third time by vandals, this time with posters stating: "Shut Down Your Options Medical;" "This is a Fake Clinic." (Attached as Exhibit E).

41.     The vandals' accusation of YOM being a "fake clinic" directly mirrored the accusations made by Defendants.

42.     In October of 2023, a complaint against Plaintiff was made to the Executive Office of Health and Human Services and the DPH.

43.     That complaint alleged that "[b]ased on recent *press reports*, [Plaintiff] Your Options Medical appears to engage in intentionally misleading and deceptive practices about the services offered to people seeking abortion and pregnancy-related care by advertising 'free pregnancy testing and ultrasounds' with 'immediate results' on the mobile unit itself while stating that, in fact, the results are 'preliminary findings.'" (emphasis added) (Attached as Exhibit F).

44.     Importantly, this complaint was not made against Plaintiff by any patient or person with first-hand knowledge, but rather by Defendant Hart Holder, who openly and publicly works in collaboration with the state of Massachusetts to target pro-life pregnancy centers. (*See e.g.*, Exhibits C, G, and H).

45.     In reality, YOM performs pregnancy tests and ultrasounds with immediate results, but the *final* results are confirmed by a physician, then provided to the patients no more than twenty-four to forty-eight hours later.

46.     On the basis of Defendant Hart Holder's complaint, the DPH conducted a review of Plaintiff's advertising, but it did not, nor has it ever, requested or required Plaintiff to make any changes to the language on the mobile unit.

47.     The sole change DPH required Plaintiff to make was an amendment to its Policies and Procedures Manual concerning the criteria for ultrasound exams eliminating any language that allowed for sonographer discretion.

48.     Plaintiff made that correction, and DPH issued a letter and summary statement to Plaintiff on February 29, 2024, clearly indicating that YOM is in compliance with state licensing requirements:

> On February 19, 2024, we conducted a desk audit follow-up review to verify that your facility had achieved and maintained compliance. The findings indicate that all deficiencies have been corrected. You are reminded that facilities are obligated to correct all deficiencies and then remain in compliance. An unannounced visit may be conducted at any time at the discretion of the MA Department of Public Health Licensure Unit.

(Attached as Exhibit I).

49.     The deficiency noted by DPH was not remotely related to the allegations contained in Defendant Hart Holder's October 2023 complaint or to the allegations from the other Defendants that the Plaintiff as a pro-life pregnancy center is engaged in deceptive and dangerous activities.

50.    Despite clearance from DPH, the Massachusetts Board of Registration in Medicine ("Board") then began an investigation of Plaintiff's medical director based on Defendant Hart Holder's October 2023 complaint.

51.    As part of that investigation, the Board served two subpoenas, both of which were both ad testificandum and duces tecum, on Plaintiff: the first was issued on December 21, 2023; the second was issued on June 5, 2024.

52.    Plaintiff complied with the first subpoena and provided the responsive documents in its possession, though many of the documents requested did not concern Plaintiff's mobile unit [the subject of the October 2023 complaint by REN].

53.    Rather, the requested documents related to Plaintiff's three permanent sites.

54.    In addition, most of the documents subpoenaed pertained to a period of time during which Plaintiff's mobile unit was not in service; that is, January 1, 2023, to December 21, 2023.

55.    Because investigative records and/or information obtained by the Board of Registration in Medicine are not confidential, they are and will be accessible to Defendant Hart Holder as the complainant. G.L. c. 112, Sec. 5 ("[I]nvestigative records or information of the board shall not be kept confidential after the board has disposed of the matter under investigation . . . nor shall the requirement that investigative records or information be kept confidential at any time apply to requests from the . . . . complainant . . . .").

56.    In using State Boards to circumvent the confidentiality of patient records, it appears that Defendant Hart Holder is utilizing (or colluding with) the government to conduct a fishing expedition into Plaintiff and its medical director solely because it is operating a pro-life pregnancy center. Sam Turken, *State Department of Public Health Warns Anti-Abortion Centers Against Using Deceptive Tactics*, wgbh.org (Jan 5, 2024), https://www.wgbh.org/news/2024-01-05/state-

department-of-public-health-warns-anti-abortion-centers-against-using-deceptive-tactics

(emphasis added) (attached as Exhibit J).

57.    On January 3, 2024, DPH issued a press release stating: "Many of these centers advertise themselves as full-service reproductive health care clinics, yet they do not provide abortion care or abortion referrals, contraception, or other important reproductive health care services. **Most centers are affiliated with national advocacy or religious organizations** that provide funding and support to advance an anti-abortion agenda." Press Release, Maintaining Integrity, Accessibility, and Transparency in Reproductive Care, DPH (Jan. 3, 2024), https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care (emphasis added) (attached as Exhibit K).

58.    The January 3, 2024, DPH press release also stated: "In Massachusetts, there are nearly 30 anti-abortion centers that operate in the state, with only four currently subject to DPH licensure under state law." *Id.* "However, if these facilities are providing medical care or advertising services that are consistent with a clinic, DPH . . . may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials. This work may be done in collaboration with the Attorney General's Office's Reproductive Justice Unit." *Id.*

59.    In addition, the January 3, 2024, DPH press release stated that "[t]he Department of Public Health **actively seeks feedback and complaints from individuals** who have had concerning experiences with anti-abortion centers **as well as from other stakeholders who have information about questionable practices**." *Id.* (emphasis added).

60.    Finally, the January 3, 2024, DPH press release indicated that it is "focused on educating the public about the facilities that provide comprehensive reproductive care and those

that **practice deceptive tactics to limit people's choices and prevent abortions**. DPH will **increase its efforts** to educate the public through a multi-faceted awareness campaign in 2024." *Id.* (emphasis added).

61.     Along with the January 3, 2024, press release, Defendant Goldstein issued a statement to "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics," as a "Reminder to Licensees Regarding Obligations and Providing Standard of Care." (Attached as Exhibit L).

62.     Within that statement, Goldstein wrote that DPH "takes patients' rights and the provision of high quality, evidence-based, safe care by all providers seriously. **This includes providing patients accurate and complete information for informed decision-making, accurate portrayal and advertising of clinical services, and licensees practicing within their scope of practice and their license.**" *Id.*

63.     Among other things, Goldstein's statement also reminded doctors that "**[f]ailure to adhere to the staffing requirements of 105 CMR 140.000 could not only jeopardize a clinic license through administrative action including licensure suspension or revocation, but may also result in the referral of licensed providers deemed out of compliance to the appropriate licensing board. Entities and individuals may be referred to the Attorney General's Office by DPH for prosecution of deceptive practices by holding the entity out as a clinic, or performing unlicensed medical services.**" *Id.*

64.     This statement was featured on the DPH webpage containing the press release regarding "anti-abortion centers" and was referred to as "guidance" for Massachusetts medical professionals. Press Release, Maintaining Integrity, Accessibility, and Transparency in

Reproductive Care, DPH (Jan. 3, 2024), https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care (emphasis added) (attached as Exhibit K).

65.     When viewed in the context of the statements made by Defendant Goldstein in the press release and the fact that it is linked on the press release webpage, it is clear that Defendant Goldstein issued this statement to threaten pro-life clinics and their doctors in line with the actions that have already been taken against YOM and its medical director.

66.     In an effort to continue and expand the campaign against YOM and other PRCs, on June 10, 2024, Defendant Governor Healey's administration launched a "first-in-the-nation" campaign against pro-life pregnancy centers throughout Massachusetts which included Plaintiff.

67.     The press release announced that "[t]he Healey-Driscoll Administration today launched a first-in-the-nation public education campaign highlighting **the dangers and potential harm of anti-abortion centers**, also called 'crisis pregnancy centers.' Anti-abortion centers often look like medical facilities and purport to offer the full spectrum of reproductive health care while, in reality, **they often mislead people about their options if they are pregnant and dissuade them from accessing abortions.**" Press Release, Healey-Driscoll Administration Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-centers.

68.     Defendant Healey stated that the campaign "includes protecting patients from **the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing comprehensive reproductive services.**" *Id.*

69.     Lieutenant Governor Kim Driscoll stated "[t]he troubling practices of anti-abortion centers serve to undermine the trust that people should have in our health care system. . . . Education and accurate information can help counter the misinformation and unethical tactics these centers use to prey on people at a particularly vulnerable time." *Id.*

70.     According to that press release, "[t]his public education campaign . . . will appear on social media platforms, billboards, radio, and transit, [and] was funded through a $1 million investment that the Massachusetts legislature passed as part of its FY2023 supplemental budget." *Id*.

71.     Defendant Goldstein stated that the State's campaign "counter-punches to the vast amount of misinformation and disinformation that these centers peddle every day, deceiving people who may be frightened or confused . . . . As the commissioner of public health, I'm resolute about calling out this deception for what it is: **a public health threat**. When people are denied factual information and the freedom to make fully informed decisions about their reproductive health, it can lead to worse mental and physical outcomes." Katie Lannan, *Mass. Officials Launch Information Campaign Warning Against Anti-Abortion Centers*, wgbh.org (June 10, 2024), https://www.wgbh.org/news/politics/2024-06-10/mass-officials-launch-information-campaign-warning-against-anti-abortion-centers.

72.     Further, "[t]he campaign was **created by the Department of Public Health (DPH) in collaboration with the Reproductive Equity Now Foundation** . . . ." *Id.*

73.     Since the government launched its campaign, billboards, posters, and ads are now present throughout Massachusetts. (Examples attached as exhibit M).

74.     DPH operates and maintains a page on its website entitled "Avoid Anti-Abortion Centers." On the main webpage, DPH states, "[Anti-abortion centers] may mislead you about your

options if you're pregnant and can put your health at risk." *Avoid Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/avoid-anti-abortion-centers (last visited Aug. 8, 2024) (attached as Exhibit N).

75.     On this same webpage, DPH actively solicits complaints against pro-life pregnancy centers: "Have you been harmed by an anti-abortion center? If you have been to an anti-abortion center, or 'crisis pregnancy center,' and have concerns about your experience, learn how you can file a civil rights complaint." *Id.*

76.     DPH's "Anti-abortion clinic" webpage links to another government webpage -- "Anti-Abortion Center Awareness Campaign: Social Media Toolkit (English)." This page is offered by the Bureau of Community Health and Prevention and the Department of Public Health. (Attached as Exhibit O).

77.     On this webpage, DPH states the following without factual basis:

> [Pro-life centers] may look like medical facilities but could put your health at risk if you're pregnant.
> [Pro-life centers], may cause harm to individuals looking for pregnancy or abortion care.
> [Pro-life centers] . . . may mislead pregnant individuals about their options . . . .
> Avoid [pro-life] centers. They may mislead you or delay your care.
> [Pro-life centers] . . . could put your health at risk.
> [Pro-life centers] are not a safe or trusted place to go for reproductive health care.

78.     In addition to these statements, DPH links from multiple webpages that it operates and maintains to a list of the "more than 30 [pro-life] centers in Massachusetts." (*See* Exhibit O).

79.     On one of the webpages, DPH states, "Even if you're not looking for an abortion, **these centers are not a safe or trusted place to go for reproductive health care.**" *Id.*

80.     The link provided by DPH goes directly to a webpage operated and maintained by Defendant REN. This webpage is entitled "What Are Anti-Abortion Centers?" *What Are Anti-*

*Abortion      Centers*,      repoequitynow.org,      https://reproequitynow.org/about-antiabortion-centers#:~:text=List%20of%20Anti%2DAbortion%20Centers%20in%20New%20England%3A (last visited Aug. 19, 2024) (attached as Exhibit P).

> **d.    REN's statements about YOM**

81.    REN receives direct financial support from the state; a budget line item from the state's 2023 budget, item 4513-1006, provides money "[f]or family and reproductive health services; provided, that not less than $1,000,000 shall be expended for a public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers and the centers' lack of medical services; provided further, that the campaign shall include information on the availability of providers across the commonwealth that provide legitimate medical and family planning services; provided further, that the campaign shall be linguistically diverse and culturally competent; and provided further, that not less than $250,000 shall be expended for Reproductive Equity Now, Inc.'s free abortion legal hotline." An Act Making Appropriations for the Fiscal Year 2023 to Provide for Supplementing Certain Existing Appropriations and For Certain Other Activities and Projects, Ch. 2 of Acts of 2023, https://www.mass.gov/doc/supplemental-budget/download at 5.

82.    Defendant REN's webpage lists every pro-life pregnancy center, including Plaintiff, in New England. (Attached as Exhibit P).

83.    It identifies all of YOM's facilities by name.

84.    Defendant REN has published a "guidebook" on its website (available for download). *CAUTION: This Clinic Does Not Provide Abortion Care: A Guidebook on Identifying and Taking Action Against Anti-Abortion Centers in New England*, Reproductive Equity Now, https://reproequitynow.org/aac-guidebook, (last visited Aug. 19, 2024) (attached as Exhibit Q).

85.     Within the guidebook, Defendant REN again lists all the pro-life pregnancy centers in New England, including Plaintiff's multiple locations in Massachusetts, and makes false, unfounded, and baseless statements. *Id.*

86.     For example, Defendant Hart Holder addresses the guidebook readers in her capacity as head of REN, stating: "We created this organizing guide because we recognize that [pro-life] centers pose a serious threat to unbiased reproductive health care here in New England," *Id.* at 3, and "[t]ogether, we can . . . put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities." *Id.* at 4.

87.     The guidebook repeats the false claim that "[Pro-life] centers use deceptive practices to attract patients . . . . They often use disinformation as a way to dissuade people from accessing abortion care." *Id.* at 12.

88.     Also pictured on page twelve, below these anti-pro-life center statements, is a Plaintiff YOM's main center in Revere, MA.

89. The guidebook lists "8 Ways [Pro-life] Centers Will Try to Deceive You."

1) "medical disinformation"
2) "fear-based language"
3) "close proximity to legitimate abortion clinics"
4) "fake service called 'abortion reversal;"
5) "names with the words 'choice,' 'choices,' 'hope,' or 'options.'"
6) "lie to you about how far along you are in your pregnancy"
7) "offer abstinence-only sex education, post-abortion support or 'grief counseling,' spiritual support, or bible study"
8) "associated with large, national [pro-life] organizations"

*Id.* at 13.

90.     In the guidebook, Defendant REN solicits information from "[p]eople who have had a negative experience with [pro-life] centers," instructing them to "call Reproductive Equity

Now's free and confidential Abortion Legal Hotline at 833-309-6301 to report their case and be referred to pro bono attorneys." *Id.* at 20.

91.     This solicitation does not limit its request to information from "patients" of pro-life centers.

92.     This is the same Hotline that receives direct financial support from the Commonwealth.

93.     The guidebook then instructs that "[p]atients in Massachusetts can also file a report with the Attorney General Office's Civil Rights Division," and provides contact information as well as instructions on filing a nurse or physician "complaint with the Commonwealth to initiate an investigation." *Id.*

94.     Defendant REN also states, "we've seen Massachusetts **conduct several investigations into [pro-life] centers <u>based on Reproductive Equity Now's complaints</u>.**" *Id.*

95.     The guidebook links to two complaints, one of which is its complaint against Plaintiff YOM. *Id.*

96.     In an article dated January 5, 2024, Defendant Holder was quoted as saying, "Anti-abortion centers **pose a serious threat to pregnant people** seeking unbiased reproductive health care in Massachusetts . . . . I do really want to thank Commissioner Goldstein for his bold leadership and **really look forward to continuing our work together to combat these centers.**" Sam Turken, *State Department of Public Health Warns Anti-Abortion Centers Against Using Deceptive Tactics*, wgbh.org (Jan 5, 2024), https://www.wgbh.org/news/2024-01-05/state-department-of-public-health-warns-anti-abortion-centers-against-using-deceptive-tactics (emphasis added) (attached as Exhibit J).

97.     In a Department of Health and Human Services press release dated June 10, 2024, Defendant Hart Holder stated, "Massachusetts is putting power in the hands of our communities by alerting them to the **dangers of deceptive anti-abortion centers. . . .** We're so proud that the Healey-Driscoll Administration **is addressing this public health threat** head-on, and we have been honored to work with the Massachusetts Department of Public Health on the creation of this first-in-the-nation public education campaign. **Together, we can combat anti-abortion centers' predatory practices** . . . ." Press Release, Healey-Driscoll Administration Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-centers (emphasis added).

98.     Defendant Hart Holder has also stated about PRCs that "They're here, they're dangerous . . . this campaign is about putting power in the hands of people by calling out anti-abortion centers' deceptive and dangerous practices." https://www.wgbh.org/news/politics/2024-06-10/mass-officials-launch-information-campaign-warning-against-anti-abortion-centers.

## V.     CAUSES OF ACTION

### <u>COUNT I</u>

**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**
**(Claim Against all Defendants)**

99.     Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

100.     Pursuant to 42 U.S.C. § 1983, Plaintiff YOM brings this claim against Defendants for acting under color of state law to deprive its of its First Amendment right to free speech as guaranteed by the U.S. Constitution.

101.     Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacities.

102.     The conduct of the State Defendants constituted a violation of YOM's clearly established free speech rights such that every reasonable State official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; actively seeking complaints against PRCs in a targeted campaign of harassment, threats, and unequal enforcements based on political and religious viewpoint is a clear constitutional violation that is closely analogous with the constitutional violations in past cases.

103.     This claim is also brought against REN and Executive Director Holder, as they acted under the color of law. REN and Executive Director Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership in this campaign as a joint action with Massachusetts officials.

104.     It is clearly established that First Amendment rights can be violated by the chilling effect of governmental action that engages in viewpoint-discriminatory implicit threats.

105.     As delineated above, each of the named State Defendants individually engaged in these threats. Governor Healey publicly claimed that PRCs engage in deceptive and dangerous tactics and as Attorney General issued the advisory that falsely accused PRCs of deceptive advertising. Commissioner Goldstein exercised his authority to accuse PRCs of wrongdoing,

threatening them with legal action, and making public statements such as, "As the commissioner of public health, I'm resolute about calling out this deception for what it is: a public health threat."

106.   The Constitution prohibits the government from "abridging the freedom of speech." This prohibition applies to state governments and state government officials through the Fourteenth Amendment.

107.   The First Amendment ensures that government officials may not rely on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech.

108.   Four factors have been used to determine whether government speech crosses the line from persuasion to coercion, under a totality-of-the-circumstances standard where no single factor is dispositive: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024).

**A.     Word Choice**

109.   Defendants' choice of words goes far beyond mere disagreement or criticism; the State has repeatedly accused PRCs of illegal behavior like deception, misrepresentation, and fraud. The State has publicly accused YOM of actionable misconduct.

110.   For example, State advertisements regularly refer to PRCs like Plaintiff YOM as engaging in "deceptive advertising." The term "Deceptive Advertising" is a term of art; Massachusetts law prohibits medical advertising "that is false, deceptive, or misleading." 243 Mass. Code Regs. 2.07(11)(a)(1). That term of art is applied by the State when an entity or individual has been found to engage in misconduct. Here, the State has applied that label categorically to all PRCs of the same viewpoint, regardless of any actual wrongdoing.

111.    These labels of wrongdoing have been applied to Plaintiff YOM despite the fact that a recent investigation expressly cleared it of these very accusations and found that Plaintiff YOM is not engaging in deceptive advertising.

112.    The State Defendants are simultaneously clearing Plaintiff YOM through formal investigations and continuing to classify Plaintiff YOM publicly as a wrongdoer.

113.    These targeted, false, and baseless accusations established a system of informal censorship designed to suppress the pro-life viewpoint of Plaintiff YOM with the intent to obstruct, chill, deter, and retaliate against Plaintiff YOM's speech. These actions demonstrate that the State will continue to target YOM regardless of its legal compliance.

114.    Defendants' actions constitute a concerted effort to deprive PRCs like YOM of their freedom of speech by threatening government prosecution against those PRCs that refuse to provide, refer for, or endorse abortion.

### B.    The Existence of Regulatory Authority

115.    The relevant facts herein demonstrate that the full authority of the State has been leveraged against Plaintiff YOM thereby posing a clear unconstitutional threat.

116.    Here the statements at issue come directly from the State authorities with the relevant regulatory authority, such as the Governor, Attorney General, and the head of DPH. When they threaten the existence of PRCs and warn people to stay away, they do so with the force of law.

117.    Defendants have regulatory authority over medical facilities, including Plaintiff YOM as a medically licensed facility. They have exercised that authority to engage in blatant viewpoint discrimination.

118.     Massachusetts State officials used communications and their power to single out and smear PRCs with disfavor to the public.

**C.     The Speech Was Perceived as a Threat**

119.     Here, Massachusetts State officials used their power to single out PRCs via communications and enforcement actions for disfavor.

120.     Defendants' statements, which warn against the existence of PRCs as public health threats and accuse them of criminal conduct, would cause a reasonable person to perceive such statements as a threat against those centers.

121.     Plaintiff YOM did in fact perceive Defendants' statements to be such a threat.

122.     As a direct, immediate, and foreseeable result of Defendants' threats, one of Plaintiff YOM's doctors quit providing services for YOM.

123.     Losing a doctor caused direct, tangible injury to YOM in that patients had to be turned away and denied care.

124.     Because of Defendants' threats, Plaintiff YOM anticipates that it may no longer be able to provide its services and be forced to shut down as a result of the viewpoint discrimination it is experiencing.

**D.     Defendants' Speech Referenced Adverse Consequences**

125.     Defendants' threats against PRCs have repeatedly threatened adverse consequences against them, on the basis of the viewpoint of YOM and other PRCs.

126.     For example, the statement "The Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers" calls for viewpoint-discriminatory complaints, complaints based ultimately on political disagreement rather than any wrongdoing. In making this statement, the State Defendants

proclaimed that they are "actively" seeking reports and complaints against only one kind of clinic: PRCs.

127.    In addition, read in context, Defendant Goldstein's January 3, 2024, memorandum to healthcare professionals warned pro-life doctors, nurses, and other healthcare providers that their licenses would be in jeopardy if they worked with PRCs.

128.    Defendants' other public statements likewise call explicitly for reports to be submitted and complaints filed against PRCs.

129.    The State Defendants' conduct is unconstitutional coercion and threatens Plaintiff YOM because of its moral, religious, philosophical, and political views.

130.    These threats have unconstitutionally chilled Plaintiff YOM's speech as it continues to be targeted with abnormally high enforcement measures because of its pro-life viewpoint.

131.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

132.    Defendants' intentional actions resulted in significant damages to Plaintiff YOM, including but not limited to damages due to reputational harm, increased costs for security and safety, and loss to YOM.

133.    In addition to the above-described damages, absent an injunction against Defendants, Plaintiff YOM will suffer irrecoverable loss and irreparable harm. All of the above injuries are ongoing; the campaign of harassment against PRCs continues and will continue unless the irrevocable injuries it is causing are stopped.

## COUNT II

**Violation of Plaintiff's First Amendment Right to Free Exercise of Religion
(U.S. Const. amend. I; 42 U.S.C. § 1983)
(Claim Against all Defendants)**

134.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

135.    This claim is brought against all Defendants.

136.    Pursuant to 42 U.S.C. § 1983, YOM brings this claim against Defendants for acting under color of state law to deprive its of its First Amendment right to free exercise of religion as guaranteed by the U.S. Constitution.

137.    Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacity.

138.    The conduct of the State Defendants constituted a violation of YOM's clearly established Free Exercise rights such that every reasonable state official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; the Defendants targeted PRCs explicitly because of their religious speech with conduct that had a vastly disproportionate effect on religious PRCs.

139.    This claim is also brought against REN and Executive Director Holder, as they acted under the color of the State law. REN and Executive Director Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership as a joint action with Massachusetts officials.

140.    The First Amendment prohibits the government from burdening the "free exercise of religion." This prohibition applies to state and local governments through the Fourteenth Amendment.

141.    Under the Free Exercise Clause, state actions that single out religious entities for disfavored treatment must survive the most rigorous scrutiny. Government fails to act neutrally and in a generally applicable fashion when it restricts practices because of their religious nature.

142.    Plaintiff YOM is motivated by religious faith; as discussed above, its public statement acknowledges that fact and emphasizes that it provides its aid out of a religious motivation.

143.    Other PRCs are likewise motivated by and driven by their religious faith and belief.

144.    Defendants' advertising campaign described above was motivated by the religious faith and belief of PRCs.

145.    Government conduct must be facially neutral and generally applicable towards religious practice.

146.    The actions of the State Defendants are explicitly and facially targeted at the religious activity of PRCs: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care.

147.    On its face, Defendants' conduct is neither neutral nor generally applicable, but targets Plaintiff YOM because of its religious faith.

148.    The Free Exercise Clause protects against governmental hostility towards religions that is not only overt, but masked. This can be determined through evidence of an effect caused by non-neutral government conduct.

149.    Here, the adverse effect of the government's conduct is that religious PRCs have been singled out for disparate treatment because of their religious expression.

150.    Massachusetts PRCs, such as Plaintiff YOM, are being targeted to chill or stamp out the exercise of those beliefs.

151.    The effect of Defendants' conduct is to single out religious clinics for disparate treatment, compared with secular medical clinics that do provide abortions.

152.    There are 21 PRC entities in Massachusetts. Of the 21 PRC centers, 19 are either certainly or likely faith-based, based on the language from their organizational documents and public statements. In other words, more than 90 percent of the entities targeted by Defendants are religious.

153.    Accordingly, the real operation and effect of the Massachusetts policy is to single out for discriminatory treatment pro-life PRCs, the overwhelming majority of which are faith-based and adhere to religious views about the sanctity of human life. The effect of the policy is exactly what governmental authorities intended.

154.    The entire category of reproductive care clinics has not been targeted by Defendants, only those that promote childbirth rather than abortion.

155.    The underlying assumption of the policy is that only those PRCs that promote the sanctity of human life are likely to engage in unethical conduct; and that belief in the sanctity of human life is, for YOM, a religious one.

156.    The State's purported interest is fabricated to hide the true purpose of suppressing PRCs' religious mission to promote the sanctity of human life and support mothers in crisis pregnancies.

157.    The operative effect of the Massachusetts policy is to harass and undermine PRCs, including Plaintiff YOM, because of their religious viewpoint affirming the sanctity of human life.

158.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

<u>**COUNT III**</u>

**Violation of Plaintiff's Fourteenth Amendment Right to
Equal Protection of the Law
(U.S. Const. amend. I; 42 U.S.C. § 1983)
(Claim Against all Defendants)**

159.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

160.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the equal protection of the laws, which prohibits Defendants from treating Plaintiff differently than similarly situated medical facilities.

161.    Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacity.

162.    The conduct of the State Defendants constituted a violation of YOM's clearly established Equal Protection rights such that every reasonable state official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; the Defendants discriminated against PRCs like YOM explicitly because of their religious and political

speech and punished YOM for its exercise of constitutional rights, engaging in viewpoint-based official harassment.

163.   This claim is also brought against REN and Executive Director Hart Holder, as they acted under the color of law. REN and Executive Director Hart Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership as a joint action with Massachusetts officials.

164.   The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

165.   The conduct of the government here expressly distinguishes the speech of PRCs for disparate treatment. Accordingly, such conduct is presumptively invalid.

166.   No extraordinary or adequate justification exists for such viewpoint-based discrimination.

167.   Defendants knowingly and willfully violated Plaintiff YOM's equal protection rights by seeking to selectively enforce regulations against YOM, applying an unequal standard on YOM, and imposing unjustified investigations.

168.   DPH has targeted YOM for disproportionate investigation on the basis of its viewpoint.

169.   Although zero patient complaints have ever been lodged with Defendants against YOM, Defendants directed threats against YOM and other PRCs and claimed they are a danger to public health.

170. Similarly situated entities that do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants. These entities are closely comparable to YOM, with the only possible basis for a distinction being the differing viewpoint.

171. Defendants knew or should have known of similarly situated entities at the time they engaged in their investigations and any purported lack of such knowledge was due to a "see-no-evil" policy of enforcement.

172. Defendants discriminated against Plaintiff YOM and PRCs because of their personal animus against PRCs and Defendants' commitment to a contrary viewpoint.

173. The disparate treatment of YOM-related programs and the comparators was caused by Defendants' intent to punish and/or inhibit YOM because of YOM's constitutionally protected viewpoint.

174. Defendants' selective enforcement against YOM and similar groups has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory, and undertaken in bad faith and without a rational basis.

175. Defendants' conduct does not further any compelling or even legitimate government interest.

176. Defendants' selective enforcement actions against YOM and similar organizations are based on YOM's and other PRCs' views and speech relating to the sanctity of life. These considerations are impermissible bases for an enforcement action.

177. Defendants' actions have resulted in significant damages to YOM, conduct directly attributable to this selective and discriminatory enforcement.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests the following relief:

(A)    A declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants have violated YOM's rights to free speech, due process, and equal protection under the United States Constitution for targeting YOM on account of its viewpoints and speech;

(B)    A permanent injunction ordering the Defendants, their agents, representatives, employees, servants and all persons and entities in concert or participation with them from ceasing any advertising activity or campaign that falsely accuses YOM of misconduct or of being a threat to public health and thereby has the purpose or effect of interfering with YOM's exercise of the rights protected by the First Amendment to the United States Constitution;

(C)    Compensatory or, in the alternative, nominal damages for the violation of Plaintiff's protected constitutional rights;

(D)    Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(E)    All other further relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff demands trial by jury on all claims and issues to triable.

DATED: August 19, 2024.

Respectfully submitted,

SAMUEL J. WHITING
/s/ Samuel J. Whiting
MASSACHUSETTS LIBERTY LEGAL CENTER
  (Massachusetts Bar No. 711930)
sam@malibertylegal.org

JORDAN SEKULOW*
  (D.C. Bar No. 991680)

STUART J. ROTH*
  (D.C. Bar No. 475937)
ANDREW EKONOMOU*
  (GA Bar No. 242750)
OLIVIA F. SUMMERS*
  (D.C. Bar No. 1017339)
CHRISTINA (STIERHOFF) COMPAGNONE*
  (D.C. Bar No. 1657929)
NATHAN MOELKER*
  (VA Bar No. 98313)

THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

* Not licensed in this court, PHV motions forthcoming.