UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

A WOMAN'S CONCERN, INC. d/b/a YOUR
OPTIONS MEDICAL CENTERS,

                    Plaintiff,

            v.                                    CIVIL ACTION
                                                  NO. 1:24-cv-12131-LTS
MAURA HEALEY, Governor of Massachusetts,
sued in her individual and official capacities;
ROBERT GOLDSTEIN, Commissioner of the
Massachusetts Department of Public Health, sued in
his individual and official capacities;
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC., REBECCA HART
HOLDER, EXECUTIVE DIRECTOR OF
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC.,

                    Defendants.


**MEMORANDUM OF LAW IN OPPOSITION TO
REN DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

   I.    Plaintiff Has Standing and Has Adequately Pleaded a Claim. ........................... 4

      A. YOM Need Not Succumb to Threats to Its First Amendment Rights in Order to Have Standing. ................................................................................................ 6

      B. Injury in Fact: Plaintiff YOM has Pleaded That It Engages in Core Religious Speech and Expression—Which Defendants Have Unconstitutionally Threatened. ...................... 8

      C. Traceability: Defendants' Action Caused the Deprivation of YOM's Constitutional Rights ................................................................................................. 11

      D. A Favorable Decision Would Redress Injury ............................................. 13

   II.   Defendants REN and Holder Acted Under Color of Law ................................. 13

   III.   The *Noerr-Pennington* Doctrine Has No Application In this Case ............................. 17

   IV.   In the Alternative, This Court Should Grant Plaintiff YOM Leave to Amend............ 20

CONCLUSION.............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) .................. 5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................... 5

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)....................................................... 3, 7

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)........................................................ 3, 8, 9, 10

*Blum v. Yaretsky*, 457 U.S. 991 (1982)................................................................ 6, 14, 15

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) ......................... 14

*Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48 (D. Mass. 2013)......................... 20

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)........................................... 14

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).......................................... 19

*Calderón-Serra v. Wilmington Tr. Co.*, 715 F.3d 14 (1st Cir. 2013)............................................ 20

*Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520 (1993) ........................................... 4

*Decotiis v. Whittemore*, 635 F.3d 22 (1st Cir. 2011) ..................................................... 2

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961).................................................................................... 17

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013)............................. 6

*Feminist Women's Health Center, Inc. v. Mohammad*, 415 F. Supp. 1258 (N.D. Fla. 1976)...... 18

*Flagg Bros. v. Brooks*, 436 U.S. 149 (1978)................................................................ 14

*Foman v. Davis*, 371 U.S. 178 (1962) ........................................................................ 20

*García-Catalán v. United States*, 734 F.3d 100 (1st Cir. 2013) .................................................. 5

*Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1 (1st Cir. 2018) ............................................... 4

*Household Goods Carriers' Bureau v. Terrell*, 452 F.2d 152 (5th Cir. 1971)............................. 18

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) ......................................... 15

*Lamb Enters. v. Toledo Blade Co.*, 461 F.2d 506 (6th Cir. 1972)................................................ 18

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ............................................................. 5

*LSO, Ltd. v. Stroh*, 205 F.3d 1146 (9th Cir. 2000) ........................................................... 5

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) .......................................................... 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................ 5

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ........................................... 5

*McGurn v. Bell Microproducts*, 284 F.3d 86 (1st Cir. 2002) ........................................... 6

*Murphy v. Mass. Dep't of Developmental Servs.*, 2014 U.S. Dist. LEXIS 183350
    (D. Mass. 2014) ............................................................................................................ 14

*NCAA v. Tarkanian*, 488 U.S. 179 (1988) ........................................................................ 14

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................................... *passim*

*Perkins v. Londonderry Basketball Club*, 196 F.3d 13 (1st Cir. 1999). ........................... 14

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49 (1993) ........... 19

*Raines v. Byrd*, 521 U.S. 811 (1997). ................................................................................. 1

*Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015) .................................................... 4

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) .................................................................... 14

*Rodríguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278 (1st Cir. 2014) ......... 5

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) .................. 4

*Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) ..................................................... 11

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50 (1st Cir. 2012) .................... 6

*Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25 (1st Cir. 2010) .................... 5

*South Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85
    (D. Mass. 2010)............................................................................................................. 19

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................................................... 4

*State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400 (1st Cir. 1970)............................ 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).................................................. 7

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................................................... 1, 11

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ........................................ 17, 18

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075
    (5th Cir. 1988) .................................................................................................. 19, 20

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................ 6

*Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007) .................................................. 7

**Statutes**
42 U.S.C. § 1983 ............................................................................................................ 1

**Other Authorities**

*About Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/info-details/about-abortion-
    centers ............................................................................................................... 13, 17

*Get in Touch with the Abortion Legal Hotline*, Reproductive Equity
    Now, https://reproequitynow.org/hotline ................................................................ 16

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 1, 2

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 2

Fed. R. Civ. P. 15(a) .................................................................................................... 20

**Treatises**

17 A.L.R. Fed. 645 ........................................................................................................ 18

**Regulations**

243 Mass. Code Regs. 2.07(11)(a)(1) ........................................................................... 9

Plaintiff A Woman's Concern, Inc. d/b/a Your Options Medical Centers ("YOM") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") of defendants Reproductive Equity Now Foundation, Inc. ("REN") and its president, Rebecca Hart Holder, (collectively, "REN Defendants" or "Defendants).

## INTRODUCTION

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024). To state a claim for a threat to speech, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. Plaintiff's complaint states a claim for declaratory, compensatory, and injunctive relief under 42 U.S.C. § 1983 for violations of Plaintiff's constitutionally protected rights under the First and Fourteenth Amendments. Plaintiff has standing to bring its claims because the actions alleged in the complaint threaten an immediate and irreparable denial of Plaintiff's constitutional rights and have already chilled the exercise of its rights to free speech and free exercise of its religion. Plaintiff has adequately stated its claims.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a Plaintiff must "show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). In sum, to satisfy Article III, a plaintiff must have a sufficient "personal stake" in the alleged dispute and have an alleged injury that is particularized as to him. *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint need only "'give

the defendant fair notice of what the . . . claim is and the grounds upon which it rests,' and allege 'a plausible entitlement to relief.'" *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011).

Plaintiff's complaint easily meets the requirements under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and the Court should DENY Defendants' motion to dismiss in its entirety. In the alternative, Plaintiff asks that the Court GRANT Plaintiff leave to amend the Complaint.

## BACKGROUND

Abortion is one of the most divisive issues that this country faces, and Americans hold deeply opposed views on this issue. But the First Amendment requires that all Americans should be free to share their beliefs on the issue with others. Neither the state itself nor its "trusted partners" acting under color of its law should use their authority to threaten those who exercise their right to expressly their deeply held opposition to abortion.

The U.S. Constitution prevents the government from crossing the line from state-sponsored speech into state-sponsored censorship. Neither the state itself nor those acting under color of its law may use authority to engage in impermissible viewpoint discrimination. While, as Defendants state in their Motion, instances where the conduct of private parties constitutes state action are "rare," Doc. No. 34 at p. 1, Defendants themselves have declared that they are partnered together, Doc. No. 1 at ¶¶ 72, 96, in a "first-in-the-nation" campaign, Doc. No. 1 at ¶¶ 66, 67, 97, against pro-life pregnancy centers, including Plaintiff, to subject them to revocation of licenses and/or prosecution, Doc. No. 1 at ¶¶ 60, 63. Defendants' mission is to "combat" and "stop them," Doc. No. 1 at ¶¶ 86, 96, 97, and to convince the public to 1) file complaints against Plaintiff and other Pregnancy Resource Centers ("PRCs"), Doc. No. 1 at ¶¶ 59, 75, 90, even if they are not patients with first-hand knowledge or experience, Doc. No. 1 at ¶¶ 59, 77, 79, 90-91, and 2) to "avoid" all PRCs because the Defendants have labeled them "unsafe," "dangerous," and a "public health threat." Doc. No. 1 at ¶¶ 67-69, 71, 74, 77, 79, 80, 86, 96-98. This partnership with the government

in an impermissible censorship-and-retaliation scheme is based on derogatory, false, and unfounded accusations. It and involves thinly veiled threats of, and actual, investigations that act as the prelude to regulatory and/or prosecutorial action against Plaintiff and other PRCs. And it is exactly the kind of unique instance where an otherwise private entity has engaged in state action, namely, impermissible discrimination based on the religious and political viewpoints of Plaintiff.

Defendants' actions are on their face impermissible state censorship, especially when viewed in totality, as is required under the law. The Constitution prohibits "informal censorship," such as "coercion, persuasion, and intimidation" that improperly target and threaten speech. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015). Implicit censorship may be identified by the Court by "look[ing] through forms to the substance" of the Defendants' conduct to determine, in context, whether the Defendants have offended the First Amendment by misusing their power. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

As Plaintiff laid out in its complaint, this case is necessitated by an overt viewpoint-based campaign of harassment, suppression, and threats against Plaintiff YOM and other PRCs. Doc. No. 1 at ¶¶ 32-98. YOM exercises its rights to freedom of speech and free exercise of religion through religiously and politically based advocacy and charitable work. Doc. No. 1 at ¶¶ 14-25, 142. Indeed, the very heart of YOM's mission is to *serve* the community in which it resides by providing information, aid, and tangible resources to women and couples facing unexpected pregnancies. Doc. No. 1 at ¶ 16. Continuing its mission is dependent upon Plaintiff's ability to freely speak and to exercise its religion by not only maintaining its medical status, which requires compliance with state licensing requirements (including the oversight of a licensed Medical Director), and to keep its doors open, but also by getting people to walk through its doors. Doc. No. 1 at ¶¶ 117, 123-24. All Defendants are fully aware of Plaintiff's religious beliefs and have made statements that are derogatory of their religious nature and affiliations. Doc. No. 1 at ¶ 57,

Attachment to Doc. No. 1, #5, p. 12.

## ARGUMENT

By acting under the law as Massachusetts' "trusted partner" (as so identified by the government), Defendants are engaging in an ongoing injury of Plaintiff's First Amendment rights. Plaintiff has standing to seek relief, and Defendants' actions violate Plaintiff's constitutional rights and create a substantial risk that they will continue to suffer these injuries if these actions are allowed to continue. While Government officials can express their views, "[w]hat [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. Such conduct is "presumptively unconstitutional." *Id.*

### I.    Plaintiff Has Standing and Has Adequately Pleaded a Claim.

The First Amendment guards against government action "targeted at specific subject matter," a form of speech suppression known as content-based discrimination. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995) (Government action aimed at the suppression of "particular views . . . on a subject," and which discriminates based on viewpoint, is "presumptively unconstitutional.").

"A constitutionally sufficient injury arises from an 'invasion of a legally protected interest' that is both 'concrete and particularized' as well as 'actual or imminent,' rather than 'conjectural or hypothetical.'" *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)).

> "Concrete" is not, however, necessarily synonymous with "tangible." Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete. See, *e.g.*, *Pleasant Grove City* v. *Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520 (1993) (free exercise).

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

When it comes to threatened infringements on the First Amendment, "First Amendment cases raise 'unique standing considerations,'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)), that counsel allowing plaintiffs their day in court, resulting in a "lowered threshold for establishing standing." *Id.* In fact, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000). Moreover, at the initial pleading stage a plaintiff need simply allege these potential injuries, not prove them in every detail: "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (1992) (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 889 (1990)).

Defendants assert that Plaintiff has "failed to allege sufficient facts to show" that Defendants REN and Holder engaged in state action. Doc. No. 34 at p. 18. However, on a motion to dismiss, "[a] complaint need not allege every fact necessary to win at trial, but need only include sufficient facts to make it 'plausible on its face.'" *Rodríguez-Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Indeed, Plaintiff "need not demonstrate that [it] is likely to prevail" at this stage, *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013), but it must simply show that the combined allegations state "a plausible, not a merely conceivable, case for relief." *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), "and gauging a pleaded situation's plausibility is a 'context-specific' job that compels

[the Court] 'to draw on' [its] 'judicial experience and common sense.'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55-56 (1st Cir. 2012) (quoting *Iqbal*, 556 U.S. at 677). Further, "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013). Indeed, "[w]hen . . . 'the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage.'" *McGurn v. Bell Microproducts*, 284 F.3d 86, 93 (1st Cir. 2002) (quoting *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995)).

A.      **YOM Need Not Succumb to Threats to Its First Amendment Rights in Order to Have Standing.**

Defendants assert that Plaintiff lacks standing by claiming that Plaintiff "never alleges that it has, in fact, refrained from exercising its First Amendment rights." Doc. No. 34 at p. 9. That statement significantly misstates the standard for First Amendment injuries: "[one] does not have to await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982). The question, at the pleading stage, is not whether Plaintiff's injury stems from a complete shutting down of its First Amendment rights. Rather, the "question [is] whether any perceived threat to [Plaintiff] is sufficiently real and immediate to show an existing controversy." *Id.* First Amendment claims have never been required to meet such an onerous, complete cessation of speech standard. Parties can challenge the potential enforcement of laws before their actual application when those laws threaten constitutional rights. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 386, 392-93 (1988). In *American Booksellers*, Virginia argued that plaintiffs lacked standing, claiming "that plaintiffs' challenge was premature, having been made before the statute became effective." *Id.* at 392. The Supreme Court emphatically

rejected the argument, making clear that plaintiffs can bring pre-enforcement challenges before a law is implemented, and explained:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without actual prosecution.

*Id.* at 393. That threat of self-censorship is at the core of the protections of the First Amendment and accordingly, the Supreme Court has left no doubt that individuals must be able to challenge laws before those laws are enforced against them.

In the case of government censorship, as Plaintiff alleges exists in this case, courts have regularly made clear that *any* attempt at government censorship is actionable, even if a plaintiff continues to speak. *See, e.g.*, *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007) (holding that a reasonable juror could have found a First Amendment violation even though a plaintiff failed to accede to defendants' threats); *Backpage.com, LLC*, 807 F.3d at 231 ("Notice that such a threat [by a public official to employ coercive state power] is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent."). In short, the law is clear that plaintiffs do not need to succumb to threats for them to be unconstitutional. "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 159 (citation omitted). *Vullo* made clear that the operative standard does not require succumbing to threats: instead, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action

in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191.

In the complaint, Plaintiff has set forth the facts pertaining to Defendants' conduct and speech – including that of REN Defendants – that has given rise to the injury that Plaintiff has faced and is continuing to face. It is this which establishes Plaintiff's standing. The NRA did not succumb to the threats in *Vullo*, and YOM need not succumb to the threats it has received either.

Here, Plaintiff has pleaded a set of facts that, when viewed in context and as a whole, plausibly demonstrate that the REN Defendants, alongside Defendants Healey and Goldstein, have censored and threatened its religious and political speech and free exercise rights through a pattern of conduct that has targeted Plaintiff YOM and other pregnancy resource centers ("PRCs") in Massachusetts. Such efforts have intentionally been done in a manner that deprives Plaintiff of its rights to freedom of speech and free exercise of its religion as guaranteed by the First Amendment to the U.S. Constitution, as well as its rights under the Equal Protection clause of the Fourteenth Amendment. YOM does not need to wait until the public is actually "prevented from seeking out and receiving YOM's services," Doc. No. 34 p. at 19, in order to hold the Defendants accountable for depriving Plaintiff of those rights. In addition, Plaintiff has already suffered harm, as alleged in the complaint and discussed below.

### B.      Injury in Fact: Plaintiff YOM has Pleaded That It Engages in Core Religious Speech and Expression—Which Defendants Have Unconstitutionally Threatened.

The First Amendment ensures that government officials may not rely on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Under a line of precedent originating in *Bantam Books*, "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors*." Vullo*, 602 U.S. at 180. To proceed on such a claim, "a plaintiff must plausibly allege conduct that, viewed in context, could

be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. The rights against viewpoint-based government coercion and threats based on speech are clearly established.

In *Bantam Books* the government "publicly denounced as objectionable materials which failed to meet with its approval, and threatened distributors of the materials with prosecution." *State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400, 1401 (1st Cir. 1970). The government agency, "through the public nature of its pronouncements – arrogated to itself the role of public censor. The public was told, in effect, what it should and should not read. The injury to both publishers and distributors of the materials was complete when the commission's announcements were made." *Id.* at 1402.

 Here, Defendants' actions are parallel to those in *Bantam Books*. Defendants' statements about Plaintiff and other PRCs go far beyond mere disagreement; the Defendants have repeatedly accused PRCs of illegal behavior, including deception, misrepresentation, fraud, and the like. Defendants have also publicly accused Plaintiff of actionable misconduct. For example, state advertisements regularly refer to PRCs like YOM as engaging in "deceptive advertising." The term "Deceptive Advertising" is a term of art; Massachusetts law prohibits medical advertising "that is false, deceptive, or misleading." 243 Mass. Code Regs. 2.07(11)(a)(1). That term of art is applied by the state when an entity or individual has been found to engage in misconduct. Here, the Defendants have applied that label categorically to all PRCs of the same viewpoint, regardless of any actual wrongdoing.

Moreover, these labels of wrongdoing have been applied to Plaintiff YOM even though a recent investigation expressly cleared it of these very accusations and found that, to the contrary of these accusations, YOM is not engaging in deceptive advertising. The State Defendants are simultaneously clearing YOM through formal investigations and continuing to classify YOM

publicly as a wrongdoer. This contrast makes clear to YOM that no matter what happens or how carefully it complies with the law, it will still be a target of the State. And the REN Defendants' assertions that their complaint against YOM was well-founded because the State required some unrelated corrective action does not dissolve it of wrongdoing.

Defendants are classifying YOM as a public health malefactor and a false advertiser regardless of whether it is one or not. This situation would be comparable to a state bar taking out advertisements accusing the NAACP of false representations and false advertising, even though its own investigation cleared the NAACP of any wrongdoing. These targeted accusations regardless of wrongdoing have established a "system of informal censorship" designed to suppress YOM's core protected speech. These actions constitute a concerted effort to deprive PRCs like YOM of their freedom of speech by threatening government prosecution against those PRCs that dare to refuse to provide abortion. Far from protected government speech, Defendants' actions constitute an threat to employ coercive state power against PRCs. Plaintiff has alleged sufficient facts to show that it suffered an injury in fact, an injury to its First Amendment right to be free from government threats because of its speech.

*Vullo* concerned statements like "[t]he NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations . . . ." 602 U.S. at 184. Governor Healey and the REN Defendants have gone even further than mere accusations of "extremism"; they have accused the PRCs of being menaces to public health and of violating other state criminal laws, in the absence of proof thereof. In *Bantam Books*, the defendant sent official notices to a distributor for blacklisted publications that highlighted the commission's "duty to recommend to the Attorney General" violations of the State's obscenity laws.  372 U. S., at 62-63. The communications here are similar; public communications warning doctors associated

with PRCs of the State's authority to investigate them and doing so because of their religious pro-life work and advocacy.

Publicly labeling someone as a lawbreaker, accusing them of engaging in illegal activity, in order to stifle their advocacy and speech on a contentious public issue is undoubtedly an injury in fact. The Supreme Court likewise recently held that individuals had standing to sue a credit reporting agency that labeled them as criminals and potential terrorists and that such an injury is an injury in fact. There, the Court had "no trouble concluding that the 1,853 class members suffered a concrete harm that qualifies as an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). Defendants cite *TransUnion* several times in their Memorandum, and it is dispositive here: "reputational harm," of the type "associated with the tort of defamation" is sufficient to show an injury in fact. *Id.* Here, that harm has occurred in a manner that specifically constituted a threat to YOM's First Amendment rights.[1]

## C.   Traceability: Defendants' Action Caused the Deprivation of YOM's Constitutional Rights

The injuries YOM has experienced to its reputation and its First Amendment rights are directly traceable to the Defendants and their accusations against YOM. It is by the Defendants' public statements and conduct that YOM's First Amendment rights have been threatened and its speech chilled. Defendants do not deny, but concede, making the statements they are accused of making. Accordingly, the injuries in this case are properly traced to them.

The fact that the Defendants' speech targeted all PRCs does not lessen its weight,[2] it makes

---

[1] It is this point which distinguishes this case from *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). Plaintiff is not bringing a Section 1983 claim for defamation. But the injury in fact that it has experienced, i.e., the chilling of its First Amendment rights, are of a kind similar to damages that result from defamation.

[2] Defendants assert Plaintiff has not been harmed because Plaintiff is not "specifically named on DPH's website or in any of the advertisements that are part of the Public Education Campaign."

(footnote continued)

it worse; likewise, Vullo "wanted Lloyd's to disassociate from all gun groups, although there was no indication that such groups had unlawful insurance policies similar to the NRA's." *NRA of Am. Vullo*, 602 U.S. at 192. Defendants here attacked all PRCs, including Plaintiff, simply for existing and holding pro-life viewpoints. Such an attack is necessarily discriminatory. All relevant statements have been issued by the State, in conjunction with the state, pursuant to state authority, labeling YOM a deceptive advertiser with the full authority of Massachusetts law. No individual statement should be taken in isolation; instead, each must be viewed "against the backdrop of other allegations in the complaint" such that the "allegations as a whole" are considered evidence of an impermissible threat. *Id*. at 195. These statements, made with the support and assistance of REN Defendants, caused the injuries that Plaintiff delineated in its complaint. These injuries caused direct harm to YOM. A reasonable person would perceive Defendants' statements warning against the existence of pregnancy resource centers as a public health threat and accusing them of criminal conduct to constitute a threat against those centers. YOM did in fact perceive Defendants' statement to be such a threat. As a direct, immediate, and foreseeable result of Defendants' threats, one of YOM's doctors quit providing services for YOM.  The loss of its doctor caused a direct and tangible injury to YOM, an injury immediately traceable to the public threats of Defendants. For example, YOM patients had to be turned away and denied care because of the lack of this doctor. Because of Defendants' threats, YOM anticipated that it may soon no longer be able to provide its services at all and be forced to shut down as a result of the viewpoint discrimination it is

---

Doc. No. 34 at p. 5. However, Plaintiff *is* specifically named in a link on DPH's website, Doc. No. 1 at ¶ 78, and named and a photo of one of its facilities is included in a publication put out by REN Defendants–in partnership with the government–and linked to on the government's website. Doc. No. 1 at ¶¶ 78, 82-85, 88, 95. Moreover, when clicking the link on the DPH website the user is immediately taken to REN's website with no notice to the user that they are leaving the DPH website.

experiencing.[3] In addition, Plaintiff has experienced reputational damage and increased security costs.

### D.        A Favorable Decision Would Redress Injury

In addition to damages, absent an injunction against Defendants, YOM will suffer irrecoverable loss and irreparable harm. All the above injuries are ongoing; the campaign of harassment against PRCs continues and will continue unless the irrevocable injuries it is causing are stopped. An injunction enjoining Defendants to stop falsely labelling YOM as a public health threat would directly redress the injuries that YOM has experienced.

### II.    Defendants REN and Holder Acted Under Color of Law

A core issue of this case is undoubtedly whether Defendants REN and Holder acted under color of state law. But as the "trusted partner" of Massachusetts, acting on its behalf, Defendants have explicitly crossed the line into state action. Massachusetts has made it very clear that Defendants are "a trusted partner of the Massachusetts Department of Public Health." *About Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/info-details/about-anti-abortion-centers (last visited Nov. 8, 2024). And by acting in a partnership with the state to engage in this conduct, Defendants are acting under color of law.

The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement

---

[3] REN Defendants submitted two exhibits to support its contention that Plaintiff was not damaged, stating, "[t]he Superior Court denied YOM's request for a preliminary injunction," Doc. No. 34 at p. 4, and that the court declared the investigation to be "within BORIM's authority to conduct and declined to enjoin." Doc. No. 34 at p. 12. Notably, the court did not "address the question[] of irreparable harm . . . ," Def. Exhibit II at p. 3, supporting Doc. No. 34, nor did it weigh-in on the merits of the complaint submitted by REN to DPH. Rather, the court indicated that [t]he narrow issue before the court [was] whether to enjoin or require enforcement of the administrative subpoena issued to [Plaintiff]." Def. Ex. II 3. Nothing in the state court's opinion or holding aids Defendants or supports their contention that the complaint to DPH was well-founded.

of federal rights "fairly attributable to the State?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). As the Supreme Court has stated: "we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988).

There are several tests used to determine whether state action occurs, all of which involve a consideration of the underlying facts and circumstances. There are not three, but five, tests:

> The tests focus on: (1) whether there is a symbiotic relationship (*Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 723-25 (1961)); (2) whether the private actor assumes a public function (*Flagg Bros. v. Brooks*, 436 U.S. 149, 157-58 (1978)); (3) whether the private actor is of such a close nexus to the state because the state has either ordered or coerced the private actor to action (*Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982)); (4) whether there is joint participation (*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 930-32 (1982)); and (5) whether the private and state actors are pervasively entwined (*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 297-98 (2001)). While not exclusive, a finding of indirect state action can be made if any of these tests are satisfied. The inquiry and outcome depend on the facts and circumstances of each case.

*Murphy v. Mass. Dep't of Dev. Servs.*, 2014 U.S. Dist. LEXIS 183350, *44-45 (D. Mass. 2014). Moreover, the state actor inquiry "is a targeted one, with the challenged conduct at the hub of the analytical wheel. Thus, the focal point is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19-20 (1st Cir. 1999).

Here, there is a close nexus and symbiotic relationship between Defendants REN and Holder and the State Defendants. All Defendants are also explicitly and jointly participating in the actions at issue here.

First, the actions of the REN Defendants qualify as State action under the nexus and symbiotic relationship tests. The inquiry of the nexus test is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419

U.S. 345, 351 (1974). A plaintiff alleging state action can meet this standard by showing that the State "has provided . . . significant encouragement, either overt or covert." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Defendants REN and Holder and the Commonwealth of Massachusetts have collaborated extensively since Defendant Healey launched her campaign against PRCs. In June, Healy initiated the campaign, at which Defendant Holder spoke alongside the state saying, "Massachusetts is alerting [communities] to the dangers of deceptive anti-abortion centers. . . . We're so proud that the Healey-Driscoll Administration is addressing this public health threat head-on, and we have been honored to work with the Massachusetts Department of Public Health on the creation of this first-in-the-nation public education campaign. Together, we can combat anti-abortion centers' predatory practices . . . ." Doc. No. 1 at ¶ 97. Likewise, Defendant Healey issued a press release where she warned patients about crisis pregnancy centers, Doc. No. 1 at ¶ 34. In that press release, she included and *relied* upon a statement from Defendant Holder.

The announcement of the pro-abortion campaign at issue in this action, *see* Doc. No. 1 at ¶ 97, makes very clear that REN and Holder are operating as "trusted partners" of the state and in tandem with the State Defendants. Many speakers emphasized the close connection and relationship: "We are grateful to the Healey-Driscoll Administration and Reproductive Equity Now for their unwavering commitment to protecting the rights, health, and economic security of women and girls in Massachusetts." *Id.* "HealthQ is grateful to Governor Healey, Secretary Walsh, Commissioner Goldstein, and Reproductive Equity Now for their commitment and efforts to ensure every person seeking an abortion in Massachusetts is able to find the care they want . . . ." *Id.*

Defendant Healey dedicated one million dollars to this public campaign from which REN directly benefited. Specifically, REN received $250,000 for its free abortion legal hotline. Doc.

No. 1 at ¶ 81. Massachusetts also created a dedicated webpage about anti-abortion centers featuring direct links to REN's list of anti-abortion clinics, including Plaintiff. Doc. No. 1 at ¶ 75. The government did not merely fund the abortion hotline, as the complaint alleges, it went beyond funding the hotline to expressly operate it in tandem with REN.

Second, take the symbiotic relationship test: Specifically addressing a symbiotic relationship between a private entity and the state, REN published a guidebook repeating false claims that these anti-abortion centers are deceptive and misleading, and further encouraged patients to file a report with the Attorney General's Civil Rights Division, providing instructions on how to do so. Doc. No. 1 at ¶¶ 84 to 95. Defendant Holder even thanked Defendant Goldstein for his work and said she "really look[ed] forward to continuing our work together to combat these centers." Doc. No. 1 at ¶ 96. The State supports that guidebook: its website states, "The Reproductive Equity Now Foundation provides a Massachusetts Abortion Care Guide that offers information about safe, trusted abortion care in the state. In addition, learn about abortion protections at mass.gov/AbortionAccess." Doc. No. 1 at ¶ 97, *see* Pl. Ex. Q.

Finally, there is explicit joint participation between the State Defendants and the REN Defendants. The public education campaign is explicitly "created by the Department of Public Health (DPH) in collaboration with the Reproductive Equity Now Foundation[.]" Doc. No. 1 at ¶ 67. Moreover, the Abortion Legal Hotline was expressly "created by the Reproductive Equity Now Foundation, the Massachusetts Attorney General's Office, the Women's Bar Foundation, and the ACLU of Massachusetts." *Id.*

In short, one qualifies as a state actor when they act in partnership with the state. REN's hotline states that it is created "in partnership with," among other entities, the "Massachusetts Attorney General's Office." *Get in Touch with the Abortion Legal Hotline*, Reproductive Equity Now, https://reproequitynow.org/hotline (last visited Nov. 8, 2024). Massachusetts has made very

clear that REN is "a trusted partner of the Massachusetts Department of Public Health." *About Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/info-details/about-anti-abortion-centers (last visited Nov. 8, 2024). The REN Defendants cannot deny being a state actor while simultaneously boasting of doing that very thing on their website.[4] They cite no case where a party that publicly claimed to be a government partner in the specifically challenged conduct, and was acknowledged by the State as such, was nonetheless not a state actor.

### III.   The Noerr-Pennington Doctrine Has No Application In this Case

The *Noerr-Pennington* doctrine is a particular legal doctrine that shields from liability those who exercise their right to petition to the government. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  It has no bearing here for at least three reasons.

First, Plaintiff's action is *not* "predicated on the DPH Complaint." Information about that complaint is of course included in this case as an important factual component; for example, the fact that Defendants filed that complaint is significant evidence of their knowledge of YOM's activity. But the basis for the Defendants' liability, the predicate of this case, lies elsewhere: the Defendants "acted as the trusted partner of the State, with State funding and support, and in explicit partnership in this campaign as a joint action with Massachusetts officials." Doc. No. 1 at ¶ 103. The REN Defendants' conduct at issue here is not merely the complaint to the state; it is that at every step in the process of this campaign of threats and harassment Defendants served the State's "trusted partner" and operative. Defendants cite no case where someone sued for their falsehoods

---

[4] REN Defendants' discussion of why its DPH complaint is not state action is irrelevant. Of course the filing of the complaint itself was not a state action. But a party does not need to be a state actor in every respect to be liable as a state actor; the inquiry instead focusses on the specific conduct at issue and whether that conduct was done in tandem and in partnership with the state.

and misrepresentations in public statements was entitled to immunity for their conduct because they had filed a complaint elsewhere about the other party. This lawsuit is not predicated on the filing of a complaint; it is predicated on a targeted campaign of threats to quash Plaintiff's speech. Even if the complaint did fall within the scope of *Noerr-Pennington*, it could still nonetheless serve as evidence.

> The Supreme Court itself noted this in *Pennington*:
>
> It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the "established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."

*Pennington*, 381 U.S. at 670 n.3; *see also Household Goods Carriers' Bureau v. Terrell*, 452 F.2d 152, 158 (5th Cir. 1971) In other words, immunity does not mean inadmissibility; "offering the exhibit was to demonstrate the purpose and character of defendants' acts, a permissible use even if the letter was within the *Noerr* exception." *Lamb Enters. v. Toledo Blade Co.*, 461 F.2d 506, 516 (6th Cir. 1972). In short, courts have emphasized that even if "communications are immunized under *Noerr-Pennington*, evidence of such communications is admissible to establish a larger overall" course of conduct. *Feminist Women's Health Center, Inc. v. Mohammad*, 415 F. Supp. 1258, 1268 (N.D. Fla. 1976); *see generally Application of Doctrine Exempting from Federal Antitrust Laws Joint Efforts to Influence Legislative or Executive Action*, 17 A.L.R. Fed. 645.

> Second, the *Noerr-Pennington* doctrine does not extend to baseless activity.
>
> Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. . . . [A]ctions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). An exception to *Noerr-Pennington* immunity exists in cases of "sham petitioning." To prove this, a plaintiff must show that the petitioner's efforts were "objectively baseless" to the extent that "no reasonable litigant could expect success on the merits," and that the petitioner's true intent was to harm the plaintiff through abuse of the governmental process. *Pro. Real Estate Invs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993). Here, the complaint that was filed was objectively baseless, a complaint based on semantics, as was explained in Plaintiff's Complaint. Defendants concede that the basis of its complaint was an inconsistency between YOM's advertisement of offering ultrasounds with "immediate" pregnancy results and the statement of YOM's Executive Director that the results were only "preliminary findings." Doc. No. 34 at p. 11. It therefore acknowledges the nature of its complaint. As Plaintiff explained in its Complaint, Doc. No. 1 at ¶¶ 43-45, the discrepancy between the words "immediate results," and "preliminary findings" is mere semantics. Anyone, especially those familiar with medical terms, should easily be able to understand the explanation that was provided. Those visiting the bus do get "immediate results," in the form of the texts, ultrasounds, etc., but the results are then reviewed by a medical doctor and given to the patients within 24-48 hours. The result of the investigation shows that this claim was baseless and the wording that REN complained about was unchanged.[5] A needless complaint about mere semantics is precisely the kind of petition activity not protected by *Noerr-Pennington*.

Third, "[t]he *Noerr-Pennington* doctrine does not apply to government activities." *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 112 (D. Mass. 2010); *see Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1083

---

[5] DPH required a correction that was entirely unrelated to the subject matter of REN's complaint.

(5th Cir. 1988) ("The point of the *Noerr-Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws . . . ."). Plaintiff's 1983 claim stands or falls on the assertion that Defendants, as "trusted partners" of the state, have acted as government actors. If challenged conduct is government activity, *Noerr-Pennington* does not apply as a matter of law. *See Brockton Power LLC v. City of Brockton*, 948 F. Supp. 2d 48, 66 (D. Mass. 2013).

### IV.     In the Alternative, This Court Should Grant Plaintiff YOM Leave to Amend.

As discussed above, the allegations of the Complaint are sufficient to state claims for relief and establish standing. If the Court disagrees, however, Plaintiff YOM should be granted leave to amend. Under the Federal Rules of Civil Procedure, leave to amend should be freely granted. *See* Fed. R. Civ. P. 15(a); *Calderón-Serra v. Wilmington Tr. Co.*, 715 F.3d 14, 19 (1st Cir. 2013) (quoting Fed. R. Civ. P. 15(a)). Here, cause will exist to grant leave to amend and no prejudice will result because this action has been pending for only a few months, no trial dates have been set, discovery has not yet started, the remaining Defendants have not yet responded to the Complaint, and REN Defendants will not suffer any prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive on part of the movement, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely granted.'").

### CONCLUSION

For the foregoing reasons, Plaintiff YOM respectfully requests that this Court DENY Defendants' Motion to Dismiss in its entirety. In the alternative, Plaintiff requests that the Court GRANT it leave to amend its Complaint.

Respectfully submitted,

YOUR OPTIONS MEDICAL

By counsel,

OLIVIA F. SUMMERS*
/s/ Olivia F. Summers
(D.C. Bar No. 1017339)

ANDREW EKONOMOU*
(GA Bar No. 242750)
CHRISTINA (STIERHOFF) COMPAGNONE*
(D.C. Bar No. 1657929)
NATHAN MOELKER*
(VA Bar No. 98313)
JORDAN SEKULOW**
(D.C. Bar No. 991680)
STUART J. ROTH**
(D.C. Bar No. 475937)

THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
(Massachusetts Bar No. 711930)
sam@mafamily.org

*Appearing Pro Hac Vice
** Pro Hac Vice Forthcoming

Dated November 12, 2024

## <u>CERTIFICATE OF SERVICE</u>

I, Olivia F. Summers, hereby certify that on November 12, 2024, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Olivia F. Summers</u>
Olivia F. Summers
