UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

A WOMAN'S CONCERN, INC. d/b/a YOUR
OPTIONS MEDICAL CENTERS,

                  Plaintiff,

v.

MAURA HEALEY, Governor of Massachusetts,
sued in her individual and official capacities;
ROBERT GOLDSTEIN, Commissioner of the
Massachusetts Department of Public Health, sued in
his individual and official capacities;
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC., REBECCA HART
HOLDER, EXECUTIVE DIRECTOR OF
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC.,

                  Defendants.

CIVIL ACTION
NO. 1:24-cv-12131

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO
STATE DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................2

ARGUMENT .....................................................................................................................6

     I.      Plaintiff Has Pled a Free Speech Claim for Unconstitutional Threats.................... 6

     II.     Plaintiff has Pled a Free Exercise Claim for Religious Discrimination............... 14

     III.    Plaintiff has Pled an Equal Protection Claim........................................................ 17

     IV.    Qualified Immunity is No Shield for Unconstitutional Threats............................ 20

CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)............................................................... 6

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).......................................................... 1, 6, 7, 20

*Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001)................. 18

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (2012)............................... 14, 15

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................................................. 19

*Commonwealth v. Landry*, 438 Mass. 206 (2002) ........................................................................ 9

*Dobbs v. Jackson Women's Health Org.*, 597 U.S 215 (2022) ................................................... 17

*Gillette v. United States*, 401 U.S. 437 (1971).......................................................................... 14

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .............................................................................. 20

*Kennedy* v. *Warren*, 66 F. 4th 1199 (9th Cir. 2023) ................................................................. 9

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018) .......... 14, 15, 16

*McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) ........................................................................ 18

*Missouri* v. *Biden*, 83 F. 4th 350 (5th Cir. 2023)..................................................................... 9

*Newman v. Burgin*, 930 F.2d 955 (1st Cir. 1991) ..................................................................... 20

*NRA of Am. v. Vullo*, 49 F.4th 700 (2nd Cir. 2022)................................................................. 9

*NRA of Am. v. Vullo,* 602 U.S. 175 (2024) ........................................................ 1, 6, 8, 10, 12, 20

*O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) ................................................................. 7

*Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011).............................................. 1

*Okwedy v. Molinari*, 333 F.3d 339 (2nd Cir. 2003)................................................................... 7

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008).......................................................................... 15

*Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991) ................................................. 8

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ................................................. 18

*R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906 (9th Cir. 2005)..............................................8

*Romer v. Evans*, 517 U.S. 620 (1996)...........................................................................................19

*Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995) ......................................................................18

*State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400 (1st Cir. 1970)........................................7

*Tapalian v. Tusino*, 377 F.3d 1 (1st Cir. 2004)............................................................................17

*U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973).................................................................19

**Statutes**

243 Mass. Code Regs. 2.07(11)(a)(1)...............................................................................................9

42 U.S.C. § 1983 ..............................................................................................................................1

**Other Authorities**

Press Release, Healey-Driscoll Administration Launches First-in-the-Nation Public Education

Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human

Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-

launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-

centers. ............................................................................................................................................5

The Federalist No. 51 (James Madison) (Roy P. Fairfield ed., 2d ed. 1966))..............................18

Plaintiff A Woman's Concern, Inc. d/b/a Your Options Medical Centers ("YOM") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") of Defendants Maura Healey, in her individual and official capacities, and Dr. Robert Goldstein, in his individual and official capacities (collectively, "State Defendants," or "Defendants").

## INTRODUCTION

Government officials may speak freely. But what they must not do is cross the line from persuasion into viewpoint-based threats and coercion of people's political views. Such "speech" is not protected by the First Amendment; it is forbidden by it. The First Amendment ensures that government officials may not rely on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). The Supreme Court has made clear that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *NRA of Am. v. Vullo,* 602 U.S. 175, 180 (2024). To proceed on such a claim, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. YOM's Complaint states a claim for declaratory, compensatory, and injunctive relief under 42 U.S.C. § 1983 for violations of YOM's constitutionally protected rights under the First and Fourteenth Amendments, based on such unconstitutional threats by the State Defendants.

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). In particular, the law simply "requires sufficient detail in the complaint to give a defendant fair notice of the claim and the grounds upon which it rests." *Id.* at 8. YOM's Complaint meets the requirements under Fed. R. Civ. P. 12(b)(6), and the Court should DENY Defendants' motion to dismiss in its

entirely. In the alternative, Plaintiff asks that the Court GRANT YOM leave to amend the Complaint.

## BACKGROUND

The Constitution draws a clear line. Members of the government may speak, but they may not use their power to censor and threaten others for their speech. State officials may not use their authority to engage in impermissible viewpoint discrimination that singles out members of the public for mistreatment based on their political and religious views. Here, the government has crossed the line to a censorship-and-retaliation scheme based on derogatory, false, and unfounded accusations. While investigations have cleared YOM of wrongdoing, the Defendants continue to classify YOM as a "public health threat" and accuse it of misrepresentations and falsehoods, solely because of its political and religious views. Such a campaign constitutes a First Amendment threat.

Massachusetts's use of state power to target and stigmatize pregnancy resource centers ("PRCs") like YOM has been ongoing. In July 2022, then-Attorney General Maura Healey issued an advisory accusing PRCs of false advertising and deceptive practices. Compl. ¶ 34; Compl. Ex. C. That advisory accused "Anti-Abortion Centers" of providing "inaccurate or misleading results," of "mislead[ing] people about how far they are into their pregnancy," and of "provid[ing] inaccurate and misleading information about abortion[.]" *Id.* It also listed "warning signs" like "providing . . . baby clothes" or being "listed as a pregnancy resource center, pregnancy help center, pregnancy care center, or women's resource center on AAC websites such as helpinyourarea.com/massachusetts." *Id.* According to this advisory, just being a PRC is enough of a warning sign for the State Defendants to declare a clinic misleading and dangerous to Massachusetts citizens.

The Massachusetts Legislature has enacted into law "a public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers

and the centers' lack of medical services;" contrasting them with "legitimate medical and family planning services." Compl. ¶ 81. That law, on its face, set aside state funds to engage in a viewpoint-based campaign attacking the "legitima[cy]" of PRCs. Defendants then carried out that campaign.

On January 3, 2024, the Massachusetts Department of Public Health ("DPH"), led by Defendant Commissioner Robert Goldstein, issued a press release again singling out PRCs, titled "Maintaining Integrity, Accessibility, and Transparency in Reproductive Care." Compl. ¶ 57; Compl. Ex. K. This press release stated that "[t]he Department of Public Health *actively* seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." *Id.* (emphasis added). It singled out PRCs based on religious affiliation. Defendants admit this: "'Many of these centers advertise themselves as full-service reproductive health care clinics,' the Department noted, 'yet they do not provide abortion care or abortion referrals, contraception, or other important reproductive health care services. Many centers are affiliated with national advocacy or *religious organizations* that provide funding and support to advance an anti-abortion agenda.'" Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 6 (emphasis added).

YOM has been operating as a PRC since 1991. Compl. ¶ 14. It offers its services for religious reasons. Compl. ¶ 15. It is licensed with the state as a medical facility, Compl. ¶ 23, and has never received a patient complaint, Compl. ¶ 24. Defendants concede that after a recent investigation, YOM's advertising was reviewed and in a letter dated February 29, 2024, DPH's Division of Health Care Facility Licensure and Certification informed YOM that the Department had verified that the clinic "had achieved and maintained compliance." Compl. ¶ 48; Compl. Ex. I.

Defendants launched their discriminatory public "education" campaign pursuant to the

legislative mandate, a "first-in-the-nation" campaign targeting PRCs. Created in collaboration with Defendant REN, statements of this campaign appear on social media, billboards, the radio, and public transit. Compl. ¶¶ 66-72. A press release from Defendants announcing the campaign claims that the campaign would "highlight[] the dangers and potential harm of anti-abortion centers" which "often look like medical facilities and purport to offer the full spectrum of reproductive health care while, in reality, they often mislead people about their options if they are pregnant and dissuade them from accessing abortions." Compl. ¶ 67. It highlighted that the campaign would "amplify how anti-abortion centers provide misinformation about abortion services to prevent people from making an informed choice about their care," and "is designed to help people understand their full range of options, directing them to . . . information about how to recognize anti-abortion centers and where to access unbiased, full-spectrum reproductive health care in Massachusetts." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 8.

The Governor's statement about the launch of this program reads:

In Massachusetts, we are committed to protecting and expanding access to safe and legal abortion . . . . That includes protecting patients from the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing comprehensive reproductive services. This campaign is an important way to provide accurate information so residents can make informed decisions about reproductive care that are right for them.

Press Release, Healey-Driscoll Administration Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-centers.

Moreover, Commissioner Goldstein's statement about the program reads:

Every day, individuals in the Commonwealth walk into anti-abortion centers unaware that these facilities are masquerading as comprehensive medical providers and pose a significant risk to the health and well-being of those seeking help, support, and options. . . . As a physician, I find this kind of deception and

> misrepresentation unconscionable, and as Commissioner, I feel compelled to push
> back as hard as possible against these shameful practices and blatant
> misinformation.

*Id.* He also stated that the State's campaign "counter-punches to the vast amount of misinformation and disinformation that these centers peddle every day, deceiving people who may be frightened or confused." Compl. ¶ 71. He then expressly exercised his authority as Commissioner to classify PRCs as a public health threat: "As the commissioner of public health, I'm resolute about calling out this deception for what it is: a public health threat." *Id.*

DPH operates and maintains a page on its website entitled "Avoid Anti-Abortion Centers." Compl. ¶ 74; Compl. Ex. N. DPH actively solicits complaints against pro-life pregnancy centers: "Have you been harmed by an anti-abortion center? If you have been to an anti-abortion center, or 'crisis pregnancy center,' and have concerns about your experience, learn how you can file a civil rights complaint." Compl. ¶ 75. DPH also states the following on its website, urging people to stay away from all PRCs.

> [Pro-life centers] may look like medical facilities but could put your health
> at risk if you're pregnant.
> [Pro-life centers], may cause harm to individuals looking for pregnancy or
> abortion care.
> [Pro-life centers] . . . may mislead pregnant individuals about their options
> . . . .
> Avoid [pro-life] centers. They may mislead you or delay your care.
> [Pro-life centers] . . . could put your health at risk.
> [Pro-life centers] are not a safe or trusted place to go for reproductive health
> care.

Compl. ¶ 77; Compl. Ex. O. DPH warns people against trusting PRCs: "Even if you're not looking for an abortion, these centers are not a safe or trusted place to go for reproductive health care." *Id.*

Defendants' actions are on their face impermissible state censorship, especially when viewed in totality, as is required under the law. The Constitution prohibits "[i]nformal measures," such as "coercion, persuasion, and intimidation" that improperly target and threaten speech. *See*

*Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015). Implicit censorship may be identified by the court by "look[ing] through forms to the substance" of the defendants' conduct to determine, in context, whether state officials have offended the First Amendment by misusing power to intimidate others for their speech. *See Bantam Books, Inc*, 372 U.S. at 67. Here, Massachusetts officials are using their power to target PRCs as a public health threat based on their religious faith and viewpoint.

## ARGUMENT

This case is not about whether state officials can express political opinions. It is about something far more dangerous: whether government officials can use their power to threaten members of the public based on the expression of their political and religious views. Government officials can express their views, "[w]hat [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. Such conduct is "presumptively unconstitutional." *Id.* Defendants' "first-in-the-nation" campaign, accusing medical and religious facilities of being a public health threat, based on their protected viewpoint, is such an unconstitutional threat.

### I.    Plaintiff Has Pled a Free Speech Claim for Unconstitutional Threats.

Two doctrines are well established: government officials can freely speak their views, and government cannot use its power to threaten and coerce the speech of others. In other words, the *speech* of government actors is protected by the First Amendment; its threats are not. In *Bantam Books*, the Supreme Court explained that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech. *Bantam Books, Inc.*, 372 U.S. at 67. Although the defendant in that case, a state agency, lacked the "power to apply formal legal sanctions," it still engaged in implied threats such that a book distributor "reasonably understood" the commission to threaten

adverse action, and thus the distributor's "compliance with the [c]ommission's directives was not voluntary." *Id.* at 66-68. In *Bantam Books*, the government "publicly denounced as objectionable materials which failed to meet with its approval, and threatened distributors of the materials with prosecution." *State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400, 1401 (1st Cir. 1970). The government agency, "through the public nature of its pronouncements – arrogated to itself the role of public censor. The public was told, in effect, what it should and should not read. The injury to both publishers and distributors of the materials was complete when the commission's announcements were made." *Id.* at 1402. This use of public authority to denounce and threaten violates the First Amendment by subtly stifling the speech of the public, implicitly threatening them for their speech.

> As the Second Circuit has summarized the doctrine:
>
> What matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.

*Okwedy v. Molinari*, 333 F.3d 339, 344 (2nd Cir. 2003). As the Ninth Circuit has also aptly summarized, "*Bantam Books* and its progeny draw a line between coercion and persuasion: The former is unconstitutional intimidation while the latter is permissible government speech." *O'Handley v. Weber*, 62 F.4th 1145, 1163 (9th Cir. 2023).

Defendants contend that "criticism" falls within the government speech doctrine. But the conduct here goes far beyond criticism. Defendants have used their government power to label PRCs as a "public health threat" and to target them for viewpoint-discriminatory enforcement. As documented in detail above, Defendants have repeatedly accused PRCs like YOM of wrongdoing, such as false advertising, misrepresentations, and deception, and publicly warned the public to stay

away from PRCs as a dangerous threat to public health. Such targeted threats are not mere speech. The decision in *R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 911 (9th Cir. 2005), is not to the contrary. As Defendants themselves concede, the plaintiff in that case – *unlike here* – did not bring a First Amendment challenge to the content of the state's campaign pursuant to the *Bantam Books* framework. Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 10. Indeed, *R.J. Reynolds Tobacco Co.* cannot stand as precedent against Plaintiff in this case where the key issue here was not brought or analyzed in *R.J. Reynolds Tobacco Co.* Likewise, while the court in *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991), acknowledged that criticism is permitted, it also made clear that threats (such as exist in this case) are analyzed differently: "when the government threatens *no sanction* – criminal or otherwise – we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights." *Id.* (emphasis added).

The State Defendants' Motion to Dismiss never addresses or discusses the governing standard used to determine whether government conduct crosses the line to coercion. To determine whether speech is coercive, courts use four factors, according to a totality-of-the-circumstances standard where no single factor is dispositive: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Vullo*, 602 U.S. at 189 (quoting *NRA of Am. v. Vullo*, 49 F.4th 700, 715 (2nd Cir. 2022)); *see also Missouri v. Biden*, 83 F.4th 350, 380 (5th Cir. 2023); *Kennedy* v. *Warren*, 66 F.4th 1199, 1207 (9th Cir. 2023).

First, Defendants' choice of words goes far beyond mere disagreement or criticism; the State Defendants have repeatedly accused PRCs of illegal behavior like deception, misrepresentation, and fraud – all actionable misconduct. The Motion to Dismiss summarizes Defendants' activity as "issuing official communications that warn the public against deceptive

tactics that have been employed by anti-abortion centers, solicit complaints from people concerned about their experience with anti-abortion centers, and encourage people to seek abortion care from trusted providers." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 9. But this is only the tip of the iceberg. As noted above, Defendants have accused *all* PRCs of providing "inaccurate or misleading results," of "mislead[ing] people about how far they are into their pregnancy," and of "provid[ing] inaccurate and misleading information about abortion[.]" Compl. ¶ 34; Compl. Ex. C. They have accused PRCs of the prohibited activity of "deceptive advertising." *See* 243 Mass. Code Regs. 2.07(11)(a)(1) (prohibiting medical advertising "that is false, deceptive, or misleading"). That term of art is being used categorically to characterize all PRCs of the same religious viewpoint, regardless of any actual wrongdoing. Defendant Goldstein has accused PRCs of "deception and misrepresentation" and "shameful practices and blatant misinformation." Compl. ¶ 67. Defendant Healey has accused PRCs of "deceptive and dangerous tactics." *Id.* Defendant Goldstein has classified all PRCs as "a public health threat." Compl. ¶ 71. The State Defendants have accused PRCs of "misinformation" and bias. Compl. ¶ 67. The term "public health threat" is also a term of art, used to describe, for example, a "public health threat: the transmission of blood-borne diseases by intravenous drug abusers." *Commonwealth v. Landry*, 438 Mass. 206, 209 (2002).

The language Defendants use to stigmatize PRCs is far *stronger* than the language used to support liability in *Vullo*; Vullo merely "encouraged" entities to evaluate the "reputational risks[] that may arise from their dealings with the NRA." *NRA of Am.*, 602 U.S. at 176. Defendants have gone far beyond that to publicly classify PRCs as threats to public health. The Motion to Dismiss presents this speech as "criticism of some anti-abortion centers' deceptive advertising," Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 10, but Defendants' own words did not merely criticize some PRCs; they attacked *all of them* as a threat to public health.

Defendants argue that requests for information from the public are commonplace. But they have gone far beyond the typical request: "The Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." Compl. ¶ 57; Compl. Ex. K. They are "actively" pursuing complaints against PRCs, in contrast to medical clinics of different viewpoints. Defendants also have issued a public warning to avoid PRCs through a website entitled "Avoid Anti-Abortion Centers." Compl ¶ 74; Compl. Ex. N. This website categorically urges members of the public to avoid all PRCs and to file complaints about them. The website prominently displays the statement: "Have you been harmed by an anti-abortion center? If you have been to an anti-abortion center, or 'crisis pregnancy center,' and have concerns about your experience, learn how you can file a civil rights complaint." *Id.* The website also links directly to another website, one maintained by the REN Defendants, that specifically names every PRC in the New England area, including YOM.

These labels of wrongdoing and requests for complaints have been applied to Plaintiff YOM even though a recent investigation expressly cleared it of these very accusations and found that Plaintiff YOM is not engaging in deceptive advertising. The State Defendants are simultaneously clearing Plaintiff YOM through formal investigations and continuing to classify Plaintiff YOM publicly as a wrongdoer. Defendants claim that the solicitation of complaints about other entities, such as car dealerships, is commonplace. But what is not commonplace is a state webpage entitled "Avoid Car Dealerships" that names every car dealership in the area, argues that *all* car dealerships are inherently misleading, and urges people to use state-sponsored transportation options instead. Such a warning is a specific and targeted threat, not "commonplace in government." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 12. It would be particularly

egregious if a car dealership had recently been investigated and cleared of any wrongdoing, but was still identified and accused of wrongdoing nonetheless.

Importantly, the Motion to Dismiss continues with the very kind of statements that are the crux of this case. The Complaint contends that it is inappropriate, dangerous, and unconstitutional for the government to classify PRCs as dangerous or public health threats, simply because of a disagreement with their viewpoints. In several places, the Motion to Dismiss continues to use the same language; claiming that "[r]emoving the Governor's and Commissioner's ability to advise on timely, and time-sensitive, reproductive health issues, or to criticize public health harms in the Commonwealth, would impede the functioning of state government." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 21-22. Likewise, the State Defendants argue that "Your Options Medical seeks to prohibit the state Defendants from accurately warning the public that anti-abortion centers do not provide comprehensive reproductive health care." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 1. This language highlights that Defendants are still engaging in the same conduct, and continue to classify entities like YOM as a "public health harm" without a factual basis for doing so. Claiming without basis that a public health facility like YOM is a "public health harm," despite an official state finding to the contrary, purely because of YOM's expressed viewpoint opposing abortion is precisely the kind of abuse of government power that the Constitution prohibits.

The government's assertions and accusations are more than mere criticism. Again, the State Defendants have repeatedly accused PRCs of illegal behavior like deception, misrepresentation, fraud, and other illegal acts. Those words are accusations of misconduct, not mere political disagreement. For the Governor to classify an organization as fraudulent and deceptive is more than mere opinion; it is placing on YOM the discriminatory opprobrium of government disfavor. In *Vullo*, the NRA plausibly alleged a First Amendment claim based on third-party coercion where

Vullo, the Superintendent of the New York Department of Financial Services ("DFS"), informed insurance companies that DFS would be "less interested" in pursuing their regulatory violations if they ceased providing insurance to the NRA and issued guidance letters urging the insurance companies to take "prompt action" to manage risks from dealing with the NRA. 602 U.S. at 184. Vullo, too, used public health as part of her threat, warning organizations to take action about these "reputational risks" in order to "promote public health and safety." *Id.* Here, the State has gone far beyond simply being "less interested" in imposing consequences, a subtle threat, to explicitly threaten doctors with consequences for working with PRCs, demand that people stay away from the so-called public health threat of PRCs with a religious viewpoint, and encourage the filing of complaints against them.

Second, the existence of regulatory authority strongly weighs in favor of Plaintiff YOM. "Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191-92. Here, the statements at issue come directly from state authorities that wield regulatory authority, such as the Governor and the DPH Commissioner. "The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." *Id.* at 191. Defendants in their Motion to Dismiss quoted the second half of this sentence, the objective inquiry, but ignored the first half. Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 11. But this factor is crucial here and weighs heavily in favor of Plaintiff YOM. When the Governor and the DPH Commissioner classify an entity as a public health threat, they do so exercising their robust authority to regulate. All the speech at issue here represented the official statements of state leadership with the imprimatur of their authority. This strongly weighs in favor of a finding of coercion. The statements at issue come directly from the State authorities with the relevant regulatory authority, such as the Governor, Attorney General,

and the head of DPH. When they threaten the existence of PRCs and warn people to stay away, they do so with the force of law.

Third, Defendants' speech has been perceived as a threat. YOM's Complaint alleges that YOM itself has perceived Defendants' conduct to be a threat against it for its religious activity. Compl. ¶ 121. It also has alleged that other individuals have perceived Defendants' conduct as such a threat; for example, one of YOM's doctors quit as a result of the ongoing threats from the State. Compl. ¶ 122. Any reasonable person would perceive public statements that stigmatize centers as fraudulent and threatening to public health to be a threat and a warning, and the fact that YOM's doctor has in fact taken it as such is further strong evidence of that perception.

Fourth, Defendants' statements against YOM and other PRCs have repeatedly threatened adverse consequences against them on the basis of their viewpoint. "The Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." Compl. ¶ 57; Compl. Ex. K. Defendants also have issued a public warning to avoid PRCs. Compl ¶ 74; Compl. Ex. N. The Commissioner of DPH issued a memorandum warning healthcare professionals that they could lose their licenses for working with PRCs. Compl ¶127; Compl. Ex. L. The government's website categorically urges members of the public to avoid all PRCs and to file complaints about them. The website prominently displays the statement: "Have you been harmed by an anti-abortion center? If you have been to an anti-abortion center, or 'crisis pregnancy center,' and have concerns about your experience, learn how you can file a civil rights complaint." *Id.* The State Defendants aggressively criticize pro-life pregnancy centers for even existing, and then proclaim that they are "actively" seeking reports and complaints against them. That is a targeted threat of law enforcement. Defendants have threatened adverse consequences against the PRCs, consequences based on their refusal to provide abortion.

The totality of facts in context demonstrates that Defendants have crossed the line into coercion. Actions that individually might perhaps be lawful can form an overall practice that violates the First Amendment. *Vullo*, 602 U.S. at 196. The Supreme Court explained that "although Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress the NRA's protected expression. So, the contention that the NRA and the insurers violated New York law does not excuse Vullo from allegedly employing coercive threats to stifle gun-promotion advocacy." *Id.* Likewise here, the State of Massachusetts can set up a hotline, issue warnings, or investigate fraud. But what it cannot do is carry out those acts in a viewpoint-discriminatory fashion in order to threaten the speech of PRCs. A campaign of viewpoint-discriminatory threats and intimidation cannot hide behind the Defendants' regulatory authority.

## II.    Plaintiff Has Pled a Free Exercise Claim for Religious Discrimination.

Massachusetts's targeting of the state's pro-life pregnancy centers qualifies as "[o]fficial action that targets religious conduct for distinctive treatment." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (2012). More specifically here, a religious viewpoint of PRCs like YOM – the sanctity of human life – is being targeted for disfavored treatment, the disapprobation of the state's campaign. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018) (The Free Exercise Clause protects "religious viewpoints" against discriminatory treatment).

The Free Exercise Clause "forbids subtle departures from neutrality." *Gillette v. United States*, 401 U.S. 437, 452 (1971). The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *City of Hialeah*, 508 U.S. at 547. Even a regulation

or policy that is facially neutral may violate the Clause if it masks governmental hostility. *Id.* at 534. The effect of a law in its real operation is strong evidence of such an object. *Id.*

Plaintiff has identified a burden to its religious conduct. "[T]he adverse effect of the government's conduct is that religious PRCs have been singled out for disparate treatment because of their religious expression." Compl. ¶ 149. As Plaintiff alleges in its complaint, the real operation and effect of the Massachusetts policy is to single out for discriminatory treatment pro-life PRCs, the overwhelming majority of which are faith-based and adhere to religious views about the sanctity of human life. In particular, the operative effect of the Massachusetts policy is to harass and undermine PRCs, including Plaintiff YOM, because of their religious viewpoint affirming the sanctity of human life. The state is actively threatening and targeting YOM and other PRCs for their religious activity, labelling them misinformation and a public health menace, and stifling their speech by these threats. These threats have accordingly burdened YOM's religious beliefs.

*Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008), did not contain the threats to operation at issue here, threats that have actually resulted in YOM losing an employee. YOM has alleged that Defendants' campaign has threatened and stifled YOM's religious speech. Moreover, YOM has alleged expressly that the public "education" campaign involves direct expression of hostility toward religion. *See Masterpiece Cakeshop*, 584 U.S. at 639 (concluding civil rights commission adjudicator's statements expressing hostility to religion during plaintiff's formal public hearing violated the First Amendment). The actions of the State Defendants are explicitly and facially targeted at the religious activity of PRCs: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." Compl. ¶ 146. An expression of hostility towards religion in this way is closely analogous to the hostility in *Masterpiece Cakeshop*:

[T]he Commission's treatment of Phillips' case violated the State's duty under the

> First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint . . . . [T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.

*Masterpiece Cakeshop, Ltd.,* 584 U.S. at 638. The religious animus in the State Defendants' official statement was not isolated; it was expressed through the campaign of intimidation and harassment delineated above and incorporated here by reference.

Defendants contend that YOM does not allege selective enforcement of the regulations governing licensed health care facilities. But, as Defendants concede, YOM's complaint does not challenge those regulations as unconstitutional. On the contrary, it assumes their facial legitimacy. In fact, YOM's recent clearance under those regulations highlight the importance of this case. Even after being cleared under those facially neutral regulations, YOM *is still* publicly classified by the State Defendants as a public health threat and accused of misrepresentations and falsehoods because of YOM's viewpoint, not any actual conduct. Defendants even acknowledge that the Department's Division of Healthcare Licensure "found Your Options Medical to be in compliance with the Department's regulations." Def. Mem. In Supp of Mtn to Dismiss, ECF No. 43, 18. But the Defendants continue to classify YOM as a public health threat regardless.

In responding to YOM's Complaint, the State Defendants ignore the allegations of express animus towards religion cited in the Complaint. But that animus is significant. *Masterpiece Cakeshop* involved the discriminatory application of Colorado's public accommodations law to a religious viewpoint. The Colorado Civil Rights Commission permitted three other bakers to refuse customer requests that violated their moral principles but denied Mr. Phillips the same permission because his moral opposition to a customer's request was based on his religious beliefs. 584 U.S. at 638. Likewise here, Defendants' conduct is not facially neutral and it evinces palpable hostility against all PRCs. The real operation and effect of their actions is to single out for discriminatory

treatment pro-life PRCs that adhere to religious views about the sanctity of human life, solely because of their religious views about life. The entire category of reproductive care clinics is not targeted – only those that have the expressly religious viewpoint of promoting childbirth and adoption rather than abortion. The underlying operative assumption of the campaign is that only those religious PRCs that promote the sanctity of human life are likely to engage in unethical conduct, meriting the State Defendants' campaign.

Defendants have referenced *Dobbs.* The *Dobbs* Court recognized that as a "question of profound moral and social importance," abortion generates deep division within the country. *Dobbs v. Jackson Women's Health Org.*, 597 U.S 215, 269 (2022); *see also id.* at 337-339, 344 (Kavanaugh, J., concurring) (recognizing that abortion as an "extraordinarily weighty" issue and that efforts to limit abortion "represent the sincere and deeply held views of tens of millions of Americans"). In the eyes of Massachusetts, however, there is only one correct viewpoint; and PRCs, because they are "affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda," have been classified as a public health threat. Compl. ¶ 57. The operative effect of the Massachusetts policy is to harass and undermine PRCs because of their religious viewpoint, and this constitutes a Free Exercise violation.

### III.    Plaintiff Has Pled an Equal Protection Claim.

Plaintiff's Equal Protection claim closely parallels the Free Exercise claim. Defendants discriminated against PRCs like YOM explicitly because of their religious and political speech and punished YOM for its exercise of constitutional rights, engaging in viewpoint-based official harassment that constituted unconstitutional discrimination. *See Tapalian v. Tusino*, 377 F.3d 1, 7 (1st Cir. 2004) (holding that plaintiff successfully showed that city official violated the Equal Protection Clause by a "malicious orchestrated campaign."). "In order to establish [a claim of selective treatment, a plaintiff must] allege facts indicating that, 'compared with others similarly

situated, [it] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001) (emphases omitted) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)); *McGuire v. Reilly*, 260 F.3d 36, 49 (1st Cir. 2001) ("[T]he equal protection interests involved in the differential treatment of speech are inextricably intertwined with First Amendment concerns . . . ."). The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

The conduct of the government here expressly distinguishes the speech of PRCs for disparate treatment, and as discussed above, does so on the basis of religion. PRCs are all facially discriminated against by this campaign, when contrasted with clinics that are similar but provide abortion. The government's conduct here is targeted towards religious activities, imposing additional scrutiny upon religious PRCs that is not imposed on non-religious centers. Accordingly, such conduct "is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979). Facially, by the very language of the Defendants' statements, Defendants are treating PRCs differently because of their religious motivation. This selective treatment is the very sort of unequal treatment the Constitution protects against.

Moreover, the Constitution's equal protection guarantee is understood to "guard one part of the society against the injustice of the other part" by checking the tendency of legislative majorities to be vindictive. The Federalist No. 51, at 161 (James Madison) (Roy P. Fairfield ed., 2d ed. 1966)). In several equal protection decisions, the Supreme Court has held unconstitutional state or local enactments because such enactments were motivated by animus toward a politically

unpopular group and justified by no legitimate government purpose.  One such decision is *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973), which invalidated a federal law excluding from the food stamp program households composed of unrelated individuals. Discrediting the government's purported explanation that such households were more likely to under-report income and to evade detection, the Court concluded that the rule disqualified many otherwise eligible needy households, and reflected a "bare congressional desire to harm a politically unpopular group . . . ." *Id*. at 534, 537-38. Twelve years later in *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), the Court invalidated a local ordinance that was applied to a special permit for operating a group home for the mentally disabled. It found that the government's interests such as population density and protecting the inhabitants against the risk of flooding was not credible, given that nursing or convalescent homes were allowed without a permit and mental disability had no relationship to population density. *Id*. The Court concluded that the weakness of the government's justifications masked "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding." *Id*. at 448. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id*. at 446. *See also Romer v. Evans*, 517 U.S. 620 (1996) (holding unconstitutional a Colorado constitutional provision prohibiting regulation to protect homosexuals from discrimination). In *Romer*, the Supreme Court deemed the "disqualification of a class of persons from the right to seek specific protection from the law," a "status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id*. at 632, 635. The same analysis is also applicable here; the State has no rational basis to single out *all* PRCs, particularly when PRCs like YOM have been expressly cleared by state investigations. There is no factual support for classifying *all* PRCs as public health threats.

**IV.    Qualified Immunity is No Shield for Unconstitutional Threats.**

In addition to their individual capacity claims, Plaintiff has requested injunctive relief based on Defendants' official capacities. Qualified immunity, granted or not, is no shield to that relief. *See, e.g.*, *M.M.R.-Z. v. Puerto Rico*, 528 F.3d 9, 13 (1st Cir. 2008) ("qualified immunity does not apply to official capacity claims, usually aimed at injunctive relief based on *Ex parte Young*, 209 U.S. 123, 159-60 (1908)").

Moreover, qualified immunity is no shield here. It is well established that Government action falling short of actual punishment, such as threats or intimidation, may implicate the First Amendment by causing a "chilling effect" on speech. *Bantam Books* has ensured that the law is well established, and that government officials may not use their authority to threaten the First Amendment rights of the people. The prohibition against unconstitutional threats is also clearly established by *Vullo*. If anything, the claim here is stronger than that in *Vullo*, as here the State Defendants have gone beyond private warnings to public threats. The law imputes knowledge of binding Supreme Court decisions to public officials: "a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Under *Bantam Books* and *Vullo*, it is clearly established that a government official must not classify opponents as a "public health threat" in the absence of wrongdoing and subject those opponents to opprobrium because of disagreement. These cases establish a right not to be threatened because of one's political views.

**CONCLUSION**

For the foregoing reasons, Plaintiff YOM respectfully requests that this Court DENY Defendants' Motion to Dismiss in its entirety. In the alternative, Plaintiff requests that the Court GRANT it leave to amend its Complaint.

Respectfully submitted,

YOUR OPTIONS MEDICAL

By counsel,

OLIVIA F. SUMMERS*
/s/ Olivia F. Summers
(D.C. Bar No. 1017339)

ANDREW EKONOMOU*
(GA Bar No. 242750)
CHRISTINA (STIERHOFF) COMPAGNONE*
(D.C. Bar No. 1657929)
NATHAN MOELKER*
(VA Bar No. 98313)
JORDAN SEKULOW**
(D.C. Bar No. 991680)
STUART J. ROTH**
(D.C. Bar No. 475937)

THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
(Massachusetts Bar No. 711930)
sam@mafamily.org

*Appearing Pro Hac Vice
** Pro Hac Vice Forthcoming

Dated January 10, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Olivia F. Summers, hereby certify that on January 10, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Olivia F. Summers</u>
Olivia F. Summers