**~~IN THE~~ UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| A Woman's Concern, Inc. d/b/a Your Options Medical Centers, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No.: 1:24-cv-12131-LTS |
| Maura Healy, Governor of Massachusetts, sued in her individual and official capacities; Robert Goldstein, Commissioner of the Massachusetts Department of Public Health, sued in his individual and official capacities; Reproductive Equity Now Foundation, Inc.; Rebecca Hart Holder, Executive Director of Reproductive Equity Now Foundation, Inc., | ) ) ) ) ) ) ) ) ) | **AMENDED** COMPLAINT |
| Defendants. | ) ) | |

Plaintiff, A Woman's Concern, Inc. d/b/a Your Options Medical Centers (hereinafter "Your Options Medical," "YOM," or "Plaintiff"), brings this action for declaratory, compensatory, and injunctive relief to vindicate and defend its constitutional and civil rights to provide medical services without fear of retaliation and threat because of its political and religious views. Maura Healey, Governor of Massachusetts, along with Commissioner Robert Goldstein ("Defendants"), have engaged in a pattern of conduct to target YOM and other pregnancy resource centers ("PRCs") in Massachusetts, thus depriving Plaintiff of its rights to freedom of speech and free exercise of its religion as guaranteed by the First Amendment to the U.S. Constitution. In addition, Defendants have engaged in impermissible viewpoint discrimination against Plaintiff on the basis of its religious and political speech in violation of the Equal Protection clause of the Fourteenth Amendment. The State Defendants' "trusted partner" Reproductive Equity Now Foundation, Inc.

("REN"), led by Director Rebecca Hart Holder ("Defendants"), have similarly acted – under color of law – to deprive Plaintiff of its rights to freedom of speech and free exercise of its religion as guaranteed by the First Amendment, and to discriminate against Plaintiff on the basis of its religious and political speech in violation of the Fourteenth Amendment.

## I.    PRELIMINARY STATEMENT

1.    Government officials can express their views; "[w]hat [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression." *NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Such conduct is "presumptively unconstitutional." *Id.* This case is necessitated by an overt viewpoint-based campaign of harassment, suppression, and threats against YOM and other PRCs. Directed by Governor Healey and the other Defendants, this campaign involves selective law enforcement prosecution, public threats, and even a state-sponsored advertising campaign with a singular goal – to deprive YOM, and groups like it, of their First Amendment rights to voice freely their religious and political viewpoints regarding the sanctity of human life in the context of the highly controversial issue of abortion.

2.    Defendants' retaliation and selective-enforcement campaign accuses YOM and other PRCs of being a public health threat, of carrying out false and misleading advertising, and of other falsehoods, while actively urging citizens to report PRCs to State law enforcement. Defendants' campaign is not isolated; in fact, it began when Governor Healey, as Attorney General, issued consumer advisories making it emphatically clear that pro-life PRCs are not welcome in Massachusetts because of their views and speech. Moreover, Defendants have knowingly targeted pro-life PRCs for repeated enforcement actions without a proper basis and based solely on REN's unwarranted complaints, in violation of their rights to equal protection under the law.

3.      Defendants' campaign of intimidation has directly contributed to the decision of one of YOM's doctors to stop practicing for YOM. His departure created significant costs for YOM, including requiring YOM to turn patients away. Plaintiff YOM has also been forced to operate in a culture of fear and harassment from the State, and continues to face unprecedented investigations, including unnecessary subpoenas, despite a prior state investigation clearing YOM of any wrongdoing.

4.      Absent relief, Defendants' blacklisting campaign will continue to damage YOM and its members, as well as endanger the free speech, free exercise, and association rights guaranteed by the Constitution. In fact, these threats are likely to have their desired effects forcing YOM to stop operating if the unwarranted intimidation tactics continue. It is well-settled that viewpoint discrimination applied through threats of legal sanctions and other means of coercion and intimidation violates the United States Constitution where, as here, such measures chill protected First Amendment activities. That very kind of selective censorship scheme is evidenced here. Moreover, the threats in this case were targeted explicitly against the religious speech of PRCs in violation of the Free Exercise Clause.

**II.     PARTIES**

5.      Plaintiff, Your Options Medical, is a religious-based nonprofit organization, organized under the laws of the Commonwealth of Massachusetts, with a principal place of business at 103 Broadway, Revere, Suffolk County, Massachusetts.

6.      Defendant, Maura Healey, is the current governor of Massachusetts and the former Attorney General of Massachusetts. She is named in this action in her individual and official capacities.

3

7.      Defendant, Robert Goldstein, is the Massachusetts Commissioner of Public Health. He is named in this action in his individual and official capacities.

8.      Defendant Reproductive Equity Now Foundation, Inc. is a 501(c)(3) nonprofit organization with the organizational goal of "Advancing reproductive justice and eliminating barriers to safe, legal abortion care." https://reproequitynow.org/what-we-do.

9.      Defendant Rebecca Hart Holder, is and was at all times relevant to this Complaint, ~~Executive Director and/or~~ President of Defendant Reproductive Equity Now Foundation, Inc.

### III.     JURISDICTION AND VENUE

10.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, enforceable under the Civil Rights Act, 42 U.S.C. § 1983 et seq.

11.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331.

12.     This Court has authority to award the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested compensatory and injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and all the acts described in this Complaint occurred in this district.

### IV.     FACTUAL ALLEGATIONS

#### a.      Background

14.     Plaintiff was founded in 1991 by three Christian families in Boston who saw the need to offer women in unplanned pregnancies a safe place to receive help and support in choosing life.

15.     Plaintiff believes that all human life is sacred and made in the image of God.

16.     As a Christian organization, Plaintiff is committed to aiding women and couples facing unexpected pregnancies by providing ultrasounds, counseling, and meeting the practical and material needs that may otherwise cause them to consider abortion.

17.     As a life-affirming entity, Plaintiff does not perform abortions, does not refer for abortions, and does not advertise that it performs abortions.

18.     The heart of Plaintiff's ministry is to meet the emotional, relational, material, and spiritual needs of mothers and their babies.

19.     All of YOM's services for pregnant women are provided free of charge, including pregnancy testing, ultrasounds, and pregnancy options counseling, as well as the provision of baby clothes, diapers, and other supplies to mothers of newborns.

20.     Plaintiff is a medical clinic and has been licensed by the Massachusetts Department of Public Health ("DPH") since 1999.

21.     As a medical clinic, Plaintiff provides information about abortion pill reversal, a process that uses the drug progesterone to reverse the effect of medication abortion. *Your Options Medical: What is Abortion Pill Reversal* (Mar. 16, 2020), https://www.youroptionsma.org/post/what-is-abortion-pill-reversal.

21.22.  Plaintiff currently operates multiple medical pregnancy centers and a mobile medical clinic.

22.23.  Its medical licensure allows Plaintiff to offer lab-quality pregnancy testing and ultrasounds, which it has provided to women for the last twenty-five years.

23.24.  Plaintiff has renewed its licensing with the DPH every two years, as required by law.

5

~~24.~~25.  During the twenty-five years that Plaintiff has operated as a medical clinic in Massachusetts, it has received zero (0) patient complaints.

~~25.~~26.  Plaintiff operates a client-facing website, stating: "As a non-profit, we are able to provide our services at no cost to you because of the generosity of our donors. We do not provide pre-natal care or abortion services so there is no financial gain or any other pressure for you to make a decision regarding your pregnancy." *Your Options Medical: Free Pregnancy Testing and Ultrasound*, https://youroptionsma.org (last visited Aug. 19, 2024) (attached as Exhibit A). This same statement also appears on every other page of the website.

~~26.~~27.  DPH is vested with authority to regulate medical clinics in the State, to initiate investigations and civil enforcement actions against regulated entities, and to refer potential criminal violations to the Massachusetts Attorney General for prosecution.

**b.      Violence and Vandalism Against Pro-Life Organizations and Persons (Including Plaintiff) in Recent Years**

~~27.~~28.  Immediately following the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, PRCs were made targets of violence and vandalism. *See* Micaiah Bilger, *New Study Shows Pro-Life Groups Have Been Attacked 22 Times More Than Pro-Abortion Groups*, LifeNews.com (Nov. 1, 2022, 5:04 PM), https://www.lifenews.com/2022/11/01/study-pro-life-groups-have-been-attacked-22-times-more-than-pro-abortion-groups/; *see also Much More Violence Against Pro-Life People Than Against Pro-Choice Since the Supreme Court Leak on May 3rd: 135 Attacks on Pro-Life People Between The Supreme Court Leak on May 3rd and September 24th, 2022, Only 6 Attacks Were Identified in the Other Direction*, Crime Research (Oct. 31, 2022), https://crimeresearch.org/2022/10/136-pro-abortion-attacks-between-the-supreme-court-leak-on-may-3rd-and-september-24th-2022/; *see also* Micaiah Bilger, *Leftists Vandalize Church and Pregnancy Center on the Same Night*, LifeNews.com (Oct. 20, 2022),

6

https://www.lifenews.com/2022/10/20/leftists-vandalize-church-and-pregnancy-center-on-the-same-night/.

28.29.  Plaintiff is one of the many pro-life organizations listed in these articles that was targeted for vandalism.

29.30.  On June 26, 2022, two days after the *Dobbs* decision was published, Plaintiff's building was vandalized with the word "SCAM" written in spray paint. (Attached as Exhibit B).

30.31.  Plaintiff was again targeted for vandalism on July 21, 2022, and July 28, 2022.

31.32.  No one to YOM's knowledge has been prosecuted for the repeated criminal acts perpetrated against it.

### DEFENDANTS' PUBLIC ACTIONS AGAINST PLAINTIFF

**b.  c.        The State's Public False Statements Against YOM Prior to the Public Smear Campaign**

32.33.  In response to these acts of vandalism, Massachusetts officials did not pursue a public awareness campaign to bring these vandals to justice.

33.34.  Instead, government officials took affirmative steps to contribute to, and escalate, the hostile rhetoric against pro-life organizations, such as YOM.

34.35.  On July 6, 2022, just weeks after YOM was first vandalized, then-Attorney General Maura Healey issued a factually baseless "advisory" stating: "While crisis pregnancy centers claim to offer reproductive healthcare services, their goal is to prevent people from accessing abortion and contraception." Press Release, AG Healey Warns Patients About Crisis Pregnancy Centers: Advisory Informs People That Crisis Pregnancy Centers Do Not Offer Abortion or Comprehensive Reproductive Care, Office of Attorney General Maura Healey (July 7, 2022),

7

https://www.mass.gov/news/ag-healey-warns-patients-about-crisis-pregnancy-centers    (Attached as Exhibit C).

~~35.~~36.  The advisory also states that "while Crisis Pregnancy Centers may appear to be reproductive health care clinics, they do not provide abortion care or referrals, contraception, or other reproductive health care, **despite what they may advertise**." *Id.* (emphasis added).

37.    In that same advisory, Rebecca Hart Holder, ~~Executive Director~~President of Defendant REN, also without factual basis, stated: "**Crisis pregnancy centers, or fake clinics, are dangerous facilities that use deceptive advertising to deceive pregnant people into believing that they provide abortion care,** when in reality, many do not even have doctors on staff to discuss the full range of health care options with clients." *Id.* (emphasis added).

~~36.~~38.  At the time this "advisory" was issued, the State offered no evidence of any complaints against pro-life centers in Massachusetts.

~~37.~~39.  Just fifteen days after this consumer alert calling pro-life pregnancy centers "fake," "dangerous," and "deceptive," on July 21, 2022, one of Plaintiff's buildings was again vandalized with spray paint.

~~38.~~40.  Spray painted on the building were the words "IF ABORTION'S NOT SAFE NEITHER ARE YOU."

~~39.~~41.  Also spray painted on the building was the symbol A with a circle around it – commonly known as the "Anarchy symbol." (Attached as Exhibit D).

~~40.~~42.  Eight days later, on July 28, 2022, Plaintiff was targeted a third time by vandals, this time with posters stating: "Shut Down Your Options Medical;" "This is a Fake Clinic." (Attached as Exhibit E).

8

41.43.  The vandals' accusation of YOM being a "fake clinic" directly mirrored the accusations made by Defendants.

**d.     The REN Complaint**

42.44.  In October of 2023, a complaint was filed against Plaintiff was made towith the Executive Office of Health and Human Services and the DPH.

43.45.  That complaint alleged that "[b]ased on recent *press reports*, [Plaintiff] Your Options Medical appears to engage in intentionally misleading and deceptive practices about the services offered to people seeking abortion and pregnancy-related care by advertising 'free pregnancy testing and ultrasounds' with 'immediate results' on the mobile unit itself while stating that, in fact, the results are 'preliminary findings.'" (emphasis added) (Attached as Exhibit F).

44.46.  Importantly, as discussed in detail in paragraphs *infra*, this complaint was not made against Plaintiff by any patient or person with first-hand knowledge, but rather by Defendant Hart Holder, who openly and publicly works in collaboration with the state of Massachusetts to target pro-life pregnancy centers. (*See e.g.*, Exhibits C, G, and H).

45.47.  In reality, YOM performs pregnancy tests and ultrasounds with immediate results, but the *final* results are confirmed by a physician, then provided to the patients no more than twenty-four to forty-eight hours later.

46.48.  On the basis of Defendant Hart Holder's complaint, the DPH conducted a review of Plaintiff's advertising, but it did not, nor has it ever, requested or required Plaintiff to make any changes to the language on the mobile unit.

47.49.  The sole change DPH required Plaintiff to make was an amendment to its Policies and Procedures Manual concerning the criteria for ultrasound exams, eliminating any language that allowed for sonographer discretion.

48.50.  Plaintiff made that correction, and DPH issued a letter and summary statement to Plaintiff on February 29, 2024, clearly indicating that YOM is in compliance with state licensing requirements:

> On February 19, 2024, we conducted a desk audit follow-up review to verify that your facility had achieved and maintained compliance. The findings indicate that all deficiencies have been corrected. You are reminded that facilities are obligated to correct all deficiencies and then remain in compliance. An unannounced visit may be conducted at any time at the discretion of the MA Department of Public Health Licensure Unit.

(Attached as Exhibit I).

49.51.  The deficiency noted by DPH was not remotely related to the allegations contained in Defendant Hart Holder's October 2023 complaint or to the allegations from the other Defendants that the Plaintiff as a pro-life pregnancy center is engaged in deceptive and dangerous activities.

50.52.  Despite clearance from DPH, the Massachusetts Board of Registration in Medicine ("Board") then began an investigation of Plaintiff's medical director based on Defendant Hart Holder's October 2023 complaint.

51.53.  As part of that investigation, the Board served two subpoenas, both of which were both ad testicandum and duces tecum, on Plaintiff: the first was issued on December 21, 2023; the second was issued on June 5, 2024.

52.54.  Plaintiff complied with the first subpoena and provided the responsive documents in its possession, though many of the documents requested did not concern Plaintiff's mobile unit [the subject of the October 2023 complaint by REN].

53.55.  Rather, the requested documents related to Plaintiff's three permanent sites.

54.56.  In addition, most of the documents subpoenaed pertained to a period of time during which Plaintiff's mobile unit was not in service; that is, January 1, 2023, to December 21, 2023.

55.57.  Because investigative records and/or information obtained by the Board of Registration in Medicine are not confidential, they are and will be accessible to Defendant Hart Holder as the complainant. G.L. c. 112, Sec. 5 ("[I]nvestigative records or information of the board shall not be kept confidential after the board has disposed of the matter under investigation . . . nor shall the requirement that investigative records or information be kept confidential at any time apply to requests from the . . . . complainant . . . .").

56.58.  In using State Boards to circumvent the confidentiality of patient records, it appears that Defendant Hart Holder is utilizing (or colluding with) the government to conduct a fishing expedition into Plaintiff and its medical director solely because it is operating a pro-life pregnancy center. Sam Turken, *State Department of Public Health Warns Anti-Abortion Centers Against Using Deceptive Tactics*, wgbh.org (Jan 5, 2024), https://www.wgbh.org/news/2024-01-05/state-department-of-public-health-warns-anti-abortion-centers-against-using-deceptive-tactics (emphasis added) (attached as Exhibit J).

One**.    The State Defendants' Public Statements**

57.59.  As noted above, on January 3, 2024, DPH issued a press release stating: "Many of these centers advertise themselves as full-service reproductive health care clinics, yet they do not provide abortion care or abortion referrals, contraception, or other important reproductive health care services. **Most centers are affiliated with national advocacy or religious organizations** that provide funding and support to advance an anti-abortion agenda." Press Release, Maintaining Integrity, Accessibility, and Transparency in Reproductive Care, DPH (Jan. 3, 2024), https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care (emphasis added) (attached as Exhibit K).

11

58.60.  The January 3, 2024, DPH press release also stated: "In Massachusetts, there are nearly 30 anti-abortion centers that operate in the state, with only four currently subject to DPH licensure under state law." *Id.* "However, if these facilities are providing medical care or advertising services that are consistent with a clinic, DPH . . . may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials. This work may be done in collaboration with the Attorney General's Office's Reproductive Justice Unit." *Id.*

59.61.  In addition, the January 3, 2024, DPH press release stated that "[t]he Department of Public Health **actively seeks feedback and complaints from individuals** who have had concerning experiences with anti-abortion centers **as well as from other stakeholders who have information about questionable practices**." *Id.* (emphasis added).

60.62.  Finally, the January 3, 2024, DPH press release indicated that it is "focused on educating the public about the facilities that provide comprehensive reproductive care and those that **practice deceptive tactics to limit people's choices and prevent abortions**. DPH will **increase its efforts** to educate the public through a multi-faceted awareness campaign in 2024." *Id.* (emphasis added).

61.63.  Along with the January 3, 2024, press release, Defendant Goldstein issued a statement to "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics," as a "Reminder to Licensees Regarding Obligations and Providing Standard of Care." (Attached as Exhibit L).

64.    The initial file name for this statement was "**Guidance on Anti-abortion center and standard of care reminder guidance - 1.3.2024**" and apparently was not updated to match the more innocuous-sounding title featured in the statement itself. It has since been updated.

62.65.  Within that statement, ~~Defendant~~ Goldstein wrote that DPH "takes patients' rights and the provision of high quality, evidence-based, safe care by all providers seriously. **This includes providing patients accurate and complete information for informed decision-making, accurate portrayal and advertising of clinical services, and licensees practicing within their scope of practice and their license.**" *Id.*

63.66.  Among other things, Defendant Goldstein's statement also reminded doctors that "**[f]ailure to adhere to the staffing requirements of 105 CMR 140.000 could not only jeopardize a clinic license through administrative action including licensure suspension or revocation, but may also result in the referral of licensed providers deemed out of compliance to the appropriate licensing board. Entities and individuals may be referred to the Attorney General's Office by DPH for prosecution of deceptive practices by holding the entity out as a clinic, or performing unlicensed medical services.**" *Id.*

67.    Defendant Goldstien's statement also specifically singled out pro-life clinics and their practices; for example, it expressly criticized the prescription of progesterone for the purposes of counteracting the abortion pill. *Id.*

68.    His statement threatens physicians with discipline and penalties for the prescription of progesterone, even though progesterone is frequently used to support pregnancies, particularly at-risk pregnancies such those initiated by assisted reproductive technology like IVF, and is perfectly lawful as a prescription medication in Massachusetts.

64.69.  This statement was featured on the DPH webpage containing the press release regarding "anti-abortion centers" and was referred to as "guidance" for Massachusetts medical professionals. Press Release, Maintaining Integrity, Accessibility, and Transparency in

Reproductive Care, DPH (Jan. 3, 2024), https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care (emphasis added) (attached as Exhibit K).

65.70.  When viewed inThe file name of the document containing the statement explicitly referred to "Guidance on Anti-abortion centers." With the context of the statements made by Defendant Goldstein in theof the DPH press release and the fact that itthis document is linked on the press release webpage, it is clear that Defendant Goldstein issued this statement to threaten pro-life clinics and their doctors in line with the actions that have already been taken against YOM and its medical director.

71.    Again, the statement called out specific acts of medical sites and providers, like YOM, such as providing even mere information about the use of progesterone as a potential aid for reversing a medication abortion, as dangerous and possibly resulting in legal liability, despite the lawfulness of abortion pill reversal.

72.    It also made vague threats toward doctors who engaged in, or were even affiliated with clinics that engaged in so-called "deceptive practices," such as the prescription of progesterone for reversal of the abortion pill.

73.    These statements were designed to chill activities of pro-life medical providers at PRCs, including Plaintiff, as well as chill the speech of pro-life centers like Plaintiff.

74.    In an effort to continue and expand the campaign against YOM and other PRCs, on June 10, 2024, Defendant Governor Healey's administration launched a "first-in-the-nation" campaign against pro-life pregnancy centers throughout Massachusetts which included Plaintiff.

66.75.  As discussed in detail below, the preparation and coordination for that campaign consisted of REN working in close tandem with state officials, with their authorization to convey messages that the state officials themselves could not do themselves.

67.76.  The press release announced that "[t]he Healey-Driscoll Administration today launched a first-in-the-nation public education campaign highlighting **the dangers and potential harm of anti-abortion centers**, also called 'crisis pregnancy centers.' Anti-abortion centers often look like medical facilities and purport to offer the full spectrum of reproductive health care while, in reality, **they often mislead people about their options if they are pregnant and dissuade them from accessing abortions.**" Press Release, Healey-Driscoll Administration Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-centers.

68.77.  Defendant Healey stated that the campaign "includes protecting patients from **the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing comprehensive reproductive services.**" *Id.*

69.78.  Lieutenant Governor Kim Driscoll stated "[t]he troubling practices of anti-abortion centers serve to undermine the trust that people should have in our health care system. . . . Education and accurate information can help counter the misinformation and unethical tactics these centers use to prey on people at a particularly vulnerable time." *Id.*

70.79.  According to that press release, "[t]his public education campaign . . . will appear on social media platforms, billboards, radio, and transit, [and] was funded through a $1 million investment that the Massachusetts legislature passed as part of its FY2023 supplemental budget." *Id.*

71.80.  Defendant Goldstein stated that the State's campaign "counter-punches to the vast amount of misinformation and disinformation that these centers peddle every day, deceiving

people who may be frightened or confused . . . . As the commissioner of public health, I'm resolute about calling out this deception for what it is: **a public health threat**. When people are denied factual information and the freedom to make fully informed decisions about their reproductive health, it can lead to worse mental and physical outcomes." Katie Lannan, *Mass. Officials Launch Information Campaign Warning Against Anti-Abortion Centers*, wgbh.org (June 10, 2024), https://www.wgbh.org/news/politics/2024-06-10/mass-officials-launch-information-campaign-warning-against-anti-abortion-centers.

~~72.~~81.  Further, "[t]he campaign was **created by the Department of Public Health (DPH) in collaboration with the Reproductive Equity Now Foundation** . . . ." *Id.*

~~73.~~82.  Since the government launched its campaign, billboards, posters, and ads are now present throughout Massachusetts. (Examples attached as exhibit M).

~~74.~~83.  DPH operates and maintains a page on its website entitled "Avoid Anti-Abortion Centers." On the main webpage, DPH states, "[Anti-abortion centers] may mislead you about your options if you're pregnant and can put your health at risk." *Avoid Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/avoid-anti-abortion-centers (last visited Aug. 8, 2024) (attached as Exhibit N).

~~75.~~84.  On this same webpage, DPH actively solicits complaints against pro-life pregnancy centers: "Have you been harmed by an anti-abortion center? If you have been to an anti-abortion center, or 'crisis pregnancy center,' and have concerns about your experience, learn how you can file a civil rights complaint." *Id.*

~~76.~~85.  DPH's "Anti-abortion clinic" webpage links to another government webpage -- "Anti-Abortion Center Awareness Campaign: Social Media Toolkit (English)." This page is

offered by the Bureau of Community Health and Prevention and the Department of Public Health. (Attached as Exhibit O).

77.86.  On this webpage, DPH states the following without factual basis:

> [Pro-life centers] may look like medical facilities but could put your health at risk if you're pregnant.
> [Pro-life centers], may cause harm to individuals looking for pregnancy or abortion care.
> [Pro-life centers] . . . may mislead pregnant individuals about their options . . . .
> Avoid [pro-life] centers. They may mislead you or delay your care.
> [Pro-life centers] . . .  could put your health at risk.
> [Pro-life centers] are not a safe or trusted place to go for reproductive health care.

78.87.  In addition to these statements, DPH links from multiple webpages that it operates and maintains to a list of the "more than 30 [pro-life] centers in Massachusetts." (*See* Exhibit O).

79.88.  On one of the webpages, DPH states, "Even if you're not looking for an abortion, **these centers are not a safe or trusted place to go for reproductive health care.**" *Id.*

80.89.  The link provided by DPH goes directly to a webpage operated and maintained by Defendant REN. This webpage is entitled "What Are Anti-Abortion Centers?" *What Are Anti-Abortion Centers*, repoequitynow.org, https://reproequitynow.org/about-antiabortion-centers#:~:text=List%20of%20Anti%2DAbortion%20Centers%20in%20New%20England%3A (last visited Aug. 19, 2024) (attached as Exhibit P).

## d̶f.    REN's statements about YOM

81.90.  REN receives direct financial support from the state; a budget line item from the state's 2023 budget, item 4513-1006, provides money "[f]or family and reproductive health services; provided, that not less than $1,000,000 shall be expended for a public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers and the centers' lack of medical services; provided further, that the campaign shall

include information on the availability of providers across the commonwealth that provide legitimate medical and family planning services; provided further, that the campaign shall be linguistically diverse and culturally competent; and provided further, that not less than $250,000 shall be expended for Reproductive Equity Now, Inc.'s free abortion legal hotline." An Act Making Appropriations for the Fiscal Year 2023 to Provide for Supplementing Certain Existing Appropriations and For Certain Other Activities and Projects, Ch. 2 of Acts of 2023, https://www.mass.gov/doc/supplemental-budget/download at 5.

82.91.  Defendant REN's webpage lists every pro-life pregnancy center, including Plaintiff, in New England. (Attached as Exhibit P).

83.92.  It identifies all of YOM's facilities by name.

84.93.  Defendant REN has published a "guidebook" on its website (available for download). *CAUTION: This Clinic Does Not Provide Abortion Care: A Guidebook on Identifying and Taking Action Against Anti-Abortion Centers in New England*, Reproductive Equity Now, https://reproequitynow.org/aac-guidebook, (last visited Aug. 19, 2024) (attached as Exhibit Q).

85.94.  Within the guidebook, Defendant REN again lists all the pro-life pregnancy centers in New England, including Plaintiff's multiple locations in Massachusetts, and makes false, unfounded, and baseless statements. *Id.*

86.95.  For example, Defendant Hart Holder addresses the guidebook readers in her capacity as head of REN, stating: "We created this organizing guide because we recognize that [pro-life] centers pose a serious threat to unbiased reproductive health care here in New England," *Id.* at 3, and "[t]ogether, we can . . . put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities." *Id.* at 4.

18

87.96.  The guidebook repeats the false claim that "[Pro-life] centers use deceptive practices to attract patients . . . . They often use disinformation as a way to dissuade people from accessing abortion care." *Id.* at 12.

88.97.  Also pictured on page twelve, below these anti-pro-life center statements, is a Plaintiff YOM's main center in Revere, MA.

89.98.  The guidebook lists "8 Ways [Pro-life] Centers Will Try to Deceive You."

1) "medical disinformation"
2) "fear-based language"
3) "close proximity to legitimate abortion clinics"
4) "fake service called 'abortion reversal;'"
5) "names with the words 'choice,' 'choices,' 'hope,' or 'options.'"
6) "lie to you about how far along you are in your pregnancy"
7) "offer abstinence-only sex education, post-abortion support or 'grief counseling,' spiritual support, or bible study"
8) "associated with large, national [pro-life] organizations"

*Id.* at 13.

90.99.  In the guidebook, Defendant REN solicits information from "[p]eople who have had a negative experience with [pro-life] centers," instructing them to "call Reproductive Equity Now's free and confidential Abortion Legal Hotline at 833-309-6301 to report their case and be referred to pro bono attorneys." *Id.* at 20.

91.100.    This solicitation does not limit its request to information from "patients" of pro-life centers.

92.101.    This is the same Hotline that receives direct financial support from the Commonwealth.

93.102.    The guidebook then instructs that "[p]atients in Massachusetts can also file a report with the Attorney General Office's Civil Rights Division," and provides contact

information as well as instructions on filing a nurse or physician "complaint with the Commonwealth to initiate an investigation." *Id.*

94.103.    Defendant REN also states, "we've seen Massachusetts **conduct several investigations into [pro-life] centers** <u>based on Reproductive Equity Now's complaints</u>**."** *Id.*

95.104.    The guidebook links to two complaints, one of which is its complaint against Plaintiff YOM. *Id.*

105.    As discussed *infra*, these complaints were submitted in coordination with the State to justify the launch of Defendants' campaign against PRCs.

96.106.    In an article dated January 5, 2024, Defendant Holder was quoted as saying, "Anti-abortion centers **pose a serious threat to pregnant people** seeking unbiased reproductive health care in Massachusetts . . . . I do really want to thank Commissioner Goldstein for his bold leadership and **really look forward to continuing our work together to combat these centers.**" Sam Turken, *State Department of Public Health Warns Anti-Abortion Centers Against Using Deceptive Tactics*, wgbh.org (Jan 5, 2024), https://www.wgbh.org/news/2024-01-05/state-department-of-public-health-warns-anti-abortion-centers-against-using-deceptive-tactics (emphasis added) (attached as Exhibit J).

97.107.    In a Department of Health and Human Services press release dated June 10, 2024, Defendant Hart Holder stated, "Massachusetts is putting power in the hands of our communities by alerting them to the **dangers of deceptive anti-abortion centers. . . .** We're so proud that the Healey-Driscoll Administration **is addressing this public health threat** head-on, and we have been honored to work with the Massachusetts Department of Public Health on the creation of this first-in-the-nation public education campaign. **Together, we can combat anti-abortion centers' predatory practices** . . . ." Press Release, Healey-Driscoll Administration

Launches First-in-the-Nation Public Education Campaign on the Dangers of Anti-Abortion Centers, Executive Office of Health and Human Services (June 10, 2024), https://www.mass.gov/news/healey-driscoll-administration-launches-first-in-the-nation-public-education-campaign-on-the-dangers-of-anti-abortion-centers (emphasis added).

98.108.        Defendant Hart Holder has also stated about PRCs that "They're here, they're dangerous . . . this campaign is about putting power in the hands of people by calling out anti-abortion         centers'         deceptive         and         dangerous         practices." https://www.wgbh.org/news/politics/2024-06-10/mass-officials-launch-information-campaign-warning-against-anti-abortion-centers.(*See* Exhibit H).

### DEFENDANTS' PRIVATE EFFORTS AND COORDINATION ON PUBLIC SMEAR CAMPAIGN

### g.    Coordination between State Officials and REN

109.    In March of 2023, the Massachusetts legislature passed a Fiscal Year 2023 supplemental budget for a "public information campaign warning people about crisis pregnancy centers," a project that had been previously vetoed by then-Governor Baker. (*See* Exhibit R).

110.    Additionally earmarked in the Supplemental Budget was $250,000.00 to fund REN's legal hotline. *Id.*

111.    As described *infra*, Defendants Rebecca Hart Holder and REN were intimately involved with the State Defendants in the creation and direction of this anti-PRC campaign, from its inception to its implementation.

112.    At the time that this budget was passed for the campaign, DPH had provided no evidence of any complaints filed with DPH against pro-life pregnancy centers.

113.    On March 29, 2023, the Director of Child/Adolescent Health and Reproductive Health at DPH contacted REN via email and offered REN the opportunity to co-author government public service announcements targeting pro-life pregnancy centers.

114.    The DPH Director informed REN that the FY23 supplemental budget had been signed. This email then stated, "Congrats! We'd be happy to talk with you about what you would like to see in the campaign . . . ." (Attached as Exhibit S).

115.    Defendant Hart Holder immediately replied on March 29, 2023, to accept the offer to discuss the campaign, stating that REN had "ideas about how to structure the Hotline contract and some urgent needs" and expressing excitement to "dig in on the CPC education campaign . . . ." *Id.*

116.    On April 12, 2023, the DPH Director contacted Defendant Hart Holder seeking information to establish REN as a first-time government contractor, demonstrating the formalization of this public-private partnership for the purposes of running the legal hotline in conjunction with the one-million-dollar public awareness campaign. *Id.*

117.    On April 19, 2023, Hart Holder designated Jane Piercy at REN as the point person to handle the government contract, and Piercy completed an "Earmark Contact Collection Form" providing REN's information to facilitate the contractual relationship.

118.    On July 20-21, 2023, Defendant Hart Holder exchanged emails with Jenifer McKenna, Founder and CEO of JMAC Consulting and co-author of "Designed to Deceive," a pro-abortion/anti-PRC report that was conducted by those, like Ms. McKenna, who are ideologically opposed to the values and work of pregnancy resource centers like YOM. (Attached as Exhibit T).

119.    In those emails, Defendant Hart Holder informed Ms. McKenna that DPH was seeking bids from advertising firms to create the campaign. *Id.*

120.    Defendant Hart Holder also informed Ms. McKenna that "[o]nce the [PR] firm is in place, we can start discussing strategies and timeframe," indicating that REN would be involved with working with the PR firm in shaping and creating the campaign alongside DPH. *Id.*

121.    In addition, Defendant Hart Holder connected Ms. McKenna to individuals within DPH who would be involved in the anti-PRC ad campaign. *Id.*

122.    REN and government officials met together regularly from 2023 forward to coordinate this campaign.

123.    On August 4, 2023, Anna Marie Finley from MORE Advertising [hereinafter "More"] contacted government officials and REN personnel to confirm an upcoming Crisis Pregnancy Center (CPC) Campaign Kick-Off meeting on August 7, 2023, to start discussions of the ad campaign, further demonstrating the coordination between the government and REN Defendants in creating and implementing this campaign. (Attached as Exhibit U).

124.    An agenda for an August 7, 2023, meeting outlined specific talking points for the campaign, including questions about "What do we want individuals to know?" regarding crisis pregnancy centers and their "specific harmful practices," and "why individuals should avoid them." *Id*.

125.    MORE developed a Campaign Agenda Outline that proposed "Stakeholder interviews" with REN as part of the research process for the anti-PRC campaign. *Id*.

126.    The agenda specifically asked "How much does DPH want to call out these centers? Identify them individually, for example?" and "What are we calling them? Crisis pregnancy centers, anti-abortion clinics, both, fake clinics?" *Id.*

127.    A PowerPoint presentation titled "anti abortion clinics environmental scan" was developed, containing negative descriptions of PRCs, presenting them as inherently deceptive and untrustworthy. (Attached as Exhibit V).

128.    The presentation included a map contrasting specific identified crisis pregnancy centers with "Real Clinics," sample lists of crisis pregnancy centers and their naming conventions, and messaging suggestions for the ad campaign. *Id.*

129.    The presentation also included a screenshot of YOM's website, identifying it specifically as a deceptive organization. *Id.*

130.    It also included a YOM Facebook post as an example of PRC advertising that needed to be addressed by Defendants. *Id.*

131.    The presentation identified specific individuals already interviewed for the campaign, including Carrie Baker, Jenifer McKenna, individuals at REN, and representatives from various other reproductive health organizations, such as Planned Parenthood. *Id.*

132.    However, to Plaintiff's knowledge, only REN was included in government communications with MORE regarding the campaign creation and implementation.

133.    Slides from MORE specifically identified and acknowledged the religious nature of PRCs and stated as an action item, "How do we want to tackle/address religious aspects of these places." *Id.*

134.    Any decision to limit public condemnation of the religious nature of Plaintiff and other pro-life pregnancy centers was based not on a concern of engaging in impermissible viewpoint discrimination. Rather, the advertising company advised that targeting PRCs because of their religious nature did not test well with the campaign's target audience, many of whom hold their own religious view about abortion. (*See* Attached Exhibit W).

135.    Slides from MORE specifically named YOM as one of the relevant pregnancy resource centers.

136.    Slides from MORE identified REN as a "Key informant/provider" for the campaign. (*See* Exhibit X).

137.    During the course of preparing for the campaign, MORE provided multiple project briefs to Defendants.

138.    On September 27, 2023, Finley provided a Project Brief based on a September 25, 2023, meeting, documenting "key informant research insights" that included extensive interviews with advocacy organizations and healthcare providers opposed to PRCs, including specifically REN and Defendant Hart Holder by name. *Id.*

139.    The September Project Brief contained generalizations about experiences of "many patients" at PRCs, labeling recommendations for PRCs in messaging, and specific language to avoid in the campaign. *Id.*

140.    An August Project Brief, among other things, claimed that the PRCs are "Funded by anti-abortion groups and religious orgs with the explicit agenda to prevent abortion," and that they "Push the unsupported, unproven, and dangerous 'abortion pill reversal.'" (*See* Exhibit V).

141.    In this same Project Brief, Plaintiff YOM was specifically listed as one of the "anti-abortion clinics" in Massachusetts. The label for the map on which Plaintiff YOM was included in the brief was "AACs v. Real Clinics in MA." Plaintiff YOM is a medically licensed clinic. *Id.*

142.    The Project Brief further used information from Plaintiff YOM's website to demonstrate the look, tone, and language used by PRCs. *Id.*

143.    The Brief also identified other awareness campaigns by pro-abortion organizations, including Planned Parenthood, ReproAction, Abortion Care Network and others. It identified one

state-sponsored abortion awareness campaign, in New York, but notably highlighted a key difference between the New York public campaign and the planned Massachusetts campaign: "Does **NOT** CALL OUT [Anti-Abortion Clinics] in the same way." Indeed, New York's campaign focused on providing information about abortion providers.

144.    Between October 11–18, 2023, government officials and advocacy partners refined a Creative Brief for the "anti-abortion center awareness campaign," with stated goals to increase awareness so that pregnant people could "avoid their deceptive practices and associated dangers." (Attached as Exhibit Y).

145.    The Creative Brief employed a "Know, Feel, Do methodology" designed to make individuals: (1) KNOW that anti-abortion centers mislead and deceive; (2) FEEL empowered with knowledge; and (3) DO avoid these centers and seek care elsewhere. *Id.*

146.    The campaign specifically targeted "Pregnant people and anyone who could become pregnant; ages ~16-45, lower income, and without a regular SRH provider," demonstrating deliberate targeting of vulnerable populations. *Id.*

147.    The campaign materials noted that the primary audience, while demographically diverse, shared "the pursuit of easily accessible care and services" and were "motivated by that same need." *Id.*

148.    Secondary audiences included "[i]nfluencers of individuals who are pregnant or could become pregnant, as well as policy makers and providers," expanding the reach beyond direct service seekers. *Id.*

149.    The Creative Brief was expressly designed to grab audience attention and counteract PRC's own messaging tactics.

150.    The Creative Brief accused pregnancy resource centers of acting to purposefully deceive and mislead people seeking care. *Id.*

151.    It targeted PRCs specifically for their beliefs, encouraging people to seek "care that's based on what you need—not on someone else's beliefs." *Id.*

152.    The Creative Brief outlined specific "Creative Ways In" including messaging such as "FREE ISN'T ALWAYS FREE" suggesting that free services from PRCs "come at a very steep price—your health, your options, and your future." *Id.*

153.    Another messaging approach labeled "WOLF IN SHEEP'S CLOTHING" characterized PRCs for their views, as assuming "a false identity" for the purpose of "deceiving their patients, preying on fear, sowing the seeds of doubt and shame, and furthering their own agenda." *Id.*

154.    The campaign materials promoted messaging stating that PRCs' "lies impact your life" and that they "will try to influence patients' care choices, judge decisions, and delay you from accessing comprehensive care." *Id.*

155.    Throughout these materials PRCs were repeatedly targeted for their religious beliefs and views.

156.    On or about November 7, 2023, a MORE employee sent an email requesting planning and budget approval from both DPH employees and REN employees, including Defendant Rebecca Hart Holder, demonstrating that REN had approval authority over government campaign budgets. (Attached as Exhibit Z).

### h.    Complaint Solicitation and Regulatory Targeting

157.    After working closely for seven months with DPH on the creation of the anti-PRC campaign, on October 17, 2023, Defendant Hart Holder submitted a formal complaint to

Commissioner Goldstein and Health Secretary Kate Walsh, based on news articles from August of 2023, requesting an investigation into YOM and its mobile medical unit for "false and deceptive advertising and potential out-of-scope medical practices." (*See* Exhibit F).

158.    Simultaneously, the campaign on which Defendant Hart Holder was working with the other Defendants specifically added to the campaign a call-to-action to "File a complaint," with materials stating that "This campaign will help connect individuals to information and support to file complaints against AACs." (Attached as Exhibit AA).

159.    A document that provided overall guidance to the complaint, Campaign Concepts, was updated to specifically add additional information on filing complaints only a few weeks after Defendant Hart Holder's complaint. *Id.*

160.    Government factsheets developed for the campaign included calls to action directing individuals to "[f]ind trusted reproductive health care providers, including abortion providers" and provided information about filing complaints with the Attorney General's office. (Attached as Exhibit BB).

161.    DPH also developed a "postcard" to send to members of the public that solicited complaints against PRCs. It stated "Have you been harmed by an ant-abortion center? Learn how to file a complaint" and included a QR code to file a complaint online, as well as the phone number for the Attorney General's Civil Rights Division. *Id.*

162.    On November 14, 2023, REN employee Claire Teylouni gave approval for a pharmacy mailer requested by MORE, demonstrating REN's decision-making authority over campaign materials. (Attached as Exhibit CC).

163.    On November 15, 2023, MORE employee Anna Marie Finley sent an email to DPH and REN, including Defendant Hart Holder, requesting approval for marketing concepts. (Attached as Exhibit DD).

164.    On or about November 16, 2023, REN employee Taylor St. Germain sent a reply email weighing in on design choices for advertisements, with her input carrying the same weight and authority as DPH employees offering suggestions. *Id.*

165.    On or about November 16, 2023, a MORE employee sent a reply email specifically highlighting changes that would be incorporated due to REN employee Taylor St. Germain's suggestions. *Id.*

166.    On or about November 16, 2023, a MORE employee sent an email summarizing proposed changes to advertisements, with approval received both from a DPH official and REN employee Taylor St. Germain, with St. Germain specifically saying "ditto" when approval was initially given by the DPH employee. *Id.*

167.    On or about November 27, 2023, a DPH employee circulated an email with the subject line "For EHS review by Dec 4: Anti-abortion center package (licensure guidance, comms strategy)" to other government employees. (Attached as Exhibit EE).

168.    That email detailed DPH's reasoning and plan for the anti-abortion center campaign. Specifically, the email noted that "[t]here was press earlier this year about two centers operating in Massachusetts . . . ." *Id.*

169.    Notably, at the time that the budget was approved for FY23 for the one-million-dollar campaign and $250,000 REN legal hotline, DPH had presented no evidence that there were any formals complaint against any PRCs in Massachusetts. Further, the press stories DPH

referenced in this email regarding the centers were published in the summer of 2023, well after the budget had for, and work had begun on, the public smear campaign.

170.    The DPH November 27, 2023, email further included a hyperlink to a document entitled "DRAFT anti-abortion cetner and standard of care reminder guidance – 11.21.2023," and in the paragraph following that hyperlink, DPH stated that "[w]hile [the linked document] does not specifically refer to anti-abortion centers (as the requirements outlined therein would apply to any licensed site/provider), **the examples used in the document do put anti-abortion centers on notice**." *Id.* (Emphasis added.)

171.    Similarly, the next paragraph included a link to a document entitled "Anti-Abortion Centers – DPH Public Document Draft2 – 11.21.2023," and DPH explained that document "does more specifically refer to anti-abortion centers and outlines our concerns, the limited role of licensure under statute, and informs the public on how to file complaints related to these centers. We think both of these issued together take a strong stance reflective of DPH's concern with the operation of these centers, particularly given how unsafe they can be." These statements illustrate that DPH was not merely issuing generic reminders to licensed sites/providers but intended to threaten PRCs like Plaintiff YOM and the medical providers who work with them. *Id.*

172.    On or about December 4, 2023, Defendant Hart Holder, on behalf of Defendant REN, submitted a formal complaint to the Executive Office of Health and Human Services based on a lawsuit filed in June of 2023, requesting a formal investigation into the second of the two PRCs referenced in DPH's November 27, 2023, email. (Attached as Exhibit FF).

173.    Indeed, the only two instances referenced by DPH as justification for launching the $1,000,000 anti-PRC media campaign and issuing licensure reminders were the ones used by Defendants REN and Hart Holder as the basis for formal legal complaints to DPH in October and

December of 2023 – prior to and simultaneously with DPH sharing its justification and plan for the anti-PRC campaign with the Governor's office.

174.    Without those two complaints filed – not by patients of a PRC – but by DPH's collaborator in the anti-PRC campaign with full knowledge of DPH's agenda and schedule for the launch of the licensure guidance and anti-PRC campaign, DPH would have had no formal complaints filed with the State against PRCs to reference.

175.    On or about December 5, 2023, Robert Goldstein sent a memo to the Governor and Lieutenant Governor of Massachusetts requesting authorization for DPH to "release licensure guidance clarifying licensure requirements for anti-abortion center operation and care delivery, public/cover messaging to accompany the licensure guidance, and a communications strategy." (Attached as Exhibit GG).

176.    The December 5, 2023, memo specifically stated that the messaging to pregnancy resource centers about licensure requirements was "meant to serve as a strong reminder of requirements under licensure." *Id.*

177.    In the licensure guidance issued by DPH in January of 2024, DPH states: "A nurse or physician assistant may not engage in any behavior that is likely to have an adverse effect on health, safety, or welfare of the public." That sentence includes a footnote (16) that states, "See American College of Obstetricians and Gynecologists ***advocacy stance*** regarding medication abortion 'reversals.'" *See* Exhibit L. (Emphasis added).

178.    Similarly, an earlier sentence in the guidance states: "For example, there is strong evidence that medication abortion reversal is unproven, unethical, and unsafe to provide to patients; such that a physician or APRN who offers or provides this treatment could be found to be practicing inconsistently with accepted practice and subject to discipline." However, that

sentence references the same source as footnote 16, the "**advocacy stance**" of — not the State, not of a Massachusetts' Medical Board, or even the Massachusetts Department of Public Health, but — the pro-abortion American College of Obstetricians and Gynecologists. *Id.*

179.    The reversal of medication abortion, or "abortion pill reversal," is one of the medical options about which Plaintiff YOM informs its patients.

180.    Women often regret their abortions, even shortly after initiating the process.

181.    The abortion pill reversal is a bioidentical prescription of the naturally occurring hormone, progesterone, to counteract the effects of the first phase of medical abortions, the ingestion of Mifepristone pills.

182.    Progesterone is only an option for women within a short period of time after having taken Mifepristone, yet it is an option that Plaintiff YOM has seen used successfully. It is a critical element of ensuring that a woman is informed of *all* her options.

183.    On June 20, 2024, a public records request was submitted to DPH asking for "all complaints filed with DPH regarding pregnancy resource centers/'anti-abortion centers,' and any communications related to such complaints" between June 19, 2022, and June 20, 2024.

184.    In response, DPH produced only **two complaints, both of which were submitted by Reproductive Equity Now** – not by women claiming to be victims of misconduct by pregnancy resource centers.

185.    These two complaints included the one filed on October 17, 2023, against Plaintiff by REN regarding Plaintiff's mobile clinic and one filed on December 4, 2023, against another PRC by REN regarding an alleged incident of medical malpractice that had nothing to do with the PRC's status as a pro-life center.

186.    In other words, while DPH has consistently claimed that its "public education campaign" against PRCs is a neutral and unbiased effort predicated on consumer complaints against these centers' "deceptive practices," nothing could be further from the truth; instead, DPH and REN colluded together to justify the campaign because of their opposition to the viewpoints and beliefs of Plaintiff and other PRCs.

187.    **REN concocted the only two identified complaints in Massachusetts, and DPH used these as a pretext to launch its pre- planned million-dollar smear campaign against PRCs.**

188.    In contrast, a recent public records request for similar complaints to DPH against abortion clinics revealed that between 2022 and 2024, DPH received at least eight complaints regarding Massachusetts abortion clinics.

189.    These complaints included allegations that the clinics were using outdated medications, engaging in deceptive advertising, creating fire hazards, allowing nursing staff to impersonate physicians, and engaging in negligent and dangerous treatment of patients.

190.    At least three abortion clinics in Massachusetts have failed their DPH inspections from 2018 to present for committing serious violations such as not using sterile surgical equipment, using outdated or unlabeled drugs, keeping biohazardous material in a staff breakroom refrigerator, not checking patient vitals before administering anesthesia, not keeping a proper inventory of controlled substances, and more. (For example, *see* Exhibit HH).

191.    Further, at least one of the abortion clinics that failed its inspection in 2018 was not only allowed to stay open, but a follow-up records request revealed that this clinic has not been inspected again since 2018. This violates DPH regulations that require inspections to be done at

least every two years. In contrast, pregnancy resource centers, including Plaintiff YOM's centers, have been inspected every two years.

192.    These records expose that abortion clinics that are endangering patient health and safety are getting a pass from DPH. Despite the many complaints against them, no "public education campaign" has been launched against abortion clinics. Taxpayer money has not been used to threaten and smear them. None of their doctors have been driven out of their practice by the State.

193.    DPH's double standard for pro-life centers and abortion clinics constitutes clear evidence that its "public education campaign," and the threats against PRCs that have accompanied it, are based on the religiously based pro-life viewpoints of these centers, not on any true concern for public health.

194.    On or about January 3, 2024, REN employee Taylor St. Germain sent an email expressing a strong desire to ensure the interactive map would be viewed on the REN website rather than the government website, because the REN website was better equipped to protect the privacy of people seeking abortion information. (Attached as Exhibit II).

195.    On or about January 3, 2024, a MORE employee sent an email to REN employee Taylor St. Germain acknowledging potential confusion if the mass.gov website linked directly to REN without a sub-page, with subsequent emails dismissing this concern in favor of a direct link to the REN website. *Id.*

196.    This demonstrates that Defendants knew the campaign could lead people to confuse the government of Massachusetts and REN for the same actor.

197.    A series of emails occurred between REN employee Taylor St. Germain and an DPH employee discussing the phrasing of a REN press release regarding the government's actions,

with the discussion centered around phrasing that would paint the government in the best light. (Attached as Exhibit JJ).

198.    REN created PowerPoint slides explaining the campaign launch in detail and circulated that explanation to both DPH and MORE advertising, taking the lead in producing materials. (Attached as Exhibit KK).

199.    On or about the first part of January 2023, a DPH employee stated: "We were using the [two REN] complaints as a reason to put out this guidance now rather than March, when the health marketing campaign launches. We're hoping to do a media push in March, but didn't want to wait until then to announce this guidance." (Attached as Exhibit LL).

200.    **The REN complaints were, in other words, expressly a pretext for Defendants' activities.**

201.    On January 4, 2024, a draft of a statement on behalf of DPH was prepared by REN referencing that "Reproductive Equity Now recently filed two complaints against licensed anti-abortion centers," specifically mentioning Defendant Hart Holder's Complaint. *Id*.

202.    Defendant Hart Holder's response included the statement, "We're proud that the Department of Public Health is taking our complaints against these anti-abortion centers seriously." *Id.*

203.    Commissioner Goldstein sent a letter to the editor of the Boston Globe that encouraged people with concerns about healthcare providers to file formal complaints and specifically directed those with negative experiences to call REN or file a report with the AG's Civil Rights Division. *Id.*

204.    Government materials referenced and promoted the "New England Abortion Care Guide" which "lists reproductive health care clinics and flags anti-abortion centers to avoid," demonstrating official endorsement of REN's privately created blacklists.

205.    It should be noted that despite the Defendants' million-dollar effort to solicit complaints from the public, a public records request revealed that *no complaints* were filed with the Attorney General's Office within the first seven months of the public campaign, and no indication of any being filed since that records request. This further exposes how Defendants' campaign represents a solution in search of a problem, one that was directed not toward real issues but targeted at chilling the religious viewpoints of Plaintiff and other pro-life pregnancy resource centers. *EXCLUSIVE: Massachusetts' Democrat Governor Fails to Push Public Against Pro-Life Pregnancy Centers*, LifeSiteNews (Jan. 28, 2025, 9:32 AM), https://www.lifesitenews.com/news/exclusive-massachusetts-democrat-governor-fails-to-push-public-against-pro-life-pregnancy-centers/?utm_source=most_recent&utm_campaign=canada.

### i.    Ongoing Coordination between DPH and REN

206.    For several months, staff from DPH and from REN went back and forth in many detailed communications, coordinating the campaign at issue in this case.

207.    On January 9, 2024, REN employee Taylor St. Germain sent an email to Massachusetts Government employee Sophie Hamlin, including both REN employees and a MORE employee in her email. The email contained PowerPoint slides from a meeting conducted on or around January 9, 2024, wherein REN took the lead in planning and coordinating the press-conference and launch event for the campaign.

208.    The PowerPoint presentation detailed how REN would draft a press release containing information on PRCs and why "public education is crucial to blunt their impacts." (*See* Exhibit KK).

209.    It continued on to summarize the planned messaging for the press conference, inform of the location of the event, plan the rough time window of the event, ask who will provide logistics like podiums and mics, and determines the event's speakers, including Governor Maura Healey and Rebecca Hart Holder. *Id.*

210.    It also explained how REN would draft a media advisory and op-ed which "DPH/Gov's Office" would revise and approve. *Id.*

211.    Finally, it proposed post-conference activities such as interviews with local reporters and visiting abortion clinics to "hear from providers about anti-abortion centers." *Id.*

212.    This clearly demonstrates that REN was not acting as a mere government consultant to government activities but, rather, took an active role over which the DPH or Governor's Office merely advised and approved.

213.    On February 26, 2024, DPH officials worked to change all references from "crisis pregnancy center" to "anti-abortion center" throughout government materials to match the ad campaign terminology. (Attached as Exhibit MM).

214.    Between February 21-29, 2024, extensive coordination occurred between the campaign and the Attorney General's office to align the ad campaign language with the AG's anti-PRC advisory.

215.    Government officials specifically requested emphasis on the word "LIE!" in campaign materials when referencing PRCs (such as "they LIE to your face"), demonstrating intent to use inflammatory language. (Attached as Exhibit NN).

216.    Email communications revealed plans for government factsheets to link directly to information from REN about crisis pregnancy centers, specifically using REN to call out individual pregnancy resource centers in a way the government cannot do. (Attached as Exhibit OO).

217.    REN was specifically thanked for its many contributions to the campaign, with messages from government officials like "Thank you, REN team, for your review of the AAC Mass.gov content." (Attached as Exhibit PP).

218.    On February 21, 2024, MORE employee Anna Finley sent an email to REN employee Taylor St. Germain noting that it would be beneficial to place logos of pregnancy resource centers on the linked REN website because use of the logos was not allowed on the mass.gov site, demonstrating that the government was attempting to circumvent restrictions and obligations by enlisting REN. (*See* Exhibit OO).

219.    Specifically, Ms. Finley stated: "The use of logos of the AACs is awesome to keep [on REN's linked PDF], too, and not something we can do on mass.gov," demonstrating coordination to circumvent government limitations on targeting specific organizations. *Id.*

220.    In response, St. Germain indicated that they were "on the same wavelength." *Id.*

221.    A February 27, 2024 email from Sophie Hamlin of the Massachusetts government stated to REN, "I appreciate all of the work you (and the DPH and MORE team) are doing to get this aligned with the Gov team's requests." (Attached as Exhibit QQ).

222.    On May 21, 2024, REN's Taylor St. Germain sent employees from DPH and MORE Advertising a copy of REN's guide titled "Caution: This Clinic Does Not Provide Abortion Care." (*See* Exhibit Q).

223.    On June 5, 2024, government officials coordinated with REN about "connecting with schools to ensure they utilize the posters" from the anti-crisis pregnancy center campaign.

224.    Between June 6-10, 2024, extensive coordination occurred for a press conference launching the ad campaign, with invitations sent to numerous advocacy organizations including REN the Abortion Truth Coalition, MassNOW, Center for Reproductive Rights, and various abortion funds.

225.    The press conference was strategically located at Brookline Women's Health Services, an abortion clinic (ironically one that, in 2018 failed a health inspection because, among other things, it was using non-sterile equipment, including blades and surgical equipment, had medication and equipment stored in the same refrigerator as food, had no policy on emergency transfer of patients, no policy on serious complaints, no policy on reporting serious events, despite staff meeting minutes indicating possible reportable events, had "research specimens" in unlabeled cups with red liquid in an unlocked refrigerator and under the microwave, etc.), because it was "protected from protesters" and would "have a greater impact."

226.    This abortion clinic was chosen as an explicit alternative to other locations where protestors might be present.

227.    Peggy Slasman, a DPH employee, reminded those involved to emphasize in the press advisory that Goldstein is an MD/PhD.

228.    A June 6, 2025, email emphasized the list of campaign goals, one of which was to inform individuals who may have been "harmed" at an anti-abortion center or who have questions or concerns about potentially inappropriate health care practices at such centers about how to file a complaint.

229.    Government officials coordinated with local and state police to fend off protesters and mentioned a law enforcement "fusion center" that tracks pro-life advocates' activities for "any signs of mobilization from antis."

230.    Email communications from June 6-7, 2024, discussed whether to hide the ball or "use discretion" in the title of press conference announcements to avoid alerting opposition groups to the nature of the campaign.

231.    Taylor St. Germain, a REN employee, suggested using vaguely worded announcements initially "so the antis don't have [time] to plan" protests, followed by more specific announcements closer to the event: "then send the one saying 'anti-abortion centers' on Sunday/Monday?"

232.    Two different headlines were prepared for staggered release: first "Healey-Driscoll Administration to Launch Reproductive Health Public Awareness Campaign" and later "Healey-Driscoll Administration to Unveil Anti-Abortion Center Public Awareness Campaign." (Attached as Exhibit RR).

j.    **Summary: Defendants' Statements and Actions Constituted Unconstitutional Threats**

233.    Defendants' coordinated statements and actions described above constitute threats of discriminatory government retaliation against Plaintiff and other pro-life pregnancy centers based on their religious and political viewpoints.

234.    **Threat 1: Legal and Regulatory Retaliation.** Defendants issued explicit threats of licensure suspension, revocation, and prosecution. These threats were directed at lawful medical practices, specifically abortion pill reversal. As discussed above, DPH guidance relied on an a mere advocacy stance of the pro-abortion American College of Obstetricians and Gynecologists

in order to threaten physicians who offer or inform women about the lawful prescription of pergesterone to potentially reverse the effects of the abortion pill. Defendant Goldstein's statement specifically threatened physicians with discipline and penalties, stating that doctors who provide certain treatments "could be found to be practicing inconsistently with accepted practice and subject to discipline," directly targeting medical professionals associated with pro-life centers like YOM. In addition, DPH made vague threats against pro-life medical providers for engaging in "deceptive practices," a term used frequently by Defendants in the public smear campaign. YOM continues to face unwarranted scrutiny through multiple subpoenas and investigations despite maintaining a clean 25-year operational record and receiving zero patient complaints.. The threats are viewpoint-based and target Plaintiff solely because of its pro-life and religious beliefs.

235.    **Threat 2: Defamation and Public Disparagement.** Defendants launched a $1 million state-funded advertising campaign publicly branding Plaintiff and similar pro-life centers as "dangerous," "deceptive," "fake clinics," and "a public health threat" through billboards, social media, radio, and transit advertising across Massachusetts. Defendant Goldstein officially declared that pro-life pregnancy centers constitute "a public health threat," while Defendant Healey characterized them as using "deceptive and dangerous tactics." Defendant Hart Holder similarly branded them as "dangerous facilities" that "pose a serious threat to pregnant people." These official condemnations were designed to damage Plaintiff's reputation, deter patients, and chill its religiously motivated speech and activities. The Defendants condemned Plaintiff for providing care based on its moral and religious beliefs rather than based on Defendants' preference for abortion.

236.    **Threat 3: Warnings against using YOM's Services.** Through official state websites and public campaigns, Defendants warned citizens that pro-life centers "may mislead you

about your options if you're pregnant and can put your health at risk," and claimed that they "are not a safe or trusted place to go for reproductive health care[.]" DPH maintains an official webpage titled "Avoid Anti-Abortion Centers" that actively discourages use of Plaintiff's services and directs citizens to alternative providers. Their statements described in the paragraph above were also designed to deter clients from visiting Plaintiff's clinics.

237.    **Threat 4: Systematic Complaint Solicitation and Selective Enforcement.** Defendants created multiple official channels to solicit complaints against pro-life pregnancy centers, with DPH stating it "actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." The state provides direct funding to REN's complaint hotline and instructs citizens to file complaints with the Attorney General's Civil Rights Division and state licensing boards. This systematic complaint solicitation has resulted in selective enforcement actions against Plaintiff, including ongoing investigations initiated solely by REN's complaints without any patient complaints against Plaintiff in its 25-year history.

238.    **Threat 5: Targeted Identification and Community Mobilization.** Defendants, through their coordination with REN, published and disseminated lists identifying Plaintiff by name and location, along with instructional materials on how to "take action against" pro-life centers. REN's state-funded guidebook specifically lists all of Plaintiff's facilities and instructs community members to "put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities." The state directly links to these materials from official government websites, effectively endorsing and amplifying targeted harassment of specifically identified organizations, such as Plaintiff.

239.    **Threat 6: Public-Private Collusion to Circumvent Constitutional Limits.**
Defendants coordinated with REN as their acknowledged "trusted partner" to accomplish through private action what they could not constitutionally do directly. The state provided funding to REN while REN filed the complaints that triggered state investigations, published the targeting materials, and operated the complaint hotline—all while state officials publicly endorsed REN's characterizations and linked to REN's materials from official government websites. This partnership was designed to evade constitutional constraints on government censorship by using a private entity as a proxy.

240.    **Chilling Effect on Plaintiff.** These coordinated threats have had immediate and devastating effects on Plaintiff's operations and constitutional rights. One of Plaintiff's doctors ceased practicing for YOM as a direct result of Defendants' intimidation campaign, forcing Plaintiff to turn away patients and incur significant operational costs. The public branding as "dangerous" and a "public health threat," combined with official warnings against using Plaintiff's services, has damaged Plaintiff's reputation and deterred patients from seeking its free medical and counseling services. Plaintiff has been forced to divert resources from its core religious mission while operating under constant fear that its speech and religious exercise will trigger further government retaliation. The ongoing investigations, subpoenas, and regulatory scrutiny have created a pervasive atmosphere of intimidation that directly chills Plaintiff's First Amendment rights.

241.    Defendants' campaign represents a systematic, coordinated effort to silence Plaintiff's pro-life message through government coercion, threats, and intimidation. By branding Plaintiff as dangerous, threatening prosecution and license revocation, soliciting public complaints, funding a statewide campaign against its viewpoint, and coordinating with private

actors to accomplish unconstitutional goals, Defendants have created a comprehensive scheme of viewpoint discrimination. This conduct violates the fundamental principle that government officials cannot "use the power of the State to punish or suppress disfavored expression." The coordinated nature of these threats, involving both state officials and their private partners, demonstrates a deliberate strategy to circumvent constitutional protections through government-sponsored censorship. Without judicial intervention, these threats will continue to cause irreparable harm to Plaintiff's constitutional rights and ability to fulfill its religious mission.

## V.    CAUSES OF ACTION

### COUNT I

**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**
**(Claim Against all Defendants)**

~~99.~~242.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

~~100.~~243.    Pursuant to 42 U.S.C. § 1983, Plaintiff YOM brings this claim against Defendants for acting under color of state law to deprive its of its First Amendment right to free speech as guaranteed by the U.S. Constitution.

~~101.~~244.    Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacities.

~~102.~~245.    The conduct of the State Defendants constituted a violation of YOM's clearly established free speech rights such that every reasonable State official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; actively seeking complaints against PRCs in a targeted campaign of harassment, threats, and

unequal enforcements based on political and religious viewpoint is a clear constitutional violation that is closely analogous with the constitutional violations in past cases.

103.246.    This claim is also brought against REN and Executive DirectorPresident Holder, as they acted under the color of law. REN and Executive DirectorPresident Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership in this campaign as a joint action with Massachusetts officials.

247.    The role of REN and President Holder was expressly, in part, to perform functions that the State Defendants would not, such as naming and listing PRCs like YOM.

248.    As the facts above discuss at length, REN acted on the State's behalf as its agent to carry out the campaign at issue in this case.

249.    REN and state actors were joint participants in the campaign at issue in this case, carrying out a mutual symbiotic relationship, where REN operated in tandem with the State and under its auspices.

104.250.    It is clearly established that First Amendment rights can be violated by the chilling effect of governmental action that engages in viewpoint-discriminatory implicit threats.

105.251.    As delineated above, each of the named State Defendants individually engaged in these threats. Governor Healey publicly claimed that PRCs engage in deceptive and dangerous tactics and as Attorney General issued the advisory that falsely accused PRCs of deceptive advertising. Commissioner Goldstein exercised his authority to accuse PRCs of wrongdoing, threatening them with legal action, and making public statements such as, "As the commissioner of public health, I'm resolute about calling out this deception for what it is: a public health threat."

106.252.        The Constitution prohibits the government from "abridging the freedom of speech." This prohibition applies to state governments and state government officials through the Fourteenth Amendment.

107.    The First Amendment ensures that government officials may not rely on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech.

253.

254.    Plaintiff's claim is pleaded according to the governing framework of *NRA of Am. v. Vullo*, 602 U.S. 175 (2024) and *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).

108.    Four factors have been used to determine whether government speech crosses the line from persuasion to coercion, under a totality-of-the-circumstances standard where no single factor is dispositive: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024).

255.

**A.    Word Choice: Threats.**

109.256.        Defendants' choice of words goes far beyond mere disagreement or criticism; the State has repeatedly accused PRCs of illegal behavior like deception, misrepresentation, and fraud. The State has publicly accused YOM of actionable misconduct.

110.257.        For example, State advertisements regularly refer to PRCs like Plaintiff YOM as engaging in "deceptive advertising." The term "Deceptive Advertising" is a term of art; Massachusetts law prohibits medical advertising "that is false, deceptive, or misleading." 243 Mass. Code Regs. 2.07(11)(a)(1). That term of art is applied by the State when an entity or

individual has been found to engage in misconduct. Here, the State has applied that label categorically to all PRCs of the same viewpoint, regardless of any actual wrongdoing.

111.258.    These labels of wrongdoing have been applied to Plaintiff YOM despite the fact that a recent investigation expressly cleared it of these very accusations and found that Plaintiff YOM is not engaging in deceptive advertising.

112.259.    The State Defendants are simultaneously clearing Plaintiff YOM through formal investigations and continuing to classify Plaintiff YOM publicly as a wrongdoer.

113.260.    These targeted, false, and baseless accusations established a system of informal censorship designed to suppress the pro-life viewpoint of Plaintiff YOM with the intent to obstruct, chill, deter, and retaliate against Plaintiff YOM's speech. These actions demonstrate that the State will continue to target YOM regardless of its legal compliance.

261.    The State Defendants' conduct goes beyond permissible government speech and constitutes unconstitutional coercion of third parties to suppress Plaintiff's protected speech. The Department's January 3, 2024, press release and guidance memorandum, combined with the public education campaign, created a regulatory environment designed to pressure and intimidate healthcare providers from associating with or providing services to Plaintiff.

262.    The Department's guidance memorandum, while ostensibly addressed to all licensees, was issued in direct response to solicited complaints about anti-abortion centers and specifically warned of potential referrals to the Attorney General's Office for violations and used examples of potential violations that would specifically put pro-life medical sites and providers on notice that they were being targeted.

263.    The memo file that was sent to medical providers was also labeled "Guidance on Anti-Abortion Centers," clearly exposing its true intended audience and effect. When viewed in

context with the Department's public statements soliciting complaints about anti-abortion centers and the coordinated public education campaign characterizing such centers as "dangerous," a reasonable healthcare provider would understand this as a threat of regulatory enforcement action for continued association with facilities like Plaintiff's.

264.    Moreover, the guidance memorandum expressly highlighted the prescription of progesterone to counter the effects of Mifepristone (the abortion pill reversal) as something that DPH would consider problematic thus threatening pro-life medical sites and providers against prescribing that medication, despite the fact that it is lawful in Massachusetts.

265.    The timing and coordination of these actions demonstrate coercive intent. Within months of each other, the State Defendants: (1) issued regulatory guidance with enforcement warnings to medical professionals regarding "anti-abortion centers," (2) launched a $1 million public campaign denouncing such centers (3) actively solicited complaints against such centers, and (4) collaborated with advocacy groups to amplify negative messaging. This coordinated campaign was designed to and did create a chilling effect on Plaintiff's ability to operate and maintain relationships with healthcare providers.

266.    Defendants' actions constitute a concerted effort to deprive PRCs like YOM of their freedom of speech by threatening government prosecution against those PRCs that refuse to provide, refer for, or endorse abortion.

114.

**B.    The Existence of Regulatory Authority**

115.267.    The relevant facts herein demonstrate that the full authority of the State has been leveraged against Plaintiff YOM thereby posing a clear unconstitutional threat.

116.268.    Here the statements at issue come directly from the State authorities with the relevant regulatory authority, such as the Governor, Attorney General, and the head of DPH. When they threaten the existence of PRCs and warn people to stay away, they do so with the force of law.

117.269.    Defendants have regulatory authority over medical facilities, including Plaintiff YOM as a medically licensed facility. They have exercised that authority to engage in blatant viewpoint discrimination.

118.270.    Massachusetts State officials used communications and their power to single out and smear PRCs with disfavor to the public.

### C.    The Speech Was Perceived as a Threat

119.271.    Here, Massachusetts State officials used their power to single out PRCs via communications and enforcement actions for disfavor.

120.272.    Defendants' statements, which warn against the existence of PRCs as public health threats and accuse them of criminal conduct, would cause a reasonable person to perceive such statements as a threat against those centers.

121.273.    Plaintiff YOM did in fact perceive Defendants' statements to be such a threat.

122.274.    As a direct, immediate, and foreseeable result of Defendants' threats, one of Plaintiff YOM's doctors quit providing services for YOM.

123.275.    Losing a doctor caused direct, tangible injury to YOM in that patients had to be turned away and denied care.

124.276.    Because of Defendants' threats, Plaintiff YOM anticipates that it may no longer be able to provide its services and be forced to shut down as a result of the viewpoint discrimination it is experiencing.

277.    Plaintiff YOM has seen a direct and immediate reduction in the clients who go to it for help, as a direct and foreseeable result of Defendants' unconstitutional conduct.

**D.    Defendants' Speech Referenced Adverse Consequences**

125.278.    Defendants' threats against PRCs have repeatedly threatened adverse consequences against them, on the basis of the viewpoint of YOM and other PRCs.

126.279.    For example, the statement "The Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers" calls for viewpoint-discriminatory complaints, complaints based ultimately on political disagreement rather than any wrongdoing. In making this statement, the State Defendants proclaimed that they are "actively" seeking reports and complaints against only one kind of clinic: PRCs.

127.280.    In addition, read in context, Defendant Goldstein's January 3, 2024, memorandum to healthcare professionals warned pro-life doctors, nurses, and other healthcare providers that their licenses would be in jeopardy if they worked with PRCs.

281.    The January 3, 2024, memorandum likewise threatened consequences for the prescription of progesterone, if done for the purpose of abortion reversal.

128.282.    Defendants' other public statements likewise call explicitly for reports to be submitted and complaints filed against PRCs.

129.283.    The State Defendants' conduct is unconstitutional coercion and threatens Plaintiff YOM because of its moral, religious, philosophical, and political views.

130.284.    These threats have unconstitutionally chilled Plaintiff YOM's speech as it continues to be targeted with abnormally high enforcement measures because of its pro-life viewpoint.

131.285.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

132.286.    Defendants' intentional actions resulted in significant damages to Plaintiff YOM, including but not limited to damages due to reputational harm, increased costs for security and safety, and loss to YOM.

133.287.    In addition to the above-described damages, absent an injunction against Defendants, Plaintiff YOM will suffer irrecoverable loss and irreparable harm. All of the above injuries are ongoing; the campaign of harassment against PRCs continues and will continue unless the irrevocable injuries it is causing are stopped.

288.    A reasonable official in Defendants' position would have known that launching a coordinated campaign to discourage public support for religious healthcare providers, while simultaneously ramping up regulatory scrutiny and enforcement threats, would violate clearly established First Amendment principles prohibiting government coercion of protected speech and religious exercise.

## COUNT II

**Violation of Plaintiff's First Amendment Right to Free Exercise of Religion**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**
**(Claim Against all Defendants)**

134.289.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

135.290.    This claim is brought against all Defendants.

136.291.    Pursuant to 42 U.S.C. § 1983, YOM brings this claim against Defendants for acting under color of state law to deprive its of its First Amendment right to free exercise of religion as guaranteed by the U.S. Constitution.

137.292.    Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacity.

138.293.    The conduct of the State Defendants constituted a violation of YOM's clearly established Free Exercise rights such that every reasonable state official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; the Defendants targeted PRCs explicitly because of their religious speech with conduct that had a vastly disproportionate effect on religious PRCs.

139.294.    This claim is also brought against REN and Executive DirectorPresident Hart Holder, as they acted under the color of the State law. REN and Executive DirectorPresident Hart Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership as a joint action with Massachusetts officials.

140.295.    The First Amendment prohibits the government from burdening the "free exercise of religion." This prohibition applies to state and local governments through the Fourteenth Amendment.

141.296.    Under the Free Exercise Clause, state actions that single out religious entities for disfavored treatment must survive the most rigorous scrutiny. Government fails to act

neutrally and in a generally applicable fashion when it restricts practices because of their religious nature.

142.297.    Plaintiff YOM is motivated by religious faith; as discussed above, its public statement acknowledges that fact and emphasizes that it provides its aid out of a religious motivation.

143.298.    Other PRCs are likewise motivated by and driven by their religious faith and belief.

144.299.    Defendants' advertising campaign described above was motivated by the religious faith and belief of PRCs.

145.300.    Government conduct must be facially neutral and generally applicable towards religious practice.

146.301.    The actions of the State Defendants are explicitly and facially targeted at the religious activity of PRCs: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." https://www.mass.gov/news/maintaining-integrity-accessibility-and-transparency-in-reproductive-care.

302.    The State Defendants' actions specifically target and burden Plaintiff's religious exercise by creating a hostile regulatory environment for faith-based healthcare providers. The public education campaign and regulatory actions single out organizations that, consistent with their religious beliefs, do not provide or refer for abortion services.

303.    The Department's characterization of centers that do not provide abortion services as inherently "deceptive" and "dangerous" constitutes hostility toward religious organizations whose faith prevents them from participating in abortion services.

304.    This targeting is not based on neutral healthcare standards but on the religious conviction that leads these organizations to offer alternatives to abortion.

305.    The State Defendants have created a regulatory framework that effectively penalizes religious organizations for operating healthcare facilities consistent with their faith. Organizations that provide abortion services face no similar scrutiny, public denouncement, or coordinated campaigns questioning their legitimacy, demonstrating selective targeting based on religious viewpoint.

147.306.    On its face, Defendants' conduct is neither neutral nor generally applicable, but targets Plaintiff YOM because of its religious faith.

148.307.    The Free Exercise Clause protects against governmental hostility towards religions that is not only overt, but masked as well. This can be determined through evidence of an effect caused by non-neutral government conduct.

149.308.    Here, the adverse effect of the government's conduct is that religious PRCs have been singled out for disparate treatment because of their religious expression.

150.309.    Massachusetts PRCs, such as Plaintiff YOM, are being targeted to chill or stamp out the exercise of those beliefs.

151.310.    The effect of Defendants' conduct is to single out religious clinics for disparate treatment, compared with secular medical clinics that do provide abortions.

152.311.    There are 21 PRC entities in Massachusetts. Of the 21 PRC centers, 19 are either certainly or likely faith-based, based on the language from their organizational documents and public statements. In other words, more than 90 percent of the entities targeted by Defendants are religious.

153.312.    Accordingly, the real operation and effect of the Massachusetts policy is to single out for discriminatory treatment pro-life PRCs, the overwhelming majority of which are faith-based and adhere to religious views about the sanctity of human life. The effect of the policy is exactly what governmental authorities intended.

154.313.    The entire category of reproductive care clinics has not been targeted by Defendants, only those that promote childbirth rather than abortion.

155.314.    The underlying assumption of the policy is that only those PRCs that promote the sanctity of human life are likely to engage in unethical conduct; and that belief in the sanctity of human life is, for YOM, a religious one.

315.    Internal communications, discussed above, revealed that Defendants were explicitly aware of the religious nature of PRCs and set out to attack that religious viewpoint.

156.316.    The State's purported interest is fabricated to hide the true purpose of suppressing PRCs' religious mission to promote the sanctity of human life and support mothers in crisis pregnancies.

157.317.    The operative effect of the Massachusetts policy is to harass and undermine PRCs, including Plaintiff YOM, because of their religious viewpoint affirming the sanctity of human life.

158.318.    Defendants' unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

## COUNT III

**Violation of Plaintiff's Fourteenth Amendment Right to
Equal Protection of the Law
(U.S. Const. amend. I; 42 U.S.C. § 1983)
(Claim Against all Defendants)**

55

159.319.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

160.320.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the equal protection of the laws, which prohibits Defendants from treating Plaintiff differently than similarly situated medical facilities.

161.321.    Insofar as this claim seeks damages, it is brought against the State Defendants in their individual capacities. Insofar as it seeks injunctive relief, it is brought against them in their official capacity.

162.322.    The conduct of the State Defendants constituted a violation of YOM's clearly established Equal Protection rights such that every reasonable state official in similar circumstances would have understood that the conduct violated YOM's constitutional rights; the Defendants discriminated against PRCs like YOM explicitly because of their religious and political speech and punished YOM for its exercise of constitutional rights, engaging in viewpoint-based official harassment.

163.323.    This claim is also brought against REN and Executive DirectorPresident Hart Holder, as they acted under the color of law. REN and Executive DirectorPresident Hart Holder acted as the trusted partner of the State, with State funding and support, and in explicit partnership as a joint action with Massachusetts officials.

164.324.    The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

165.325.    The conduct of the government here expressly distinguishes the speech of PRCs for disparate treatment. Accordingly, such conduct is presumptively invalid.

166.326.    No extraordinary or adequate justification exists for such viewpoint-based discrimination.

167.327.    Defendants knowingly and willfully violated Plaintiff YOM's equal protection rights by seeking to selectively enforce regulations against YOM, applying an unequal standard on YOM, and imposing unjustified investigations.

168.328.    DPH has targeted YOM for disproportionate investigation on the basis of its viewpoint.

329.    Defendants have engaged in selective enforcement of healthcare regulations based on Plaintiff's religious viewpoint and the specific services it provides. While numerous healthcare facilities operate with similar licensing structures and provide limited services within their specialty areas, only "anti-abortion centers" have been subjected to the heightened scrutiny, public denouncement, and the coordinated campaigns described herein.

330.    The Department has not launched similar public awareness campaigns warning against other categories of specialized healthcare providers that do not offer comprehensive services, such as urgent care centers that do not provide surgical services, specialty clinics that focus on specific conditions, or other faith-based healthcare facilities with religious limitations on services provided.

169.331.    Although zero patient complaints have ever been lodged with Defendants against YOM, Defendants directed threats against YOM and other PRCs and claimed they are a danger to public health.

332.    As discussed above, many more complaints have been filed against abortion providers rather than pro-life PRCs. Nonetheless, Defendants have nonetheless chosen to carry out a campaign that expressly targets PRCs alone.

170.333.    Similarly situated entities that do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants. These entities are closely comparable to YOM, with the only possible basis for a distinction being the differing viewpoint.

171.334.    Defendants knew or should have known of similarly situated entities at the time they engaged in their investigations and any purported lack of such knowledge was due to a "see-no-evil" policy of enforcement.

172.335.    Defendants discriminated against Plaintiff YOM and PRCs because of their personal animus against PRCs and Defendants' commitment to a contrary viewpoint.

173.336.    The disparate treatment of YOM-related programs and the comparators was caused by Defendants' intent to punish and/or inhibit YOM because of YOM's constitutionally protected viewpoint.

174.337.    Defendants' selective enforcement against YOM and similar groups has been knowing, willful, arbitrary, capricious, unreasonable, discriminatory, and undertaken in bad faith and without a rational basis.

175.338.    Defendants' conduct does not further any compelling or even legitimate government interest.

176.339.    Defendants' selective enforcement actions against YOM and similar organizations are based on YOM's and other PRCs' views and speech relating to the sanctity of life. These considerations are impermissible bases for an enforcement action.

177.340.    Defendants' actions have resulted in significant damages to YOM, conduct directly attributable to this selective and discriminatory enforcement.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests the following relief:

(A)  A declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendants have violated YOM's rights to free speech, free exercise, due process, and equal protection under the United States Constitution for targeting YOM on account of its viewpoints and speech;

(B)  A permanent injunction ordering the Defendants, their agents, representatives, employees, servants and all persons and entities in concert or participation with them from ceasing any advertising activity or campaign that falsely accuses YOM of misconduct or of being a threat to public health and thereby has the purpose or effect of interfering with YOM's exercise of the rights protected by the First Amendment to the United States Constitution;

(C)  Compensatory or, in the alternative, nominal damages for the violation of Plaintiff's protected constitutional rights;

(D)  Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

(E)  All other further relief to which Plaintiff may be entitled.

**JURY DEMAND**

Plaintiff demands trial by jury on all claims and issues to triable.

DATED: August 19, 2024June 20, 2025.

———

                    Respectfully submitted,

                    SAMUEL J. WHITING
                    OLIVIA F. SUMMERS**
                    /s/ Samuel J. WhitingOlivia F. Summers

(D.C. Bar No. 1017339)~~MASSACHUSETTS LIBERTY LEGAL CENTER~~

~~THE~~
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
osummers@aclj.org

~~(Massachusetts Bar No. 711930)~~

~~sam@mafamily.org~~

JORDAN SEKULOW*
   (D.C. Bar No. 991680)

STUART J. ROTH*
   (D.C. Bar No. 475937)
ANDREW EKONOMOU***
   (GA Bar No. 242750)
~~OLIVIA F. SUMMERS*~~
   ~~(D.C. Bar No. 1017339)~~
CHRISTINA (STIERHOFF) COMPAGNONE***
   (D.C. Bar No. 1657929)
NATHAN MOELKER***
   (VA Bar No. 98313)

THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
   Washington, D.C. 20002
   Telephone: (202) 546-8890
   Facsimile: (202) 546-9309
~~osummers@aclj.org~~
SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
(Massachusetts Bar No. 711930)

* Not licensed in this court, PHV motions forthcoming.
** Admitted PHV.

60

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically with the Court on June 20, 2025. Service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.


OLIVIA F. SUMMERS
/s/ Olivia F. Summers