1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3    _____

4    A WOMAN'S CONCERN, INC., doing
     business as Your Options Medical,
5                                          Civil Action No.
            Plaintiff,                     1:24-cv-12131-LTS
6
          v.
7
     MAURA T. HEALEY, Governor of
8    Massachusetts, sued in her individual
     and official capacities, et al.,
9
            Defendants.
10

11   _____

12

13       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

14

15                          MOTION

16

17                   Thursday, May 8, 2025
                          10:04 a.m.
18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 13
22   One Courthouse Way
     Boston, Massachusetts

23

24   Rachel M. Lopez, CRR
     Official Court Reporter
25   raeufp@gmail.com

1                    **A P P E A R A N C E S**

2

    On behalf of the Plaintiff:

3

        AMERICAN CENTER FOR LAW AND JUSTICE
4        BY:  OLIVIA F. SUMMERS, NATHAN J. MOELKER, AND CHRISTINA
        A. COMPAGNONE
5        1000 Regent University Drive
        Suite 422
6        Virginia Beach, Virginia  23464
        (757) 955-8176
7        osummers@aclj.org
        nmoelker@aclj.org
8        ccompagnone@aclj.org

9

        MASSACHUSETTS FAMIL INSTITUTE
10        BY:  SAMUEL WHITING
        401 Edgewater Place
11        Suite 580
        Wakefield, Massachusetts  01880
12        (781) 569-0400
        sam@mafamily.org

13

14

    On behalf of the Defendants Healey and Goldstein:

15

        OFFICE OF THE ATTORNEY GENERAL
16        BY:  PHOEBE FISCHER-GROBAN, MEREDITH G. FIERRO, AND
        DEBORAH J. FRISCH
17        One Ashburton Place
        McCormack Building
18        Boston, Massachusetts  02108
        (617) 963-2589
19        phoebe.fischer-groban@mass.gov
        meredith.g.fierro@mass.gov
20        deborah.frisch@mass.gov

21

22

23

24

25

**A P P E A R A N C E S,** C o n t.

On behalf of the Defendants Reproductive Equity Now and
Holder:

      GOULSTON & STORRS
      BY:  CARLA A. REEVES AND MARTIN M. FANTOZZI
      One Post Ofice Square
      Boston, Massachusetts  02109
      (617) 574-3853
      creeves@goulstonstorrs.com
      mfantozzi@goulstonstorrs.com

**P R O C E E D I N G S**

1

2          (In open court.)

3          THE COURTROOM CLERK:  The United States District

4    Court for the District of Massachusetts is now in session,

5    the Honorable Leo T. Sorokin presiding.

6          THE COURT:  Please be seated.

7          THE COURTROOM CLERK:  Today is Thursday, May 8,

8    2025, and we are on the record in civil case number

9    24-cv-12131, A Woman's Concern, Inc., versus Maura T. Healey,

10   et al.

11         Will counsel please state your name for the record.

12         MS. SUMMERS:  Olivia Summers, counsel for the

13   plaintiff.

14         THE COURT:  All right.  Good morning, Ms. Summers.

15         MR. MOELKER:  Nathan Moelker, counsel for the

16   plaintiff.

17         THE COURT:  I'm sorry, I can't hear you.

18         MR. MOELKER:  Nathan Moelker, counsel for the

19   plaintiff, Your Honor.

20         THE COURT:  All right.  Good morning, Mr. Moelker.

21         MR. WHITING:  Sam Whiting, counsel for the

22   plaintiff, Your Honor.

23         THE COURT:  "White" or "Whiting"?

24         MR. WHITING:  Whiting.

25         MS. COMPAGNONE:  Christina Compagnone, counsel for

1    the plaintiff.

2              THE COURT:  Say your last name again?

3              MS. COMPAGNONE:  Compagnone.

4              THE COURT:  All right.  Good morning,

5    Ms. Compagnone.

6              MS. TURNER:  Tracey Turner, paralegal.

7              THE COURT:  Oh.  Good morning.

8              MS. FISCHER-GROBAN:  Good morning, Your Honor,

9    Phoebe Fischer-Groban, on behalf of the state defendants.

10             THE COURT:  Good morning, Ms. Fischer --

11             MS. FISCHER-GROBAN:  Fischer-Groban.

12             THE COURT:  Groban.  My apologies.

13             MS. FRISCH:  Deborah Frisch for the state

14   defendants.

15             MS. FIERRO:  Good morning, Your Honor,

16   Meredith Fierro, on behalf of the state defendants.

17             MS. REEVES:  Good morning.  Carla Reeves, on behalf

18   of Reproductive Equity Now Foundation and Rebecca Hart

19   Holder.

20             THE COURT:  What's your last name again?

21             MS. REEVES:  Carla Reeves.

22             THE COURT:  Reeves.  Good morning, Ms. Reeves.

23             MR. FANTOZZI:  Good morning, Your Honor, Martin

24   Fantozzi, also on behalf of Reproductive Equity Now

25   Foundation, Inc., and Rebecca Hart Holder.

1              THE COURT:  All right.  Good morning.

2              All right.  I've read all the papers.  I'm sorry

3    it's taken me quite this long to get to a hearing.  And I'm

4    happy to really -- there are two things that I'm interested

5    in:  One is the motion to dismiss, obviously, and the

6    responses; and the other, which we can talk about at the end,

7    is just the request in the papers, at the end of the

8    plaintiff's papers, to amend -- opportunity to amend and then

9    augmented by the notice that you filed last week and how that

10   should intercept with how to proceed with the pending motions

11   and what's sort of the best way to handle all of that.

12             Okay.  So it's your motion, so I'll hear you first.

13             I think the state, probably.

14             And I will tell all of you this, just to simplify a

15   little bit.  I see, sort of -- there's obviously a lot of

16   issues here, but there's two general issues.  One, which is

17   common to both motion to dismiss, is, essentially, does the

18   complaint state a claim.  Right?  And I see resolution of the

19   motion to dismiss requires answering that question, no matter

20   what -- what the resolution is of the contention of the

21   private parties as to whether they're state actors or whether

22   there's standing.  So that's, I think, the primary issue.

23             And then the secondary issue is whether they are

24   fairly treated as state actors and whether the plaintiffs

25   have standing.

1          So go ahead.  That's why I think you should go

2     first.

3          MS. FISCHER-GROBAN:  I'm happy to go first.

4          Thank you, Your Honor.  Phoebe Fischer-Groban, on

5     behalf of the state defendants.

6          Your Honor, the complaint doesn't state a claim.

7     This case is about the state's ability to educate its

8     residents about public health issues.  And *Vullo* made quite

9     clear, and all of the Supreme Court's cases have made quite

10    clear, that the state can express its own viewpoint and that

11    educating the public is a really critically important state

12    function, especially in moments of confusion about civil

13    rights.  And that's exactly what this case is about here.

14    Government's must be able to educate their residents about

15    public harms and inform them about where they can access

16    reproductive healthcare.

17         And here, governments can do so forcefully, and

18    they can do so in an effort to persuade people.  And here,

19    the public education campaign is directed at the public.  The

20    public can ignore it.  They can disagree with it.  They can

21    go to whatever clinic they wish, or they cannot go to a

22    clinic at all.  And when the government speaks its own view,

23    as it did here in a public education campaign, the First

24    Amendment doesn't apply.

25         This is about the state government's ability to

1    educate the public, and for that reason, the complaint fails

2    to state a free speech claim.

3            THE COURT:  What about their contention that by

4    saying that pregnancy resource centers are public health

5    threats, are threats, engage in deceptive advertising, that

6    that impliedly threatens them or people who work with them.

7            MS. FISCHER-GROBAN:  It doesn't, and I'll tell you

8    why -- for two reasons.  First, there's no restriction.

9    There's no regulation of these clinics or any of these

10   clinic's speech, which is to say they can express -- the

11   remedy here is more speech.  They can do their own public

12   relations campaign.  They can protest.  They can organize a

13   demonstration.

14           And as *Vullo* tells us, they can also take their

15   complaints to the ballot box.  They can elect different

16   legislators who will not pass a budget that allocates funds

17   requiring a public education campaign about anti-abortion

18   centers.  Similarly, they could elect different public

19   officials who share their viewpoint.

20           But here, there are no threats.  There is no

21   intimidation.  This is a public education campaign, educating

22   the public.  It, in no way, restricts or suppresses A Woman's

23   Concern or Your Options Medical, the clinics that they

24   operate, speech.

25           I'll address here, also, the language of threats

1    and coercion come from the *Vullo* case and this kind of

2    alternative theory that they assert in their complaint, which

3    also fails to state a claim, which is this idea, coming from

4    the Supreme Court's decision in *Bantam Books,* and then

5    recently applied in *Vullo*, that the state cannot, through

6    intermediaries, through third parties, suppress speech that

7    it couldn't suppress on its own.

8              So in *Bantam Books* --

9              THE COURT:  You can't do indirectly what you can't

10   do directly.

11             MS. FISCHER-GROBAN:  Exactly.

12             But here, there are no threats.  There is no

13   coercion.  And the facts of *Bantam Books* and the facts of

14   *Vullo* are quite instructive here to show why this complaint

15   doesn't state a claim.  In *Bantam Books*, for example, there's

16   a commissioner who decides that certain books are obscenity.

17   And they do have the authority to refer those books to the

18   attorney general for prosecution, but instead what they do is

19   they go directly to book distributors -- those are the third

20   parties -- and they say, "Hey, wouldn't it be nice if you

21   cooperated with us and took those books off the shelves and

22   stop distributing them so that we don't have to notify the

23   attorney general of what you're doing."

24             So here, what the Supreme Court is concerned about

25   is that's an informal prior restraint.  What happened there

was that the commissioner, through notices to the distributor
and police officer visits, was essentially going to the
distributors to have them take books off the shelves, which
was a prior restraint.

And what was important to the court there, it meant
that then there wasn't the transparent, fair process of an
obscenity criminal proceeding, in other words; that this was
trying to -- informally removing what the commissioner deemed
to be obscene books off the shelves and stifling the speech
of the book publishers through the book distributors.

In *Vullo*, there are kind of similar allegations.
So in *Vullo,* we have a public official who publically speaks
against the NRA and gun groups and properly expresses the
viewpoint of that administration on gun rights.  But then
here's the problematic part.  Then that administrator -- at
least the complaint alleged in that case -- that public
official had a private meeting with insurance companies,
where it said to these insurance companies, "Listen, we know
you do business with NRA and other gun advocacy groups.  We
also know that some of you may violate the law through the
insurance policies that you offer those groups.  Some of you
may not.  Here's what we'll do.  We want you to disassociate
from the NRA and the gun groups.  If you do that, we will
look the other way on any regulatory violations that you may
have, and we will focus on the other insurance companies who

1    don't disassociate from gun groups."

2         Here, there are no allegations whatsoever.  There's

3    words.  There's the word threat.  There's the word "coerce."

4    There's these labels in the complaint.  But there's no actual

5    threat.  There's no actual coercion of the type that was

6    identified.

7         THE COURT:  What about their allegation that the

8    doctor stopped working with them?

9         MS. FISCHER-GROBAN:  I'm glad you asked about that.

10   They allege that a doctor that volunteers with them stopped

11   working for them.  But what's missing is the part that would

12   state a claim, the actual threat or coercion by the state

13   that would cause that reaction.  And there are absolutely no

14   allegations of any threats or coercion by the state.

15        THE COURT:  What about their suggestion that just

16   by having the commissioner of public health as the head of

17   the one part of the licensing, medical licensing authority of

18   the state, saying these groups, generally, PRCs generally are

19   public health threats, they engage in deceptive advertising,

20   they do disinformation would reasonably cause a licensed

21   medical professional to say, "You know, I don't think I want

22   to work with those people, because I may get looked at.  I

23   might get my license revoked.  I might get audited.  I

24   might -- I don't need those problems."

25        MS. FISCHER-GROBAN:  Here's what's missing again,

1    that was present in *Bantam Books,* that was present in *Vullo*:

2    any sort of direct communication.  And also the Court in

3    *Vullo* was concerned about the fact that it was a private

4    communication, this private meeting where the deal was struck

5    that was alleged in the complaint.  There are absolutely no

6    allegations of any threat or coercion directed at this

7    doctor.

8            And let me talk about the commissioner's guidance.

9    So the commissioner is responsible for overseeing, and the

10   Department of Public Health, the safe provision of healthcare

11   in the Commonwealth.  As part of that statutory

12   responsibility, the commission licenses healthcare

13   facilitates, it licenses -- it regulates healthcare

14   providers.

15           As part of that possibility --

16           THE COURT:  Separately from board of medicine,

17   board of nursing?

18           MS. FISCHER-GROBAN:  Exactly.  The Board of

19   Registration in Medicine -- and I'm happy to answer any

20   questions about that process -- is a separate body that is

21   largely independent and it oversees the licensure of

22   physicians.  And then there's, separately, a Board of

23   Registration in Nursing that separately oversees the

24   licensure and regulation of nurses.  And then the Department

25   of Public Health oversees the licensure of facilities, like

1    Your Options Medical.

2            So the Department of Public Health and the

3    commissioner have the statutory responsibility to ensure that

4    when healthcare and healthcare services are provided to

5    patients in the Commonwealth, that it's done so safely, and

6    that the services themselves are advertised accurately and

7    transparently.  And so the commissioner has to be able to

8    remind providers in the Commonwealth about their legal

9    obligations under the law.

10           THE COURT:  Is there any allegation that these

11    plaintiffs -- not -- this plaintiff is engaged in

12    disinformation or deceptive advertising?

13           MS. FISCHER-GROBAN:  No -- well, there is --

14    actually, we have, actually, the REN report about the

15    allegations.

16           THE COURT:  Right.  But that was resolved.

17           MS. FISCHER-GROBAN:  If we're sitting in the

18    allegations in the complaint, the Board of Registration in

19    Medicine investigation is proceeding based on that complaint.

20    I'm just basing this on the face of the complaint.

21           THE COURT:  Yes.

22           MS. FISCHER-GROBAN:  And all we have alleged in the

23    complaint here -- so Your Options Medical clinics are

24    licensed healthcare facilities.  They're licensed by the

25    department of health.  They allege in their complaint that

1 they're subject to licensure reviews every two years.

2    THE COURT:  But they allege in the complaint that,

3 as to DPH, the complaint made by REN was resolved.

4    MS. FISCHER-GROBAN:  We have a letter in the

5 complaint that says that, "We found one violation related to

6 their policy" --

7    THE COURT:  Yes.

8    MS. FISCHER-GROBAN:  -- "but you're in compliance."

9 And that letter is dated February 2024.  That's before the

10 public education campaign that they complain of here.  So all

11 that is, it shows normal licensing activity by the regulator.

12    So *Vullo* makes clear that, first of all, states, of

13 course, can pursue conceded violations of regulations and

14 state law.  They, of course, can do that.  And also, having a

15 viewpoint, a different viewpoint from the government doesn't

16 immunize one from regulation; which is to say here we have,

17 in the commissioner's introduction to this memo, "I'm

18 receiving complaints about certain practices at healthcare

19 facilitates that are within the purview of my regulation and

20 my statutory obligation to protect people in the Commonwealth

21 from deceptive practices.  Here is a reminder to these

22 regulated entities of what they're obligations are."  It

23 doesn't say anything about Your Options Medical in there.

24    THE COURT:  You mean the letter from the

25 commissioner.

1          MS. FISCHER-GROBAN:  Exactly.  So the letter of the

2     commissioner, it's a common letter.  It's just stating, kind

3     of, generally applicable neutral law and saying, "I've

4     received some complaints about potential violations of these

5     regulations.  I want to remind everybody of their obligation

6     to comply with the law."  That is a typical state function,

7     and there is nothing in that reminder that's directed

8     specifically at Your Options Medical or that's inconsistent

9     with them going through their normal licensing review by the

10    department and being told, you know, "We don't see any

11    regulatory violations here."

12         THE COURT:  Okay.

13         MS. FISCHER-GROBAN:  I'm happy to answer any other

14    questions that the Court has.  But I also simply -- I also

15    want to just note that the complaint also fails to state a

16    free exercise claim.  There are no allegations of any burden

17    on religious exercise here.  And finally, also, that the

18    state defendants are entitled to -- those sued in their

19    individual capacity are entitled to qualified immunity.

20    There are minimal allegations about these individual

21    defendants, entirely speech, and there are certainly no

22    allegations or argument, and it's the plaintiff's burden on

23    this point to demonstrate a violation of a constitutional

24    right or --

25         THE COURT:  Do they get damages?

1          MS. FISCHER-GROBAN:  A violation of a clearly
2     established --
3          They need to sue them in their individual capacity
4     to entitle them to damages.
5          THE COURT:  Oh.  So they get damages in their
6     individual capacity, but not in their official.
7          MS. FISCHER-GROBAN:  Prospective injunctive relief
8     in their official only.  Correct.
9          THE COURT:  Okay.  Okay.  Anything --
10         I'm sorry, is there anything else that you want to
11    say?
12         MS. FISCHER-GROBAN:  I'm happy to answer any
13    further questions.  I'm happy to sit down.
14         THE COURT:  I don't know that I have another
15    question at the moment.
16         MS. FISCHER-GROBAN:  Okay.
17         THE COURT:  Give me one second.
18         I guess the last question -- you sort of touched on
19    it, but just to be sure, part of, I think, the plaintiff's
20    argument is that the state officials are essentially
21    classifying them, the plaintiff, with all pregnancy resource
22    centers.  I'm using that term just because it seems that both
23    of you did, and it encompasses -- I think it encompasses the
24    plaintiffs; that you're classifying -- that, one, the state
25    officials are, sort of, treating the plaintiff in that larger

1    group of pregnancy resource centers, treating them all as

2    sort of one group in their commentary that they make, and

3    that they're classifying -- the state officials are

4    essentially classifying these group pregnancy resource

5    centers as wrongdoers, as opposed to merely criticizing them;

6    classifying them as wrongdoers by saying that they are

7    engaging in deceptive advertising and by saying that they're

8    a public health threat.  And that, in so doing it, is sort of

9    leading into their various constitutional claims and that's

10   different than merely --

11            I think they concede -- I'm going to ask them, but

12   I assume they concede, or I sense from their papers that they

13   concede that they're not immune from criticism, even

14   vigorous, scathing, and scalding criticism; that that is the

15   essence of the First Amendment and that the government

16   officials have the right to say those things, scalding

17   criticism or any kind of criticism.  But they say that

18   classifying them as a wrongdoer, that's different and that

19   that's what the state officials are doing and that puts them

20   in a different box.

21            I'm wondering what you say about that.

22            MS. FISCHER-GROBAN:  That is criticism.  That is

23   government criticism.  As Your Honor recognized, and as they

24   do partially concede, the state can criticize, and it can

25   also attempt to persuade the public.  What it can't do is

1    coerce or threaten.  We don't have allegations of coercion or

2    threatening.

3         And also, I mean, the Department of Public Health

4    here is the entity that regulates Your Options Medical as a

5    licensee, and the only allegation that we have here is of

6    neutral regulatory, kind of, activity, after which the

7    department said, "You're in compliance.  We see no regulatory

8    violations."  So when it comes to the state's actual

9    activity, there are no allegations here of intimidation or

10   threatening or coercion.

11        And the public education campaign, the prior

12   purpose is to educate the public.  It's to say to the public,

13   "We want you to be aware of the limited services that these

14   centers provide, and we want to direct you, if you're

15   interested, to places where there's comprehensive

16   reproductive healthcare and where you'll get complete

17   counseling on your options."

18        So this idea that the government is permitted to

19   criticize, and there's no allegations here that the

20   government is going beyond that -- in fact, the allegations

21   in the complaint about regulation clearly show that there's

22   absolutely no coercion or threatening or retaliation here.

23   It's completely neutral and benign.

24        THE COURT:  Okay.  Thanks.

25        Ms. Reeves, on the -- not on the state actor

1    standing questions, but just first on the motion to dismiss
2    on the merits, is there anything that you want to add to what
3    the state argued?  If there is, go ahead.
4            MS. REEVES:  So I would not add anything more to
5    what the state has already stated to the Court.
6            THE COURT:  Okay.  You're not waiving the other --
7            I should have said at the beginning two things.
8    One, you're not waiving -- at the moment, I just want to
9    focus on the motion to dismiss, because I want to hear from
10   the plaintiffs.  And it just -- it would be more helpful to
11   me to hear all of that together, rather than the other
12   issues, too.  So if you -- if you don't have anything to add
13   to what the state had to say about the merits of the motion
14   to dismiss, you don't waive anything by not talking about
15   those other issues right now.
16           And just to be clear to all of you, what I
17   generally say -- and I a apologize, I forgot to say this at
18   the beginning -- if you all walked out -- if you had never
19   said anything, and you just walked out of the hearing and
20   never said a word, you have waived nothing.  You have
21   whatever arguments you have in your papers.
22           The only way you're going to waive anything, is if
23   you say, "I waive," whatever follows is gone.  But if you
24   don't say that, you won't have waived anything and all those
25   will be before me.

1          And you're unlikely to be able to address

2   everything that's in the papers, in the argument, and that's

3   fine.  And I understand that.  And I have the papers.  I'm

4   not going to resolve it orally, as you might imagine.  And so

5   okay.

6          So anything on the motion -- on the merits of the

7   claims?

8          MS. REEVES:  So the one point that I'll make,

9   Your Honor, is that I agree with what's been shared with the

10  Court, with respect to the questions raised and the points

11  that the state has already articulated to the Court.  And I

12  can get to this when Your Honor is prepared to hear from me

13  on the state action issue, but I do want to note that part of

14  that inquiry involves an allegation of state action or

15  conduct that can be attributed to the state that results in a

16  deprivation of a federally protected right.  So for that

17  reason, I would just, again, agree with the arguments that

18  have been made by the state up to this point.

19         I'm happy to take any questions about the DPH

20  complaint, the letter that came up, to the extent you have

21  any more.  I will end up going back to that in the context of

22  the argument that we've outlined for the Court on the pending

23  issue.

24         THE COURT:  Sure, I understand that.

25         Not at the moment, I don't have any more questions.

```
 1              I want to hear from the plaintiff first.
 2              Go ahead.  I'll hear from you, Ms. Summers.
 3              MS. SUMMERS:  Thank you, Your Honor.
 4    Olivia Summers for the plaintiff.
 5              We just want to start out by reiterating that we're
 6    at the Rule 12(b)(6) stage, and the motion to dismiss
 7    survives -- actually, the complaint should survive a motion
 8    to dismiss if it's merely pled sufficient factual material,
 9    accepted as true to state a claim for relief, and that the
10    Court must draw all inferences in our favor and accept all
11    factual allegations as true.
12              THE COURT:  I actually have a slight disagreement
13    with you as to that.  I don't think the law requires me to
14    draw all inferences in your favor.  I actually think that's
15    an inaccurate statement of the law.  I think the law requires
16    me to draw all reasonable inferences in your favor.
17              MS. SUMMERS:  Yes, Your Honor.
18              THE COURT:  I don't think I draw unreasonable
19    inferences in your favor.
20              With that correction, then, yes.
21              MS. SUMMERS:  Yes, Your Honor, I completely agree
22    with that correction.
23              THE COURT:  Okay.
24              MS. SUMMERS:  Thank you.
25              I just want to go directly to some of the things
```

1    that you were questioning the defendants about.

2                THE COURT:  Sure.

3                MS. SUMMERS:  First of all, you stated that you

4    can't do indirectly what you can't do directly.  The

5    government can't do directly -- indirectly what it can't do

6    directly.

7                THE COURT:  I asked her that, yes.

8                MS. SUMMERS:  Yes.  And that is our argument.

9    That's the argument that, I believe, is in *Vullo* and in

10   *Bantam Books*.

11               And here, the state did not merely offer a

12   pro-abortion information campaign to inform the public that

13   there is such a thing as abortion, that they can access

14   abortion, that there's state funding for abortion.  What they

15   did was they used its official government platform to

16   delegitimize and suppress a religious pro-life by labeling

17   the plaintiff, and other pregnancy resource centers in the

18   state, as dangerous, deceptive, and a threat to public

19   health.

20               Now, we have argued this in our opposition to the

21   motion to dismiss, but a deceptive practice is -- allegation

22   is actually a legal term of art.  It's a legal conclusion.

23   And it's accusing the plaintiff and other pregnancy resource

24   centers of being engaged in that illegal activity.  In fact,

25   if the plaintiff or other pregnancy resource centers were

engaged in this illegal activity, the state could pursue
legal action against them for that wrongdoing.

Now, Justice Douglas, in his concurrence in *Bantam Books,* pointed to this very thing.  To paraphrase
Justice Douglas in the context of this case, if a valid law
has been violated, antiabortion centers can be made to
account.  But they would then have on their side all the
procedural safeguards of the Bill of Rights, including,
potentially, a trial by jury.

Now, from the viewpoint of the state, that is a
more cumbersome procedure than a public campaign, accusing
them all of being engaged in illegal activity.

THE COURT:  I'm not sure you'd get a trial by jury,
depending on which way they proceeded.  I don't think, for
example, if they moved to -- you wouldn't get a trial by jury
before the Department of Public Health or the board of
medicine if they took regulatory action on your licenses.
You could appeal those decisions, pursuant to, I think,
Chapter 30A to state court.  I don't know that you could
appeal that to federal court.

So you might -- there might be other mechanisms to
sue them for constitutional violations.  You could certainly,
within those proceedings, raise constitutional claims, but
I'm not sure you would -- it depends on how the posture of
the case is as to whether you get a jury trial.

1            MS. SUMMERS:  Yes.  Yes, Your Honor.

2            THE COURT:  Okay.

3            MS. SUMMERS:  Now, it would be a more cumbersome

4    procedure for the state to go after wrongdoers individually,

5    rather than labeling them all as being engaged in illegal

6    activity.  But that is what the Constitution is designed to

7    protect against.  It is designed to fence in the government

8    from making any intrusions, unwarranted intrusions into --

9            THE COURT:  So you would say, one, they can

10   affirmatively say -- or could they say the following:

11   Abortion is legal in Massachusetts, within certain time

12   limits.

13           MS. SUMMERS:  Yes, Your Honor.

14           THE COURT:  They could say that.

15           MS. SUMMERS:  Yes.

16           THE COURT:  That would be an accurate statement.

17           MS. SUMMERS:  Yes.

18           THE COURT:  And they would be within their rights

19   to say that.

20           MS. SUMMERS:  Yes, Your Honor.

21           THE COURT:  And then they could explain all sorts

22   of spinning out parts of that, who they could go to, who is

23   authorized -- not everybody's authorized to administer such a

24   procedure.  Right?

25           MS. SUMMERS:  Right.

```
 1              THE COURT:  They have to -- they could say who gets
 2    to do it, it's licensed medical people or certain medical
 3    people, whoever that is.  That's not really an issue in
 4    dispute between all of you.  They could make sort of more
 5    statements about that.
 6              They could even say, "And there are some people who
 7    aren't authorized to do it," right?
 8              MS. SUMMERS:  Yes, Your Honor.
 9              THE COURT:  They can even list who those people
10    are, if they chose.
11              MS. SUMMERS:  Yes.
12              THE COURT:  Or list some of them.  It would be a
13    long list, if they listed everybody.  Right?
14              And you say all of that is fine, right?
15              MS. SUMMERS:  Yes, Your Honor.
16              THE COURT:  Then the second step would be could
17    they criticize you?  Not you personally, but could they
18    criticize your clients?
19              MS. SUMMERS:  Yes, Your Honor, they could criticize
20    the clients.
21              THE COURT:  So they are free to speak and say not
22    only factual information, like a factual information would be
23    that your clients don't offer abortions.  Right?  That would
24    be both a factual statement and a true factual statement.
25              MS. SUMMERS:  Yes.
```

```
 1              THE COURT:  And they could make various other

 2      factual statements about your clients like that.  That would

 3      all be permissible.

 4              MS. SUMMERS:  Yes.

 5              THE COURT:  So could they -- in -- what kind of

 6      criticism could they make?  Can they say, "What you do is

 7      bad"?  In other words, that's a laden judgment, right?

 8              MS. SUMMERS:  It is a judgment call, Your Honor.  I

 9      think we would argue that the problem here is they're

10      accusing them of being engaged in actually prohibited

11      activities, not that it's preferable that people get

12      abortions --

13              THE COURT:  So which words are accusing your

14      clients of engaging --

15              MS. SUMMERS:  They're accusing them of being

16      engaged in deceptive practices.  Even in it's briefing, the

17      state used that term "deceptive practices"; that "We were

18      concerned with some of the deceptive practices of pregnancy

19      resource" --

20              THE COURT:  What about public health threat?

21              MS. SUMMERS:  Public health threat, yes, that is

22      also --

23              THE COURT:  So is that an accusing -- you say that

24      would be something that they can't say.

25              MS. SUMMERS:  Yes, Your Honor.  They're actively
```

1    accusing them of threatening the public's health, based on

2    their religious pro-life speech that values life.  So the

3    fact that they oppose abortion is what is at issue here, not

4    that they don't offer abortion.  It's that's they believe

5    that abortion is not preferable to choosing life or adoption

6    or parenting, so they are, based on their religious beliefs,

7    proposing an alternative to abortion.

8              THE COURT:  True.

9              MS. SUMMERS:  And it is that religiously based

10   speech that is being targeted.  It is not their practice of

11   not providing abortions.

12             THE COURT:  So let me just ask you this.  So

13   suppose -- suppose the governor wanted to say that sugary

14   soda is a public health threat.  Okay?  Presumably the people

15   who sell soda don't sell it on the -- for my purposes and my

16   question, assume they don't sell it based on a religious

17   belief.  Okay.  That the reason that they sell soda with

18   sugar is not because of any religious views.

19             Would the governor be free, or any of these

20   officials, to say that sugary soda is a public health threat,

21   if it was their belief?

22             MS. SUMMERS:  So in that situation, Your Honor,

23   that is a consumer product that they are criticizing.  It is

24   not a religious belief that is being expressed.  It is not

25   speech.

 1              THE COURT:  Right.

 2              MS. SUMMERS:  So in that case, they can criticize

 3     the consumer product as being potentially dangerous.

 4              THE COURT:  Could they criticize the -- if

 5     somebody, say one of the people who sold it, stood up, or

 6     whether a celebrity who was hired to stand up, stood up and

 7     said, "You should buy this soda.  It tastes great.  It's

 8     really good," could they criticize that speech and say --

 9     again, the person is not making -- it's not expressing a

10     religious view, so there's no religious aspect to the claim.

11     Could they say that's a public health threat?

12              MS. SUMMERS:  By sharing his opinion about

13     whether --

14              THE COURT:  That soda is good.  So you have

15     somebody saying, "Soda is good.  Buy soda.  It tastes good.

16     It's good."

17              And they say, "Hey, that soda, that sugary soda

18     they're talking about, sugary soda is a public health

19     threat."

20              Could the state officials say that's a public

21     health threat.

22              MS. SUMMERS:  I believe in that context,

23     Your Honor, yes, because it's going to a product -- the

24     underlying claim is actually going to the product, not to the

25     speech about the product.

1                 Here plaintiffs are not engaged in performing

2    abortions.  They're opposing abortions.  They're not

3    providing abortion service.  So it's a fundamental reason

4    they exist is to speak out against abortion and that is

5    what's being suppressed here.  It's not on the opinion of

6    whether abortion is bad or not, that the state prefers

7    abortion, and that they would like to get people to --

8    consumers to go to those clinics and get those services, what

9    they are targeting here is the free speech of the pregnancy

10   resource centers and their free -- their religious expression

11   in providing resources to women.  But it's not a consumer

12   product.

13                THE COURT:  So could the state public officials

14   say, "Democrats are bad"?

15                MS. SUMMERS:  I think that they could potentially

16   be libel to certain claims under tort theories, potentially,

17   for just labeling everybody as "bad," depending on what

18   the --

19                THE COURT:  Could they -- if they said that

20   democrats were public health threats or republicans were

21   public health threats -- you could substitute either one --

22   would that be a violation of either the democrats, if they

23   said democrats were a public health threat, or the

24   republicans, if they said republicans are a public health

25   threat?  Would that be a violation of the First Amendment

1    rights?

2            MS. SUMMERS:  I think there would be some strong

3    arguments that that would be a violation of -- well, in that

4    situation there, they're accusing them of -- I don't know

5    that it's their speech that they are criticizing in that

6    scenario by stating that they are bad.  Again, that's

7    different, because if they are actually targeting --

8            THE COURT:  I'm not saying bad.  Forget bad.  I

9    think that's a bad -- "bad" is a bad example.  Agree.  Say

10   that public health threat.

11           MS. SUMMERS:  So if they stated that democrats were

12   a public health threat, without any underlying allegations as

13   to actual wrongdoing, then, yes, I think that would be

14   problematic.

15           THE COURT:  So if they say they're public health

16   threats because of various views or things they do or don't

17   do or things they say or don't say --

18           MS. SUMMERS:  If those views are based on their

19   free speech, that's problematic.

20           Now, if they're actually engaged in illegal

21   activity, have been convicted of illegal activity, or are

22   otherwise engaged in things where they can actually show that

23   they are a threat to public health, because they have the

24   tools to be able to go after people who are actually public

25   health threats or engaged in deceptive practices --

1          THE COURT:  Could they say it's a public health

2     threat to not get vaccinated for tuberculosis or polio?

3          MS. SUMMERS:  Again, Your Honor, that's something

4     that the state provides as a consumer product.  It's not

5     religious speech that's being targeted.

6          THE COURT:  But there are people who don't get --

7     who do refuse all medical care based on religious beliefs.

8          MS. SUMMERS:  Yes, Your Honor.

9          THE COURT:  And could they criticize the decisions

10    of those people as public health threats?

11         MS. SUMMERS:  I believe, Your Honor, in that

12    situation, it is, again, different, because there are

13    underlying studies or cases that the state could point to

14    that actually point to potential hazards to health.  But in

15    that case, it's actually not receiving something internally

16    in them, a disease --

17         That's exactly what we're saying here is a public

18    health threat is a diseased-based.  Actually based in the

19    law, it focuses on pathogens, bloodborne pathogens.  That's

20    what public health is, described in Massachusetts law.  And

21    yet here, it is their speech that is being described a threat

22    to public health.  It is the fact that they --

23         THE COURT:  Well, it can't be that they are

24    restricted to use the words "public health threat" only with

25    respect to bloodborne pathogens.  I mean, is there a

```
1    case that --
2              MS. SUMMERS:  I'm thinking, Your Honor, in our
3    response to the motions to dismiss, that we cited the term
4    that is identified in Massachusetts law as what the meaning
5    of public health threat is, one of the descriptors.
6              THE COURT:  Where did you cite that?
7              MS. SUMMERS:  One of the descriptors.
8              It's in our response to, I believe, defendants'
9    motion to dismiss.
10             THE COURT:  I'm -- just point me to the page or the
11   cite, because I don't recall a statute state law definition
12   of public health threat.
13             MS. SUMMERS:  We put it as one of the descriptors
14   that is used.  I think it's this --
15             THE COURT:  You had a citation to state definition
16   of medical advertising.
17             MS. SUMMERS:  Yes, we did that, as well,
18   Your Honor.
19             I apologize.
20             THE COURT:  That's all right, take your time.
21             MS. SUMMERS:  Our table of contents got a little
22   blacked out in our -- when we printed it.
23             THE COURT:  I'll tell you what, you don't have to
24   find it right now.
25             MS. SUMMERS:  I'm so sorry, Your Honor.
```

```
1                 THE COURT:  It's okay.  It's fine.
2                 Why don't we keep going.  You have a bunch of
3       people, they can look for it.  And if need be, you can always
4       submit something later or tomorrow, and just say, "You know
5       what?  This is the state law."  I didn't recall that, and I
6       don't want to miss it.  And so that's why I just wanted to --
7                 MS. SUMMERS:  Yes, Your Honor.  And I don't want to
8       represent that we exclusively included all of the terms that
9       could be potentially used, but it was an example of what is
10      defined as a public health threat --
11                THE COURT:  Health threat.
12                MS. SUMMERS:  -- in Massachusetts law, for an
13      example.
14                Your Honor, sorry, we've --
15                THE COURT:  Sure.
16                MR. MOELKER:  Page 9.
17                MS. SUMMERS:  It's on page 9.
18                THE COURT:  Of your opposition to the state
19      defendants or the other?
20                MR. MOELKER:  State defendants, Your Honor.
21                MS. SUMMERS:  It's on Docket Number 50.  It's in
22      our response to the -- and then it's not quite -- it's at the
23      end of the second-to-last paragraph there.  It says, "The
24      state defendants have accused PRCs of" --
25                THE COURT:  Oh, I see.  "The term 'public health
```

1 threat' is also a term of art used to describe, for example,

2 a public health threat, the transmission of bloodborne

3 diseases."

4     I see.  Okay.  Thank you.  Sorry I missed that.

5     Okay.  I guess what I'm trying to understand is the

6 line -- I guess I'd start with establish that they can

7 affirmatively speak out about any topic that they want to,

8 abortion was the example.  And that seems pretty undisputed

9 and pretty clear.  And I'm wondering whether your view is

10 they can criticize.  And if they can, what -- where is --

11 what moves things -- what moves this complaint from criticism

12 to prohibited threats, for lack of a better word, and where

13 is that line?  That's why I'm asking about the different

14 kinds of public health threats.

15     So the first one is, can they criticize?

16     MS. SUMMERS:  Yes, Your Honor, they can criticize.

17 And I think the case law clearly speaks that it can be quite

18 aggressive criticism.

19     THE COURT:  Scalding.

20     MS. SUMMERS:  It can be -- yes, exactly.  It can be

21 very criticizing of your beliefs, even.

22     THE COURT:  Of your client's beliefs.

23     MS. SUMMERS:  Yes.  But what they can't do is

24 suppress our client's belief --

25     THE COURT:  Right.

1          MS. SUMMERS:  -- because it is a disfavored

2     viewpoint.  And that is what's occurring here.

3          Let's go back to the timeline regarding the

4     public --

5          THE COURT:  Sure.

6          MS. SUMMERS:  -- Department of Public Health's

7     guidance issuance and Reproductive Equity Now's complaint

8     that it filed against the plaintiff.  In 2023, the state

9     passed the budgetary item for this campaign.  And in that --

10    within that budget, an additional $250,000 was allocated to

11    Reproductive Equity Now -- no less than $250,000 was

12    allocated to Reproductive Equity Now to run a hotline, a

13    legal hotline to bring in complaints against pregnancy

14    resource centers.

15         Now, this campaign started in early 2023.  Our

16    complaint alleges that Reproductive Equity Now was --

17         THE COURT:  I thought they passed the money in

18    2023?

19         MS. SUMMERS:  They passed the budgetary item for

20    the budget of 2023.

21         THE COURT:  Oh, I see.  For fiscal year 2023.

22         MS. SUMMERS:  For fiscal year 2023.

23         THE COURT:  Okay.

24         MS. SUMMERS:  So the planning and spending for that

25    budget could start in 2023.  And our complaint alleges that

1    the state defendants and the Reproductive Equity Now

2    defendants have both said that Reproductive Equity Now is a

3    partner and collaborator in creating this public awareness

4    campaign.

5            So in 2023, October, after this whole campaign has

6    begun, and everybody's aware that it's something that they're

7    working on, Reproductive Equity Now files a complaint against

8    Your Options Medical, one of the few medically licensed

9    clinics in the state of Massachusetts.

10           On the basis of that complaint, the Department of

11   Public Health looked into the allegations.  And then as we --

12   as you were discussing with the defendant, it did find them

13   deficient in something that was not related to the actual

14   allegations of the complaint, the deceptive practices or the

15   deceptive advertising allegations, something separate.  And

16   then they were --

17           THE COURT:  That was an issue about the manual.

18           MS. SUMMERS:  Yes, some language in their manual

19   that they needed to correct.

20           THE COURT:  About sonograph.  And those are the

21   people -- the sonographers are the persons who administer and

22   read the ultrasounds?

23           MS. SUMMERS:  Yes, Your Honor.  And it was a

24   language about their --

25           THE COURT:  Discretion.

1          MS. SUMMERS:  -- discretion.  So they corrected

2     that, and they were found to be in compliance.

3          On the basis of that complaint against the mobile

4     clinic, Reproductive -- excuse me, Your Options Medical's

5     medical director became under investigation by the board of

6     health.

7          THE COURT:  That's the two subpoenas.

8          MS. SUMMERS:  Excuse me?

9          THE COURT:  That's the two subpoenas related to

10    that?

11         MS. SUMMERS:  Yes, that's the two subpoenas related

12    to that.

13         So in January, the Department of Public

14    Health issues this guidance --

15         THE COURT:  But the letter, the complaint letter

16    that they -- that REN filed, raised a possibility of a

17    violation of medical practice procedures.

18         MS. SUMMERS:  Yes.

19         THE COURT:  Okay.

20         MS. SUMMERS:  They were -- and that deficiency was

21    corrected.  But, again, the doctor was not named, the medical

22    director was not named as a person who was being complained

23    of.  There was no patient complaint.  It was merely, "We saw

24    this wording on this bus, and then we saw this report of what

25    this medical -- or director of the pregnancy center said, and

1     so here's our complaint."

2            Now, the Department of Public Health issued its

3     guidance in the first part of January -- or in January of

4     2023.

5            THE COURT:  You're talking about the guidance,

6     you're talking about something like five-page letter --

7            MS. SUMMERS:  The letter to advise licensed medical

8     professionals that they need to be aware of these issues.

9            THE COURT:  Right.

10           MS. SUMMERS:  Along with that, they issued a public

11    press release.  And in that press release, they specifically

12    discussed pregnancy resource centers, which they called

13    "antiabortion centers."  They indicated that they are

14    affiliated with national advocacy and religious

15    organizations; that there are 30 of them in the state; only

16    four of them are currently subject to DPH licensure; and

17    really, honed in on what was it that they were targeting with

18    that notice to the licensed professionals.  So that is what

19    we are lodging is the coercive activity that they engaged in,

20    the threats of the medical providers who are licensed by the

21    state, who are working with pro-life religious organizations,

22    such as Your Options Medical.

23           So we just wanted to clarify that timeline there.

24           THE COURT:  Okay.

25           MS. SUMMERS:  And that we --

```
1            THE COURT:  So you're saying that if they hadn't
2    issued the press release, there was nothing wrong with the
3    letter.
4            MS. SUMMERS:  The letter actually indicates
5    practices that pregnancy resource centers are well aware of
6    that they are accused of being engaged in.  So if you are
7    familiar --
8            THE COURT:  The letter doesn't accuse anyone of
9    doing anything, does it?
10           MS. SUMMERS:  It warns them not to engage in that
11   kind of activity.
12           THE COURT:  You mean it warns unlicensed people.
13           MS. SUMMERS:  No, it warns medical licensed --
14           THE COURT:  Oh.  It warns licensed people to not
15   violate all sorts of regulations.
16           MS. SUMMERS:  To not violate things, but also not
17   to work with people who might be violating things.
18           So the language in there, on its face, to people
19   who are not familiar with this arena, could seem that it's
20   not targeted at medical directors or medical license
21   professionals who are working with pregnancy resource
22   centers.  But it was specifically worded in a way to alert
23   pregnancy resource centers and their medical directors that
24   they were being warned by the state.  And that is our
25   allegation, and we believe that is a reasonable inference,
```

1    given the press release that also was issued to underscore --

2         THE COURT:  That medical -- that licensed medical

3    professionals, who are working with unlicensed facilities or

4    working with licensed facilities?

5         MS. SUMMERS:  Either, Your Honor.  There are

6    thousands of medical professionals who volunteer at pregnancy

7    resource centers --

8         THE COURT:  Sure.

9         MS. SUMMERS -- even ones that are not --

10        THE COURT:  But the reason that I'm probing in on

11   that is, if I recall correctly, part of the letter

12   says that -- describes certain activities that some people or

13   some organizations might be engaged in and suggest that those

14   activities are the kinds of activities that might require

15   licensure by the Department of Public Health.

16        MS. SUMMERS:  Yes.

17        THE COURT:  And that failure to obtain licensure

18   would be a violation of the Department of Public Health's

19   regulations.

20        That doesn't seem to focus --

21        But your clients are licensed?

22        MS. SUMMERS:  Yes.

23        THE COURT:  And so I read that -- and correct me if

24   I'm wrong, but I don't read that paragraph as talking about

25   your client, because your client is licensed.

1    What I read that is applying to if your client were

2    doing what it's doing, but weren't licensed, I would think

3    that paragraph was talking about your clients because they

4    weren't licensed.  And just drawing the inference that what

5    you do, in some way, requires a DPH license, that's why you

6    have one, and it described things that were somewhat similar

7    to what your client does, that seem to be saying, "Hey, if

8    you're working -- if you're that" -- I won't call it a

9    clinic, because that begs the question.  "But if you're doing

10   those things that sound like a clinic, you need to get

11   registered or otherwise you face consequences."

12          MS. SUMMERS:  (Nods head.)

13          THE COURT:  But what I'm missing is the connection

14   to the license -- the doctor who works with, say, you, or any

15   nurse or any other professional who's licensed, worrying that

16   working with someone who is licensed would subject them to a

17   problem.  I see why, if I were the licensed person, and I

18   worked with the equivalent of you, who is you unlicensed, I

19   would read that and be worried.

20          MS. SUMMERS:  Right.  And Your Honor, in Exhibit L,

21   there's language that says that, "A nurse or physician

22   assistant" --

23          THE COURT:  Hold on.  Let me grab that, because I

24   want to?

25          MS. SUMMERS:  Sorry.

```
 1                    THE COURT:  That's okay.
 2                    Can you give me the page number, just so I can be
 3          reading along with you.
 4                    MS. SUMMERS:  I believe it is page 4.
 5                    THE COURT:  This would be in 1-3, page 4?  No?
 6                    MS. SUMMERS:  It's Exhibit L.
 7                    THE COURT:  Okay.  Hold on.  1-4 -- oh, I see.  I
 8          have Exhibit L, page 3 of Exhibit L.
 9                    MS. SUMMERS:  I believe it's page 4.  Right?
10                    MR. MOELKER:  4.
11                    MS. SUMMERS:  4.
12                    THE COURT:  All right.  I think I might -- does
13          page 4 start with the first word "deceptive," comma?
14                    MS. SUMMERS:  Yes, Your Honor.
15                    THE COURT:  Okay.  Where are you?
16                    MS. SUMMERS:  One, two, three -- the fourth
17          paragraph there, "A nurse" --
18                    THE COURT:  Yes.
19                    MS. SUMMERS:  "A nurse or physician assistant may
20          not engage in any behavior that is likely to have an adverse
21          effect on the health, safety, or welfare of the public."
22                    And if you look at the footnote citation there,
23          they are specifically referring to "medical abortion
24          reversals," which is also known as an abortion pill reversal,
25          which is the prescription of progesterone to try to counter
```

1 the effects of mifepristone which stops progesterone.  So

2 it's combatting the stopping of progesterone and prescription

3 of it.

4    Now this is a --

5    THE COURT:  So just pause so I understand.

6    So that's saying that if you're a nurse or

7 physician assistant, and you participate in the

8 administration of that abortion reversal medication, that you

9 could be engaging in activity that has an adverse effect on

10 health safety?

11    MS. SUMMERS:  Yes.

12    THE COURT:  And presumably creates licensure

13 issues.

14    MS. SUMMERS:  Yes.  It is something that is a

15 practice that is exclusive to pro-life pregnancy resource

16 centers.  And the medical?

17    THE COURT:  But does your client do that?

18    MS. SUMMERS:  Yes, Your Honor.

19    THE COURT:  You do administer that.

20    Is that in the complaint.

21    MS. SUMMERS:  I believe we do put in our

22 complaint -- we put in our website that has it on there, but

23 I don't know if we actually --

24    THE COURT:  I see.  It's not alleged -- you don't

25 think it's alleged in the complaint specifically.

1          MS. SUMMERS:  No.

2          THE COURT:  But you think, on the Exhibit A, which

3     is the website?

4          MS. SUMMERS:  Generally, we -- in our complaint, we

5     stated that there were -- that this was targeted towards

6     medical professionals who work with pregnancy resource

7     centers, and there was language in there to indicate why.  I

8     don't think we named that footnote.

9          THE COURT:  No, I understand.  The reason that I'm

10    asking is I didn't read the complaint -- I wouldn't have read

11    the complaint as alleging that you administered that.  So I

12    wasn't sure that that paragraph and that letter had anything

13    to do with you, because you -- I understood you to have

14    alleged that your organization provides counseling; provides

15    ultrasounds; diagnoses the -- or reads the ultrasounds;

16    provides clothes, and certain other items to expectant

17    mothers; doesn't provide prenatal care, other than the

18    ultrasounds; doesn't provide -- doesn't deliver babies;

19    doesn't provide postnatal care after birth.  So it didn't

20    occur to me that --

21         MS. SUMMERS:  I believe, Your Honor, that it -- the

22    nonmedical professionals there will counsel about abortion

23    pill reversal, and they work with a medical director who's

24    licensed by the state who could prescribe that.

25         THE COURT:  Who might prescribe as part of that

```
1    person's work with your organization.

2              MS. SUMMERS:  Yes.

3              THE COURT:  As distinct from whatever they do

4    elsewhere.

5              MS. SUMMERS:  Yes.

6              THE COURT:  I see.  Okay.  And it says that in --

7              MS. SUMMERS:  Although, Your Honor, I will clarify

8    that, if the person came in to their private practice or the

9    hospital and was requesting progesterone to aid in

10   miscarriage management or otherwise stopping a miscarriage,

11   whether spontaneous or elective, that they could do that in

12   their private practice, as well.

13             THE COURT:  All right.  Okay.  In any event,

14   whether it says it expressly or not, in Exhibit A --

15             MS. SUMMERS:  Yes.  And it is one of the things --

16             THE COURT:  -- it is one of the things that your

17   organization provides through it's own auspices, not through

18   people who volunteer with you, whatever they might do

19   elsewhere in their life work activities, but as part of --

20             MS. SUMMERS:  It is part of the services that

21   they --

22             THE COURT:  It's a service that the clinic offers.

23             MS. SUMMERS:  Yes.

24             And Your Honor, I will point out that this is --

25   specifically, there are lists of things that the state finds
```

1    as problematic language or things, counseling that the

2    centers engage in, and that even ones that maybe not offer

3    that as a service, that that's problematic that they even

4    share that information with women; that that's what's

5    considered to be deceptive or misleading or part of the

6    public health --

7              THE COURT:  Say that again?  What's deceptive?

8              MS. SUMMERS:  Even providing information to women

9    about the abortion pill reversal.

10              THE COURT:  I see.  Where does it say that?

11              MS. SUMMERS:  I believe they -- let's see here.

12              So the state links to Reproductive Equity Now's

13    guideline, guidebook, in ways to identify pro-life pregnancy

14    resource centers.  And this is on page 17 of our complaint,

15    Your Honor, paragraph number 89.  And they list it as

16    number 4, a "fake service called 'abortion reversal'."

17              THE COURT:  Okay.  Got it.  Go ahead.

18              So one of the threats that you see is that in the

19    letter that the Department of Public Health issued, is the

20    statement that providing that --

21              MS. SUMMERS:  The abortion pill reversal or

22    medication abortion reversals?

23              THE COURT:  Right.  That using that medicine for

24    the purposes of reversing an abortion may be behavior that

25    has an adverse effect on health and safety.

1          MS. SUMMERS:  Yes.  And they cite directly to that

2    in their footnote, Your Honor.

3          And again, that goes to the coercion of the third

4    parties, who are working with the pregnancy resource centers,

5    that enable them, our clients particularly, enable them to

6    actually work as a medical clinic.

7          THE COURT:  Can they regulate that?  In other

8    words, there's another footnote in that letter that talks

9    about that more specifically.  I think it's footnote 6.

10          MS. SUMMERS:  Oh, footnote 6?

11          THE COURT:  What I'm wondering about that, is it

12    just seems like that -- that I assume that the state isn't

13    all over what kind of medicines can be used for what kind of

14    purposes and what things are appropriate medical practices

15    and not appropriate medical practices.  And that -- and I

16    assume that if their position is that you can't use that

17    medicine for abortion reversal, that applies to everybody

18    who's a licensed medical provider, who could use that

19    medicine in Massachusetts.

20          In other words, Mass. General I don't think of as a

21    religious institution.  I could be wrong, but that's my

22    impression of it.  If they used that medicine or doctor on

23    staff, prescribed that medicine for that purpose, I assume

24    that paragraph would apply to them, too.

25          MS. SUMMERS:  So Your Honor, there is some ongoing

1    case law regarding this whole issue and some disagreement

2    within the medical community about the effectiveness of the

3    abortion pill reversal.  For example, in Colorado, the

4    legislature actually passed a law banning medical providers

5    from prescribing progesterone for the purposes of the

6    abortion pill reversal.  That's ongoing litigation.

7            THE COURT:  Over the legality of that.

8            MS. SUMMERS:  Over the legality of that, yes,

9    Your Honor.

10           THE COURT:  Whether that's religious

11   discrimination, First Amendment violation, or just whether

12   they have the statutory authority to do that.

13           MS. SUMMERS:  It's based on First Amendment

14   religious discrimination claim.  Because, again, I'm not

15   aware of anyone who offers abortion pill reversal outside of

16   a religious-based viewpoint, other than in the context of its

17   progesterone, which has been prescribed for years, to help

18   with miscarriage management.  So it's not a new science.

19   It's not -- it's a naturally occurring hormone.  It's

20   prescribed in all sorts of cases to help women keep their

21   babies when they want to.

22           The only difference here is they've been given

23   mifepristone to start the inhibiting of progesterone

24   naturally, and now they're being prescribed a dose of

25   progesterone to try to counteract the mifepristone.  And that

1    is what's being said is dangerous here, even though it's been

2    used for many years in the medical practice.

3            So if the state were specifically regulating the

4    prescription of mifepristone purely in the context of the

5    abortion pill issue, that seems problematic when it's allowed

6    in other situations.

7            THE COURT:  Why?

8            MS. SUMMERS:  And it's specifically provided by

9    pro-life --

10            THE COURT:  I mean, we allow fentanyl use for

11    certain purposes but not for other purposes.

12            MS. SUMMERS:  Again, Your Honor, again, this is

13    something that is being debated, but our stance is that --

14            THE COURT:  I mean, the question -- it can't be

15    that -- your position is not that they can't regulate a drug

16    in one purpose, but not for another purpose.  Your position

17    has to be it's religiously motivated.

18            MS. SUMMERS:  Yes.  Our position is that it

19    is religiously motivated.

20            THE COURT:  I mean, you would agree, they can't

21    give -- a doctor can't prescribe fentanyl, a dose of fentanyl

22    to a child that walks in with a cold.

23            MS. SUMMERS:  Yes.

24            THE COURT:  I mean, if the state regulated that,

25    that has to be permissible.

1          Whereas, the doctor could prescribe fentanyl to

2     someone who's undergoing surgery.  Right?

3          MS. SUMMERS:  Yes, Your Honor.

4          THE COURT:  So the difference -- the fact that

5     they're distinguishing uses, I don't know, I find that -- you

6     would have to give me something better to persuade me on

7     that.  That seems completely contrary to the entire

8     regulation of the medical system.

9          But what you're saying is not that it's use.

10    You're saying that it's a religious -- that it's because of

11    its religious purpose or reason behind it.

12         MS. SUMMERS:  Yes, there are religious purposes

13    behind it.

14         And also, we would contend that it's actually not a

15    different use.  It's used to manage elective abortions versus

16    spontaneous abortions, but the effect on the body is the

17    same.  So it's not necessarily a different situation, it's

18    just that one was an elective abortion versus nonelective,

19    what in the medical community call it, an abortion, is a

20    miscarriage.  So that term of art is a spontaneous abortion

21    is referred to, colloquially, as a miscarriage; whereas

22    elective abortion is taking an abortion bill or going and

23    getting a surgical abortion.

24         THE COURT:  Oh.  Okay.

25         MS. SUMMERS:  So our argument is that it's still

1    managing the same kind of care, attempting to stop

2    progesterone from being blocked to the baby.

3            THE COURT:  Got it.

4            MS. SUMMERS:  But it's only when it's in the

5    context of, based on a religious viewpoint, that you can have

6    this --

7            THE COURT:  So what you're saying here is one

8    threat is the threat that -- in the letter, with respect to

9    the use of that drug; and that while it reads as facially

10   neutral, in the sense that it seems to apply to the use of

11   that, whether it's at Mass. General or by your clinic, that

12   as a practical matter, in a context, the only people who use

13   this medication with respect to what you describe as elective

14   abortions are people who are religiously motivated.

15           MS. SUMMERS:  Yes.

16           THE COURT:  Or expressing their -- or using it to

17   help them further their religious view that an abortion is

18   not comported with their religious views.  And so that is an

19   element of religious discrimination and that that is one part

20   of the threats in the letter.

21           MS. SUMMERS:  Yes, Your Honor, that is exactly what

22   we are stating.

23           THE COURT:  All right.  What else -- and the second

24   part is that the letter should be read -- the way -- what you

25   would say -- I think what you're saying is the letter should

1    really be read, this press release is a signal to everybody,

2    other than people like your clinics, ignore the letter.

3              MS. SUMMERS:  Yes.

4              THE COURT:  And a signal to you or people who

5    are --

6              Well, you're not representing anybody other than

7    your client.

8              MS. SUMMERS:  No, we're just representing Your

9    Options Medical, though we do argue that it is applied to all

10   of the pregnancy resource centers in the state.

11             THE COURT:  Can you do that?

12             MS. SUMMERS:  Well, Your Honor, it says on there --

13             THE COURT:  Do you have standing to assert its

14   application as to people who aren't parties before me?

15             MS. SUMMERS:  Your Honor, I think that's just a

16   plain reading of the press release that they put out, because

17   they stated that there are 30 pregnancy antiabortion centers

18   in the state, and then they are applying that language to

19   them.  Although, they identify only four as being regulated

20   by DPH, they still address the other ones that are not

21   regulated.  So we're not asserting standing for them, we're

22   just staying that on the plain language of that press

23   release, they're applying it to all the pregnancy resource

24   center in the state.

25             THE COURT:  I see.  Right.  But you're not seeking

1    relief for them.

2              MS. SUMMERS:  No, Your Honor.  We are here

3    specifically for --

4              THE COURT:  Just for -- I got it.

5              MS. SUMMERS:  Yes.

6              THE COURT:  So that's the second.  If I'm just

7    thinking about the threats, the first is the progesterone;

8    the second is, sort of, the context.

9              Are there others?

10             MS. SUMMERS:  Well, there's the direct threat to

11   our pregnancy resource, Your Options Medical.  So our

12   plaintiff here, our client, directly threatening their

13   religious expression, again, because they've been licensed by

14   the state for 25 years, and they have to go through that

15   renewal process every two years.  But they are put on notice,

16   also, of types of language and counseling options, like the

17   abortion pill reversal; that even if their medical director

18   is not directly engaged in, in speaking about that, just

19   providing that information can put them in jeopardy of losing

20   their license.

21             So we believe that *Vullo* applies, with respect to

22   the third party, the medical director.  But then here it

23   directly applies, a course of effect upon the pregnancy

24   resource centers and tries to censor and stifle their

25   religious speech and free exercise rights.

1    THE COURT:  In other words, to the extent that you

2    wish, and your client wishes to say to people, "Hey, this is

3    an option for you," even if there's no medical director, even

4    if nobody is providing it through your clinic, just that this

5    is essentially threatening or chilling your ability to say

6    those things to the people who come to the clinics.

7    MS. SUMMERS:  Yes, Your Honor.

8    THE COURT:  Got it.  What else?

9    MS. SUMMERS:  We also have the state activity

10   soliciting public complaints, directing them to the legal

11   hotline that is run by Reproductive Equity Now, asking them

12   whether they have been patients or not, to file complaints

13   against these centers.  And that is also putting our client

14   on notice that they may need to be cautious of their

15   language, because, again, the public at large is being asked

16   to report on them, not specifically their clients or people

17   that are visiting Your Options Medical.  And that, while may

18   not prevent our client from speaking, does chill and create a

19   hostile environment for them in their religious speech and

20   expression.

21   THE COURT:  Okay.  What next?

22   MS. SUMMERS:  We also have a statement -- I'll try

23   to find this one for you -- that even if you're not seeking

24   an abortion, these places are dangerous and deceptive and not

25   safe for you to go to.  So it's not even saying that just

1    because they don't provide abortions, they're not safe or

2    they're deceptive or they're misleading or a threat to public

3    health, but -- this is on page 15 of our complaint,

4    paragraph 79, quote, "Even if you're not looking for an

5    abortion, these centers are not safe or trusted place to go

6    for reproductive healthcare."

7              THE COURT:  And so you view that as not merely

8    criticism.

9              MS. SUMMERS:  Yes, Your Honor.

10             THE COURT:  Why?

11             MS. SUMMERS:  Because again, they are saying that

12   they are not safe or trusted and that they are a threat to

13   health, without any underlying accusations of actual

14   wrongdoing.  And the state could, if this were actually

15   factual allegations against the centers, instead of general

16   allegations of wrongdoing, they could specifically go after

17   those wrongdoing centers.

18             Again, that in an informal form of censorship of

19   chilling their speech, and they're trying to do indirectly,

20   what they aren't able to do directly, because there haven't

21   been any instances of them, or let's say Your Options

22   Medical, being engaged in deceptive practices.  They've been

23   cleared by the state.  And yet, they were specifically

24   included in this campaign, or generally, from the state's

25   view, but specifically when linked to Reproductive Equity

1  Now's guidebook that lists and names our client as one of the

2  centers that is problematic.

3          THE COURT:  Okay.

4          MS. SUMMERS:  Your Honor, I don't know that I have

5  anything else on that.

6          THE COURT:  Okay.

7          MS. SUMMERS:  But if you have any other questions,

8  I'm happy to answer.

9          THE COURT:  No.  Just to wrap up, I want to make

10  sure that I understand, that it's primarily these things that

11  you've identified that move them from criticism, which you

12  concede they can do.  Right?

13          MS. SUMMERS:  To coercion.

14          THE COURT:  Well, they can certainly affirmatively

15  speak about abortion.  Right?

16          MS. SUMMERS:  Yes.

17          THE COURT:  You don't disagree with that.

18          But they can criticize, right?  Is that right?

19          MS. SUMMERS:  Yes, Your Honor.

20          THE COURT:  And even scalding criticism, right?

21          MS. SUMMERS:  Yes.

22          THE COURT:  What they can't do is threaten,

23  suppress, or retaliate.

24          MS. SUMMERS:  Yes, Your Honor.

25          And/or discriminate based on viewpoint.

```
 1              THE COURT:  Or discriminate.  Right.
 2              And so the threat -- the threatening suppression,
 3      both with respect to third parties, such as the medical
 4      professionals who volunteer and directly with your
 5      organization, arises out of labeling them, either impliedly
 6      threatening action with respect to the --
 7              Progesterone?  Is that the drug?
 8              MS. SUMMERS:  Progesterone, yes.
 9              THE COURT:  The solicitor of the complaints or
10      the -- the sort of -- what you say is an implication that
11      they're going to take regulatory action, or merely just
12      labeling them, without actually engaging in any regulatory
13      activity.
14              MS. SUMMERS:  Yes.
15              And also, in addition, Your Honor, I did highlight
16      the fact that they indicate in that press release that they
17      are a religiously affiliated organization.  Our client is a
18      religiously affiliated organization.  So that speaks to the
19      religious discrimination, the religious targeting, as opposed
20      to just criticizing secular centers in general.
21              THE COURT:  I see.  Okay.
22              And the viewpoint discrimination, explain that to
23      me a little bit.
24              MS. SUMMERS:  So Your Options Medical is
25      idealogically, based on its Christian values and beliefs,
```

1    apposed to abortion.

2         THE COURT:  No, I get that your client has a

3    viewpoint.  It's a viewpoint both protected by the First

4    Amendment free speech and a religiously motivated or grounded

5    in religious beliefs viewpoint.  That part I think is very

6    clear.  And I don't think they disagree with that.

7         MS. SUMMERS:  No, I don't think they made any

8    allegations that that is not true.  But we're stating that

9    the state engaged in this campaign to target those religious

10   organizations because it disfavors their pro-life viewpoint

11   and favors abortion; and that is a religiously based

12   viewpoint, and that's why there's heightened scrutiny.

13        THE COURT:  So how does that play out?  They could

14   have a public campaign promoting abortion if they wanted.

15   That wouldn't be viewpoint discrimination that violated your

16   client's rights?

17        MS. SUMMERS:  (Nods head.)

18        THE COURT:  Is that right?

19        MS. SUMMERS:  Correct.

20        THE COURT:  They -- but they -- if they have a

21   public campaign that -- putting aside threats and coercion,

22   but if they have a public campaign that criticizes what your

23   client does, would that be a viewpoint discrimination?  And

24   would that be subject to heightened scrutiny?

25        MS. SUMMERS:  So if we're -- if it could be

1    determined that it's mere criticism, that would pass

2    constitutional muster.  I guess the problem would be some

3    argument as to what --

4              THE COURT:  But if it was more than mere criticism,

5    it was scalding --

6              MS. SUMMERS:  If it were criticism, Your Honor, in

7    any form, versus coercive activity and express viewpoint

8    discrimination -- now, they could have had a campaign that

9    was against anybody that didn't provide the full spectrum of

10   reproductive services, including abortion, adoption

11   referrals, parenting options, like if you were going to

12   discuss the full spectrum, then even secular providers have

13   limited reproductive services.  So they could have criticized

14   anybody, and all people who were not providing the full

15   spectrum of those services, and that would not be a viewpoint

16   discrimination, because it would not be selectively

17   targeting, solely, pregnancy resource centers that are of a

18   religious nature.

19             THE COURT:  So if they did a public relations

20   campaign, if the legislature appropriated the money and they

21   did a public relations campaign, and instead of calling you a

22   public health threat, and those kinds of words, said, "There

23   are these things called 'public resource centers.'  Public

24   resource centers provide some of them -- many of them are not

25   licensed, some are licensed; that all of them generally

1    provide counseling about having a baby; some, or all of them,

2    provide information about some aspects of abortions; that

3    none of these organizations refer people for abortions; none

4    of these people provide abortions.  None of these people will

5    explain to you any -- the benefits, if any, of an abortion.

6    And many of them don't provide," I don't know, "prenatal

7    care," or whatever, some other things.

8              And they said, "You should think carefully before

9    you avail yourselves of those services, because they don't

10   provide these things.  And you should be an informed medical

11   consumer or an informed pregnant or potentially pregnant

12   woman by seeking out a variety of sources.  And here's a list

13   of places that provide other kinds of services," and listed

14   everybody by county who was licensed to provide different

15   aspects of the services you just described.  Would that be

16   viewpoint discrimination?

17             MS. SUMMERS:  No, Your Honor.  I think that would

18   be a perfectly acceptable kind of campaign.

19             THE COURT:  Even though they focused it on

20   pregnancy resource centers.  In other words, nothing in the

21   campaign talked about --

22             MS. SUMMERS:  If they were merely describing those

23   kinds of centers, without using specific language and calling

24   them deceptive and a threat to public health and fraudulent,

25   and those kinds of things, fake, I think that would be

1    perfectly acceptable.  I think that would be the kind of

2    public education campaigned that the Supreme Court considered

3    in *NIFLA v. Becerra*, which ACLU addressed in its amicus brief

4    here.  That is the kind of campaign that the Supreme Court

5    was considering in *NIFLA* one, *NIFLA v. Becerra*, *NIFLA* two,

6    *Evergreen*.

7            THE COURT:  So the selection of focusing on

8    pregnancy resource centers in the campaign wouldn't be a

9    viewpoint discrimination, even though if the whole campaign

10   just focused on the, quote, short -- I'm not saying they are

11   shortcomings, but, the, quote, shortcomings of pregnancy

12   resource centers, that that selection wouldn't be viewpoint

13   discrimination, even though they weren't doing -- well,

14   period.  That's not the viewpoint discrimination.

15           MS. SUMMERS:  Well, Your Honor, that could

16   encapsulate more than just pregnancy resource centers that

17   are Christian-based organizations; that could encapsulate

18   secular organizations.  So it's not necessarily viewpoint

19   discrimination.

20           THE COURT:  No, but what I'm saying is, if they

21   just focused on organizations that do what your client does.

22           MS. SUMMERS:  Yes.

23           THE COURT:  I don't know that all the organizations

24   that you describe in the complaint and you refer to are

25   religious based or not.  But they focused on organizations

1    that do -- that provide the -- both the array of and the

2    absence of other services that -- that fit the profile of

3    what we've all been talking about as pregnancy resource

4    centers.  Right?  Places that provide counseling, maybe an

5    ultrasound.  They provide some information about some aspects

6    of abortion.  They don't suggest to people to have an

7    abortion.  They don't refer people for abortions.  To the

8    extent -- I'm not taking a position on it, but to the extent

9    that there are benefits for abortion in a particular

10   circumstance, they don't describe those, I'm assuming.  And

11   they focus their campaign just on those organizations, but

12   describing -- having the kind of campaign I described, not

13   these other words that were used, would that be viewpoint

14   discrimination or not?  Or religious discrimination?

15           MS. SUMMERS:  I don't -- I don't see that as being

16   viewpoint discrimination.

17           THE COURT:  Okay.  So the selection of focusing --

18   the choice by the state officials to focus on this group,

19   even if all those groups that are pregnancy resource centers

20   are religiously motivated, that wouldn't be viewpoint

21   discrimination?

22           MS. SUMMERS:  I don't think it is what we are

23   seeing in this situation, which is the state pointing out --

24           THE COURT:  It doesn't have the coercion that is

25   here.

1           MS. SUMMERS:  Yes.

2           THE COURT:  I understand that.  But you have also

3     used the words "viewpoint discrimination."  I'm

4     distinguishing.  I understand that the coercion suppression

5     things are separate.  I'm wondering if just the selection, if

6     you're saying that's viewpoint discrimination or not.  That's

7     what I'm trying to figure out.

8           MS. SUMMERS:  That's hard for me to completely

9     answer, Your Honor, but I believe that here, the focus on the

10    religious nature and the vocalization on that focus of the

11    religious nature of these organizations is really what

12    enhances the viewpoint discrimination.  In the kind of

13    campaign that you have alleged, that sounds to me like it

14    could encapsulate -- even if they're focusing, that is their

15    intent purpose, could encapsulate secular groups that don't

16    provide those same services or provide the same services that

17    they do, but not from a religious viewpoint.

18          THE COURT:  Right.  It would encompass -- but as a

19    practical matter, if everyone who does that is religiously

20    motivated, then --

21          MS. SUMMERS:  Then I think, under the case law,

22    there could be -- if the -- if the outcome of the policy

23    does, in fact, only target religious organizations, then that

24    could be an indication that there is viewpoint

25    discrimination.  So I think that there could be an argument

1    made for that.

2            THE COURT:  I mean, there's viewpoint

3    discrimination in the sense that they picked -- they picked a

4    viewpoint to express, and they picked a viewpoint to -- they

5    wanted to express that viewpoint because it was different

6    than another viewpoint in the community.  And so in that

7    sense, they're -- depending on one's meaning of the word

8    "discrimination" -- but they have picked it because they

9    disagree with -- I mean, presumably every time people express

10   a viewpoint, it's in part because they disagree with someone

11   else's viewpoint.  So they've picked this viewpoint, because

12   they disagree with that viewpoint.  And what I'm trying to

13   figure out is, even if it doesn't come with --

14           MS. SUMMERS:  The same burden.

15           THE COURT:  Coercion, right?  If your position is

16   that, itself, is a violation of the First Amendment, the

17   selection, or not.

18           MS. SUMMERS:  I believe in that case, in that

19   analogy --

20           THE COURT:  Scenario.

21           MS. SUMMERS:  -- situation that you have presented,

22   Your Honor, that the state would have a much stronger

23   argument that it is not viewpoint based.

24           THE COURT:  I'm not asking if they have a stronger

25   argument.  I understand their argument would be stronger in

1    those facts.  I'm trying to figure out -- and the reason that
2    I'm asking the question is not hypothetical.  I'm trying to
3    figure out if one of the things that I have to decide here --
4    and you don't have to put it in -- you're not resolving it
5    for all time memorial.  I understand this is not the only
6    case of involving the First Amendment that you might do, but
7    whether, in this particular case, you are claiming that the
8    mere selection of the topic itself is a viewpoint
9    discrimination or not.  If you're not, you're not.  If you
10   are, you are.  It's just a question of what I have to decide.
11              And if you -- in other words, even if there is no
12   coercion, even if there is no suppression, is the mere
13   selection of the topic viewpoint discrimination then a
14   violation of your client's First Amendment rights?
15              MS. SUMMERS:  I will have to say yes, Your Honor,
16   in light of *Masterpiece*.
17              THE COURT:  In light of what?
18              MS. SUMMERS:  *Masterpiece Cake* house.
19              THE COURT:  Oh, *Masterpiece Cake*.
20              MS. SUMMERS:  And other similar Supreme Court
21   precedent that the specific selection of that viewpoint,
22   whether directly expressed or not, can be an indication that
23   it is viewpoint discrimination because of its effect on that
24   particular viewpoint.
25              THE COURT:  In the absence of an effect is a

1    violation of law?  What if they said, "We disagree with this
2    viewpoint," and -- would they be able to -- and they didn't
3    have any suppression.  They didn't have any coercion, because
4    the speaker didn't have that authority.  Right?  And wasn't
5    in direct communication with somebody who did.  But they
6    just -- they picked it for that reason, and they opposed that
7    viewpoint.  Right?  Would then it be violation of the law?
8    Or is it only if they have downstream effect.

9        MS. SUMMERS:  Yes, if you've taken all the facts
10   together as a whole, and it is violating religious viewpoints
11   exclusively, then that can be taken as religious animus.

12       THE COURT:  How does it violate religious views?

13       MS. SUMMERS:  The burden or chill expressive
14   religious activities and speech by disfavoring that viewpoint
15   at the state level, even absent some other situation.  So the
16   fact that it effects and burdens religious speech can be
17   taken as viewpoint discrimination in Supreme Court precedent.

18       THE COURT:  Okay.  What if the governor said, "This
19   is a Christian nation"?  If the governor said, "This is a
20   Christian nation," would people who aren't Christian, who are
21   religious, have a claim that they're worried by the governor
22   saying that -- I'm not saying that the governor has said it
23   or hasn't.  But if the govern said that, would that state a
24   claim that at least, plausibly, someone who was regulated by
25   the state could say -- who wasn't Christian, would they be

1    able to say that they may be -- you know, that they're at

2    risk of whatever privileges that are contingent on state

3    regulation?

4            MS. SUMMERS:  No, Your Honor.  I believe that

5    the -- your statement that this is a Christian nation --

6            THE COURT:  Christian state, I suppose, would be

7    what the governor would say.  Yeah.

8            MS. SUMMERS:  The governor would say that this is a

9    Christian state, but without any further animus or direction,

10   in that situation, you're not even targeting, exclusively,

11   other religious organizations or religious persons, secular

12   persons.  Everybody it encompassed, I don't see how that's

13   targeting any religious viewpoints.

14           THE COURT:  What if they said that other religions

15   are a threat?

16           MS. SUMMERS:  I believe that there would be

17   lawsuits filed, Your Honor.

18           THE COURT:  Well, that -- yeah, the lawsuits are

19   filed about all sorts of things all day long.  That doesn't

20   mean any of them are any good.  I mean, some of them are.

21           MS. SUMMERS:  If the state were to say that, "We

22   are a Christian state and other religious -- or religious

23   persons, other religions are a public health threat and a

24   danger to our state," yes, I think that would be problematic

25   and would burden and chill the religious expression of other

1    religious persons who are not Christian, or even secular

2    ones, for that matter.

3            THE COURT:  Okay.  I don't think I have any other

4    questions.  It's been really helpful.  I appreciate that.

5    Thank you.

6            Anything you want to say?

7            MS. FISCHER-GROBAN:  I just have a few quick

8    points, although I'm mindful of the time.  I just want to

9    make one quick point.

10           On the one hand, it is helpful to be directed to

11   Exhibits K and L to the complaint as the source of this

12   alleged threat.  I think if Your Honor carefully reads these

13   documents, it's quite clear that under *Bantam Books* and

14   *Vullo*, the complaint does not allege a threat based on this

15   maintaining integrity, accessibility, and transparency in

16   reproductive care press release, and then the ensuing

17   memorandum from the commissioner.  A careful review of these

18   reveals absolutely no plausible threat to providers.  In

19   fact, at the very start of it, "The Department of Public

20   Health is committed to comprehensive reproductive care

21   healthcare access."  That seems okay, based on the discussion

22   that we just had.

23           "In the wake of recent complaints regarding several

24   antiabortion centers" --

25           THE COURT:  What are you reading from?

1              MS. FISCHER-GROBAN:  Sure.  Exhibit K to the

2       complaint.  This is Document 1-4, at page 10.  And this is

3       the press release where --

4              THE COURT:  I got it.

5              MS. FISCHER-GROBAN:  Sure.  I'm just pointing to

6       this preamble.

7              THE COURT:  Oh, I see.  Yes.

8              MS. FISCHER-GROBAN:  Right.  "The purpose of this

9       review is to make sure DPH professional licensees and

10      facility licensees, including these centers, are adhering to

11      their designated scope of practice and operating

12      transparently and free from deceptive practices."

13             There's no threat here.  There is no coercion here.

14      The complaint doesn't plausibly allege any sort of actionable

15      threat or coercion based on this language.

16             And furthermore, the Department of Public Health is

17      statutorily required to oversee the safe provision of

18      healthcare in the Commonwealth.  It must be able to, when it

19      receives reports of conduct, practices that violate state

20      laws and regulations, it must be able to issue communications

21      like this and the ensuing memorandum.

22             I also want to add, this discussion about footnotes

23      6 and 7, which includes, I might add, a citation to the

24      American College of Obstetricians and Gynecologists, who say

25      that medication abortion reversal is not supported by

science, none of this is in the complaint.  There's no
allegation that the application of 243 CMR 103 to advance
practiced registered nurses, none of this is in the
complaint.  But that's kind of beside the point.

The complaint -- the -- on its face, it's clear
that this was in response to complaints about harmful and
unsafe regulatory violations at centers.  That's what
prompted this.  And so nothing in here -- again, I encourage
a close read.  Nothing in here constitutes a threat.  And
this is all -- this is about conduct and healthcare towards
pregnant patients.  This is not about speech or beliefs.
This is about the regulation of the provision of healthcare
at licensed healthcare facilities in the Commonwealth.

I also just want to make a point about this
discussion about religion.  There's no animus towards
religion alleged anywhere in this complaint factually.

THE COURT:  What about their claim that by focusing
on groups that most or all of whom are religiously motivated
in expressing a viewpoint that comes -- that the activity
itself is the expression of their religious beliefs -- I
think that's probably a fair characterization -- and that the
views being expressed in the counseling are their religiously
based views, that by focusing, selecting this particular
category to focus on is, itself, a form of religious
discrimination and chills what they're doing?

1          MS. FISCHER-GROBAN:  I actually -- so this

2     document, again, this is a category of providers.  They -- or

3     some are licensed, some are not.  The statement here that

4     they are -- many of them are kind of funded or organized by

5     religious organizations expresses no animus towards religion.

6     In fact, in the allegations that they have, it's a way to

7     identify them.  These are religious organizations.  They

8     admit that they are religious organizations.  This is not

9     about the practice of religion.  There is no burden on

10    religious beliefs.  There is no chilling of religious

11    beliefs.  This is about the provision of healthcare.

12          THE COURT:  What about the labeling of deceptive

13    either they're advertising, web pages, or what they do and

14    don't talk about in counseling?

15          MS. FISCHER-GROBAN:  Your Honor, first of all, none

16    of the public education campaign or any of the statements by

17    any of the public officials are directed at Your Options

18    Medical.  But most importantly, they're directed at practice.

19          And again, I think a close reading of the exhibits

20    show that they say many of these centers do this.  Often,

21    "may."  None of them are saying Your Options Medical does

22    this.

23          But also, they're directed at practices where a

24    clinic is not transparent about what it does.  In other

25    words, it advertises one thing, it does another thing.  It

1   says it provides comprehensive reproductive healthcare

2   services; it actually doesn't.

3           These are about time sensitive medical decisions.

4           THE COURT:  But what about their claim or their

5   argument that to the extent you're saying that they say they

6   provide comprehensive reproductive healthcare and they don't,

7   that you're just labeling them as wrongdoers and sort of

8   impliedly threatening their existence, or at least their

9   relationships with licensed people, but not taking any action

10  against them?

11          MS. FISCHER-GROBAN:  I'm going to break that into

12  three parts -- and now I forget my three parts, after I was

13  so organized in my response.  I'll try to reclaim.

14          The first part is this labeling thing.  This is not

15  a defamation case.  This is not a tort case.  There's kind

16  of:  This underlying concept of when the state criticizes us,

17  it must be true.  And if we disagree with what the state says

18  or we believe it's inaccurate, that that's somehow a First

19  Amendment violation.  That could be a tort claim, but that is

20  not a First Amendment violation.  And that's really what's

21  underlying this complaint:  We disagree with what they're

22  saying about us, and we think it's factually inaccurate.  So

23  that's part one about the labeling that I want to make clear.

24          Part two, again, this word "threat" -- we have

25  *Bantam Books*, we have *Vullo*.  They describe threats.  *Vullo*

1    is at a 12(b)(6) stage.  Reading the facts in those cases,

2    there's no plausible allegation of a threat here, based on

3    this kind of regulation of entities after report of practices

4    and conduct that violate state regulations and state law.

5            I think those are the two points that I want to

6    make, but if that didn't answer your question, I'm happy to

7    answer further parts of it.

8            THE COURT:  No, I understand.  Okay.

9            MS. FISCHER-GROBAN:  Those are the additional

10   points that I wanted to make.  If you have any further

11   questions, I'm happy to answer them.

12           THE COURT:  I don't think -- I think I know -- I

13   understood from what you said, your answers to the things

14   that I talked to --

15           I guess the question that I would ask is what I

16   spent a lot of time with Ms. Summers on was the line between

17   even scalding criticism, which seems within your rights, the

18   rights of your clients, and the threats and the coercion.

19   And so is there anything else either what would crossover, or

20   why this hasn't crossed over?

21           MS. FISCHER-GROBAN:  Two answers to that.  The

22   first is, again, there's two theories here.  It's either the

23   state itself is threatening or coercing Your Options

24   Medical -- and again, a close reading of the exhibits show

25   that is not happening.  And the second is that we're coercing

1    a third party.  And there we have an excellent example.  We

2    have *Vullo*.  We have *Bantam Books*.  That is what coercion

3    looks like.  That is what a plausible allegation of a threat

4    or coercion looks like.

5         A -- and those cases show that the concern here in

6    *Vullo*, for example, is the private meeting, where a deal is

7    struck, that the insurance companies are going to forego

8    their business relationships with the NRA because the state

9    disagrees with the NRA's viewpoint.  We have nothing close to

10   that here.

11        And I think another thing that's really important

12   here is that in both *Bantam Books*, *Vullo*, *Backpage*, which was

13   discussed in *Vullo*, we have states saying:  Our regulatory

14   activity towards you is going to depend on you disassociating

15   from a group that we disagree with.

16        There are no allegations that that happened here.

17        For example, again, a close reading of the

18   commissioner's reminder to providers about their regulatory

19   obligations in response to complaints of violations of those

20   regulatory obligations, harming people in the Commonwealth,

21   the commissioner is just reminding them.

22        What's present in those other cases and is not

23   present here is a state actor saying to somebody, "Whether or

24   not we pursue you for regulatory violations or violations of

25   the law or refer you to the attorney general depends not on

1      your conduct, but on whether you disassociate from this group

2      who's speech we disagree with."

3              So in *Bantam Books*, the Court is concerned because

4      taking the books, the publisher's books off the shelf, that's

5      a prior restraint.  And that was what was affected by this

6      communication.

7              Here, there's absolutely no allegation, no

8      plausible allegation, no factual allegation, that what the

9      commissioner is saying is, "We will not pursue people for

10     violations of state law so long as they disassociate from

11     antiabortion abortion centers, pregnancy resource centers,"

12     whichever term you want to use.  And those were key to these

13     third-party coercion cases, and it is absolutely not present

14     here.

15             THE COURT:  Okay.  Anything you want to add for --

16     on these issues?  I don't think we're going to get into, in

17     the oral argument, on the standing in the third party.

18             MS. FRISCH:  Okay.

19             THE COURT:  So first of all, super helpful, and

20     very -- really interesting set of issues.  So thank you.

21             Let me just talk briefly about the motion to -- or

22     the potential motion to amend and how that intersects.

23             So I was thinking a lot about that, and I'm curious

24     what you all think about it.  But here's one thought that I

25     had.  It strikes me that on any motion to amend, there's two

1    questions.  Right?  There's the Rule 15 question.  Are you
2    too late?  Were you dilatory?  I don't really see any issues
3    of that nature here.  I mean, if they want to amend, they
4    need permission, because they're past, under the rule, the
5    time in which they could amend as of right.
6            But there are, essentially, two outcomes to the
7    motion to dismiss -- or three.  One is, it's allowed
8    completely, and the case is dismissed.  The second is, it's
9    denied completely.  And the third is some of it is thrown
10   out, and some is not.  I mean, you all know that.  And so in
11   the scenario where some or all of it is thrown out, I would
12   expect that the plaintiffs wish to seek to amend.  That's
13   what they've said.
14           Ordinarily, what I might do is I would say -- what
15   I would often do -- if I dismissed the whole case, what I
16   typically would do in a case like this, where you -- you've
17   advanced what you have and what you haven't about what an
18   amended complaint would be, I would simply say, "File a
19   motion for leave to amend."  I would say, "Tell me what the
20   difference is.  Tell me why it solves the problems."
21           And I would say to you, "Oppose."  And I would say
22   to you, "Oppose on everything, not just Rule 15 timing, but
23   on Rule 12."
24           And we'll do it once more, and either it is
25   sufficient and it goes forward, or it doesn't.  And probably

1    my view would be, then, we're done.  We're either going to

2    discovery after that, or you're going to the Court of Appeals

3    if I think it's dismissed.  Because -- not for sure, but it

4    seems unlikely that there's a third or fourth round of

5    litigation over that.  That seems unnecessary.

6         So that's what -- and so what I'm thinking about

7    here, to be frank with you, this is a complicated set of

8    issues of constitutional law.  It's very well advanced by all

9    three groups of you.  And maybe the most sensible thing to

10    do -- I mean, you could tell me if you think there's really

11    significant Rule 15 issues separate from what amounts to

12    12(b)(6) issues.  But I'm thinking is why shouldn't I do

13    this -- why shouldn't we resolve all of this once?

14         It's a question for all of you.  I haven't resolved

15    this in my mind.  And if we're resolving it once, I think

16    what that would mean is just say, "Amend the complaint."  In

17    other words, forget, like, having to file a motion for a

18    leave to amend.  Just amend the complaint, and you either

19    tell me that you just want to say, "Judge, we don't need to

20    amend our briefs, because these briefs apply to that."  But I

21    suspect you're probably going to want to amend your briefs.

22    And you file -- then you'll file new briefs.

23         And you'll oppose and explain why.

24         And maybe if you file an amended complaint, you

25    give everybody a redline, just so we know what's different,

1    you know.

2            So -- and then I resolve it, like, on that

3    comprehensive record.  I know you have more documents.  You

4    say they bear on it.  I don't know how they bear on it.  I'm

5    not saying they don't, but I just don't know what it says.

6    And then I resolve everything once.

7            That's one thought, and I'm wondering what you all

8    think about it before I just go off and do something.

9            MS. SUMMERS:  Well, Your Honor, our viewpoint would

10   be that that option that you presented, if you were inclined

11   to tell us that we need to amend our complaint, that just

12   allowing us to do that would be our preference, rather than

13   filing the motion to amend and having the back and forth.  I

14   think that that would be an unnecessary waste of the time and

15   resources both the Court and all of the parties involved.

16           THE COURT:  Just to make sure I'm being clear, what

17   I'm saying is one possible way to proceed is you just amend

18   the complaint -- that is, I have all of this.  You have an

19   idea of what the issues are that I'm thinking about.  I don't

20   know that they're, like, stunning.  Like a significant

21   question of what's the coercion, threat, suppression, right?

22   And that's not your only issue, but that is, obviously, a key

23   issue in this case.

24           And so one way to proceed would simply be, okay,

25   30 days, or some reasonable period of time, file an amended

1    complaint.  And then we'll dispense with the Rule 15 part,

2    because, I mean, subject to what the defendants tell me, I

3    don't -- this -- if I were -- if I dismiss -- the only way

4    this comes about, the Rule 15, is if I dismissed it.  If I

5    dismissed it and you moved to amend, I might dismiss it on

6    Rule 12 grounds.  It seems hard -- it seems unlikely that I

7    would dismiss it on the grounds that you were dilatory or

8    that you didn't move promptly enough.  Because, essentially,

9    you would primarily being amending, I think, based on the new

10   documents that you got -- and some of them you got awhile

11   ago, but the vast bulk of -- half of them, or more, you got

12   on April 28th.

13          So it seems to me the real question -- and we

14   should decide cases on the merits anyway, generally.  That's

15   what Rule 1 says.  And so it would just be, you know, file an

16   amended complaint.  You could either file a new motions to

17   dismiss or the same, but not both.  And then you'd oppose.

18          Because if you amend, there's going to be --

19   they're going to be fighting over the same -- we're going to

20   be fighting over it again, so why not just have a more

21   complete record and do it once.  That's what I was thinking

22   about.

23          That's fine with you.

24          MS. SUMMERS:  Yes, that's acceptable to us,

25   Your Honor.

1           THE COURT:  What do you think?

2           MS. FISCHER-GROBAN:  I'll just state our position,

3    which I must, which is, that amendment would be futile,

4    because this case is about kind of these public facing

5    statements, and we know what those are.  Those are alleged in

6    the complaint.  So my position is that nothing that they

7    identify in their notice or these kind of internal documents

8    would affect the facts in this case as they've alleged them

9    in their complaint.  So that's my position.

10          If the Court disagrees with that position, then

11   what you propose -- what the Court proposes works for us.

12          THE COURT:  So I'm sorry, first -- I'll get back to

13   that, but did you have anything to say on this?

14          MS. REEVES:  Your Honor, I agree with the state's

15   position on the futility of the amendment and will also note

16   that the plaintiffs had -- excuse me, plaintiff had an

17   opportunity to decide when the complaint would be filed in

18   this case and elected to pursue a public records request when

19   it did and had control over, you know, when it would get,

20   sort of, access to whatever information it needed to

21   incorporate into a complaint against the defendants in this

22   case.

23          So I just wanted to add that point, because the

24   parties have invested a lot of time and resources into

25   briefing up to this point.  And we do believe, speaking on

1    behalf of the REN defendants and Holder, that we have

2    articulated reasons under both Rule 12(b)(1) and 12(b)(6) for

3    dismissal, based on standing and failure to state a claim.

4              THE COURT:  Right.  Okay.

5              So just to be clear, I'm not saying -- I'm going to

6    think about this.  I think what I'll likely do is -- what's

7    today?  Some time between today -- hopefully today or

8    tomorrow, and definitely by Monday, I will tell you which way

9    I'm going; that is, I'll either say I'm going to decide the

10   motion to dismiss, and then you'll get the decision and

11   you'll all respond as you wish and as you see best, or I'm

12   going to just say, "File an amended complaint and proceed as

13   the way I've described."

14             Just so you're all clear, I'm not -- if I select

15   the do the amended complaint, I'm not -- that's not an

16   expression of a view that the existing complaint states a

17   claim or that it doesn't state a claim.  It is just a

18   determination that, like, from a sort of practical part I

19   recognize --

20             Part of the hesitation, just to be frank with you,

21   about going down this road, is you've all spent a lot of

22   time.  You're not from Massachusetts, so I assume you flew --

23   or I don't think you are.  You flew here.  So that's time,

24   that's expense.  You all have invested a lot of time and

25   effort in the motion to dismiss.  It's clear that these

```
 1    are --
 2               It is true, as you say, Ms. Summers, lots of people
 3    can sue.  People sue over everything and anything.  It is
 4    really quite astonishing sometimes.  But not all of those
 5    suits are well taken or well prepared.  It's quite a range.
 6    Obviously, all of you have well prepared the papers and
 7    thought about the issues and engaged with them in a
 8    thoughtful and meaningful way, so I'm cognizant of that.  I'm
 9    also just thinking about a -- that is part of the reason that
10    maybe I should just resolve it and then go forward.
11               But you're going to -- if I dismiss it, you're
12    going to file a motion for leave to amend.  I have no doubt
13    about that, and there's nothing wrong with that.  That's
14    perfectly fine.
15               And so then you're going to argue that their
16    amendment is futile.
17               Even if I dismiss the complaint, I don't know if
18    it's futile, because I don't know what they're going to say
19    in the complaint.  And I don't know how those documents or
20    whether an amendment would be entirely that, just those
21    documents, or whether there's anything else that they're
22    thinking about.
23               So part of me thinks that there's a value to one
24    comprehensive resolution, because my thought would be if we
25    did this, it depends what -- it seems unlikely that there
```

1    would be -- I would be unlikely to think it was sensible or

2    reasonable to have a third amended complaint in this context.

3    Obviously, there could be some unusual circumstances which

4    would warrant it, but it seems exceptionally unlikely.  So

5    that's just what I'm pondering, and I'll think about that a

6    little bit.  Okay.

7           Any last -- if there's anything anyone wants to

8    comment on that before we adjourn?  No.  Okay.

9           Thank you very much.  Have a good day.  We stand in

10    recess.

11           (Court in recess at 11:46 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                      Dated this 8th day of July, 2025.

14

15

16

17               /s/ RACHEL M. LOPEZ

18

19

20          _____
                 Rachel M. Lopez, CRR
21               Official Court Reporter

22

23

24

25