UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

A WOMAN'S CONCERN, INC. d/b/a YOUR
OPTIONS MEDICAL CENTERS,

                    Plaintiff,

          v.

MAURA HEALEY, Governor of Massachusetts,
sued in her individual and official capacities;
ROBERT GOLDSTEIN, Commissioner of the
Massachusetts Department of Public Health, sued in
his individual and official capacities;
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC., REBECCA HART
HOLDER, EXECUTIVE DIRECTOR OF
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC.,

                    Defendants.

CIVIL ACTION
NO. 1:24-cv-12131-LTS
Leave to file granted on 8/21/2025

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
STATE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

ARGUMENT ..................................................................................................................6

    I.      Plaintiff Has Sufficiently Pleaded a Free Speech Claim ....................................... 6

           A.      Defendants Have Already Unconstitutionally Chilled the Plaintiff's Speech. ...................................................................................................... 7

           B.      Defendants Have Engaged in Unconstitutional Threats. ........................... 8

                  1.      Word Choice and Tone: Defendants' Language Constituted Accusations of Illegal Conduct. .................................................. 10

                  2.      The Existence of Regulatory Authority: Defendants Possessed the Power to Punish. .................................................. 16

                  3.      Perception as a Threat: Reasonable Readers Perceived Defendants' Conduct as a Threat. .................................................. 17

                  4.      Threat of Adverse Consequences: Defendants Threatened PRC's Existence. .................................................................... 18

    II.      Plaintiff Has Pleaded a Free Exercise Claim for Religious Discrimination. ........ 20

    III.      Plaintiff Has Pleaded an Equal Protection Claim. ................................................ 22

    IV.      Qualified Immunity is No Shield for Unconstitutional Threats........................... 24

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Pages**

*Aebisher v. Ryan*,
    622 F.2d 651 (2d Cir. 1980)........................................................................................ 7

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ............................................................................. 11, 16

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).............................................................................................. 9, 25

*Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*,
    246 F.3d 1 (1st Cir. 2001)....................................................................................... 23

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960).................................................................................................. 7

*Carey v. Brown*,
    447 U.S. 455 (1982)................................................................................................ 14

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (2012)........................................................................................... 20, 21

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)................................................................................................ 24

*Commonwealth v. Landry*,
    438 Mass. 206 (2002) ............................................................................................. 11

*Connell v. Signoracci*,
    153 F.3d 74 (2d Cir. 1998)..................................................................................... 13

*DeJong v. Pembrook*,
    662 F. Supp. 3d 896 (S.D. Ill. 2023)..................................................................... 25

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022).................................................................................................. 2

*Gillette v. United States*,
    401 U.S. 437 (1971)................................................................................................ 20

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)................................................................................................ 25

*Kennedy* v. *Warren*,
  66 F. 4th 1199 (9th Cir. 2023) ................................................................. 10

*Laird v. Tatum*,
  408 U.S. 1 (1972) ..................................................................................... 7

*M.M.R.-Z. v. Puerto Rico*,
  528 F.3d 9 (1st Cir. 2008) ....................................................................... 24

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  584 U.S. 617 (2018) .................................................................. 20, 21, 22

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................ 14

*NRA of Am. v. Vullo*,
  602 U.S. 175 (2024) ....................................................... 1, 6, 7, 9, 10, 17

*NRA of Am. v. Vullo*,
  49 F.4th 700 (2d Cir. 2022) .................................................................... 10

*NRA of Am. v. Vullo*,
  No. 21-0636-cv, 2025 U.S. App. LEXIS 17762 (2d Cir. July 17, 2025) ................................. 25

*Ocasio-Hernandez v. Fortuño-Burset*,
  640 F.3d 1 (1st Cir. 2011) ................................................................... 2, 17

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) ..................................................................... 9

*Penthouse Int'l, Ltd. v. Meese*,
  939 F.2d 1011 (D.C. Cir. 1991) ............................................................... 13

*Pers. Adm'r of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ................................................................................ 23

*R.J. Reynolds Tobacco Co. v. Shewry*,
  423 F.3d 906 (9th Cir. 2005) ................................................................... 13

*Rattner v. Netburn*,
  930 F.2d 204 (2d Cir. 1991) .................................................................... 20

*Romer v. Evans*,
  517 U.S. 620 (1996) ................................................................................ 24

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) .................................................................................. 6

*Rubinovitz v. Rogato,*
   60 F.3d 906 (1st Cir. 1995).................................................................... 23

*State Cinema of Pittsfield, Inc. v. Ryan,*
   422 F.2d 1400 (1st Cir. 1970)................................................................. 9

*Tapalian v. Tusino,*
   377 F.3d 1 (1st Cir. 2004)....................................................................... 23

*U.S. Dept. of Agric. v. Moreno,*
   413 U.S. 528 (1973)................................................................................ 24

*Virginia v. Am. Booksellers Ass'n,*
   484 U.S. 383 (1988)................................................................................ 8

**Statutes**

18 U.S.C. § 1956........................................................................................ 11

42 U.S.C. § 1983........................................................................................ 1

**Other Authorities**

243 Mass. Code Regs. 2.07(11)(a)(1)......................................................... 11

Plaintiff A Woman's Concern, Inc. d/b/a Your Options Medical Centers ("YOM") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") [Doc. #70] of Defendants Maura Healey, in her individual and official capacities, and Dr. Robert Goldstein, in his individual and official capacities (collectively, "State Defendants," or "Defendants").

## INTRODUCTION

Massachusetts officials have weaponized their regulatory authority to stifle religious viewpoints they oppose. Rather than exercising their legitimate power to express their views on abortion policy, Defendants crossed the constitutional line into coercive threats and accusations of criminal wrongdoing that have chilled Plaintiff's speech. Under *NRA of Am. v. Vullo*, government officials violate the First Amendment when they use regulatory power to "punish or suppress views that the government disfavors," regardless of whether formal sanctions are imposed. 602 U.S. 175, 180 (2024). Defendants orchestrated a coordinated campaign deploying legal terms of wrongdoing such as "public health threats" and "deceptive advertising" against religious pregnancy resource centers ("PRCs"), such as YOM, actively solicited complaints against them, and both threatened and enacted regulatory consequences—all while ignoring bad conduct by abortion providers.

Defendants orchestrated this suppression campaign by weaponizing Reproductive Equity Now ("REN") as a state-sanctioned surrogate—deliberately tasked with delivering public censure that state officials knew they could not lawfully issue themselves. As one revealing communication makes plain: "[t]he use of logos of the [PRCs] is awesome to keep [on REN's linked PDF], too, and not something we can do on mass.gov[.]" Amend. Compl. ¶ 219. This constituted government censorship by proxy, no less constitutionally offensive for being laundered through a third party.

Defendants' viewpoint-based targeting of PRCs and chilling of their speech violates the Constitution. YOM's Amended Complaint states a claim for declaratory, compensatory, and injunctive relief under 42 U.S.C. § 1983 for violations of YOM's constitutional rights under the

First and Fourteenth Amendments, based on the State Defendants' unconstitutional chilling of its speech. "The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). In particular, the law simply "requires sufficient detail in the complaint to give a defendant fair notice of the claim and the grounds upon which it rests." *Id.* at 8. YOM's Amended Complaint amply does so.

## STATEMENT OF FACTS

Your Options Medical ("YOM") is a Christian nonprofit organization founded in 1991 to provide support to women facing unplanned pregnancies. Amend. Compl. ¶ 14. YOM operates as a life-affirming entity that does not perform abortions, does not refer for abortions, and does not advertise that it performs abortions. *Id.* ¶¶ 15, 17. YOM has been licensed by the Massachusetts Department of Public Health ("DPH") as a medical clinic since 1999 and has renewed its licensing every two years as required by law. *Id.* ¶¶ 20, 24. YOM offers information about abortion pill reversal. *Id.* ¶ 21. YOM has received zero patient complaints. *Id.* ¶ 25.

Following the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), PRCs became targets of violence and vandalism nationwide. *Id.* ¶ 28. YOM was vandalized three times in the summer of 2022, with spray paint labeling it a "SCAM" and threatening messages stating, "IF ABORTION'S NOT SAFE NEITHER ARE YOU." *Id.* ¶¶ 30, 40. Rather than pursuing those who committed these criminal acts, Massachusetts officials instead escalated hostile rhetoric against PRCs. *Id.* ¶¶ 33-34.

On July 6, 2022, then-Attorney General Maura Healey issued a factually baseless "advisory" falsely claiming that "crisis pregnancy centers claim to offer reproductive healthcare services" but "do not provide abortion care or referrals, contraception, or other reproductive health care, despite what they may advertise." Amend. Compl. ¶¶ 35-36. The advisory was issued without

any evidence of complaints against pro-life centers in Massachusetts. *Id.* ¶ 38. In March 2023, the Massachusetts legislature passed a supplemental budget allocating $1 million for a "public information campaign warning people about crisis pregnancy centers" and an additional $250,000 to fund REN's legal hotline. *Id.* ¶¶ 90, 109-110. This budget was passed despite no complaints filed with DPH against *any* PRC. *Id.* ¶ 112.

From 2023 forward, REN and government officials met regularly to coordinate the anti-PRC campaign. *Id.* ¶ 122. Campaign materials were developed through extensive collaboration, with REN having approval authority over government campaign budgets and decision-making authority over campaign materials. *Id.* ¶¶ 156, 162-166.

In October 2023, REN filed a complaint against YOM based on "recent press reports," alleging deceptive practices regarding YOM's mobile medical unit. *Id.* ¶¶ 44-45. Importantly, this complaint was not filed by any patient or person with first-hand knowledge, but by REN's Rebecca Hart Holder, who openly worked in collaboration with the State Defendants to target PRCs. *Id.* ¶ 46. This complaint was an intentional pretext; state officials were "using the [two REN] complaints as a reason to put out this guidance now rather than March, when the health marketing campaign launches." *Id.* ¶ 199. DPH conducted an investigation based on this complaint and found that YOM was in compliance with state licensing requirements, issuing a letter on February 29, 2024, stating: "[t]he findings indicate that all deficiencies have been corrected." *Id.* ¶ 50. The sole required change was unrelated to REN's complaint. *Id.* ¶ 51. Nonetheless, the Massachusetts Board of Registration in Medicine then began an investigation of Plaintiff's medical director based on Defendant Hart Holder's complaint. *Id.* ¶ 52. This investigation has resulted in extensive and ongoing document requests of YOM. *Id.* ¶¶ 53-58.

A public records request revealed that between June 2022 and June 2024, DPH received only two complaints regarding PRCs—both filed by REN, *not by any patients*. Amend. Compl. ¶

184. In stark contrast, DPH received at least eight complaints regarding abortion clinics during the same period, including allegations of using outdated medications, deceptive advertising, and negligent treatment. *Id.* ¶¶ 188-189. At least three abortion clinics failed their DPH inspections for serious violations, including not using sterile surgical equipment, using outdated drugs, and keeping biohazardous material in staff break rooms, yet no public education campaign was launched against them. *Id.* ¶¶ 190-192.

On January 3, 2024, DPH issued a press release specifically targeting "anti-abortion centers," stating they "do not provide abortion care or abortion referrals, contraception, or other important reproductive health care services" and targeting them for their religious views, stating that they are "affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." *Id.* ¶ 59. The press release announced that DPH would educate "the public about the facilities that provide comprehensive reproductive care and those that practice deceptive tactics to limit people's choices[.]" *Id.* ¶ 62.

Commissioner Goldstein simultaneously issued guidance to Massachusetts medical professionals with the original file name "Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024," threatening physicians who provide information about progesterone for abortion pill reversal. Amend. Compl. ¶¶ 64, 67-68. The guidance warned that such physicians "could be found to be practicing inconsistently with accepted practice and subject to discipline," despite progesterone being a lawful prescription medication in Massachusetts. *Id.* ¶¶ 68, 71.

On June 10, 2024, Governor Healey's administration launched what it called a "first-in-the-nation" public education campaign against PRCs throughout Massachusetts. *Id.* ¶ 74. The campaign appeared on media platforms across Massachusetts. *Id.* ¶ 79. Governor Healey stated the campaign "includes protecting patients from the deceptive and dangerous tactics that anti-

abortion centers often use." *Id.* ¶ 77. Commissioner Goldstein declared the campaign would "counter-punch to the vast amount of misinformation and disinformation that these centers peddle every day" and called PRCs "a public health threat." *Id.* ¶ 80.

DPH created and maintains a webpage entitled "Avoid Anti-Abortion Centers" that actively warns citizens that PRCs "may mislead you about your options if you're pregnant and can put your health at risk." Amend. Compl. ¶ 83. The webpage actively solicits complaints against PRCs, asking: "Have you been harmed by an anti-abortion center?" *Id.* ¶ 84. The January 3, 2024, DPH press release explicitly stated that "[t]he Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers[.]" *Id.* ¶ 61.

The Defendants' unconstitutional threats here included explicit warnings of license revocation, Amend. Compl. ¶ 66, creation of multiple official complaint mechanisms, *id.* ¶ 61, official webpages soliciting complaints, *id.* ¶¶ 83-84, and state funding of REN's free abortion legal hotline specifically targeting PRCs. *Id.* ¶ 90. DPH Guidance used language specifically designed to "put anti-abortion centers on notice" that their standard practices could trigger enforcement. *Id.* ¶ 170.

Government websites directly link to REN's webpage listing "more than 30 [pro-life] centers in Massachusetts," including all of YOM's facilities identified by name and location. Amend. Compl. ¶¶ 87, 91-92. REN's guidebook, relied on by the State Defendants, specifically targets YOM, including photographs of YOM's main center and instructions on how to "take action against" pro-life centers and "put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities." *Id.* ¶¶ 95, 97.

Of the twenty-one PRC entities in Massachusetts, nineteen are either certainly or likely faith-based, meaning more than ninety percent of the entities targeted by Defendants are religious

organizations. *Id.* ¶ 311. Internal campaign communications revealed that Defendants were explicitly aware of the religious nature of PRCs and included as an action item: "How do we want to tackle/address religious aspects of these places." *Id.* ¶ 133. The campaign specifically targeted PRCs for their beliefs, encouraging people to seek "care that's based on what you need—not on someone else's beliefs." *Id.* ¶ 151. Campaign materials characterized PRCs as assuming "a false identity" for the purpose of "deceiving their patients, preying on fear, sowing the seeds of doubt and shame, and furthering their own agenda." *Id.* ¶ 153.

As a direct result of Defendants' intimidation campaign, one of YOM's doctors ceased practicing for YOM, forcing YOM to turn away patients and incur significant operational costs. *Id.* ¶ 240. Further, YOM has experienced a direct and immediate reduction in clients seeking its services as a result of Defendants' unconstitutional conduct. *Id.* ¶ 277.

## ARGUMENT

This case is not about whether state officials can express opinions. It is about something far more dangerous: whether government officials can use their power to chill and threaten members of the public based on the expression of their political and religious views. Government officials can express their own views; "[w]hat [they] cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. Such conduct is "presumptively unconstitutional." *Id.* Defendants' "first-in-the-nation" campaign, branding medical and religious facilities as dangerous to public health solely because of their protected viewpoint, is precisely the kind of unconstitutional targeting the First Amendment forbids.

### I.    Plaintiff Has Sufficiently Pleaded a Free Speech Claim

Government regulation of speech is impermissible when it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Religious speech and advocacy on matters

of profound public concern is at the very core of the First Amendment, and "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). First Amendment rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

Defendants crossed the constitutional line from legitimate policy expression into unconstitutional chilling of speech by branding PRCs as "public health threats," actively soliciting complaints against them, threatening regulatory consequences, and orchestrating a public intimidation campaign that has already chilled YOM's protected speech. Defendants' conduct violates the Free Speech Clause on two independent grounds: first, their campaign has succeeded in chilling YOM's speech through concrete harm; and second, under *Vullo*'s threat analysis framework, Defendants' conduct satisfies all four factors for finding unconstitutional coercion.

### A.    Defendants Have Already Unconstitutionally Chilled the Plaintiff's Speech.

Defendants have already violated YOM's First Amendment rights through their successful campaign to chill protected speech. Constitutional violations occur when government officials use their authority to suppress disfavored viewpoints. *Vullo*, 602 U.S. at 180. "First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech. The exercise of First Amendment freedoms may be deterred almost as potently by the threat of sanctions as by their actual application." *Aebisher v. Ryan*, 622 F.2d 651, 655 (2d Cir. 1980). Once speech has been demonstrably chilled, the constitutional violation is complete.

Here, Defendants' intimidation campaign has already achieved its intended chilling effect through concrete, measurable harm to YOM's operations. The ongoing investigations, subpoenas, and regulatory scrutiny have created a pervasive atmosphere of intimidation that directly chills

YOM's First Amendment rights. The Defendants brought a baseless investigation against YOM, solely because of the REN Defendants' unfounded complaints. Amend. Compl. ¶¶ 48-58. One of YOM's doctors resigned as a direct result of Defendants' threats, forcing YOM to turn away patients and incur significant costs. *Id.* ¶ 240. YOM has also experienced an immediate reduction in clients seeking its services due to Defendants' campaign branding PRCs as "dangerous" and a "public health threat." *Id.* ¶ 277. These are not speculative future harms—they are present injuries directly caused by Defendants' unconstitutional conduct.

The chilling effect has already curtailed YOM's religious mission, placing it at risk of closure from Defendants' viewpoint-based targeting. Amend. Compl. ¶ 276. YOM has been deterred from fully expressing its pro-life message due to fear of the ongoing government retaliation and intimidation. *See* Amend. Compl. ¶¶ 235, 240, 260, 276, 309. Unlike typical First Amendment cases assessing whether government conduct is *likely* to deter protected speech, Defendants' deterrent effect is not theoretical—it has already materialized. When government conduct succeeds in chilling speech through concrete harm, the First Amendment violation has already occurred. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988) ("[T]he alleged danger of [the challenged statute] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). Thus, Defendants have violated YOM's constitutional rights through their successful campaign to suppress religious speech.

### B.     Defendants Are Engaging in Unconstitutional Threats.

Enjoining Defendants from further action is imperative, as their continued threats to suppress YOM's speech compounds the chilling effect already established. The law is well-established: the *speech* of government actors is protected by the First Amendment; *threats* are not. In *Bantam Books*, the Supreme Court explained that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion . . .

to achieve the suppression" of disfavored speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). In *Bantam Books*, the government "publicly denounced as objectionable materials which failed to meet with its approval, and threatened distributors of the materials with prosecution." *State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400, 1401 (1st Cir. 1970). In *Vullo*, the NRA prevailed on a First Amendment claim of coercion after DFS Superintendent Vullo informed insurance companies that the agency would be "less interested" in pursuing regulatory violations if they ceased providing insurance to the NRA, while also urging them to take "prompt action" against NRA-related risks. 602 U.S. at 184. Vullo framed these "reputational risks" as threats to "public health and safety." *Id.* This use of public authority to denounce and threaten violates the First Amendment by chilling the speech of the public, intimidating them for their speech. In the First Amendment context, courts must "look through forms to the substance" of government conduct. *Bantam Books, Inc.*, 372 U.S. at 67.

As the Second Circuit has summarized the doctrine:

> What matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.

*Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

YOM does not challenge the State's right to express its own *views* on abortion; it challenges the State's use of regulatory authority to *coerce* YOM and other PRCs into silence. This conduct exceeds mere criticism—Defendants have wielded government power to brand Plaintiff and other PRCs as a "public health threat" and to subject them to viewpoint-discriminatory enforcement, chilling their speech. Yet even in their Second Motion to Dismiss, the State Defendants fail to address the governing standard for when government speech crosses the line into coercion.

To determine whether speech is a coercive threat, courts use four factors, according to a totality-of-the-circumstances standard: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Vullo*, 602 U.S. at 189 (quoting *NRA of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)); *see also Kennedy v. Warren*, 66 F.4th 1199, 1207 (9th Cir. 2023). Plaintiff's allegations identify sufficient evidence of all four elements. As documented in the Amended Complaint, Defendants crossed the line from speech to coercion by repeatedly accusing PRCs like YOM of legal wrongdoing—such as false advertising, misrepresentations, and deception—publicly warning that they are a danger to public health. Defendants backed these accusations with enforcement threats and actions, fostering an objectively reasonable fear of government retaliation. Those threats caused immediate, concrete harms, and repeatedly invoked severe consequences, including license revocation and investigation. Defendants' conduct satisfies all four factors more clearly than the private meetings in *Vullo*—state officials conducted a public intimidation campaign to silence YOM and destroy its operations.

  **1.**  **Word Choice and Tone: Defendants' Language Constituted Accusations of Illegal Conduct.**

First, Defendants' choice of words goes far beyond mere disagreement or criticism. The State Defendants have repeatedly accused PRCs of illegal behavior like deception, misrepresentation, and fraud—all actionable misconduct using legal terms of art. Defendants went further than the private conduct in *Vullo* to accuse PRCs of damaging the public health in a public intimidation campaign. Plaintiff's Amended Complaint summarizes these threats, incorporated herein by reference. Amend. Compl. ¶¶ 234-239. Defendants issued threats of retaliation for pro-life medical facilities, conducted a campaign of public disparagement and defamation, urged people to stay away from YOM's services, engaged in systematic complaint solicitation against

PRCs, and used REN as a proxy to publish lists of PRCs, including YOM, to target for harassment and to warn the public to stay away.

Defendants' language constituted accusations of criminal conduct, not political criticism. State advertisements brand PRCs like Plaintiff YOM as engaging in "deceptive advertising," conduct that violates Massachusetts medical advertising regulations prohibiting advertising "that is false, deceptive, or misleading." 243 Mass. Code Regs. 2.07(11)(a)(1). By categorically branding all PRCs as engaging in "deceptive advertising," Defendants applied a regulatory term of art that triggers specific legal consequences. Likewise, in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 232 (7th Cir. 2015), the court found that a sheriff crossed a line in part because a threatening letter he sent used legal terminology and relied on the federal money-laundering statute, 18 U.S.C. § 1956. As in *Backpage.com*, the State Defendants' threats that make "ominous reference" to potential legal liability cross the First Amendment line. *Id.* at 234.

Similarly, "public health threat" carries legal significance beyond mere political rhetoric. Massachusetts courts use this precise terminology to describe genuine regulatory emergencies, such as "the transmission of blood-borne diseases by intravenous drug abusers." *Commonwealth v. Landry*, 438 Mass. 206, 209 (2002). When the state's chief health officer officially declares PRCs "a public health threat," reasonable observers understand this as a finding that triggers regulatory intervention and punishment, not an expression of political disagreement.

The state-funded campaign repeatedly used incendiary language to portray PRCs as predatory, dangerous, and deceitful—accusing them of "disinformation," and posing "serious threats." Amend. Compl. ¶¶ 95, 107, 108. Defendants' planned messaging claimed PRCs "LIE to your face," "may mislead you or delay your care," and "could put your health at risk." *Id.* ¶¶ 86, 215. Governor Healey said the campaign aimed to "protect[] patients from the deceptive and dangerous tactics that anti-abortion centers often use." *Id.* ¶ 77. Other campaign materials branded

PRCs as a "WOLF IN SHEEP'S CLOTHING," asserting they assume "a false identity" to "deceiv[e] their patients, preying on fear, sowing the seeds of doubt and shame." *Id*. ¶ 153. Slogans like "FREE ISN'T ALWAYS FREE" were used to claim that free services from PRCs "come at a very steep price—your health, your options, and your future." *Id.* ¶ 152. Materials stated that PRCs' "lies impact your life" and that they "will try to influence patients' care choices, judge decisions, and delay you from accessing comprehensive care." *Id*. ¶ 154. This goes beyond mere criticism; it is using the State's authority to brand PRCs as unlawful and dangerous, paving the way for increasingly aggressive state action.

Most egregiously, Defendants initiated the creation of their campaign against PRCs—including Plaintiff YOM—with full knowledge that no complaints had been lodged against them. *See* Amend. Compl. ¶ 112. They branded YOM as deceptive and dangerous despite knowing the accusations were false, and continued the campaign, still publicly portraying YOM as a wrongdoer, even *after* their own investigation formally exonerated YOM of any offenses.

The pretext for the State Defendants' campaign and investigation were complaints submitted by Defendant REN. These complaints were not "credible reports of regulatory violations," *Contra* Def. Sec. MTD, Doc. No. 71 at 20, but a pretext used to justify selective enforcement. Indeed, Defendants *admitted* using REN complaints as pretext: "We were using the [two REN] complaints as a reason to put out this guidance now." Amend. Compl. ¶ 199. Internal communications also show an explicit admission of circumventing government restrictions by using REN as the State's proxy: "[t]he use of logos of the [PRCs] is awesome to keep [on REN's linked PDF], too, and not something we can do on mass.gov." *Id*. ¶ 219. REN and DPH coordinated to create the very complaints that would justify their campaign: campaign materials specifically added "File a complaint" as a call-to-action after Defendant Hart Holder's complaint. *Id.* ¶ 158.

The language Defendants use to stigmatize PRCs is far *stronger* than the language used to support liability in *Vullo*. Vullo merely "encouraged" entities to evaluate the "reputational risks[] that may arise from their dealings with the NRA." *Vullo.*, 602 U.S. at 176. Defendants have gone far beyond that to publicly classify PRCs as dangers to public health. Defendants' own words did not merely criticize some PRCs; they attacked *all of them*. While all the incendiary words brandished by Defendants are relevant, "public health threat" and "deceptive advertising" are the two most important terms; they are terms of art that threaten specific legal consequences.

These terms are what distinguish this case from the cases cited by Defendants. Calling a business slimy, *Connell v. Signoracci*, 153 F.3d 74, 82 (2d Cir. 1998), is a far cry from the legal designation of a wrongdoer. Likewise, while the court in *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991), acknowledged that criticism is permitted, it also made clear that threats (such as exist in this case) are analyzed differently: "when the government threatens *no sanction* – criminal or otherwise – we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights." *Id.* (emphasis added).[1]

State Defendants cannot escape liability by claiming they did not mention YOM by name. Defendants created a comprehensive targeting system that effectively identified YOM through multiple mechanisms: (1) official state websites that directly link to REN materials specifically naming every PRC, including YOM's facilities, Amend. Compl. ¶¶ 91, 238; (2) the campaign

---

[1] The decision in *R.J. Reynolds Tobacco Co. v. Shewry*, 423 F.3d 906, 911 (9th Cir. 2005), is not to the contrary. The plaintiff in that case—*unlike here*—did not bring a First Amendment challenge to the content of the state's campaign pursuant to the *Bantam Books* framework and the issue accordingly was not addressed. *Id.* ("The Tobacco companies concede that . . . the message produced by the government's advertisements creates no First Amendment problem apart from its method of funding.").

materials that include photographs of YOM's facilities and location-specific information that clearly identify YOM, *Id.* ¶¶ 95, 97; (3) the State Defendants' intentional use of REN to name PRCs, *Id.* ¶ 219; and (4) the categorical denunciation of all PRCs as "public health threats," encompassing YOM as a licensed medical facility in this category.

Defendants argue that requests for information from the public are "commonplace." But they have gone far beyond the typical request: they have stated that "[t]he Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." Amend. Compl. ¶ 61. They are "actively" pursuing complaints against PRCs, in contrast to medical clinics of different viewpoints. Defendants have also issued a public warning to avoid PRCs through a website entitled "Avoid Anti-Abortion Centers." *Id.* ¶ 83. This website categorically urges members of the public to avoid all PRCs and to file complaints about them. The website links directly to another website, one maintained by the REN Defendants, that specifically names every PRC in the New England area, including YOM. *Id.* ¶ 89.

Defendants claim that the solicitation of complaints about other entities is routine, pointing to examples such as car dealerships. But that comparison is inapt. Unlike purely commercial, for-profit enterprises such as car dealerships, PRCs are religiously motivated organizations engaged in speech and activities on matters of profound moral and political significance—activities entitled to the highest protection under the First Amendment. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982) ("This Court has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'") (*quoting Carey v. Brown*, 447 U.S. 455, 467 (1982)); *see also infra* Section II. It would not be "commonplace" for the state to maintain a website entitled "Avoid Houses of Worship" that lists every church, synagogue, or mosque in the region; declares all such institutions inherently harmful or deceptive, dangers to

public health; and urges the public to file complaints against them—while promoting only state-approved secular centers instead. Such a campaign would be a specific, stigmatizing threat, not "commonplace in government." *Contra* Def. Sec. MTD, Doc. No. 71 at 16. Similar to churches, and unlike car dealerships, PRCs are generally not licensed by the Commonwealth of Massachusetts. Yet Plaintiff, one of the few licensed centers, was investigated by the State and fully cleared of any wrongdoing, while still being publicly portrayed as deceptive and dangerous. The State's solicitation of complaints is just one item in the comprehensive violation of constitutional rights: actively soliciting complaints about religious entities while labelling them as dangerous, carrying out retaliatory investigations, and lying about their services.

Importantly, the State's Second Motion to Dismiss continues with the very kind of statements that are the crux of this case. The Amended Complaint contends that it is unconstitutional for the government to classify PRCs as dangerous to public health, simply because of a disagreement with their viewpoints. In several places, the Second Motion to Dismiss continues to use the same language, claiming that "[r]emoving the Governor's and Commissioner's ability to advise on timely, and time-sensitive, reproductive health issues, to criticize public health harms in the Commonwealth, or to provide guidance on off-label prescription of a medication that is against accepted health care practice, would impede the functioning of state government." Def. Sec. MTD, Doc. No. 71 at 25. In other words, Defendants continue to classify entities like YOM as a "public health harm" without a factual basis. Asserting that a public health facility like YOM is a "public health harm," despite an official state finding to the contrary and without supportive evidence, purely because of YOM's expressed viewpoint opposing abortion, is precisely the kind of abuse of government power that the Constitution prohibits.

Here, the State has gone far beyond subtle or implied pressure. It has explicitly threatened pro-life doctors who work with PRCs, vehemently urged the public to avoid faith-based centers as

a "public health threat," encouraged complaints even from those with no direct experience, and targeted PRCs for engaging in protected religious speech and activities. While the legal standard governing First Amendment coercion does not impose bright-line rules, one principle that does emerge is that word choice accusing an entity of criminal activity is more than run-of-the-mill criticism. *Backpage.com,* 807 F.3d at 231. And that is exactly the word choice here.[2]

### 2. The Existence of Regulatory Authority: Defendants Possessed the Power to Punish.

Defendants wield far more direct regulatory power over YOM than Vullo exercised over insurance companies. Commissioner Goldstein, as the head of the Department of Public Health, directly controls YOM's medical license, the foundation of its operations. Goldstein explicitly threatened to "jeopardize a clinic license through administrative action including licensure suspension or revocation" and warned that entities "may be referred to the Attorney General's Office by DPH for prosecution." Amend. Compl. ¶ 66. The statement specifically singled out pro-life clinics and their practices and expressly criticized the prescription of progesterone to counteract the abortion pill, threatening physicians with discipline and penalties for the prescription of progesterone, even though progesterone is perfectly lawful as a prescription medication in Massachusetts. *Id.* ¶¶ 67-68.

Unlike *Vullo*'s indirect influence over third parties, Defendants possess immediate authority over YOM's ability to operate. "Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from

---

[2] Defendants cannot evade liability by alleging the fig leaf of legal violations. In *Bantam Books*, the defendant sent official notices to a distributor for blacklisted publications that highlighted the commission's "duty to recommend to the Attorney General" violations of the State's obscenity laws. 372 U.S. at 62-63. "Nothing in that case turned on the distributor's compliance with state law." *Vullo*, 602 U.S. at 196.

the official." 602 U.S. at 191-92. Here, the statements at issue come directly from State authorities that wield regulatory authority, such as the Governor and the DPH Commissioner. "The power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive." *Id.* at 191. When officials with such direct power publicly brand an entity as "dangerous" and a "public health threat," observers understand this as a regulatory threat, not mere commentary.

When the Governor and the DPH Commissioner label an entity as dangerous to public health, they speak with regulatory authority. These official statements from the State's top enforcement officials strongly support a finding of coercion: warnings to avoid PRCs and threats to their existence carry the force of the law.

### 3. Perception as a Threat: Reasonable Readers Perceived Defendants' Conduct as a Threat.

Third, Defendants' speech was understood as a threat. Defendants explicitly warned PRCs of license suspension, revocation, and prosecution, and informed pro-life physicians they "could be found to be practicing inconsistently with accepted practice and subject to discipline," directly targeting medical professionals affiliated with centers like YOM. Amend. Compl. ¶ 178. YOM itself has perceived Defendants' conduct to be a threat against it for its religious activity. *Id.* ¶ 273. Others have perceived Defendants' conduct as such a threat; for example, one of YOM's doctors quit as a result of the ongoing threats from the State. *Id.* ¶ 274. Additionally, Plaintiff YOM has experienced a direct and immediate reduction in the clients who go to it for help, as a direct and foreseeable (and expressly desired) result of Defendants' unconstitutional conduct. *Id.* ¶ 277. Because of Defendants' threats, Plaintiff YOM anticipates that it may no longer be able to provide its services and be forced to shut down because of this viewpoint discrimination. *Id.* ¶ 276. *See Ocasio-Hernandez*, 640 F.3d at 10-11 (The Court must "accept the remaining factual allegations

17

in the complaint as true and to evaluate whether, taken as a whole, they state a facially plausible legal claim."); *see also* Amend. Compl. ¶ 144 (noting the Defendants' "goals to increase awareness so that pregnant people could 'avoid their deceptive practices and associated dangers.'").

Any reasonable person would perceive public statements that stigmatize PRCs as fraudulent and dangerous to public health to be a threat and a warning of the imminent boot of targeted State "enforcement" action, and the fact that YOM's doctor inferred it as such illustrates the point. A reasonable person would perceive statements calling PRCs "dangerous," a "public health threat," and engaging in "deceptive practices" as threatening, *particularly when made by officials with regulatory authority over those facilities*. The coordinated nature of the campaign— involving regulatory guidance, public denunciation, active complaint solicitation, and enforcement actions—would signal to any reasonable observer that compliance with the State's preferred viewpoint is required.

### 4. Threat of Adverse Consequences: Defendants Threatened PRC's Existence.

Fourth, Defendants' statements against YOM and other PRCs have repeatedly threatened adverse consequences against them based on their viewpoint. Defendants have already carried out these threats by investigating YOM as a result of this campaign of intimidation. Amend. Compl. ¶ 66. Defendants made explicit threats of the most severe regulatory consequences: license revocation. *Id.* Defendants created multiple official mechanisms to generate complaints and trigger adverse consequences against PRCs. "The Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." *Id.* ¶ 61. DPH created official webpages soliciting complaints. *Id.* ¶¶ 83-84. The State provided that "$250,000 shall be expended for Reproductive Equity Now, Inc.'s free abortion legal hotline,"

which specifically solicits complaints against PRCs. *Id.* ¶ 90. The Guidance used examples and language specifically designed to "put anti-abortion centers on notice" that their standard practices could trigger enforcement. *Id.* ¶ 170. The State Defendants aggressively criticize PRCs for even existing and then proclaim that they are "actively" seeking reports and complaints against them. That is a targeted threat of law enforcement.

Most directly, Commissioner Goldstein issued guidance specifically targeting physicians who work with PRCs, warning that those who provide information about progesterone for abortion pill reversal "could be found to be practicing inconsistently with accepted practice and subject to discipline." Amend. Compl. ¶ 178. This guidance constituted a direct threat to the professional livelihood of medical professionals affiliated with centers like YOM.

REN, working hand-in-hand with the State, was able to effect even more adverse consequences. State websites link directly to REN materials that list "every pro-life pregnancy center, including Plaintiff, in New England" and provide "instructional materials on how to 'take action against' pro-life centers." Amend. Compl. ¶¶ 91, 238. REN's state-linked guidebook "instructs community members to 'put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities.'" *Id.* ¶ 238.

The totality of facts demonstrates that Defendants have crossed the line into coercion. Actions that individually might perhaps be lawful can form an overall practice that violates the First Amendment. *Vullo*, 602 U.S. at 196. The Court explained that "although Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress the NRA's protected expression. So, the contention that the NRA and the insurers violated New York law does not excuse Vullo from allegedly employing coercive threats to stifle gun-promotion advocacy." *Id.* Likewise here, the Commonwealth of Massachusetts can set up a hotline, issue warnings, or investigate fraud. But it *cannot* carry out those acts in a viewpoint-discriminatory

fashion to threaten the religious speech and activities of PRCs. A campaign of viewpoint-discriminatory threats and intimidation cannot hide behind Defendants' regulatory authority. The facts alleged, viewed in the light most favorable to the Plaintiff, are sufficient to state a claim for a violation of the First Amendment. *See, e.g.*, *Rattner v. Netburn,* 930 F.2d 204, 210 (2d Cir. 1991) (holding that "the district court's ruling that the language of the [defendant's] letter, either standing alone or in all the circumstances, is not a veiled threat of boycott or reprisal does not view that language in the light most favorable to [the plaintiff] as the nonmoving party").

## II.    Plaintiff Has Pleaded a Free Exercise Claim for Religious Discrimination.

Massachusetts has targeted religious PRCs for discrimination based on their faith-based opposition to abortion. Over 90% of the entities branded as "public health threats" are religious organizations. Amend. Compl. ¶ 311. Internal campaign communications reveal that officials explicitly strategized about "how to tackle/address religious aspects of these places." *Id.* ¶ 133. Campaign materials urged people to seek "care that's based on what you need—not on someone else's beliefs," targeting PRCs specifically for their religious convictions. *Id.* ¶ 151.

Massachusetts's targeting of the state's religious PRCs qualifies as "[o]fficial action that targets religious conduct for distinctive treatment." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (2012). More specifically here, a religious viewpoint of PRCs like YOM—the sanctity of human life—is being targeted for disfavored treatment by the State, not mere disagreement. Just as Colorado in *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, violated the Free Exercise Clause by treating religious conscience differently from secular moral positions, 584 U.S. 617, 638 (2018), Massachusetts violates the Constitution by subjecting faith-based PRCs to opprobrium that secular healthcare providers escape.

The Free Exercise Clause "forbids subtle departures from neutrality." *Gillette v. United States*, 401 U.S. 437, 452 (1971). The Constitution "commits government itself to religious

tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *City of Hialeah*, 508 U.S. at 547. Even a facially neutral regulation or policy may violate the Clause if it masks governmental hostility. *Id.* at 534.

Plaintiff has identified a burden on its religious conduct. Religious PRCs have been singled out for disparate treatment because of their religious expression. As Plaintiff alleges in its Amended Complaint, the real operation and effect of the Massachusetts policy is to single out for discriminatory treatment pro-life PRCs, the overwhelming majority of which are faith-based and adhere to religious views about the sanctity of human life. Massachusetts is actively threatening and targeting YOM and other PRCs for their religious activity, labelling them as deceptive and a public health menace, and stifling their speech with these threats. The State's actions substantially burden YOM's religious exercise by threatening regulatory sanctions for religiously motivated speech, creating a hostile regulatory environment that impairs YOM's mission, forcing YOM to choose between ostensible regulatory compliance (which in actuality is merely coerced agreement with the State's message) and its religious conscience, and stigmatizing YOM's religious beliefs through government-sponsored messaging.

YOM has alleged that the Defendants' campaign threatened and stifled YOM's religious speech. Moreover, YOM has alleged expressly that the public "education" campaign involves direct expression of hostility toward religion. *See Masterpiece Cakeshop*, 584 U.S. at 639 (concluding civil rights commission adjudicator's statements expressing hostility to religion during plaintiff's formal public hearing violated the First Amendment). The actions of the State Defendants are explicitly and facially targeted at the religious activity of PRCs: "[m]ost centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." Amend. Compl. ¶ 59. The religious animus in the State

Defendants' official statement was not isolated; it was expressed through the campaign of intimidation and harassment delineated above.

Further illustrating the hostility, even after being cleared under those facially neutral regulations, YOM *is still* publicly classified by the State Defendants as a public health danger and accused of misrepresentations and falsehoods because of YOM's viewpoint, not because of any actual conduct. *Masterpiece Cakeshop* involved the discriminatory application of Colorado's public accommodations law to a religious viewpoint. The Colorado Civil Rights Commission permitted three other bakers to refuse customer requests that violated their moral principles, but denied Mr. Phillips the same permission because his moral opposition to a customer's request was based on his religious beliefs. 584 U.S. at 638. Likewise, here Defendants' conduct is not facially neutral and it evinces palpable hostility against all PRCs. The effect of their actions is to single out for discriminatory treatment pro-life PRCs, solely because of their religious views about life. The entire category of reproductive care clinics is not targeted—only those that have the religious viewpoint of promoting childbirth and adoption rather than abortion. PRCs, because they are "affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda," have been classified as a public health danger. Amend. Compl. ¶ 59. The operative effect of the Massachusetts policy is to harass and undermine PRCs because of their religious viewpoint, and this constitutes a Free Exercise violation.

### III.    Plaintiff Has Pleaded an Equal Protection Claim.

Plaintiff's Equal Protection claim closely parallels the Free Exercise claim. The Equal Protection Clause prohibits viewpoint-based discrimination against similarly situated entities. Here, Defendants engaged in selective enforcement against pro-life PRCs while ignoring complaints against abortion providers. Defendants discriminated against PRCs like YOM explicitly because of their religious and political speech and punished YOM for its exercise of

constitutional rights, engaging in viewpoint-based official harassment that constituted unconstitutional discrimination. *See Tapalian v. Tusino*, 377 F.3d 1, 7 (1st Cir. 2004) (holding that plaintiff successfully showed that city official violated the Equal Protection Clause by a "malicious orchestrated campaign"). "In order to establish [a claim of selective treatment, a plaintiff must] allege facts indicating that, 'compared with others similarly situated, [it] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Barrington Cove Ltd. v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001) (emphases omitted) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The government may not treat someone disparately as compared with similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

The State's conduct here expressly distinguishes the speech of PRCs for disparate treatment and does so because of religion. This campaign facially discriminates against PRCs. Clinics that are similar to PRCs, but which do provide abortions, are not subjected to the State's threats or slapped with the label of a wrongdoer. The government's conduct here is targeted towards religious activities, imposing additional scrutiny upon religious PRCs. Accordingly, such conduct "is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979).

The stark disparity in treatment between PRCs and abortion clinics demonstrates unconstitutional viewpoint discrimination in violation of the Equal Protection Clause. Plaintiff relies not on "cursory" assertions, but on cold evidence gathered through public records requests. During the same two-year period that DPH received only two complaints against PRCs (both filed by REN, not patients), it received at least eight complaints against abortion clinics from actual patients alleging serious safety violations. Amend. Compl. ¶¶ 184, 188-189. Multiple abortion

23

clinics failed DPH inspections for egregious violations, including failure to use sterile surgical equipment, use of outdated drugs, and storage of biohazardous material in staff break rooms. *Id.* ¶¶ 190-192. One failed clinic has not been inspected since 2018, despite regulations requiring inspections every 2 years. *Id.* ¶ 191. Yet, Defendants launched no public education campaign against abortion clinics, created no "Avoid Abortion Clinics" webpage, and branded no abortion providers as "public health threats." Instead, they spent $1 million targeting pro-life PRCs that had zero patient complaints and clean inspection records.

The Supreme Court has held unconstitutional state or local enactments because such enactments were motivated by animus toward a politically unpopular group and justified by no legitimate government purpose. *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *see also Romer v. Evans*, 517 U.S. 620 (1996). In *Romer*, the Supreme Court deemed the "disqualification of a class of persons from the right to seek specific protection from the law" to be a "status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.* at 632, 635. That analysis is applicable here; the State has no rational basis to single out *all* PRCs, particularly when PRCs like YOM have been expressly cleared by state investigations. There is no factual support for classifying *all* PRCs as dangers to public health while allowing organizations that offer abortions free rein, despite the actual violations and complaints lodged against them.

### IV.    Qualified Immunity is No Shield for Unconstitutional Threats.

In addition to the individual capacity claims, Plaintiff seeks injunctive relief based on Defendants' official capacities. Qualified immunity, granted or not, is no shield to that relief. *See, e.g.*, *M.M.R.-Z. v. Puerto Rico*, 528 F.3d 9, 13 (1st Cir. 2008) ("[Q]ualified immunity does not apply to official capacity claims.").

Qualified immunity is no individual capacity shield here, either. The Supreme Court's 2024

decision in *Vullo* crystallized the already well-established principle from *Bantam Books* that government officials cannot use regulatory authority to coerce private speech. *Vullo*, 602 U.S. at 188 ("Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors"). Though the Second Circuit granted Vullo qualified immunity on remand, *see NRA of Am. v. Vullo*, No. 21-0636-cv, 2025 U.S. App. LEXIS 17762 (2d Cir. July 17, 2025), the claim here is stronger than that in *Vullo*, and the State Defendants here are on notice of the *Vullo* standard. Here, the State Defendants have gone beyond private warnings to public threats.

The law imputes knowledge of binding Supreme Court decisions to public officials: "a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Under *Vullo*, it is clearly established that a government official must not classify opponents as a "public health threat" in the absence of wrongdoing and subject those opponents to opprobrium because of disagreement. This principle was well-established long before the Defendants' conduct occurred. *See DeJong v. Pembrook*, 662 F. Supp. 3d 896, 915 (S.D. Ill. 2023) (holding that a threat under the *Bantam Books* framework violated clearly established rights). Defendants conducted a public intimidation campaign designed to destroy PRCs' operations – including YOM. No reasonable official could believe that branding licensed medical facilities as "public health threats," along with the litany of other State actions described above, based solely on their religious viewpoints falls within constitutional bounds. The law was clearly established, and Defendants' conduct was plainly unconstitutional.

## CONCLUSION

For the foregoing reasons, Plaintiff YOM respectfully requests that this Court DENY State Defendants' Second Motion to Dismiss in its entirety.

25

YOUR OPTIONS MEDICAL

By counsel,

OLIVIA F. SUMMERS*
/s/ Olivia F. Summers
(D.C. Bar No. 1017339)

ANDREW EKONOMOU*
(GA Bar No. 242750)
CHRISTINA (STIERHOFF) COMPAGNONE*
(D.C. Bar No. 1657929)
NATHAN MOELKER*
(VA Bar No. 98313)
THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
(Massachusetts Bar No. 711930)
sam@mafamily.org

*Appearing Pro Hac Vice

Dated August 22, 2025

## <u>CERTIFICATE OF SERVICE</u>

I, Olivia F. Summers, hereby certify that on August 22, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Olivia F. Summers</u>
Olivia F. Summers