UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

A WOMAN'S CONCERN, INC. d/b/a YOUR
OPTIONS MEDICAL CENTERS,

Plaintiff,

v.

MAURA HEALEY, Governor of Massachusetts,
sued in her individual and official capacities;
ROBERT GOLDSTEIN, Commissioner of the
Massachusetts Department of Public Health, sued in
his individual and official capacities;
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC., REBECCA HART
HOLDER, EXECUTIVE DIRECTOR OF
REPRODUCTIVE EQUITY NOW
FOUNDATION, INC.,

Defendants.

CIVIL ACTION
NO. 1:24-cv-12131-LTS

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
REPRODUCTIVE EQUITY NOW FOUNDATION, INC. AND REBECCA HART
HOLDER'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................... 2

ARGUMENT .................................................................................................. 5

    I.      YOM Has Standing and Has Adequately Pleaded a First Amendment Claim. ........... 6

        A.    YOM Need Not Succumb to Threats to Its First Amendment Rights in Order to Have Standing. .................................................................. 7

        B.    Injury in Fact: Plaintiff YOM has Pleaded that it Engages in Core Religious Speech and Expression—which Defendants Have Unconstitutionally Threatened. ........................................................ 8

        C.    Traceability: Defendants' Actions Caused the Deprivation of YOM's Constitutional Rights. ................................................................. 11

        D.    A Favorable Decision Would Redress Injury. ..................................... 12

    II.     The REN Defendants Acted Under Color of Law. ...................................... 12

        A.    The Defendants Engaged in Joint Action. .......................................... 14

        B.    Defendants Had a Close Nexus and Symbiotic Relationship. ................. 16

        C.    REN Was Used in Order to Circumvent Limitations on Government Action. .................................................................................... 17

    III.    The *Noerr-Pennington* Doctrine Has No Application In this Case. ................ 18

CONCLUSION ............................................................................................. 20

# TABLE OF AUTHORITIES

*Cases*

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) ................................................................................................. 14

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ...................................................................................... 8

*Bass v. Parkwood Hospital*,
   180 F.3d 234 (5th Cir. 1999) .................................................................................... 14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 2

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ............................................................................................ 7, 16

*Cal. Motor Transportation Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ................................................................................................. 19

*Commonwealth v. Landry*,
   438 Mass. 206 (2002) ................................................................................................ 9

*Dennis v. Sparks*,
   449 U.S. 24 (1980) ................................................................................................... 14

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ................................................................................................. 18

*Estades-Negroni v. CPC Hospital San Juan Capestrano*,
   412 F.3d 1 (1st Cir. 2005) ........................................................................................ 14

*Feminist Women's Health Center, Inc. v. Mohammad*,
   415 F. Supp. 1258 (N.D. Fla. 1976) ......................................................................... 19

*Gustavsen v. Alcon Laboratories, Inc.*,
   903 F.3d 1 (1st Cir. 2018) .......................................................................................... 6

*Jackson v. Metropolitan Edison Co.*,
   419 U.S. 345 (1974) ................................................................................................. 16

*Laird v. Tatum*,
   408 U.S. 1 (1972) ............................................................................................... 7, 11

*Lamb Enters. v. Toledo Blade Co.*,
   461 F.2d 506 (6th Cir. 1972) .................................................................................... 19

*Lopez v. Candaele,*
  630 F.3d 775 (9th Cir. 2010) ............................................................... 6

*LSO, Limited v. Stroh,*
  205 F.3d 1146 (9th Cir. 2000) ............................................................. 7

*Lugar v. Edmondson Oil Co.,*
  457 U.S. 922 (1982) ...................................................................... 12, 13

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................................ 2, 6

*Murphy v. Massachusetts Department of Developmental Services,*
  2014 U.S. Dist. LEXIS 183350 (D. Mass. 2014) ................................ 13

*NCAA v. Tarkanian,*
  488 U.S. 179 (1988) ........................................................................... 13

*NRA of America v. Vullo,*
  602 U.S. 175 (2024) ................................................. 1, 6, 8, 10, 11, 12

*Parker v. Brown,*
  317 U.S. 341 (1943) ........................................................................... 20

*Perkins v. Londonderry Basketball Club,*
  196 F.3d 13 (1st Cir. 1999) ............................................................... 13

*Perry Education Association v. Perry Local Educators' Association,*
  460 U.S. 37 (1983) ............................................................................... 6

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,*
  508 U.S. 49 (1993) ............................................................................. 19

*Rendell-Baker v. Kohn,*
  457 U.S. 830 (1982) ..................................................................... 13, 18

*Rosenberger v. Rector & Visitors of the University of Virginia,*
  515 U.S. 819 (1995) ............................................................................. 6

*Sadallah v. City of Utica,*
  383 F.3d 34 (2d Cir. 2004) ................................................................ 10

*South Middlesex Opportunity Council, Inc. v. Town of Framingham,*
  752 F. Supp. 2d 85 (D. Mass. 2010) ................................................. 20

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ............................................................................. 8

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................ 2, 10

*United Mine Workers v. Pennington*,
  381 U.S. 657 (1965) ............................................................................................... 19

*Virginia v. American Booksellers Association, Inc.*,
  484 U.S. 383 (1988) ............................................................................................... 7, 8

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) .................................................................................. 10

**Statutes**

42 U.S.C. § 1983 ........................................................................................................ 1

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ................................................................. 2

Federal Rule of Civil Procedure 12(b)(6) ................................................................. 2

**Other Authorities**

*Abortion Legal Hotline*, REPROD. EQUITY NOW, https://reproequitynow.org/hotline (last visited,
  Aug. 20, 2025) ...................................................................................................... 14

*About Anti-Abortion Centers*, MASS.GOV, https://www.mass.gov/info-details/about-anti-abortion-
  centers (last visited Aug. 20, 2025) .................................................................. 13, 15

*Avoid Anti-Abortion Centers*, MASS.GOV, https://www.mass.gov/avoid-anti-abortion-centers (last
  visited Aug. 20, 2025) ........................................................................................... 17

243 Mass. Code Regs. 2.07(11)(a)(1) ....................................................................... 9

Plaintiff A Woman's Concern, Inc. d/b/a Your Options Medical Centers ("YOM") submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion") Plaintiff's Amended Complaint filed by Defendants Reproductive Equity Now Foundation, Inc. ("REN") and its President, Rebecca Hart Holder (collectively, "Defendants," or "REN Defendants").

## INTRODUCTION

This case involves REN and its President, Rebecca Hart Holder, acting as the government's trusted partner in an unprecedented state-funded campaign targeting pro-life pregnancy resource centers ("PRCs") based on their religious and political viewpoints. REN and Hart Holder did not act as private parties exercising their First Amendment rights, but rather as state actors in concert with Massachusetts officials to target, harass, and seek to chill YOM's constitutionally protected pro-life message. REN operated as a state actor exercising joint decision-making authority over campaign materials, filing strategic complaints to justify enforcement actions, and performing speech-targeting functions the government could not accomplish directly. The Constitution's text admits no exception for government censorship through private proxies of state actors.

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024). YOM's amended complaint states a claim for declaratory, compensatory, and injunctive relief under 42 U.S.C. § 1983 for violations of YOM's constitutionally protected rights under the First and Fourteenth Amendments. YOM has standing to bring its claims because the allegations in the amended complaint threaten an immediate and irreparable denial of YOM's constitutional rights and have already chilled the exercise of its rights to free speech and free exercise of its religion. The First Amendment's central promise is that all Americans—regardless of their views on contentious issues like abortion—may participate equally in public discourse without fear of government retaliation. That promise means nothing if the

government can simply launder its censorship through private allies to maintain plausible deniability.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a plaintiff must "show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). For a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court's review is limited to the four corners of the complaint, and it must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). YOM has adequately pleaded claims against Defendants, and the Court should deny Defendants' Motion to Dismiss in its entirety.

## STATEMENT OF FACTS

This case involves a shocking level of coordination between Massachusetts government officials and the REN Defendants in launching a state-funded campaign targeting pro-life pregnancy centers, including Plaintiff. The extensive record giving rise to the allegations contained in the Amended Complaint demonstrates that the REN Defendants operated as the government's agents and joint participants, exercising decision-making authority over government materials, filing strategic complaints to justify enforcement actions, and performing targeting functions the government could not constitutionally accomplish directly.

The Commonwealth allocated $250,000 to fund REN's "free abortion legal hotline" and $1,000,000 for an anti-PRC public awareness campaign through the 2023 supplemental budget. Amend. Compl. ¶ 90. The Massachusetts Department of Public Health ("DPH") formalized REN as a full-time government contractor in April 2023. *Id.* ¶¶ 116-117. The true nature of REN's relationship with the government became clear through the Public Education Campaign launched

on June 10, 2024. *Id.* ¶ 74. This was not merely a state campaign that happened to align with REN's views—it was a formalized partnership in which REN served as the government's primary consultant. REN participated in regular coordination meetings with state officials, *id.* ¶ 122, had input into campaign messaging and strategy, *id.* ¶¶ 162, 164, and maintained ongoing communication with DPH throughout the campaign's development and implementation. In particular, REN exercised joint approval authority over campaign materials and budgets. A November 7, 2023, email from a MORE Advertising employee requested planning and budget approval from both DPH employees and REN employees, including Hart Holder. Amend. Compl. ¶ 156. REN employees provided input on advertisement design choices, with their input carrying the same weight and authority as DPH employees. *Id.* ¶ 164. REN employee Claire Teylouni approved campaign materials, demonstrating REN's decision-making authority. *Id.* ¶ 162.

REN took the lead role in planning the campaign launch. On January 9, 2024, REN sent PowerPoint slides showing how REN would draft a press release, plan messaging, and select speakers, including Governor Healey and Hart Holder. *Id.* ¶¶ 209-210. REN was not acting as a mere government consultant to government activities but, rather, took an active and prominent role over which the DPH or the Governor's Office merely advised and approved. *Id.* ¶ 212.

REN filed the only two formal complaints against Massachusetts PRCs: Hart Holder's October 17, 2023, complaint against YOM and a December 4, 2023, complaint against another PRC. Amend. Compl. ¶¶ 157, 172, 184. A DPH employee explicitly stated: "We were using the [two REN] complaints as a reason to put out this guidance now rather than March, when the health marketing campaign launches." *Id.* ¶ 199. When the legislature initially approved the campaign budget in March 2023, DPH had provided no evidence of any complaints filed with DPH against pro-life pregnancy centers. *Id.* ¶ 112.

Government officials explicitly planned to use REN to call out individual pregnancy resource centers in a way the government could not do itself. *Id.* ¶ 216. A February 21, 2024, email noted that using PRC logos was "not something we can do on mass.gov" but was "awesome to keep" on REN's materials, thereby demonstrating coordination to circumvent government limitations on targeting specific organizations. *Id.* ¶¶ 218-219.

The Defendants' unconstitutional threats here included explicit warnings of license revocation, Amend. Compl. ¶ 66, creation of multiple official complaint mechanisms where "[t]he Department of Public Health actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers," *Id.* ¶ 61, official webpages soliciting complaints, *Id.* ¶¶ 83-84, and state funding of REN's free abortion legal hotline specifically targeting PRCs. *Id.* ¶ 90. DPH Guidance used language specifically designed to "put anti-abortion centers on notice" that their standard practices could trigger enforcement. *Id.* ¶ 170. Most directly, Commissioner Goldstein threatened physicians working with PRCs regarding abortion pill reversal information, warning they "could be found to be practicing inconsistently with accepted practice and subject to discipline." *Id.* ¶ 178.

REN and Hart Holder publicly accused YOM and other PRCs of being "public health threats" and engaging in "deceptive advertising" without any factual basis. Amend. Compl. ¶¶ 61, 170. Defendants systematically branded YOM as engaging in criminal conduct and "dangerous and deceptive practices" without evidence or due process. *Id.* ¶¶ 95, 238. These false accusations, amplified through official state channels and funding, caused direct harm to YOM's reputation, deterred patients, and contributed to the resignation of one of YOM's doctors. Am. Compl. ¶ 240. This partnership with the government in an impermissible censorship-and-retaliation scheme is based on derogatory, false, and unfounded accusations.

DPH directly links from its official government webpages to REN's website, which lists every pro-life pregnancy center in New England by name and location, including Plaintiff YOM. *Id.* ¶¶ 87, 89, 91-92. REN's state-funded guidebook specifically lists YOM's facilities and instructs readers to "put a stop to the dangerous and deceptive practices of [pro-life] centers in our communities." Amend. Compl. ¶¶ 95, 238. The campaign materials themselves demonstrate this integration. The government's official campaign website includes a direct link to REN's website, *id.* ¶ 89, effectively incorporating REN's advocacy materials into the government's official messaging. Campaign materials use identical language and messaging to REN's pre-existing materials, showing the seamless integration of their efforts. *Id.* ¶¶ 86, 160-161. REN and government officials met together regularly from 2023 forward to coordinate this campaign. *Id.* ¶ 122. At the June 10, 2024, campaign launch, Hart Holder appeared alongside state officials and declared: "we have been honored to work with the Massachusetts Department of Public Health on the creation of this first-in-the-nation public education campaign." Amend. Compl. ¶ 107.

The coordinated campaign by REN, Hart Holder, and state officials has resulted in tangible and ongoing harm to YOM. As a direct result of the intimidation campaign, one of YOM's doctors quit, forcing YOM to turn away patients. *Id.* ¶ 240. Defendants' coordinated threats and intimidation campaign have significantly impacted YOM's operations, reputation, and ability to serve patients, precisely what Defendants set out to accomplish. *Id.* The ongoing threats of additional regulatory enforcement have unconstitutionally chilled YOM's speech and religious exercise. *Id.* ¶¶ 73, 235, 240, 260, 309. This campaign included threats and investigations against YOM and PRCs as the prelude to government action against YOM and other PRCs.

## ARGUMENT

By acting under the color of law as Massachusetts' trusted partner, Defendants are engaging in an ongoing injury to YOM's First Amendment rights. YOM has standing to seek relief

against Defendants' actions that violate YOM's constitutional rights and create a substantial risk of future harm. While government officials can express their own views, "[w]hat [they] cannot do . . . is use the power of the State to punish or suppress disfavored expression." *NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

## I.    YOM Has Standing and Has Adequately Pleaded a First Amendment Claim.

Massachusetts officials launched an assault on PRCs, deploying both the formal machinery of state power and a network of private allies to systematically target pro-life organizations for their constitutionally protected speech. This coordinated campaign represents exactly the kind of viewpoint-based censorship that the First Amendment forbids. Government regulation of speech is impermissible when it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). This "[d]iscrimination against speech because of its message is presumed to be unconstitutional. . . . When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-29 (1995). Citizens have the right to hear all sides of contentious issues, including deeply held moral convictions about abortion. The State may not foreclose debate by systematically delegitimizing one side through official condemnation and regulatory harassment.

"A constitutionally sufficient injury arises from an 'invasion of a legally protected interest' that is both 'concrete and particularized' as well as 'actual or imminent,' rather than 'conjectural or hypothetical.'" *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) (quoting *Lujan*, 504 U.S. at 560). When threatened infringements on the First Amendment are at stake, "First Amendment cases raise 'unique standing considerations,'" *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010) (citation omitted), that counsel allowing plaintiffs their day in court, resulting in a

"lowered threshold for establishing standing." *Id.* In fact, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

> **A.    YOM Need Not Succumb to Threats to Its First Amendment Rights in Order to Have Standing.**

Defendants assert that YOM lacks standing by claiming that it "never alleges that it has, in fact, refrained from exercising its First Amendment rights[.]" REN MTD, Doc. 73 at 10. Defendants continue to misstate the standard for First Amendment injuries: "[one] does not have to await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982). The "chilling effect" on free speech can constitute a concrete injury for standing purposes. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). YOM has pleaded specific facts demonstrating that the coordinated campaign has chilled its speech: YOM has been deterred from fully expressing its pro-life message due to fear of additional government retaliation. Amend. Compl. ¶¶ 235, 240, 260, 309. Defendants would have this Court believe YOM must first surrender its First Amendment rights before it can seek judicial protection. This misunderstands both the nature of constitutional injury and the Supreme Court's directive that the First Amendment protects against the threat of censorship.

The question at the pleading stage is "whether any perceived threat to [Plaintiff] is sufficiently real and immediate to show an existing controversy." *Blum*, 457 U.S. at 1000. First Amendment claims have never been required to meet an onerous "complete cessation of speech" standard. The First Amendment's guarantee is not that citizens may speak freely until the government stops them; it is that the government may not threaten to stop them at all. The threat of unconstitutional punishment is itself an unconstitutional act, regardless of whether the victim capitulates. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392-93 (1988).

In *American Booksellers*, the Supreme Court made clear that plaintiffs may bring pre-enforcement challenges before a law is implemented, emphasizing the danger "of self-censorship; a harm that can be realized even without actual prosecution." *Id.* at 393. YOM faces the precise harm *American Booksellers* recognized, i.e., the threat of self-censorship that chills protected speech before any formal enforcement action occurs. The First Amendment's injury is complete when the government's threatening conduct begins, not when speakers capitulate to it. *See, e.g.*, *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("Notice that such a threat [by a public official to employ coercive state power] is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent.").

In short, a plaintiff need not succumb to threats of enforcement in order to seek judicial relief. "[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). YOM, which has detailed the facts pertaining to Defendants' conduct and speech—including that of Defendants REN and Hart Holder—that caused and continues to cause the chilling of YOM's speech, has thus established standing.

> **B.    Injury in Fact: Plaintiff YOM has Pleaded that it Engages in Core Religious Speech and Expression—which Defendants Have Unconstitutionally Threatened.**

The First Amendment ensures that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180. To proceed on such a claim, "a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. Defendants have done more than merely threaten; they have taken government action against YOM, investigating it because of this campaign. Amend. Compl. ¶ 48.

Plaintiff incorporates its response to the State Defendants' Motion to Dismiss [Doc. # 80] by reference. The unconstitutional threats ranged from explicit warnings of license revocation, Amend. Compl. ¶ 66, official webpages soliciting complaints, *Id.* ¶¶ 83-84, to Commissioner Goldstein's direct threat to physicians working with PRCs regarding abortion pill reversal information, warning they "could be found to be practicing inconsistently with accepted practice and subject to discipline." Amend. Compl. ¶ 178. *See supra* Statement of Facts for additional examples of Defendants' systematic campaign of viewpoint-discriminatory threats.

Defendants have not merely disagreed with YOM's message—they have systematically branded YOM and similar organizations as public health threats engaging in "deceptive advertising" and criminal conduct. These are not casual political disagreements, but deliberate uses of the State's regulatory vocabulary—carefully calibrated to trigger enforcement consequences. Defendants' word choice reflects precision and intent. "Deceptive advertising" is not mere criticism—it is a term of art under Massachusetts law that triggers specific regulatory penalties. *See* 243 Mass. Code Regs. 2.07(11)(a)(1). Similarly, labeling organizations as "public health threats" carries legal significance that Massachusetts courts reserve for genuine emergencies requiring immediate intervention. *See Commonwealth v. Landry*, 438 Mass. 206, 209 (2002). When the Commonwealth announces that certain speakers pose "public health threats" and are deceptive advertisers and backs that pronouncement with regulatory enforcement, the message is unmistakable: conform your speech to state orthodoxy or face the consequences.

These threats and targeted accusations—untethered to any wrongdoing—have created a system of informal censorship aimed at suppressing YOM's core protected speech. Defendants' actions constitute a concerted effort to silence PRCs like YOM by threatening government prosecution against those that oppose abortion and soliciting complaints. Plaintiff has alleged sufficient facts to establish injury in fact—specifically, injury to its First Amendment right to be

free from government targeting for its speech. *Vullo* concerned statements like "[t]he NRA is an extremist organization. I urge companies in New York State to revisit any ties they have to the NRA and consider their reputations." *Vullo*, 602 U.S. at 184. Governor Healey and the Defendants have gone even further than mere accusations of "extremism"; they have accused PRCs of being menaces to public health and of violating other state criminal laws in the absence of any proof all due to the religious viewpoint of their speech.

YOM has suffered concrete economic injuries as a direct result of REN's and Hart Holder's conduct: YOM was forced to operate with reduced medical staff when one of its doctors quit providing services as a direct result of the intimidation campaign. Amend. Compl. ¶ 240. This staffing reduction forced YOM to turn away patients, resulting in reduced ability to fulfill its mission. *Id.* YOM has incurred significant additional operational costs, including enhanced security measures necessitated by the hostile environment created by the campaign. *Id.* ¶¶ 240, 286. These economic harms amply satisfy the concrete injury requirement. *See Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (economic harm constitutes concrete injury for standing purposes).

Defendants publicly branded YOM as engaging in illegal conduct without evidence or due process. As the Supreme Court recognized in *TransUnion LLC v. Ramirez*, being falsely labeled as a lawbreaker constitutes concrete reputational harm sufficient for standing. 594 U.S. 413, 432 (2021). Defendants cite *TransUnion,* and it is dispositive here: "reputational harm" of the type "associated with the tort of defamation" is sufficient to show an injury in fact. Here, that harm has occurred in a manner that specifically constituted a threat to YOM's First Amendment rights.[1]

---

[1] It is this point which distinguishes this case from *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). Plaintiff is not bringing a Section 1983 claim for defamation. But the injury in fact that

Most fundamentally, Defendants' campaign has deterred YOM from fully expressing its religious message. The Supreme Court has recognized that the "chilling effect" on free speech can constitute a concrete injury for standing purposes. *See Laird*, 408 U.S. at 11. The coordinated campaign has chilled YOM from fully expressing its pro-life message out of fear of additional government retaliation. Amend. Compl. ¶¶ 235, 240, 260, 309. The state-sponsored campaign has created a hostile environment that interferes with YOM's ability to communicate its religious message to potential patients. *See id.* These allegations more than establish a concrete First Amendment injury sufficient for standing.

### C.    Traceability: Defendants' Actions Caused the Deprivation of YOM's Constitutional Rights.

When state officials systematically brand organizations as lawbreakers and public health menaces, reasonable observers understand this as a prelude to enforcement action. YOM's doctor understood it that way—which is why he quit rather than risk professional consequences. The injuries YOM has experienced to its reputation and its First Amendment rights are directly traceable to Defendants' accusations.

Defendants here attacked all PRCs, including YOM, simply for existing and holding pro-life viewpoints. Likewise, Vullo "wanted Lloyd's to disassociate from all gun groups, although there was no indication that such groups had unlawful insurance policies similar to the NRA's." *Vullo*, 602 U.S. at 192. Categorical targeting based on ideological disagreement epitomizes the viewpoint discrimination the First Amendment forbids. All relevant statements have been issued by the Commonwealth, pursuant to state authority, labeling YOM a deceptive advertiser with the full authority of Massachusetts law. No individual statement should be taken in isolation; instead,

---

it has experienced, i.e., the chilling of its First Amendment rights, is of a kind similar to damages that result from defamation.

each must be viewed "against the backdrop of other allegations in the complaint" such that the "allegations as a whole" are considered evidence of an impermissible threat. *Vullo*, 602 U.S. at 195. These statements, made with the support and assistance of REN, caused the injuries that Plaintiff has detailed in its Amended Complaint.

A reasonable person would perceive Defendants' statements warning against the existence of PRCs, labelling them as a public health danger and accusing them of criminal conduct, to constitute a threat against those centers. YOM did, in fact, perceive Defendants' statement to be such a threat. As noted, and as a direct, immediate, and foreseeable result of Defendants' threats, one of YOM's doctors quit, Amend. Compl. ¶¶ 235, 240, 260, 276, 309, and Defendants' threats have inflicted concrete injury by damaging YOM's reputation and deterring patients from seeking its services. This decline in patient engagement, caused by viewpoint-based discrimination, constitutes an injury in fact to YOM's First Amendment rights and its ability to carry out its religious mission. REN and Hart Holder initiated the regulatory complaints that triggered ongoing government investigations, and they played an integral role in developing the state campaign that continues to harm YOM. REN cannot deny enforcement power; it used the enforcement authority of DPH to back up its enforcement claims.

### D.    A Favorable Decision Would Redress Injury.

An injunction prohibiting Defendants from continuing their campaign of official condemnation would directly address YOM's injuries. Defendants' threatening conduct continues, and absent judicial intervention, YOM faces the prospect of being driven from the public square entirely. The First Amendment demands more robust protection.

## II.    The REN Defendants Acted Under Color of Law.

The central question in any § 1983 claim against private parties is whether their conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

Massachusetts has made it very clear from the beginning that Defendants are "a trusted partner of the Massachusetts Department of Public Health." *About Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/info-details/about-anti-abortion-centers (last visited Aug. 20, 2025). And by acting in a partnership with the State, Defendants are acting under color of law. The information uncovered and incorporated in the Amended Complaint has now substantially established that the REN Defendants acted as arms of the State. When government officials explicitly acknowledge using private partners to accomplish what is "not something we can do on mass.gov," Amend. Compl. ¶ 219, they have crossed the constitutional line. When those same officials coordinate messaging, share decision-making authority, and appear jointly at press conferences, they have created a symbiotic relationship that transforms private speech into state action.

The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights "fairly attributable to the State?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). As the Supreme Court has emphasized, "we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *NCAA v. Tarkanian*, 488 U.S. 179, 192 (1988).

There are several tests used to determine whether state action occurs, all of which involve consideration of the underlying facts and circumstances: (1) symbiotic relationship, (2) assumption of a public function, (3) proximity of nexus, (4) joint participation, and (5) pervasive entanglement. *Murphy v. Mass. Dep't of Developmental Servs.*, 2014 U.S. Dist. LEXIS 183350, *44-45 (D. Mass. 2014). "[A] finding of indirect state action can be made if any of these tests are satisfied." *Id.* "[T]he focal point is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19-20 (1st Cir. 1999).

All Defendants are explicitly and jointly participating in the actions at issue. There exists a close nexus and symbiotic relationship between the REN Defendants and the State Defendants, and Massachusetts has used the REN Defendants to circumvent its own constitutional obligations.

### A.    The Defendants Engaged in Joint Action.

Under the joint action theory, private actors become state actors when they are "willful participant[s] in joint activity with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). The key inquiry is whether the private party and state officials were "joint participants" in the challenged action. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). Under the joint action test, private parties act under color of state law when the state "so far insinuated itself into a position of interdependence with [the private party] that it was a joint participant in [the challenged activity]." *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (*quoting Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999)).

There is explicit joint participation between the State Defendants and the REN Defendants. The public education campaign is explicitly "created by the Department of Public Health (DPH) in collaboration with the Reproductive Equity Now Foundation[.]" Amend. Compl. ¶ 81. Moreover, the Abortion Legal Hotline was expressly "created by the Reproductive Equity Now Foundation, the Massachusetts Attorney General's Office, the Women's Bar Foundation, and the ACLU of Massachusetts." *Id.*

One qualifies as a state actor when one acts in partnership with the state. REN's hotline states that it is created "in partnership with," among other entities, the "Massachusetts Attorney General's Office." *Abortion Legal Hotline*, Reprod. Equity Now, https://reproequitynow.org/hotline (last visited, Aug. 20, 2025). Massachusetts has made very clear that REN is "a trusted partner of the Massachusetts Department of Public Health." *About Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/info-details/about-anti-abortion-centers

(last visited Aug. 20, 2025). The REN Defendants cannot deny acting under color of law while simultaneously advertising that very role on their website.

YOM has pleaded extensive facts demonstrating joint action between REN/Hart Holder and Massachusetts officials. REN and state officials held regular meetings to coordinate campaign strategy and implementation. Amend. Compl ¶ 122. As discussed above, the Amended Complaint reveals that REN exercised decision-making authority and budget authority over government campaign materials: a MORE employee sent an email requesting planning and budget approval from both DPH employees and REN employees, including Defendant Rebecca Hart Holder. *Id.* ¶ 156. REN employees provided input on design choices for advertisements, with their input carrying the same weight and authority as DPH employees. *Id.* ¶ 164. REN employee Taylor St. Germain had approval authority, specifically saying "ditto" when approval was initially given by the DPH employee. *Id.* ¶ 166.

REN took a leadership role in the campaign that went far beyond mere consultation or working as a government contractor. REN took the lead in planning and coordinating the press conference and launch event for the campaign, including determining the event's speakers. *Id.* ¶¶ 207-209. REN would draft a media advisory and op-ed, which the government would merely revise and approve. *Id.* ¶¶ 210-212. REN's materials and recommendations become part of official government communications, and the government relied on using REN's "expertise" to justify and implement regulatory actions.

Moreover, the government *admitted* using REN complaints as a pretext: "We were using the [two REN] complaints as a reason to put out this guidance now." Amend. Compl. ¶ 199. REN and DPH coordinated to create the very complaints that would justify their campaign: campaign materials specifically added "File a complaint" as a call-to-action after Defendant Hart Holder's

15

complaint. *Id.* ¶ 158. In other words, the complaint that Defendants filed was part of the same joint action and activity they carried out with the government.

### B. Defendants Had a Close Nexus and Symbiotic Relationship.

Moreover, the actions of the REN Defendants qualify as state action under the nexus and symbiotic relationship tests. The inquiry of the nexus test is "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This standard is met by showing that the State "has provided such significant encouragement, either overt or covert." *Blum*, 457 U.S. at 1004.

REN and State officials collaborated extensively on the campaign against PRCs. Government websites directly linked to REN materials, with DPH stating "Even if you're not looking for an abortion, these centers are not a safe or trusted place to go for reproductive health care" and linking "directly to a webpage operated and maintained by Defendant REN." Amend. Compl. ¶¶ 88-89. The State and REN coordinated messaging, with multiple emails exchanged between REN employee Taylor St. Germain and a DPH employee to discuss the phrasing of a REN press release about government actions, focusing on language that would present the government favorably. *Id.* ¶ 197.

The announcement of the pro-abortion campaign at issue here, *see* Amend. Compl. ¶ 76, makes very clear that REN is operating as a trusted partner of the state and in "collaboration" with the State Defendants. Many speakers emphasized the close connection and relationship: "We are grateful to the Healey-Driscoll Administration and Reproductive Equity Now for their unwavering commitment to protecting the rights, health, and economic security of women and girls in Massachusetts." *Id.* "HealthQ is grateful to Governor Healey, Secretary Walsh, Commissioner

Goldstein, and Reproductive Equity Now for their commitment and efforts to ensure every person seeking an abortion in Massachusetts is able to find the care they want." *Id.*

Defendant Healey dedicated state funds to this public campaign that REN benefited from directly. Specifically, REN received $250,000 for its free abortion legal hotline. Amend. Compl. ¶ 90. Massachusetts also created a dedicated webpage about anti-abortion centers featuring direct links to REN's list of anti-abortion clinics, including Plaintiff. *Avoid Anti-Abortion Centers*, Mass.gov, https://www.mass.gov/avoid-anti-abortion-centers (last visited Aug. 20, 2025). The government did not merely fund the abortion hotline, as the Amended Complaint alleges; it went beyond funding the hotline to expressly carry out this agenda in tandem with REN.

As for the symbiotic relationship test: The evidence demonstrates far more than casual coordination—it shows structural interdependence. REN published a guidebook for the State Defendants repeating false claims that PRCs are deceptive and misleading and further encouraged patients to file a report with the Attorney General's Civil Rights Division, providing instructions on how to do so. Amend. Compl. ¶¶ 93-105. Defendant Hart Holder even thanked Defendant Goldstein for his work and said she "really look[ed] forward to continuing our work together to combat these centers." *Id.* ¶ 106. This level of integration exceeds the "government contractor" relationship that courts have found insufficient for state action. Here, REN is not merely providing services to the government—it is jointly developing and implementing government policy.

## C.    REN Was Used in Order to Circumvent Limitations on Government Action.

Most damning of all, the Amended Complaint establishes that REN was specifically utilized to circumvent constitutional limitations on direct government action.

A MORE employee noted "[t]he use of logos of the [PRCs] is awesome to keep [on REN's linked PDF], too, and not something we can do on mass.gov," demonstrating coordination to circumvent government limitations on targeting specific organizations. Amend. Compl. ¶ 219.

REN employee Taylor St. Germain expressed a strong desire to ensure the interactive map would be viewed on the REN website rather than the government website. *Id.* ¶ 194. The Complaint alleges a deliberate strategy to use REN as a proxy: Defendants coordinated with REN as their acknowledged "trusted partner" to accomplish through private action what they could not constitutionally do directly themselves. *Id.* ¶ 239.

This case is readily distinguishable from *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), where the Supreme Court found no state action despite government funding and regulation. In *Rendell-Baker*, the private school operated independently in its day-to-day decision-making, and the challenged personnel decisions were not compelled, encouraged, or influenced by the state. The Court emphasized that "the various regulators showed relatively little interest in the school's personnel matters." *Id.* at 841. Here, by contrast, REN's challenged conduct was not only influenced but actively coordinated with and directed by state officials. Unlike the arm's-length relationship in *Rendell-Baker*, Massachusetts officials exercised direct operational control over the campaign's development and implementation. REN did not independently develop its messaging and then seek government funding—rather, *state officials participated in the creation, approval, and dissemination of the challenged content*. The government's use of REN as an explicit "trusted partner" to accomplish what it acknowledged it could not do directly on mass.gov demonstrates the kind of strategic coordination and joint participation that was absent in *Rendell-Baker*.

## III. The *Noerr-Pennington* Doctrine Has No Application In this Case.

The Noerr-Pennington doctrine shields from liability those who exercise their right to petition the government. *E. R.R Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). It has no bearing here for at least three reasons.

First, Plaintiff's action is *not* "predicated on the DPH Complaint." *Contra* REN MTD, Doc. No. 73 at 11. Information about that complaint is of course included in this case as an important

part of the evidentiary picture. But the basis for Defendants' liability, the predicate of this case, lies not in the complaint itself: the Defendants "acted as the trusted partner of the State, with State funding and support, and in explicit partnership in this campaign as a joint action with Massachusetts officials." Amend. Compl. ¶ 294. REN's liability does not arise from its complaint to the State; rather, it stems from its role at every stage of this campaign of threats and harassment, acting as the government's trusted partner. Defendants identify no precedent granting blanket immunity for falsehoods and misrepresentations in public statements merely because the actor also filed a complaint—an overreach that finds no support in law. This lawsuit is not predicated on the filing of a complaint; it is predicated on a targeted campaign of threats. However, the complaint Defendants filed can nonetheless serve as evidence of this coercion. *See United Mine Workers v. Pennington*, 381 U.S. 657, 670 n.3 (1965). Immunity does not mean inadmissibility; "offering the exhibit was to demonstrate the purpose and character of defendants' acts, a permissible use even if the letter was within the *Noerr* exception." *Lamb Enters. v. Toledo Blade Co.*, 461 F.2d 506, 516 (6th Cir. 1972). Even if "communications are immunized under Noerr-Pennington, evidence of such communications is admissible" to show a course of conduct. *Feminist Women's Health Ctr., Inc. v. Mohammad*, 415 F. Supp. 1258, 1268 (N.D. Fla. 1976). In other words, the fact that this case is about much more than a complaint ends the *Noerr-Pennington* analysis.

Second, the *Noerr-Pennington* doctrine does not extend to baseless activity. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). An exception to *Noerr-Pennington* immunity exists in cases of "sham petitioning." To prove this, a plaintiff must show that the petitioner's efforts were "objectively baseless" to the extent that "no reasonable litigant could expect success on the merits," and that the petitioner's true intent was to harm the plaintiff through abuse of the governmental process. *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993). Defendants' actions do not constitute good-faith petitioning; they

reflect a contrived controversy deliberately weaponized to silence disfavored speech through government power.  Defendants urged DPH to investigate "deceptive practices" based on REN's own misinterpretation of routine medical procedures. Amend. Compl. ¶ 45. Anyone, especially those familiar with medical terms, should easily be able to understand that those visiting YOM's bus do get "immediate results," in the form the tests, ultrasounds, etc., but the results are then reviewed by a medical doctor and given to the patients within 24-48 hours. *See* Amend. Compl. ¶¶ 45-49. The result of the investigation shows that this claim was baseless, and the wording that REN complained about was unchanged. A needless complaint about mere semantics is precisely the kind of petition activity not protected by *Noerr-Pennington*.

Third, the *Noerr-Pennington* doctrine does not apply when private parties act as state actors. *See Parker v. Brown*, 317 U.S. 341 (1943) (state action immunity and Noerr-Pennington doctrine serve different purposes). The law is clear: *"*[t]he *Noerr-Pennington* doctrine does not apply to government activities.*" S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 112 (D. Mass. 2010). If challenged conduct is government activity, as here, *Noerr-Pennington* does not apply as a matter of law.

REN's complaint cannot be characterized as private petitioning because it was filed as part of REN's role as a state partner in the campaign against PRCs: REN's complaint was part of a coordinated strategy with state officials to target PRCs. *See* Amend. Compl. ¶¶ 105, 187, 199, 200. REN received state funding and support for its anti-PRC activities, including the Hotline that encourages such complaints. *Id.* ¶¶ 90, 101, 109-110. REN's complaint was not the plea of a concerned citizen seeking government intervention—it was a strategic weapon deployed by the State's "trusted partner" to provide cover for a predetermined campaign of regulatory harassment.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

YOUR OPTIONS MEDICAL

By counsel,

OLIVIA F. SUMMERS*
/s/ Olivia F. Summers
(D.C. Bar No. 1017339)

ANDREW EKONOMOU*
(GA Bar No. 242750)
CHRISTINA (STIERHOFF) COMPAGNONE*
(D.C. Bar No. 1657929)
NATHAN MOELKER*
(VA Bar No. 98313)
THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
osummers@aclj.org

SAMUEL J. WHITING
MASSACHUSETTS LIBERTY LEGAL CENTER
(Massachusetts Bar No. 711930)
sam@mafamily.org

*Appearing Pro Hac Vice

Dated August 22, 2025

<u>**CERTIFICATE OF SERVICE**</u>

I, Olivia F. Summers, hereby certify that on August 22, 2025, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants. Paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Olivia F. Summers</u>
Olivia F. Summers