UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| A WOMAN'S CONCERN, INC. d/b/a YOUR OPTIONS MEDICAL CENTERS, ) ) ) Plaintiff, ) ) v. ) ) MAURA T. HEALEY et al., ) ) Defendants. ) | Civil No. 24-12131-LTS |

ORDER ON MOTIONS TO DISMISS (DOC. NOS. 70, 72)

February 17, 2026

SOROKIN, J.

A Woman's Concern, doing business as Your Options Medical Centers ("YOM"), brings this action for declaratory, compensatory, and injunctive relief, alleging that Governor Maura Healey, Department of Public Health ("DPH") Commissioner Robert Goldstein, and state "partners" Reproductive Equity Now ("REN") and its Executive Director, Rebecca Hart Holder, engaged in a pattern of conduct to target and discriminate against YOM and other pregnancy resource centers ("PRCs")[1] in Massachusetts. In particular, YOM alleges that Defendants' dissemination of various public education materials criticizing PRCs and urging compliance with

---

[1] The amended complaint and its attached exhibits use several terms to describe what the Court reads to refer to the same type of establishment, including crisis pregnancy centers, anti-abortion centers, and pregnancy resource centers. See, e.g., Doc. No. 64 ¶¶ 28, 35, 60. The Court refers to these establishments as pregnancy resource centers or PRCs.

healthcare regulations violated YOM's rights to free speech, free exercise of religion, and equal protection. Each Defendant filed a motion to dismiss. Doc. Nos. 70, 72.[2]

While the Court engages in a lengthy and detailed analysis of the claims advanced and the challenges to them, the issues before the Court are straightforward. YOM concedes Defendants possess free speech rights to state their views and criticize opposing views, even with strong and scalding language. Furthermore, YOM, a DPH-licensed clinic, does not challenge the application of state medical laws to its activities, advances no legal claim that it has been subjected to any improper scrutiny or investigation, and seeks no relief whatsoever from any present or future enforcement action. Rather, YOM complains that the state's public education campaign condemning the practices of PRCs generally along with DPH's communications reminding all medical entities about regulatory requirements amount to unconstitutional threats to suppress YOM's speech and viewpoint.

The amended complaint fails primarily because it does not plausibly suggest that Defendants have targeted YOM for actual or threatened enforcement action, let alone to stifle its protected speech or viewpoint. First, YOM has not plausibly alleged any unconstitutional regulatory action. YOM takes issue with a guidance letter sent by DPH to every licensed physician, physician assistant, nurse, pharmacist, pharmacy, hospital, and clinic in Massachusetts reminding them to abide by various healthcare regulations. This guidance highlighted several medical standards and requirements, some of which apply to YOM and some that do not. No reasonable person reading the guidance would have believed it selectively targets YOM or other PRCs for their views. The guidance aimed at enforcing numerous, neutral state laws, none of

---

[2] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

which YOM challenges.  Similarly, broad, public-facing campaign statements criticizing the practices of PRCs generally as "dangerous" "public health threats" constitute permissible government expression, not unconstitutional threats of enforcement against YOM.  YOM argues that campaign materials warning that PRCs "may use deceptive advertising" invoke threats of potential enforcement action under state medical advertising regulations.  Nonetheless, YOM has not alleged that the state has taken or threatened any such regulatory action against it.  The amended complaint also alleges no facts to suggest that state officials wielded threats of enforcement action as a mechanism to suppress YOM's speech, rather than to crack down on violations of state law.

Second, Defendants focused the campaign not on the pro-life, religious views of PRCs, but rather on the quality of their medical services and advertising practices.  None of Defendants' statements suggest any hostility to religion.  No allegations plausibly show that Defendants targeted their enforcement decisions based on the views or religion of YOM specifically or PRCs generally.  Thus, the amended complaint fails, including YOM's request for "[a] permanent injunction ordering Defendants . . . [to] ceas[e] any advertising activity or campaign that falsely accuses YOM of misconduct or of being a threat to public health."  Doc. No. 64 at 58.  For these reasons and the further reasons explained below, the Court ALLOWS Defendants' motions to dismiss.

I.    BACKGROUND

The following facts are drawn from the amended complaint and documents attached as exhibits, with all reasonable inferences drawn in favor of YOM.  YOM is a religious non-profit organization that operates licensed PRCs in Massachusetts.  Doc. No. 64 ¶ 5.  YOM was founded in 1991 by three Christian families in Boston who sought to offer pregnant woman "help and support in choosing life."  Id. ¶ 14.  More specifically, YOM offers those facing unexpected

pregnancies free ultrasounds, counseling, and material support, such as diapers, baby clothes, and other supplies.  Id. ¶¶ 16, 19.  As a "life-affirming entity," YOM "does not perform abortions, does not refer for abortions, and does not advertise that it performs abortions."  Id. ¶ 17.  It also does not provide prenatal care.  Id. ¶ 26.  It offers information about the use of progesterone to reverse the effect of medication abortion, id. ¶ 21, but it does not allege that it prescribes or administers progesterone for these procedures or that it anticipates doing so, id. ¶ 26.  Furthermore, YOM does not allege that it performs deliveries or offers midwifery services. As a medical clinic, YOM has been licensed by DPH since 1999, id. ¶ 20, and currently operates multiple medical PRCs and a mobile medical clinic, id. ¶ 22.  Since its opening, YOM has received no patient complaints.  Id. ¶ 25.

After the Supreme Court's decision in Dobbs v. Jackson Women's Health Organization, various PRCs, including YOM, were targeted for vandalism.  Id. ¶¶ 28–32.  YOM's buildings were vandalized on June 26, 2022, July 21, 2022, and July 28, 2022.  Id. ¶¶ 30–31.  To YOM's knowledge, no one was prosecuted for this vandalism.  Id. ¶ 32.  YOM does not allege that any of the Defendants participated in these acts of vandalism, expressed approval of them, or were involved in them in any manner.  Nor does YOM allege that it reported these instances of vandalism to law enforcement authorities or Defendants.

On July 6, 2022, then-Attorney General Maura Healey issued a press release describing her simultaneously issued "consumer advisory warning patients seeking reproductive health services about the limited and potentially misleading nature of the services provided by crisis pregnancy centers."  Doc. No. 64-2 at 8.  The press release urged "patients to do their research before making an appointment to access abortion or reproductive healthcare, especially if they are seeking information about abortion care."  Id.  It further warned that, "while Crisis Pregnancy

4

Centers may appear to be reproductive health care clinics, they do not provide abortion care or abortion referrals, contraception, or other reproductive health care, despite what they may advertise."  Id.  The statement also quoted Defendant Rebecca Hart Holder, Executive Director of REN, a reproductive justice advocacy organization, as stating, "[c]risis pregnancy centers, or fake clinics, are dangerous facilities that use deceptive advertising to deceive pregnant people into believing that they provide abortion care, when in reality, many do not even have doctors on staff to discuss the full range of health care options with clients."  Id.; Doc. No. 64 ¶ 37.

The statement discussed PRCs generally in this manner; nothing in the press release directly or indirectly referred to YOM.  Indeed, a significant portion of the press release was dedicated to warning the public about the dangers of unlicensed PRCs, as opposed to licensed clinics like YOM.  Doc. No. 64-2 at 8 ("Most Crisis Pregnancy Centers are not licensed medical facilities or staffed by licensed doctors or nurses.").  Notably, only four out of approximately thirty PRCs in Massachusetts are licensed.  Doc. No. 64 ¶ 60; Doc. No. 64-8 at 12.  The press release went on to caution that "[s]ome Crisis Pregnancy Centers offer ultrasounds performed by unlicensed personnel," "Crisis Pregnancy Centers staffed by unlicensed personnel are not required to keep your medical records private," and "[u]nlicensed Crisis Pregnancy Centers are not required to follow codes of ethics or standards of care that govern healthcare professions."  Doc. No. 64-2 at 8–9.

Several months later, in March of 2023, the Massachusetts legislature passed a Fiscal Year 2023 supplemental budget for a million-dollar "public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers and the centers' lack of medical services," earmarking an additional $250,000 to fund REN's legal hotline.  Doc. No. 64 ¶¶ 90, 109-110.  Following the passage of this budget, the Director of

Child/Adolescent Health and Reproductive Health at DPH emailed Holder informing REN about

the budget passage, explaining that DPH would be in touch about the earmark contract for

REN's legal hotline, and stating, "[w]e'd be happy to talk with you about what you would like to

see in the campaign." Doc. No. 64-5 at 2. On April 19, 2023, REN executed the earmark

contract with the state. Doc. No. 64 ¶¶ 116–117. From August through November 2023, REN

was looped in on several communications with the state and MORE Advertising—the

advertising group retained by the state to run the public education campaign—about strategies

for the campaign. Id. ¶¶ 122–156. For example, MORE included REN officials in an email to

government officials about a kick-off meeting to launch discussions about the public education

campaign. Id. ¶ 123. Furthermore, Holder was included in an email from MORE to DPH

employees requesting approval for the campaign's media plan.[3] Id. ¶ 156; Doc. No. 64-7 at 43.

MORE met with state officials on multiple occasions to develop the campaign. For

instance, in August 2023, MORE presented an "Environmental Scan" of anti-abortion clinics to

government officials. Doc. No. 64-6 at 1. MORE's PowerPoint from this meeting identified

YOM in a list of PRCs in Massachusetts. Id. at 13. Other slides noted the religious nature of

PRCs, stating, "How do we want to tackle/address religious aspects of these places." Id. at 39.

---

[3] YOM characterizes this email as one in which a MORE employee "request[ed] planning and budget approval from both DPH employees and REN employees" and concludes that Holder and REN "had approval authority over government campaign budgets." Doc. No. 64 ¶ 156. This mischaracterizes what the actual email says. In the body of the email, the MORE employee requested approval from several redacted names. See Doc. No. 64-7 at 43. REN and Holder assert that the redacted names "are those of DPH employees, which DPH redacted pursuant to G.L. c. 66, § 10B." Doc. No. 83 at 2 n.2. YOM has neither disputed this explanation of the email nor offered a reasoned, non-conclusory basis to understand the redactions differently. In this light, the underlying email does not support YOM's conclusory statement that REN held approval authority over MORE's campaign-related work, nor is that a reasonable inference to draw from the record before the Court. See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

Another PowerPoint slide recognized that many providers worked with "patient populations with strong faith-based abortion views" who may "not resonate" with campaign materials centered on PRCs' religious ties.  Doc. No. 64-7 at 1.

As plans for the campaign took shape, on October 17, 2023, Holder submitted a letter to DPH and the state's Executive Office of Health and Human Services raising a "concern about potentially deceptive practices" by YOM and calling for an investigation into its clinics.  Doc. No. 64 ¶ 157; Doc. No. 64-2 at 16.  The letter noted that YOM advertised that its Cape Cod mobile clinic would provide "immediate" ultrasound pregnancy results.  Doc. No. 64-2 at 16–17.  The letter also derived from and cited to an article featured in the Provincetown Independent newspaper, in which YOM's director stated that "when we say immediate results, we usually mean preliminary findings," with the actual results from the ultrasound not available for another day or two.  Id.  Noting this arguable discrepancy between YOM's advertised services (immediate results) and public statements (actual results taking one-to-two days), Holder's letter alleged that YOM could be engaging in "deceptive advertising in violation of Board of Registration in Medicine and Board of Registration in Nursing regulations," or that YOM's "registered nurses could be operating outside of their scope of practice by diagnosing ultrasounds immediately."  Id. at 17.

Based on Holder's letter, DPH conducted a review of YOM's operations.  It did not require YOM to make changes to its advertising about the mobile unit or to any other advertising.  Doc. No. 64 ¶ 48.  It did, however, require YOM to eliminate language that allowed for sonographer discretion in its criteria for ultrasound exams in its Policies and Procedures

Manual.[4]  Id. ¶ 49.  Once YOM made the correction, DPH issued a letter to YOM on February

29, 2024, confirming that it achieved and has maintained compliance.  Doc. No. 64-3 at 1.  That

is, DPH informed YOM that it had "corrected" "all deficiencies" found from the review.  Id.

The letter also reminded YOM that "facilities are obligated to . . . remain in compliance" and

noted that "[a]n unannounced visit may be conducted at any time at the discretion of the MA

Department of Public Health Licensure Unit."  Id.  YOM does not allege that DPH (1) lacked the

legal authority to do what it did, (2) overreached in the manner it conducted this investigation,

(3) required a correction not necessary to ensure compliance with the law, (4) misstated the facts

when the letter noted YOM was in compliance, (5) misstated the law when the letter said YOM

was obligated to remain in compliance and always faced the possibility of unannounced DPH

visits, or (6) subjected YOM to any further investigation of any sort.

        The only other investigation that YOM cites is a separate review of its medical director

initiated by another entity, the Massachusetts Board of Registration in Medicine ("Board"),

which is not a party to this action.  Doc. No. 64 ¶ 52.  YOM alleges that the Board commenced

the investigation into its medical director based on the same October 2023 letter from Holder,

id., which had been submitted to multiple government entities, including the Board, Doc. No. 64-

2 at 18.  Notably, a state statute mandates that the Board "shall investigate all complaints relating

---

[4] YOM alleges that this "deficiency noted by DPH was not remotely related to the allegations
contained in Defendant Holder's October 2023 complaint or to the allegations from the other
Defendants that the Plaintiff as a pro-life pregnancy center is engaged in deceptive and
dangerous activities."  Doc. No. 64 ¶ 51.  This is not a reasonable inference supported by the
record.  Holder's October 2023 complaint cautioned that YOM could be providing out-of-scope
diagnostic ultrasound services.  See Doc. No. 64-2 at 17–18 ("We have further concerns
regarding Your Options Medical's claim to be able to provide appropriate and in scope
diagnostic ultrasound services . . . . Out-of-scope practice is not only unlawful, but also may
result in a misdiagnosis.").  These allegations in Holder's complaint are plainly related to DPH's
later requirement that YOM revise language about "sonographer discretion" in its manual
"concerning the criteria for ultrasound exams."  Doc. No. 64 ¶ 49.

to the proper practice of medicine" by any physician.  Mass. Gen. Laws ch. 112, § 5.  As part of this statutorily required investigation, the Board served two subpoenas on YOM in December 2023 and June 2024.  Doc. No. 64 ¶¶ 52–53.  YOM alleges that these subpoenas exceeded the scope of REN's complaint because the documents sought were not limited to the mobile unit or the dates in which the mobile unit was in service.  Id. ¶¶ 54–56.

YOM complied with the first subpoena after the Board filed a request to compel compliance in Suffolk Superior Court.  See Bd. of Registration in Med. v. A Woman's Concern, Inc., No. 2484CV00502 (Suffolk Super. Ct. Feb. 21, 2024).  In response to the second subpoena, YOM sought a preliminary injunction in state court to prevent the Board from enforcing the subpoena; however, the state court demurred, finding that the subpoena was "neither overbroad in its request nor unduly burdensome" and that "the documents sought are relevant to the Board's investigation and do not exceed the scope of its [statutory or regulatory] authority."  A Woman's Concern, Inc. v. Bd. of Registration in Med., No. 2481CV01789 (Middlesex Super. Ct. Aug. 2, 2024).[5]  YOM never sought appellate review of this decision.  Beyond the two subpoenas, YOM has not alleged any other regulatory actions taken by the Board (or by any other state actor) against its clinics.  YOM did relay during the motion hearing, however, that the Board's investigation into its medical director was still pending as of January 29, 2026.

On January 3, 2024, DPH issued a press release entitled, "Maintaining Integrity, Accessibility, and Transparency in Reproductive Care."  Doc. No. 64 ¶ 59.  The press release noted that many PRCs "advertise themselves as full-service reproductive health care clinics, yet they do not provide abortion care or abortion referrals, contraception, or other important

---

[5] The Court takes judicial notice of these events.  See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

reproductive health care services."  Id.  The press release also stated that "[m]ost centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda."  Id.

Additionally, the press release differentiated between licensed and unlicensed PRCs. Regarding the former, the press release communicated that "[l]icensed clinics must comply with the requirements and standards of medical care and services associated with this certification." Doc. No. 64-3 at 10.  As for the majority of PRCs that "are not licensed as 'clinics,'" DPH noted that it "does not have jurisdiction over these facilities and cannot oversee the quality of services they provide."  Id.  However, DPH clarified that it still "may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials."  Id. at 11.  The press release further stated that DPH "actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices."  Id.

Also on January 3, 2024, Defendant Goldstein, Commissioner of DPH, issued a guidance memorandum entitled, "Reminder to Licensees Regarding Licensure Obligations and Providing Standard of Care."  Doc. No. 64-3 at 13.  DPH addressed the guidance to all "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics."  Id.  The stated purpose of the guidance was "to outline and remind licensees of their obligations under state law and as a condition of licensure."  Id.  The remainder of the six-page guidance provided a general summary of various laws governing the recipients of the letter, including reminders about the need for regulatory compliance as well as the potential

consequences of failure to abide by the regulations.  Id. at 13–18.  The letter made no mention whatsoever of YOM or PRCs.

Nonetheless, YOM alleges that this guidance letter was "not merely issuing generic reminders to licensed sites/providers," but was "intended to threaten PRCs like Plaintiff YOM and the medical providers who work with them."  Doc. No. 64 ¶ 171.  First, YOM contends that the guidance "singled out pro-life clinics and their practices" by "expressly criticiz[ing] the prescription of progesterone for the purposes of counteracting the abortion pill."  Id. ¶ 67.  On this topic, the guidance stated:

> Physicians and Advanced Practice Registered Nurses (APRN) who practice in violation of good and accepted health care practice may be disciplined for conduct which places into question their competence to practice. For example, there is strong evidence that medication abortion reversal is unproven, unethical, and unsafe to provide to patients; such that a physician or APRN who offers or provides this treatment could be found to be practicing inconsistently with accepted practice and subject to discipline.

Doc. No. 64-3 at 15.  YOM makes no allegation that it prescribes progesterone specifically, offers abortion reversals to patients generally, or intends to offer any of these treatments in the future.

Second, YOM notes that the file name for this guidance was "Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024."  Doc. No. 64 ¶ 64.  In internal emails about drafting the guidance, DPH stated that, "[w]hile [the linked document] does not specifically refer to anti-abortion centers (as the requirements outlined therein would apply to any licensed site/provider), the examples used in the document do put anti-abortion centers on notice."  Id. ¶ 170.  Based on these details, YOM asserts that "Defendant Goldstein issued this statement to threaten pro-life clinics and their doctors in line with the actions that have already been taken against YOM and its medical director."  Id. ¶ 70.

Throughout the next several months, DPH and REN "went back and forth in many detailed communications" in preparation to launch the public education campaign. Id. ¶ 206. For example, on January 9, 2024, a REN employee sent an email to a state government employee attaching REN's PowerPoint slides from a meeting centered on planning and coordinating details of the campaign. Id. ¶¶ 207–211. The presentation indicated that REN would draft materials for the campaign, including a media advisory and op-ed, which would be sent to DPH for approval. Id. ¶ 210. Furthermore, on February 21, 2024, employees of REN, DPH, and MORE exchanged emails about plans to publish government factsheets linking directly to REN's webpages about PRCs. Id. ¶ 216. In the same email chain, a MORE employee noted that it would be beneficial for REN's website to keep publishing logos of PRCs and that this was "not something we can do on mass.gov." Id. ¶¶ 218–229; Doc. No. 64-12 at 4. And throughout May and June 2024, employees from DPH, MORE, and REN continued to exchange various other emails discussing plans for campaign materials, events, and initiatives. Doc. No. 64 ¶¶ 222–232.

On June 10, 2024, the Healey administration launched a "first-in-the-nation" campaign against PRCs, implementing the state legislature's prior funding for the campaign.[6] Id. ¶ 74. According to the administration's press release, the campaign was intended to protect "patients from the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing comprehensive reproductive services." Id. ¶ 77. A news article quoted Defendant Goldstein stating:

---

[6] At one point in the amended complaint, YOM asserts that by "funding a statewide campaign against [YOM's] viewpoint, . . . Defendants have created a comprehensive scheme of viewpoint discrimination." Doc. No. 64 ¶ 241. This assertion confuses the fact that the state legislature, not Defendants, required and funded the campaign. To the extent YOM makes this point to argue that neither the state government generally nor these public officials specifically may take a position on matters concerning medical care or abortion, the Court addresses that argument below.

> [The campaign] counter-punches to the vast amount of misinformation and
> disinformation that these centers peddle every day, deceiving people who may be
> frightened or confused . . . .  As the commissioner of public health, I'm resolute
> about calling out this deception for what it is: a public health threat.  When people
> are denied factual information and the freedom to make fully informed decisions
> about their reproductive health, it can lead to worse mental and physical outcomes.

Id. ¶ 80.

The campaign has resulted in the distribution of various public-facing materials about PRCs.  YOM alleges that "[s]ince the government launched its campaign, billboards, posters, and ads are now present throughout Massachusetts."  Id. ¶ 82.  For example, on DPH's website is a page called "Avoid Anti-Abortion Centers," which solicits complaints from those who have experienced harm from a PRC.  Id. ¶¶ 83–84.  The DPH webpage links to several others, including a page on REN's website entitled, "What Are Anti-Abortion Centers?"  Id. ¶¶ 85–89. That webpage describes PRCs as "facilities that present themselves as resources for people facing unplanned pregnancies, but in reality, exist to dissuade people from accessing abortion care."  Doc. No. 64-3 at 30.  The page provides a list of PRCs in New England, including YOM. Id.; Doc. No. 64 ¶¶ 91–92.

REN has also published a guidebook on its website, which again lists all the PRCs in New England, including YOM's centers.  Doc. No. 64 ¶¶ 93–94.  The guidebook states that PRCs "pose a serious threat to unbiased reproductive health care here in New England," "use deceptive practices to attract patients," and "often use disinformation as a way to dissuade people from accessing abortion care."  Id. ¶¶ 95–96.  It also provides the phone number of REN's free and confidential legal hotline where people can report their cases and receive referrals to pro bono attorneys.  Id. ¶ 99.  The guidebook further outlines how patients might file a report against a PRC with the Attorney General's Office.  Id. ¶ 102.

According to YOM, all these campaign initiatives and materials singled out YOM and other PRCs as a danger to public health, even though "zero patient complaints have ever been lodged with Defendants against YOM." Id. ¶ 331. YOM alleges that, "despite the Defendants' million-dollar effort to solicit complaints from the public, a public records request revealed that no complaints were filed with the Attorney General's Office within the first seven months of the public campaign, and no indication of any being filed since that records request." Id. ¶ 205. YOM also notes that a public-records request to DPH asking for all complaints filed against PRCs between June 19, 2022, and June 20, 2024, produced only two complaints, both of which were submitted by REN, "not by women claiming to be victims of misconduct by [PRCs]." [7] Id. ¶ 184. While this assertion is correct in a literal sense, it is not fully accurate. REN's second complaint brought to DPH's attention a class-action lawsuit brought by a patient who sought pregnancy testing from a PRC called Clearway Clinic. Doc. No. 64-8 at 13. Her lawsuit alleged that Clearway Clinic engaged in deceptive advertising and harmful medical practices that ultimately put her health at risk and required her to receive emergency surgery. Id. at 14. Citing the lawsuit, REN wrote that its "allegations . . . create a basis for an investigation as to whether

---

[7] YOM additionally asserts that state officials used REN's two complaints as "pretext" for launching the entire campaign, pointing to an internal email from a DPH official to a REN employee that stated, "[w]e were using the [two REN] complaints as a reason to put out [the January 3, 2023 guidance] now rather than March, when the health marketing campaign launches." Doc. No. 64 ¶ 199; Doc. No. 64-11 at 11. But in the remainder of the email thread, which YOM attached as an exhibit to the amended complaint, the DPH official qualified this statement by noting that DPH's "effort to ensure that these centers were operating appropriately has been a priority for this administration (and DPH) even before the complaints were filed." Doc. No. 64-11 at 11. The email continues: "The complaints certainly shine a much-needed light on some questionable operations . . . but it is the overarching commitment to high-quality reproductive care and the deep concerns about these centers that are driving this effort." Id. at 11–12. In any event, the campaign arose from a budget enacted by the legislature directing the campaign to occur; the legislature passed this budget in March 2023, well before the filing of either of REN's complaints.

Clearway endorses out-of-scope practices at its clinics and has engaged in deceptive and false advertising."  Id. at 15.  Thus, this complaint by REN arose from an aggrieved patient's alleged experiences at a PRC, even if the patient did not directly bring her concerns to DPH.

YOM contends that "[s]imilarly situated entities that do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants."  Doc. No. 64 ¶ 333.  For this point, YOM notes that a public-records request for complaints to DPH against abortion clinics revealed that DPH received at least eight such complaints between 2022 and 2024.  Id. ¶ 188.  However, YOM does not allege that DPH ignored these complaints against abortion providers or handled the complaints differently than complaints against PRCs.  YOM also mentions that three abortion clinics have previously failed their DPH inspections, id. ¶ 190, and that one abortion clinic has not been subjected to DPH's required two-year inspections that PRCs have had to undergo, id. ¶ 191.  Based on these facts, YOM asserts that DPH has imposed a "double standard for pro-life centers" "based on the religiously based pro-life viewpoint of these centers, not on any true concern for public health."  Id. ¶ 193.  YOM alleges that the government's actions "have had immediate and devastating effects on [its] operations and constitutional rights," including causing a doctor to resign and deterring patients from seeking its services.[8]  Id. ¶ 240.

YOM initially filed this suit on August 19, 2024.  Doc. No. 1.  All Defendants moved to dismiss the complaint.  Doc. Nos. 33, 43.  After seeking leave to do so, the American Civil Liberties Union of Massachusetts ("ACLU of Massachusetts") filed an amicus brief on January

---

[8] While YOM asserts that this doctor quit "[a]s a direct, immediate, and foreseeable result of Defendants' threats," Doc. No. 64 ¶ 274, it fails to provide any non-conclusory allegations indicating that the doctor's decision to resign from YOM was driven by Defendants' actions. YOM advances no factual allegations regarding this doctor's departure, just legal conclusions.

24, 2025.[9]  Doc. No. 53.  No party opposed the ACLU of Massachusetts's request to file the amicus brief or the brief itself.  The Court held a hearing on the motions to dismiss on May 8, 2025, during which YOM requested leave to amend its complaint in light of recently obtained public records.  The Court allowed the request, Doc. No. 60, and terminated as moot the motions then pending.  YOM filed the amended complaint on June 20, 2025.  Doc. No. 64.  The amended complaint advances three counts against all Defendants: Count I alleges a violation of the Free Speech Clause of the First Amendment; Count II alleges a violation of the Free Exercise Clause of the First Amendment; and Count III alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.  Defendants Goldstein and Healey ("State Defendants") moved to dismiss all three counts on July 25, 2025.  Doc. No. 70.  On the same day, Defendants Holder and REN moved to dismiss all counts as well.  Doc. No. 72.  YOM opposed both motions.  Doc. Nos. 80, 81.  The movants each filed a reply.  Doc. Nos. 82, 83.  The Court held a hearing on the motions on January 29, 2026.

II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The Court need not, however, "accept the complaint's legal conclusions or naked assertions devoid of further factual enhancement."  Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011) (citation modified).

---

[9] The Court considers "the amicus brief[] only insofar as [it] concern[s] legal issues and positions raised by the parties."  New Jersey v. Trump, 131 F.4th 27, 32 n.1 (1st Cir. 2025)

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). However, "[w]hen the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." Id. (citation modified). The amended complaint attaches various documents, all of which are referenced in the body of the pleading. Thus, the Court considers these documents as well.

III.    DISCUSSION

"Abortion presents a profound moral issue on which Americans hold sharply conflicting views." Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 223 (2022). While the parties themselves have differing views on abortion, this case is not about the legality or morality of abortion. Indeed, there are a number of notable matters that this case does not concern.

"This case is not about whether state officials can express opinions[,]" as YOM concedes. Doc. No. 80 at 11. The Supreme Court has made clear that "[a] government official can share her views freely and criticize particular beliefs, and she can do so forcefully in her hopes of persuading others to follow her lead." Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 188 (2024). "It is the very business of government to favor and disfavor points of view." Nat'l Endowment for Arts v. Finley, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). State officials can publicly express their views on contentious issues of public concern. Indeed, officials regularly express their views in vivid and powerful language on deeply divisive issues including, for example, what, if any, immigration the United States should permit and how it should enforce the immigration laws. These topics, of course, are not off-limits merely because some people's views about them are religiously motivated or derived from religious beliefs. Compare Camillo

Barone, <u>Bishops condemn Trump's immigration orders for stoking fear, anxiety</u>, Nat'l Cath.
Rep., Jan. 23, 2025, https://www.ncronline.org/news/bishops-condemn-trumps-immigration-
orders-stoking-fear-anxiety [https://perma.cc/X2DM-BMXF] (quoting bishops' statement that
President Trump's "dehumanizing executive orders contradict our core values of compassion,
justice and the biblical mandate to welcome the stranger"), <u>with</u> Cara Tabachnick, <u>Vice President
JD Vance blasts U.S. Catholic bishops condemning ICE entering churches and schools</u>, CBS
News, Jan. 26, 2025, https://www.cbsnews.com/news/jd-vance-interview-face-the-nation-
catholic-bishops-ice-order/ [https://perma.cc/784T-EKVZ] (quoting Vice President Vance
criticizing Catholic bishops for not being "good partner[s] in common sense immigration
enforcement").  These well-established principles are not disputed in this case.  YOM agrees, as
it must, that government officials have the right to voice their own views, to criticize opposing
views, and to do so with "aggressive" and "scalding" language.  Doc. No. 65 at 34:5–21, 56:9–
21.

      Nor is this case about whether YOM, a licensed medical provider, is exempt from the
general regulations and laws governing all medical licensees in Massachusetts.  YOM makes no
such claim here.[10]  YOM does not argue that its religious status or the religiously motivated
nature of its activity places it outside the licensure obligations imposed by the state.  YOM also
does not contend that any of the underlying state laws, rules, or regulations governing its medical
license are unconstitutional per se or as applied.  YOM concedes that it must comply with all

---

[10] Whether or how the First Amendment imposes any limits on the general application of
otherwise neutral laws to religious activity, religiously motivated activity, or activity constituting
an expression of religious belief raises issues of ongoing debate in the Supreme Court.  <u>See
generally</u> <u>Fulton v. City of Philadelphia</u>, 593 U.S. 522 (2021).

requirements that apply to all licensed medical clinics.  Indeed, the amended complaint seeks no relief from the enforcement of those rules against YOM.  Doc. No. 64 at 58.

Moreover, this case is not about the rights of all PRCs.  YOM does not bring this lawsuit as a class action on behalf of all PRCs in Massachusetts.  It asserts no claim on behalf of any other entity or person.  This is an individual case about whether Defendants' actions violate YOM's constitutional rights.  The Court considers allegations regarding other PRCs only to the extent they bear on YOM's particular claims on its own behalf in this case.

Having made clear what this case is not about, the Court turns to the dispute at hand.  This case is about whether Massachusetts government officials wielded the power of the state to unconstitutionally threaten and violate the rights of YOM.  The Court now considers that question, taking each of YOM's three causes of action in turn.

A.    Count I: Free Speech Claim

The Court begins with State Defendants' assertion that YOM fails to state a violation of the Free Speech Clause.  In considering this challenge, the Court considers not only the alleged actions of State Defendants, but also—assuming, without deciding, that REN and Holder acted as state actors—the alleged actions of REN and Holder.  It does so to consider the amended complaint in the light most favorable to YOM.

To plead a § 1983 claim, a plaintiff must allege that a person, acting under the color of law, deprived the plaintiff of a constitutionally protected right.  42 U.S.C. § 1983.  The First Amendment safeguards the right to free speech and binds states by way of incorporation through the Fourteenth Amendment.  See Locke v. Davey, 540 U.S. 712, 718 (2004).  The Free Speech Clause prohibits government entities and actors from "abridging the freedom of speech."  U.S. Const. amend. I.

Nonetheless, the Free Speech Clause "has no application" when government officials are engaging in their own expressive conduct. Pleasant Grove City v. Summum, 555 U. S. 460, 467 (2009). As mentioned above, "[t]he government can say what it wishes and select the views that it wants to express." Vullo, 602 U.S. at 187 (citation modified). Indeed, "[i]t is inevitable that [the] government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens." Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229 (2000); see Vullo, 602 U.S. at 187 (citation modified) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others, and thus does not need to maintain viewpoint-neutrality when its officers and employees speak about that venture."). The government needs this ability in order to function. "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." Keller v. State Bar of Cal., 496 U.S. 1, 12–13 (1990).

Of course, this does not mean there are no restraints on speech by government entities and actors. "While a government official can share her views freely and criticize particular beliefs in the hopes of persuading others, she may not use the power of the office to punish or suppress disfavored expression." Vullo, 602 U.S. at 176. This distinction is at the root of YOM's free speech claim. YOM argues that "Defendants crossed the constitutional line from legitimate policy expression into unconstitutional chilling of speech by branding PRCs as 'public health threats,' actively soliciting complaints against them, threatening regulatory consequences,

and orchestrating a public intimidation campaign that has already chilled YOM's protected speech."  Doc. No. 80 at 12.

Two Supreme Court cases cited by the parties help clarify the line between permissive and unconstitutional government expression.  In Bantam Books, Inc. v. Sullivan, the "Rhode Island Commission to Engage Morality in Youth" used its governmental powers to threaten legal sanctions against those who distributed publications it listed as "objectionable."  372 U.S. 58, 66–67 (1963).  Specifically, the commission sent multiple notices to a book distributor thanking him in advance for his cooperation with the commission, reminding him of the commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity, and informing him that the list of objectionable publications was circulated to local police departments.  Id. at 61–63.  Indeed, a local police officer usually visited the distributor shortly after the notices were received to confirm the actions he had taken regarding the disfavored publications.  Id. at 63.  The Supreme Court held that the commission's "system of informal censorship" was unconstitutional because the commission's coercive process to weed out "objectionable" materials "provide[d] no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter."  Id. at 70–72.

National Rifle Association of America v. Vullo is another case that illustrates when government communications transcend into suppression.  There, the plaintiff alleged that the superintendent of New York's Department of Financial Services, who held direct regulatory and enforcement authority over all insurance companies, told insurance executives in a private meeting that she would be "less interested" in pursuing insurance law infractions "so long as [the company] ceased providing insurance to [pro-]gun groups, especially the NRA."  602 U.S. 175, 192 (2024).  She proceeded to tell the executives that her department would "focus its

forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA and ignore other syndicates writing similar policies." Id. at 183.  Her actions singling out the NRA did not stop there.  She also promulgated guidance letters and a press release urging insurance companies and banks to review and discontinue their relationships with the NRA.  Id. at 183–85.  Upon weighing these facts, the Court held that the NRA had plausibly alleged that the superintendent violated its First Amendment rights by "threaten[ing] to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy."  Id. at 194.  The Court explained that, "although [the state] can pursue violations of state insurance law, [it] cannot do so in order to punish or suppress the [plaintiff's] protected expression."  Id. at 196.

Relying on Bantam Books and Vullo, YOM alleges that Defendants levied "viewpoint-discriminatory implicit threats" through their public education campaign materials and various other communications.   Doc. No. 64 ¶¶ 250, 254.  YOM's analogy to these cases fails.  The amended complaint includes no mention of any direct, express threats made against YOM by Defendants.  Cf. Vullo, 602 U.S. at 192 (complaint alleged that regulator directly threatened regulated entities that "she would 'focus' her enforcement actions 'solely' on the syndicates with ties to the NRA").  There is no allegation that any of the Defendants told YOM or other PRCs that they cannot engage in certain kinds of speech or views.  Cf. Bantam Books, 372 U.S. at 61 (commission sent notice listing "objectionable" books that could not be sold).  Nor is there any allegation that Defendants told YOM it could avoid enforcement action by abandoning its anti-abortion viewpoint.  Moreover, YOM does not allege that Defendants threatened third parties with punishment if those parties worked or affiliated with YOM.  Simply put, this case is not like Bantam Books or Vullo.  There is no direct effort to suppress speech.  Of course, there is criticism of the approach taken by PRCs—but that speech is permissible, as YOM concedes.

Without allegations of any express, coercive threats made by Defendants, the remaining question is whether the factual allegations plausibly support an inference of an implied threat to use the power of the state to suppress YOM's free speech.  YOM references various statements by Defendants.  The Court first addresses each challenged statement individually and then evaluates the statements together considering the totality of the circumstances.

        1.   *DPH's January 2024 Guidance*

The first challenged statement is the guidance memorandum issued by DPH on January 3, 2024, entitled, "Reminder to Licensees Regarding Licensure Obligations and Providing Standard of Care."  Doc. No. 64-3 at 13–18.  Addressed to "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics," the guidance provided various reminders about licensure requirements and standards.  Id. at 13.  YOM argues that DPH "issued this statement to threaten pro-life clinics and their doctors."  Doc. No. 64 ¶ 70.  The content of the guidance, however, does not support YOM's assertion.

First, the guidance did not mention or refer to YOM or PRCs at all.  Rather, much of the six-page document was dedicated to stating reminders about state regulations and laws that apply to all licensees.  For example, "any clinic providing medical services must meet the requirements of 105 CMR 140.000, including specific requirements related to staffing."  Doc. No. 64-3 at 14.  The guidance also reminded practitioners that they "are subject to professional discipline for the failure to comply with recognized standards of practice and for engaging in conduct that is dishonest or deceitful."  Id.  It reminded physician assistants ("PAs") and nurses that they must act within their scope of practice.  Id. at 14–15.  Additionally, the guidance noted that physicians may not aid or abet an unlicensed person to perform activities requiring a license.  Id. at 17.  All these reminders summarize generic licensure requirements that bind all licensed entities, regardless of the types of services they provide or the viewpoints they hold.

The guidance also stated that DPH "takes patients' rights and the provision of high quality, evidence-based, safe care by all providers seriously. **This includes providing patients accurate and complete information for informed decisionmaking, accurate portrayal and advertising of clinical services, and licensees practicing within their scope of practice and their license**."[11]  Id. at 13.  This is a generally applicable statement of DPH's regulatory priorities.  YOM does not allege that DPH's emphasis on "providing patients accurate and complete information" interferes with its ability to express its pro-life beliefs or to provide services in line with such beliefs.  YOM also does not allege that its clinics are unable to provide "accurate and complete information" to pregnant patients because of its religious viewpoint.[12]  Furthermore, there are no factual allegations that DPH has threatened disciplinary action against any PRCs for failing to provide "accurate and complete information."  This language in the guidance reflects a general expression of regulatory objectives applicable to virtually all licensees, and YOM has not argued, let alone plausibly alleged, otherwise.

Second, the guidance stated specific regulatory reminders with no connection to YOM's work at all.  For example, the guidance noted that "[a]ll practitioners and entities must comply with controlled substance requirements in M.G.L. c. 94C."  Id. at 14.  Nothing in the complaint suggests that YOM dispenses or prescribes controlled substances.  Of course, many other licensees (doctors, pharmacists, hospitals, and clinics) do dispense or prescribe controlled substances.  This directive speaks to those persons and entities, but not to YOM.  The guidance also explained that state regulations "prohibit nurses and PAs from exercising undue influence

---

[11] The Court reproduces bolded language as it appears in the original source.

[12] In fact, YOM represents that it can provide full and complete information to patients.  Its website states: "We provide information on abortion side effects, what to expect, and more so you can make a <u>fully informed</u> choice."  Doc. No. 64-2 at 6 (emphasis added).

on a patient, including the promotion or sale of services, goods, appliances, or drugs, in such a manner as to exploit the patient for financial gain." Id. at 16.  This reminder, too, is inapplicable to YOM, which is a not-for-profit organization that provides all its services free of charge.  Doc. No. 64 ¶ 19.  The guidance also stated that advanced practice registered nurses ("APRNs") "who provide abortion services must comply with Advisory Ruling 21-02."  Doc. No. 64-3 at 17.  This requirement does not apply to PRCs, which do not provide abortion services.  That the guidance included regulatory reminders directed only at abortion providers undermines YOM's assertion that the guidance was aimed at suppressing PRCs' anti-abortion viewpoint.

Third, even provisions of the guidance that bear a closer link to YOM's services have general applicability to licensed entities beyond YOM and other PRCs.  For example, the guidance stated that a nurse can provide ultrasounds "only after appropriate education and demonstrated clinical competency." Id. at 14.  It also noted that the state had previously imposed "discipline on a physician who authored ultrasound reports on the basis of sonographer impressions in lieu of personally reviewing images." Id. at 17.  These statements apply to YOM, which provides ultrasounds.[13]  Doc. No. 64 ¶ 16.  But they are not solely targeted at YOM and other PRCs.  They plainly govern any licensed entity that offers ultrasound services, including abortion providers as well as entities that use ultrasounds for non-pregnancy-related care, such as for diagnosing blood clots or detecting cysts.  The guidance also mentioned that any entity that offers ambulatory medical services—which "include procedures such as diagnosing pregnancies, performing ultrasounds and other clinical procedurals"—"**is subject to clinic licensure and must meet the requirements of 105 CMR 140.000,** unless otherwise exempt."  Doc. No. 64-3

---

[13] Nothing in the amended complaint suggests that the doctor referenced in the guidance letter worked for YOM (or any other PRC), nor does YOM advance such an argument.

at 13.  While this statement applies to YOM in a peripheral sense because it is a licensed entity that offers pregnancy diagnoses and ultrasounds, the statement does not contain any semblance of a targeted threat toward YOM.  YOM is and has been licensed at all relevant times.  This statement merely reminded clinics to comply with a regulation setting forth standards for the maintenance of licensed clinics.  Unlicensed PRCs—which are not among the recipients of this guidance precisely because they are unlicensed—may have properly viewed this statement as a warning that operating without a license while offering medical services requiring a license could result in regulatory action.  But, of course, that is a permissible and proper warning to those violating state law.

Put simply, the guidance summarized various rules and requirements for state licensure, only some of which apply to YOM.  These neutral descriptions of the standards governing licensed medical providers simply conveyed statements of Massachusetts law, not threats.  VDARE Found. v. City of Colo. Springs, 11 F.4th 1151, 1165 (10th Cir. 2021) (noting that government's "statement of [state] law" "contains no plausible threat"); Bantam Books, 372 U.S. at 72 (noting that "advising [regulated entities] of their legal . . .  liabilities" is not a First Amendment violation).  YOM does not contend that the guidance misstated any licensure requirements under state laws and regulations.  It also does not challenge the legitimacy or importance of any of the underlying medical regulations, laws, or requirements communicated in the guidance.  It does not argue these laws and rules do not apply to YOM or challenge the words or tone used in the letter.  Nor does YOM seek any relief whatsoever preventing the state from applying the governing rules to it in the future.  Doc. No. 64 at 58.

YOM does raise one substantive, medical dispute with the guidance—namely, its criticism of medication abortion reversals.  That portion of the guidance stated, "there is strong

evidence that medication abortion reversal is unproven, unethical, and unsafe to provide to patients; such that a physician or APRN who offers or provides this treatment could be found to be practicing inconsistently with accepted practice and subject to discipline." Doc. No. 64-3 at 15. This sentence was coupled with a corresponding footnote citing to the "American College of Obstetricians and Gynecologists advocacy stance regarding medication abortion 'reversals.'" Id. at 15 n.7. Based on this language, YOM claims the guidance "threatens physicians with discipline and penalties for the prescription of progesterone, even though progesterone is frequently used to support pregnancies, particularly at-risk pregnancies . . . and is perfectly lawful as a prescription medication in Massachusetts." Doc. No. 64 ¶ 68.

The amended complaint does not establish that YOM has standing to challenge this statement. YOM does not allege that its centers offer—or are even contemplating offering—medication abortion reversals, rendering it implausible that this guidance poses a threat to its operations or First Amendment rights. YOM merely alleges that it provides information about medication abortion reversals—an expressive activity that is not targeted, addressed, or suppressed by the guidance. Doc. No. 64 ¶ 21. Nothing in the guidance placed limits on discussing progesterone (or anything else) with patients. In fact, YOM's website, to this day, continues to publicly provide information about medication abortion reversals. See What is Abortion Pill Reversal?, Your Options Medical (Mar. 16, 2020), https://www.youroptionsma.org/post/what-is-abortion-pill-reversal [https://perma.cc/K5SX-RTVW]. And, there is no indication that the state has taken or threatened action to prevent YOM

or other entities from conveying this type of information.[14]  All of these circumstances directly

undermine YOM's claim that the guidance's discussion on medication abortion reversals

impermissibly suppresses or chills its protected speech.

In any event, YOM mischaracterizes the guidance, which discouraged the use of

progesterone in just one context—reversing medication abortions.  The guidance did not threaten

regulatory action against doctors who prescribe progesterone in other ways.  Furthermore, the

guidance's characterization of medication abortion reversal as "unproven, unethical, and unsafe"

reflects a proper exercise of DPH's discretion to determine medical standards for the state.  See

Simopoulos v. Virginia, 462 U.S. 506, 516 (1983) ("In view of its interests in protecting the

health of its citizens, the State necessarily has considerable discretion in determining standards

for the licensing of medical facilities."); United States v. Skrmetti, 605 U.S. 495, 524 (2025)

(quoting Gonzales v. Carhart, 550 U.S. 124, 163 (2007)) ("We afford States 'wide discretion to

pass legislation in areas where there is medical and scientific uncertainty.'").  Whether DPH is

correct that medication abortion reversal is "unproven, unethical and unsafe" is a matter for

litigation by an entity or person that has faced (or faces impending) discipline for prescribing

---

[14] Thus, this situation is not comparable to National Institute of Family & Life Advocates v. James, 160 F.4th 360 (2d Cir. 2025), a recent Second Circuit case mentioned in YOM's notice of supplemental authority.  Doc. No. 86.  There, the New York Attorney General took civil enforcement action against pro-life, non-profit organizations for making informational statements regarding abortion pill reversals.  James, 160 F.4th at 365.  YOM does not plausibly allege that type of activity.  YOM does allege that the guidance "called out specific acts of medical sites and providers, like YOM, such as providing even mere information about the use of progesterone as a potential aid for reversing a medication abortion."  Doc. No. 64 ¶ 71.  The Court need not and does not accept this allegation because it is contradicted by the plain text of the guidance, which says no such thing.  See Clorox, 228 F.3d at 32.  It speaks only to providing medication abortion reversals and says nothing about providing information about such treatments.  Plainly, YOM can discuss such a use, and nothing in the guidance (or elsewhere) plausibly suggests otherwise.

progesterone for the purpose of abortion reversals, or perhaps one that wishes to do so but fears DPH sanction.  YOM is not such an entity based on its own allegations.

Accordingly, DPH's guidance cannot be "reasonably understood" to convey an express or implicit threat to punish YOM's free speech.  Vullo, 602 U.S. at 177 (noting that plaintiff must allege that challenged communications are "reasonably understood" as threats).  To the extent the guidance reminded licensees that they could face discipline for failing to comply with licensure requirements, reminding regulated entities about their obligations under the law—and the potential adverse consequences they may face should they fail to follow the law—is a normal and necessary government function.  Id. at 201 (Jackson, J., concurring) ("[O]ur democracy can function only if the government can effectively enforce the rules embodied in legislation; by its nature, such enforcement often involves coercion in the form of legal sanctions.").  Importantly, the guidance did not link potential disciplinary action to any particular viewpoint or speech.  The guidance did not state or suggest that licensed providers would be freed from enforcement oversight if they were to disassociate from anti-abortion viewpoints.  This situation is a far cry from Bantam Books and Vullo, where the state brandished potential enforcement action in order to suppress disfavored speech.  Instead, DPH simply conveyed that licensed entities, including YOM, must comply with the regulatory mandates imposed on all licensees, or else risk facing enforcement action.  Such communications did not, as YOM alleges, "warn[] pro-life doctors, nurses, and other healthcare providers that their licenses would be in jeopardy if they worked with PRCs."  Doc. No. 64 ¶ 280.

YOM raises one additional issue with the guidance.  YOM notes that the internal file name of the statement was entitled, "Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024."  Id. ¶ 64.  Furthermore, YOM points to an internal DPH email

linking to a draft of the guidance and stating,"[w]hile [the linked document] does not specifically refer to anti-abortion centers (as the requirements outlined therein would apply to any licensed site/provider), the examples used in the document do put anti-abortion centers on notice."  Id. ¶ 170.  According to YOM, these details reveal that Goldstein "issued the statement to threaten pro-life clinics and their doctors."  Id. ¶ 70.  But these internal details about the guidance, which YOM presumably obtained through a public-records request, do not alter how the guidance was received and understood by its recipients.[15]  Drawing all the inferences in favor of YOM, these facts support the inference that at least one of DPH's purposes for drafting and issuing the guidance was to remind anti-abortion centers about standard-of-care requirements.  But internal considerations of government officials that were never communicated externally do not turn an objectively non-threatening communication into a threat.  Nor does the file name of the guidance—known only by its drafters—impact its message or how it was perceived by YOM and other recipients.  As discussed above, the guidance cannot be plausibly understood as a threat. These communications reminded YOM and other healthcare entities to abide by their existing

---

[15] Indeed, during the motion hearing, counsel for YOM noted that the intent of the government speaker does not factor into the Vullo analysis because it is the reasonable perception of the regulated entity that matters for determining whether government speech amounts to a coercive threat.

obligations under the law and professional standards.  In light of these considerations, YOM has

not plausibly shown that the guidance amounts to an unconstitutional show of coercive power.[16]

2.    *DPH's January 2024 Press Release*

Next, YOM challenges the other statement issued by DPH on January 3, 2024: the press

release entitled, "Maintaining Integrity, Accessibility, and Transparency in Reproductive Care."

Doc. No. 64-3 at 10–12.  That press release stated:

> In the wake of recent complaints regarding several anti-abortion centers, DPH has
> initiated a review of its statutory and regulatory obligations.  The purpose of this
> review is to make sure DPH professional licensees and facility licensees – including
> these centers – are adhering to their designated scope of practice and operating
> transparently and free from deceptive practices.

Id. at 10.  It proceeded to warn that many PRCs "advertise themselves as full-service

reproductive health care clinics, yet they do not provide abortion care or abortion referrals,

contraception, or other important reproductive health care services."  Id.  The release further

explained that "there are nearly [thirty] anti-abortion centers that operate in the state, with only

---

[16] Even if the file name along with DPH's internal emails about putting "anti-abortion centers on
notice" plausibly support the conclusion that Defendants created the guidance because of PRCs,
that at most supports the conclusion that DPH officials were (rightly or wrongly) concerned that
some PRCs operated improperly without a license, that some PRCs improperly prescribed
progesterone for medication abortion reversals, and that some persons reading ultrasounds at
PRCs did so beyond the scope of their training and authority.  In acting on these concerns, DPH
sent a general letter not targeted at PRCs, but rather to all licensees with reminders about these
and other compliance concerns.  YOM does not state a claim that Defendants in so doing
impermissibly violated YOM's right to be free of government suppression of its views.  Indeed,
Vullo itself illustrates the point.  There, the superintendent levied threats of selective
enforcement at a private meeting after discovering that an insurance policy issued to the NRA
had technical infractions in violation of New York insurance law.  Had the superintendent
instead warned all insurance companies that any policy (without regard to whom it was issued)
with those infractions violated the law and exposed the insurer to regulatory sanction, the NRA
would have had no case (assuming the superintendent did not then selectively threaten or
investigate the insurers based upon the views of their clients).  Here, DPH warned all licensees
generally and has not investigated or threatened them selectively, as discussed infra.

four currently subject to DPH licensure under state law." Id.  Regarding unlicensed PRCs

specifically, the press release elaborated:

> DPH does not have jurisdiction over [unlicensed] facilities and cannot oversee the quality of the services they provide.  However, if these facilities are providing medical care or advertising services that are consistent with a clinic, DPH . . . may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials.  This work may be done in collaboration with the Attorney General's Office's Reproductive Justice Unit.

Id. at 10–11.  The press release conveyed that DPH actively seeks feedback and complaints from

individuals with experience concerning PRCs, as well as other stakeholders with information

about questionable practices.  Id. at 11.  It also linked to the contemporaneous guidance

memorandum for Massachusetts licensees.  Id.

   Unlike the guidance, the press release expressly addressed and critiqued the operations of

PRCs.  Furthermore, the press release referenced DPH's ability to investigate PRCs suspected of

performing unsafe or unlicensed medical services and mentioned potential action by the Attorney

General's Office.  However, the critical question here is whether DPH invoked these regulatory

powers "to convey a threat of adverse government action in order to punish or suppress [YOM's]

speech."  Vullo, 602 U.S. at 191.  The text of the press release does not plausibly support such a

finding.

   The press release's criticism of PRCs focused on the medical services and quality of care

offered by these centers, not their viewpoints.  For example, the press release noted that PRCs

"do not provide abortion care or abortion referrals, contraception, or other important

reproductive health care services" even though many "advertise themselves as full-service

reproductive health care clinics."  Doc. No. 64-3 at 10.  It also flagged that most PRCs are not

"licensed" and thus "are largely staffed by nonmedical individuals or volunteers."  Id.  To the

extent the press release raised the possibility of legal action against PRCs, it did so in reference to facilities that engage in practices violating medical standards and requirements set by the state.

The only time the press release mentioned a non-medical detail about PRCs was the following sentence: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." Id.  But simply pointing out the political and religious ties of PRCs as a factual matter does not amount to targeting PRCs for their political and religious speech.[17] Id.  Indeed, any concern that the press release identified about PRCs was not about their speech or viewpoint, but rather about their noncompliance with governing laws.  YOM has not plausibly alleged that these discussions of medical compliance, which reflect topics squarely within DPH's regulatory purview, transgressed into impermissible threats.

Furthermore, a significant portion of the press release was dedicated to warning the public about the dangers of unlicensed PRCs, which fall outside of DPH's oversight.  The press release specifically mentioned potential prosecution by the Attorney General's Office in the context of discussing unlicensed PRCs that provide inappropriate medical services.  These cautionary statements do not apply to YOM, which is a licensed medical entity.  Accordingly, YOM cannot raise a plausible free speech claim arising from the portions of the release discussing unlicensed PRCs.

---

[17] It is true that YOM's stance of not providing abortions, not recommending abortions, and not referring patients to abortion providers is informed by its religious views.  But nothing in DPH's communications interferes with or threatens YOM's religiously motivated decision to not discuss or provide certain services.  DPH has not, for instance, sought to sanction YOM for not providing abortions or referring patients to abortion services.  Nor has DPH required YOM to discuss the option of abortion with patients.  Cf. Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 778 (2018) (striking down state law requiring PRCs to provide notice of abortion services available to patients).

Regarding licensed PRCs in particular, the press release stated the following:

> Licensed clinics must comply with the requirements and standards of medical care and services associated with this certification.  Licensed clinics usually are staffed with full- or part-time medical providers that may include physicians, nurses, nurse practitioners, or physician assistants.  These licensed facilities may provide medical services, including testing and ultrasound, as long as the service delivered is within the scope of practice for the involved provider.  The clinicians in licensed centers bear a responsibility to adhere to all license requirements and meet the professional standards to ensure the well-being of those seeking care and support.

Id. at 10.  These neutral, descriptive statements about licensed entities do not plausibly suggest unconstitutional threats to suppress speech.

Accordingly, YOM has not plausibly alleged that the press release violates its free speech rights.  The press release criticized the operations of PRCs, which DPH was permitted to do.  It raised potential enforcement action against PRCs for the provision of out-of-scope medical services, which DPH, again, was permitted to do.  Finally, the release noted that, as a result of concerns about some PRCs, DPH initiated an effort to ensure compliance with governing rules by all licensees and linked to the guidance letter noted above.  The release and the guidance letter do not plausibly suggest an improper, selective focus on PRCs based on their views; rather, DPH warned every licensee.  While DPH is prohibited from using its regulatory powers to stamp out disfavored speech, it is authorized to use its powers to stamp out improper or unsafe medical practices.

### 3.    *DPH's February 2024 Letter*

The complaint alleges only one government communication made directly and individually to YOM: the letter from DPH dated February 29, 2024, following up on the department's investigation into YOM's operations.  Cf. Bantam Books, 372 U.S. at 61 (book distributor received at least thirty-five notices from state commission).  According to YOM, DPH conducted this investigation in response to Defendant Holder's October 2023 complaint,

34

and the "sole change DPH required Plaintiff to make was an amendment to its Policies and

Procedures Manual concerning the criteria for ultrasound exams, eliminating any language that

allowed for sonographer discretion."  Doc. No. 64 ¶ 49.  The February 29 letter followed up on

this investigation and said, in its entirety:

> On February 19, 2024, we conducted a desk audit follow-up review to verify that
> your facility had achieved and maintained compliance.  The findings indicate that
> all deficiencies have been corrected.  You are reminded that facilities are obligated
> to correct all deficiencies and then remain in compliance.  An unannounced visit
> may be conducted at any time at the discretion of the MA Department of Public
> Health Licensure Unit.

Id. ¶ 50.

This letter cannot reasonably be construed as being unconstitutionally threatening or

coercive.  The communication was mostly positive—the letter confirmed that YOM corrected all

deficiencies and met compliance.  While the letter conveyed DPH's authority to ensure

continuing compliance and to conduct unannounced visits, the government does not violate the

First Amendment simply by communicating the scope of its powers to a regulated entity.

Critically, the letter did not state, or even remotely suggest, that DPH was marshaling its

regulatory authority to suppress YOM's constitutionally protected speech or to retaliate against

YOM for its speech.  The letter said nothing at all about YOM's viewpoint or speech.  Unlike in

Vullo, where the superintendent expressly threatened to take enforcement action only against

insurance companies that affiliated with pro-gun advocacy groups, the letter here did not express

or insinuate that YOM would be subjected to further enforcement action unless it changed its

pro-life stance.  Far from constituting a threat, the letter reflects a garden-variety communication

from a regulator to a regulated entity providing reminders about compliance and closing out a

matter.

Therefore, the letter and DPH's related investigation into YOM cannot be plausibly understood as an unconstitutional threat. DPH conducted a single investigation into YOM in response to Holder's complaint, which YOM does not argue was facially unsupported or frivolous. Indeed, Holder's complaint cited a public statement by YOM's Executive Director, which arguably suggested that YOM was either offering out-of-scope ultrasound services or deceptively advertising its services. Doc. No. 64-2 at 16–17. As a result of the investigation, DPH asked YOM to make a discrete change to its internal manual regarding the criteria for ultrasound exams—a requirement that bears some connection to the allegations in Holder's complaint. YOM does not contend that this required revision to its manual was improper in any way, let alone that it suppressed protected speech. Once YOM made this correction, DPH confirmed compliance. Nothing about this sequence of events suggests that DPH sought to use its regulatory powers to suppress YOM's speech. YOM does not allege that the manner in which DPH conducted its one-time investigation was overly burdensome, unfair, or coercive. YOM also does not allege that DPH selectively conducted this investigation while ignoring similar complaints against other licensed entities. Nor has YOM alleged that DPH subjected it to any subsequent enforcement actions, such as unannounced visits or additional investigations.

The complaint mentions one other regulatory action concerning YOM. YOM alleges that it has received two subpoenas as part of an investigation brought by the Board against YOM's medical director. Doc. No. 64 ¶ 53. YOM lists these subpoenas as examples of "threats" that "target Plaintiff solely because of its pro-life and religious beliefs." Id. ¶ 234. However, the Board is statutorily required to investigate all complaints relating to the proper practice of medicine by any physician. Mass. Gen. Laws ch. 112, § 5. And, as YOM itself alleges, the Board commenced this investigation "based on Defendant Hart Holder's October 2023

complaint." Doc. No. 64 ¶ 52.  That the Board followed its statutory duty to investigate a

complaint does not plausibly show an intentional decision to target YOM based on its speech and

beliefs, particularly where DPH's investigation from the same complaint resulted in a finding of

"deficiencies" (which were later corrected).  Doc. No. 64-3 at 1.

YOM suggests that the Board's subpoenas were improper because "many of the

documents requested did not concern Plaintiff's mobile unit [the subject of the October 2023

complaint by REN]."  Doc. No. 64 ¶ 54.  It also notes that "most of the documents subpoenaed

pertained to a period of time during which Plaintiff's mobile unit was not in service."  Id. ¶ 56.

YOM concludes that these subpoenas show that Holder is "utilizing (or colluding with) the

government to conduct a fishing expedition into [YOM]" "solely because it is operating a pro-

life pregnancy center."  Id. ¶ 58.

YOM's contentions are unavailing.  First, YOM has alleged no facts nor identified any

law or regulation barring the Board from investigating or seeking information beyond the

specific focus of a complaint.  In fact, YOM unsuccessfully sought to enjoin one of the Board's

subpoenas in a proceeding of which this Court takes judicial notice.  There, the state court noted

that the Board "has broad authority to regulate the conduct of the medical profession" and

concluded that the "the documents sought [by the subpoena] are relevant to the Board's

investigation and do not exceed the scope of its authority under [Mass. Gen. Laws ch.] 112, § 5

or its regulations."  A Woman's Concern, Inc. v. Bd. of Registration in Med., No. 2481CV01789

(Middlesex Super. Ct. Aug. 2, 2024) (emphasis added).  YOM did not appeal this decision to a

higher court or seek to enjoin the other subpoena.[18]  Nor does YOM seek any relief from this

Court as to the Board's investigation.

Moreover, any allegation about the Board's misconduct cannot be litigated in this

lawsuit, where neither the Board nor any of its officials are parties.  The amended complaint does

not allege that any of the named Defendants work for the Board, are involved in the Board, or

have supervisory control over the Board.  That Defendant Holder filed the complaint that

allegedly led to the Board's investigation of YOM does not sufficiently plead that Holder or any

Defendant bears liability for the Board's independent actions in initiating and carrying out its

investigation.  While YOM attempts to sweep in the Board's regulatory actions with other

actions taken by Defendants, the Court declines to take such a far-reaching view of Defendants'

liability where YOM has alleged no facts plausibly linking Defendants to the Board's actions.[19]

### 4.  *Miscellaneous Campaign Materials*

YOM's free speech claim also includes allegations about the coercive and threatening

nature of the government's public education campaign.  In particular, YOM takes issue with the

government's campaign materials describing PRCs as "dangerous" "public health threats" and

accusing them of "deceptive advertising."  Doc. No. 64 ¶ 235.  Citing this language choice,

YOM contends that "Defendants condemned Plaintiff for providing care based on its moral and

religious beliefs rather than based on Defendants' preference for abortion."  Id.

---

[18] YOM did not promptly comply with the other subpoena, and the Board moved to compel
compliance in state court.  See Bd. of Registration in Med. v. A Woman's Concern, Inc., No.
2484CV00502 (Suffolk Super. Ct. Feb. 21, 2024).  YOM filed an opposition to that motion but
subsequently agreed to comply with the subpoena before the court issued a ruling.  The parties
then stipulated to dismissing the case.

[19] The Court identifies a similar issue with YOM's allegations about vandalism.  The amended
complaint dedicates several paragraphs to describing how YOM has been vandalized on multiple
occasions.  Doc. No. 64 ¶¶ 28–35, 39–43.  However, YOM does not allege or argue that
Defendants were involved in the acts of vandalism or that they failed to investigate the
vandalism after the filing of a report.

Defendants employed strong language to condemn PRCs.  In describing PRCs, Goldstein expressed, "I'm resolute about calling out this deception for what it is: a public health threat." Id. ¶ 80.  The state issued billboards, posters, and webpages urging the public to "Avoid Anti-Abortion Centers."  Doc. No. 64-3 at 19–21; Doc. No. 64-8 at 4.  One campaign factsheet stated that PRCs "can put your health at risk" and warned that they "may use **deceptive advertising**," "**delay your care**," use "**untrained staff and volunteers**," and "provide **misinformation** about abortion."  Doc. No. 64-8 at 4.[20]  But as explained above, this case is not about whether government officials can voice harsh, aggressive, or scalding criticisms against those with opposing viewpoints—YOM agrees they can.

According to YOM, though, Defendants' "language constituted accusations of criminal conduct, not political criticism."  Doc. No. 80 at 16.  YOM repeatedly emphasizes that Defendants' campaign employed criminal threats against PRCs.  See Doc. No. 64 ¶ 272; Doc. No. 80 at 6, 21; Doc. No. 81 at 9, 14, 15, 17.  However, the amended complaint does not plausibly allege that Defendants threatened criminal punishment at all, let alone that they did so to suppress YOM's speech.

The Court begins with the term "deceptive advertising."  YOM argues that the term "deceptive advertising" implies conduct that violates 243 Mass. Code Regs. 2.07(11)(a)(1).  Doc.

---

[20] YOM also includes allegations about words from the internal "Creative Brief" used to plan the campaign's creative strategy.  See Doc. No. 64 ¶¶ 149–155 (noting Creative Brief included slogans like "WOLF IN SHEEP'S CLOTHING" and "FREE ISN'T ALWAYS FREE").  YOM quotes this language to argue that the "state-funded campaign repeatedly used incendiary language to portray PRCs as predatory, dangerous, and deceitful."  Doc. No. 80 at 16.  But the Creative Brief was an internal government planning document, not material distributed to PRCs or to the public.  Nor were the cited messages from the Creative Brief ever used in the public campaign.  In fact, the Creative Brief includes a disclaimer that the phrases included in the brief "are not verbatim messaging options—rather directional paths for the creative to follow."  Doc. No. 67-7 at 32.  Therefore, words from the internal Creative Brief cannot plausibly establish the communication of a threat to PRCs.

No. 80 at 16.  The purpose of that regulation is to "ensure that the Board issues certificates of registration only to qualified competent physicians of good moral character and to strengthen the Board's licensing processes."  243 Mass. Code Regs. 2.01(1).  That regulation does not establish criminal penalties for the violation of its terms.  The Board enacted this regulation pursuant to its authority derived from civil, not criminal, statutes.  Id. at 2.01(2) ("The Board adopts 243 CMR 2.00 under the authority of M.G.L. c. 13, §§ 9 through 11; M.G.L. c. 112, §§ 2 through 12DD; and M.G.L. c. 112, §§ 61 through 65E and 88.").  In light of these facts, YOM has not plausibly explained how the phrase "deceptive advertising" relays a threat of criminal punishment.

YOM also asserts that the label of "deceptive advertising" amounted to "targeted, false, and baseless accusations establish[ing] a system of informal censorship designed to suppress the pro-life viewpoint of Plaintiff YOM with the intent to obstruct, chill, deter, and retaliate against Plaintiff YOM's speech."  Id. ¶ 260.  In essence, YOM argues that the campaign's accusations of "deceptive advertising" by PRCs were false and baseless, and it asks the Court to infer that these statements were not intended to combat deceptive advertising at PRCs, but to stifle protected speech by YOM and other PRCs.  But YOM's conclusory assertions are unsupported by the factual allegations in the amended complaint.  First, YOM has not plausibly alleged that Defendants' statements warning the public about potentially deceptive advertisements by PRCs were "targeted" at YOM.  These statements were made in the context of widely disseminated campaign materials discussing PRCs generally.  There are no factual allegations that the state accused YOM specifically of engaging in deceptive advertising or subjected it to any enforcement action under state medical advertising laws.

Second, the amended complaint does not plausibly allege that the state's criticisms of PRCs for deceptive advertisements were "false" and "baseless."  Indeed, exhibits attached to the

amended complaint reveal that in 2023, a class-action lawsuit was filed against another Massachusetts PRC for deceptive advertising and out-of-scope medical practices after the center misdiagnosed a patient as having a viable pregnancy, even though she faced a life-threatening ectopic pregnancy.  Doc. No. 64-2 at 20; Doc. No. 64-4 at 11.  In light of these concerning allegations, which were brought to DPH's attention by REN's second complaint, a state's effort to raise public awareness about possible deceptive advertising at PRCs on a general level cannot plausibly be understood as false or baseless accusations constituting threats to infringe upon YOM's free speech rights.  See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 486 (1996) (confirming that state-coordinated "educational campaigns focused on drinking problems" would "not involve any speech restrictions"); Nat'l Inst. of Fam. & Life Advocs. v. Raoul, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (noting that government could have prevented deception at PRCs "through a public awareness campaign" because "[m]ore speech is the solution; not restricting unpopular speech").

Similarly, YOM has not plausibly alleged that campaign materials describing PRCs as a "public health threat" relayed a threat of criminal punishment or violated its free speech rights. YOM contends that that the phrase "public health threat" constitutes a coercive threat because it "carries legal significance beyond mere political rhetoric."  Doc. No. 80 at 16.  It notes that "Massachusetts courts use this precise terminology to describe genuine regulatory emergencies," such as "the transmission of blood-borne diseases by intravenous drug abusers."  Id.  But this example does not support YOM's contention that the phrase "public health threat" represents a direct threat of criminal (or civil) punishment.  YOM also does not explain why Defendants should be barred from expressing their opinions on what constitute "genuine regulatory emergencies."  Defendants' view that PRCs pose a legitimate danger to patient safety is an

opinion that they are allowed to convey to the public, even if others may disagree.  For example, some government officials may voice their opinion that remaining unvaccinated from measles poses a "public health threat."  Other officials may characterize the measles vaccine itself as a "public health threat" or an encroachment on individual liberty and urge their constituents to avoid them.  These forms of expressive activity are part and parcel to our political system.  A government's use of the phrase "public health threat" does not automatically cross the line from permissible government speech to an unconstitutional threat.  And the fact that the government speaker possesses regulatory authority does not transform the phrase into a coercive threat or alternatively require the speaker to refrain from voicing their views.  YOM also has not identified any statutory or regulatory action that would flow from such labeling.

Similarly, campaign materials urging the public to "Avoid Anti-Abortion Centers" express the state's criticism of the scope of medical services and care that PRCs provide to patients.  This language is not, as YOM argues, akin to the state telling the public to "Avoid Houses of Worship."  Doc. No. 80 at 19–20.  Neither PRCs generally nor YOM facilities in particular are houses of worship, and YOM does not allege otherwise.  They are centers that provide medical and other services to pregnant women.  Not all PRCs are even religiously affiliated.  Id. at 10.  YOM does not plausibly allege the state's campaign materials condemn it or other PRCs because of their religious beliefs; instead, the campaign materials are focused on the state's debatable assessment that these centers pose health and safety risks to patients.  See, e.g., Doc. No. 64-3 at 28 (warning that anti-abortion centers "may mislead pregnant people about their options, delay their care, and can put their health at risk").  YOM may disagree with this assessment, but that disagreement does not transform the state's speech into a threat.

Moreover, campaign materials providing information on how the public can report complaints against PRCs to the Attorney General's Office do not invoke criminal punishment or reflect threats to silence YOM's speech.  YOM specifically references a postcard developed by DPH that states: "If you have been to an anti-abortion center and have concerns about your experience, you can file a complaint online or call the Attorney General's Civil Rights Division." Doc. No. 64-8 at 3.  This postcard, which references a civil division of the Attorney General's Office, does not reasonably indicate or imply that PRCs would face criminal prosecution because of their viewpoint.  Furthermore, providing a means for patients to submit complaints to the government about their experiences with PRCs does not amount to unconstitutional suppression of speech or religion; it implements the right to petition the government—a right also secured by the First Amendment.

Finally, YOM's reliance on Backpage.com, LLC v. Dart, a non-binding case from the Seventh Circuit, is not apt here.  There, a county sheriff directly wrote a letter to credit card companies threatening legal action against them for allowing their credit cards to purchase advertisements on Backpage's website.  807 F.3d 229, 231 (7th Cir. 2015).  In the letter, which was written on stationery captioned "Office of the Sheriff," the sheriff demanded that the companies "cease and desist" from allowing their cards to be used to buy advertising on Backpage and specifically enumerated a criminal money-laundering statute.  Id.  The letter attacked the companies in an accusatory tone: "Your [credit] cards have and will continue to be used to buy ads that sell children for sex on sites like Backpage.com."  Id. at 232.  The sheriff concluded the letter with a demand that the companies "provide [him] with contact information for an individual within your organization that I can work with . . . on this issue."  Id.  The letter worked; upon receipt, the companies blocked their credit cards from purchasing ads on

Backpage's website.  Id.  There, the Seventh Circuit held that Backpage was entitled to a preliminary injunction on its claim that the letter constituted an impermissible threat in violation of the First Amendment.

The state's campaign against PRCs is materially different.  For one thing, Backpage.com involved an official's communication to third parties threatening those parties with criminal prosecution unless they stopped their business relationship with the plaintiff.  Here, there are no allegations that state officials threatened any third parties with prosecution unless they cut ties with YOM.  Beyond that central distinction, the sheriff's statements in Backpage.com are plainly distinguishable from the communications at issue here.  In Backpage.com, the sheriff issued an official "cease and desist" demand and expressly invoked a federal criminal statute.  By contrast, state officials' characterization of PRCs as "public health threats" and "deceptive" entities neither conveyed any demands nor hinted at potential criminal prosecution.  Backpage.com also involved a letter that was written, sent, and targeted to specific entities.  Here, YOM challenges broadly disseminated materials designed to provide information to the general public— information that included Defendants' opinion that members of the public should evaluate their options before selecting a medical provider, along with Defendants' view that PRCs generally are not optimal places to receive medical care or advice.

Overall, YOM's characterization of Defendants' campaign materials as threats to stifle its speech and viewpoint is not plausible.  The campaign materials express the state's opinions about the services provided by PRCs.  These opinions, though strong, do not plausibly tread beyond the bounds of constitutional government speech.

### 5. *REN's Statements*

In addition to challenging the state's speech about PRCs, YOM takes issue with various statements made by REN.  Doc. No. 64 ¶¶ 90–108.  Assuming for the sake of the analysis that

REN qualifies as a state actor, YOM has failed to sufficiently allege that REN's actions unconstitutionally suppress its speech.

First, the facts do not indicate that REN holds any direct enforcement authority over YOM. The only allegations connecting REN to any semblance of enforcement power pertain to its ability to file complaints against PRCs with the government—a power held by any ordinary member of the public. That REN has previously filed a complaint against YOM does not plausibly show that it possesses regulatory authority over YOM. Furthermore, YOM conceded at the motion hearing that REN was a state actor only for the purposes of the public education campaign, and not for the purposes of exercising the state's coercive authority against YOM or other PRCs. This cuts against YOM's assertion that REN's statements criticizing and identifying PRCs amount to coercive threats. Kennedy v. Warren, 66 F.4th 1199, 1210 (9th Cir. 2023) (finding no unconstitutional threat in part because official lacked "unilateral regulatory authority" over plaintiff).

Second, any of REN's statements denouncing PRCs as "deceptive" and "dangerous" and urging the public to avoid them do not plausibly amount to unconstitutional threats for the same reasons described above for the state's campaign materials. YOM has not sufficiently pled that REN suppresses YOM's free speech rights simply by exercising its own right to forcefully advocate against the scope of care that PRCs provide.

Third, YOM has not plausibly alleged that REN's materials listing PRCs, including YOM, by name interfere with YOM's protected speech. One of these lists is published on REN's webpage entitled, "What Are Anti-Abortion Centers," which provides information about the anti-abortion stance of PRCs to prospective patients. Doc. No. 64-3 at 30. In the context of encouraging patients seeking abortion care to "double check" the type of provider they visit, the

webpage lists all the PRCs in New England, including YOM.  Id. at 30–31.  Merely informing

the public about which facilities are PRCs and urging patients to research facilities before

seeking abortion services does not plausibly constitute an impermissible threat against YOM.

REN publishes another list of PRCs in a "guide to identifying & taking action against anti-

abortion centers in New England," which criticizes what REN says are unsafe and deceptive

practices at PRCs and reminds readers about ways to report negative experiences at PRCs.  Doc.

No. 64-4 at 1, 11–12, 23.  While the guidebook identifies YOM by name, it does not plausibly

amount to unconstitutional threats directed at silencing YOM's viewpoint or speech.  Instead,

these statements pinpointing PRCs and criticizing their operations are protected by REN's "own

undoubted right under the First Amendment to mobilize public opinion on the subject of" anti-

abortion facilities.  Connell v. Signoracci, 153 F.3d 74, 82 (2d Cir. 1998) (noting that

government official is "privileged, for example, . . . to call the topless bars a 'black eye on the

community' and a 'slimy business,' and to call for a boycott of the establishments").

Instead of wielding any enforcement authority against YOM, REN has leaned on its

persuasive authority—promulgating public communications condemning the work of PRCs and

urging the public to avoid them.  This type of expressive advocacy, which exists within the scope

of REN's own free speech rights, does not ground a plausible First Amendment claim.

6.    *Totality of the Circumstances*

Mindful of the Supreme Court's admonition to consider the facts "in context," Vullo, 602

U.S. at 191, as well as the holistic framing of YOM's allegations, the Court considers all of the

alleged actions as a whole.  Even viewed collectively, YOM fails to plausibly allege threats of

state action (implicit or express) for continued or future exercise of its First Amendment rights.

At the request of YOM, the Court considers the totality of the circumstances using the four-factor test from Vullo.[21]  There, the Supreme Court considered the following, non-exhaustive list of factors "to determine whether a challenged communication is reasonably understood to be a coercive threat": "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." Id. at 189.  Applied to this case, this four-factor test does not demonstrate that YOM has sufficiently pled its free speech claim.

Regarding the first factor—word choice and tone—Defendants used strong language to criticize the medical standards and services provided by PRCs.  Government officials are free to use forceful, even condemnatory language to criticize opposing viewpoints.  See Kennedy, 66 F.4th at 1204, 1208 (noting that Senator Warren's letter denouncing Amazon's promotion of certain books as "peddling misinformation about COVID-19 vaccines and treatments" and as "unethical, unacceptable, and potentially unlawful" was permissible government criticism). What matters is whether the particular words were used "to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." Vullo, 602 U.S. at 191. Here, YOM fails to plausibly show that Defendants levied their criticisms in order to punish or silence YOM's constitutionally protected speech.  Defendants cautioned the public about dangerous and deceptive practices at PRCs.  Facially, these communications sought to proscribe

---

[21] YOM portrays this test as the "governing standard for when government speech crosses the line into coercion."  Doc. No. 80 at 14.  However, the Supreme Court did not prescribe the four-factor test as the only, or even the preferred, method of evaluating this question.  Instead, the Court recognized that lower courts use different fact-intensive approaches when addressing this issue.  Vullo, 602 U.S. at 190.  The Court also agreed that the four factors YOM invokes are "just helpful guideposts in answering the question whether an official seeks to persuade or, instead, coerce." Id. at 191.

the provision of unsafe medical services, not religious viewpoint or speech, and to persuade the public on how to make certain choices about medical care.

This connects to the second and fourth factors—the existence of regulatory authority and reference to adverse consequences. To the extent Defendants communicated potential enforcement actions by DPH or the Attorney General's Office, they did so in the context of investigating facilities suspected of performing out-of-scope, unsafe, or unlawful medical services. The factual allegations indicate that Defendants used their regulatory authority and raised potential adverse consequences in order to promote compliance with the state's medical laws, regulations, and rules—which apply to all medical entities, not just YOM. And, DPH issued reminders about these laws in a guidance memorandum sent to all licensees, rather than in targeted communications to YOM or PRCs. That Defendants internally sought to put PRCs "on notice" about these reminders does not bring this case closer to Vullo. Here, there is no plausible showing that Defendants targeted YOM with threats of enforcement action because of its viewpoint or speech or that they unevenly applied the state's medical laws based on an entity's views. Unlike the superintendent in Vullo, Defendants did not wield their regulatory authority in a quid pro quo manner. They did not tell PRCs that they could avoid liability for laws and regulations if they shed their pro-life views or religious beliefs. They did not tell doctors that they could receive a regulatory benefit if they declined to work with PRCs. Defendants simply reminded PRCs and other entities that they must comply with generally applicable laws and regulations. That is the normal work of government officials, not an improper exploitation of state power.

As for the remaining factor—the perception of the recipient—YOM alleges that Defendants' statements "would cause a reasonable person to perceive such statements as a threat

against [PRCs]."  Doc. No. 64 ¶ 272.  But again, the crucial question is whether a reasonable person would have perceived these statements as threats to suppress or punish speech.  A public health official's stern reminder to all licensees to comply with generally applicable licensure laws or risk losing their license may be perceived as a "threat" of enforcement action, but such threat does not violate the Constitution unless it invokes enforcement to retaliate against or suppress constitutionally protected speech.  No fact suggests that any of the Defendants used or threatened enforcement action to interfere with YOM's speech.  Not to mention, many of the "threatening" statements that YOM cites are from internal government documents, not communications disseminated to PRCs or the public.  YOM fails to explain how internal discussions never meant to be seen by PRCs could have communicated threats.  Similarly, YOM broadly alleges that one of its doctors quit "as a direct result of Defendants' intimidation campaign," Doc. No. 64 ¶ 240, but fails to provide any non-conclusory factual allegations to render plausible its assertion that Defendants' actions prompted the doctor's resignation.

Overall, YOM's allegations, considered together and in context, do not plausibly plead that Defendants employed coercive threats to silence YOM's speech.  Accepted as true and with all reasonable inferences drawn in YOM's favor, the non-conclusory facts in the amended complaint show the existence of a deeply divisive issue concerning reproductive healthcare and abortions.  They show that state officials took a side on the issue, using assertive language to promote abortion access and criticize the scope of services offered by PRCs.  However, they do not plausibly suggest that any Defendant took or threatened regulatory action because YOM neither refers patients for abortions nor recommends abortions.  Rather, the allegations reveal that DPH—an agency charged with protecting the health of the public—urged medical facilities, including PRCs, to abide by various medical laws to ensure patient safety.  DPH also conducted

a single investigation into YOM based on a fact-supported complaint raising concerns about potentially deceptive and unsafe practices and required a discrete change to YOM's manual, an outcome which YOM does not challenge as improper.

The facts do not suggest that Defendants overstepped in taking enforcement action against YOM.  YOM does not allege that DPH conducted this investigation while ignoring comparable complaints against other entities.[22]  Furthermore, there are no factual allegations that Defendants told YOM or other PRCs that they could avoid enforcement by espousing different viewpoints.  The facts also do not show that the government threatened intermediaries with punishment for affiliating with YOM.  Cf. Vullo,  602 U.S. at 198; Backpage.com, 807 F.3d at 234.  Nor do they show that officials brandished criminal prosecution or deployed the police to intimidate YOM into silence.  Cf. Bantam Books, 372 U.S. at 63; Backpage.com, 807 F.3d at 232.  Indeed, there is no indication whatsoever that the government took any direct action to bar YOM from continuing to express its constitutionally protected speech or impliedly threatened YOM with enforcement action based on its views.  YOM alleges that it has experienced a reduction in patients and may be forced to shut down as a result of Defendants' campaign.  Doc. No. 64 ¶¶ 276–277.  As noted at the outset, public officials, including Defendants, are entitled to compete for the hearts and minds of the public—as is YOM.  The amended complaint, however, is utterly devoid of allegations that Defendants employed enforcement powers or threats to coerce patients to stop seeking the services of YOM or any PRCs.  Cf. Vullo, 602 U.S. at 198; Backpage.com, 807 F.3d at 234.

_____

[22] To the extent that YOM advances this argument, the Court addresses it under YOM's Equal Protection Clause claim.

One further point bears mention.  The amended complaint plausibly alleges that Defendants not only support access to abortion but also harbored concerns regarding PRCs, including that some (not YOM) were dispensing medical services without a license, that some or many engaged in misleading advertising, and that many were preventing patients from accessing a full range of reproductive healthcare options (namely, abortion care).  The amended complaint plausibly alleges that these concerns animated the campaign as well as DPH's decision to remind all licensees of various obligations imposed by state law.  Even if DPH's reminder to all licensees was really a targeted warning just to PRCs to comply with the law (although no reasonable recipient of the letter would so conclude), that is not sufficient to state a claim for the violation of YOM's free speech rights.  YOM would also need to plausibly allege, based on non-conclusory factual allegations, that this targeted warning was because of YOM's views, as opposed to conduct by PRCs arguably raising concerns under state laws.  Not only are there no such allegations, but the factual allegations YOM advances reveal government statements and actions tightly tailored to enforcing the law.  And YOM makes no claim that it is exempt (or PRCs as a group are exempt) from compliance with governing state laws.  Finally, the Court does not omit an analysis of selective enforcement but rather addresses it as part of the discussion of Count III.

Based on the foregoing reasons, the Court ALLOWS the motions to dismiss Count I.

B.    Count II: Free Exercise Claim

Next, YOM brings a First Amendment claim under the Free Exercise Clause.  The Free Exercise Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I; see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).  "When a religiously neutral and generally applicable law incidentally burdens free exercise rights," its constitutionality depends

51

on whether the law "is rationally related to a legitimate governmental interest." <u>Does 1-6 v.</u>
<u>Mills</u>, 16 F.4th 20, 29–30 (1st Cir. 2021) (citing <u>Fulton v. City of Philadelphia</u>, 593 U.S. 522,
533 (2021)).  However, the "[g]overnment fails to act neutrally when it proceeds in a manner
intolerant of religious beliefs or restricts practices because of their religious nature" or when a
law "single[s] out religion or religious practices." <u>Id.</u> at 29.  In those circumstances, the Court
may sustain the conduct or law only if it is narrowly tailored to achieve a compelling
governmental interest. <u>Id.</u>

YOM contends that Defendants' actions "specifically target and burden Plaintiff's
religious exercise by creating a hostile regulatory environment for faith-based healthcare
providers."  Doc. No. 64 ¶ 302.  There are several deficiencies in YOM's claim.  To begin, YOM
does not point to any law or policy that burdens its religious practice.  Additionally, none of
Defendants' actions or speech have prohibited YOM from identifying and operating as a
Christian, life-affirming healthcare organization.  The fact that YOM has faced a reduction in
clients—even if a plausible by-product of the state's campaign—does not violate the Free
Exercise Clause.  The constitutional guarantees of religious freedom do not include the right to
successfully operate or the right to run a healthcare clinic sheltered from the effects of opposing
views or competition.  Moreover, the state has not forced YOM into providing abortions or other
services that violate its religious beliefs.  Pursuant to its religious conviction, YOM can continue
to provide information about alternatives to abortions and medication abortion reversals.  These
considerations are important because the "threshold" question of a Free Exercise Clause claim is
"whether the plaintiff's free exercise is interfered with at all." <u>Parker v. Hurley</u>, 514 F.3d 87, 99
(1st Cir. 2008) (citation modified).  Here, there is no plausible showing that Defendants' actions
have interfered with YOM's exercise of its Christian faith.  The only thing Defendants have told

YOM it cannot do is violate medical laws, regulations, and standards that apply to all licensed medical entities in Massachusetts.  And YOM does not allege that any of these licensure laws infringe upon its ability to freely exercise its religion, nor does it challenge these laws' application to its operation as a licensed clinic.

YOM argues that the state's public education campaign is "explicitly and facially targeted at the religious activity of PRCs."  Doc. No. 64 ¶ 301.  To support this claim, YOM points to one line from DPH's January 3, 2024, press release: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda."  Id.  This statement does not disfavor religion in any way.  It merely conveys a fact about "most" PRCs that YOM does not challenge.  Beyond this single sentence, YOM cites no other public-facing government communications mentioning the religious beliefs of PRCs or expressing hostility toward religion.  Instead, most of the campaign statements that YOM takes issue with involve statements criticizing PRCs' "dangerous" and "deceptive" medical practices, which target PRCs based on the quality of their medical care and advertising practices, not their religious beliefs.  None of the challenged campaign materials explicitly or facially discriminate against YOM's religious practice.

Of course, government actions may still violate the Free Speech Clause even though they appear neutral on the surface.  "Facial neutrality is not determinative."  See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah., 508 U.S. 520, 534 (1993).  "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." Id. at 533.  But here, YOM has not plausibly alleged that the object of the state's public education campaign was to suppress its religious practice.  The campaign focused on combatting the arguably deceptive and out-of-scope practices of some PRCs, not all of which are even

religiously affiliated according to YOM.  There is no allegation that Defendants singled out religious PRCs for worse treatment than non-religious PRCs.  See Does 1-6, 16 F.4th at 30 (holding government action "generally applicable" because it does not permit "secular conduct that undermines the government's asserted interests in a similar way").

Nor has YOM alleged any facts that allow the Court to infer that Defendants were driven by religious animus.  YOM points to one internal document showing that the planners of the campaign were cognizant about many PRCs' religious ties.  Doc. No. 64 ¶¶ 133–134.  A PowerPoint used by campaign planners includes a note that inquires, "How do we want to tackle/address religious aspects of these places."  Doc. No. 64-6 at 39.  This statement does not plausibly reveal religious hostility, nor does it suggest that suppressing YOM's religious practices was the object of the campaign.  Indeed, another PowerPoint slide includes a note that the campaign should avoid focusing on PRCs' religious ties because doing so could impact how "patient populations with strong faith-based abortion views" "receive the campaign."  Doc. No. 64-7 at 1.  These internal communications, which reveal that state officials sought to disentangle the campaign from religious issues, do not show that religious animus served as a motivating factor.  These circumstances differ greatly from cases cited by YOM, where government officials made multiple comments expressing hostility against particular religious beliefs.  Church of Lukumi Babalu Aye, 508 U.S. at 540–42 (city officials described religion as "sin," "foolishness," and "abhorrent"); Masterpiece Cakeshop v. Colo. C.R. Comm'n, 584 U.S. 617, 618 (2018) (state officials disparaged business owner's faith as "despicable" and "compared his invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust").

For the foregoing reasons, YOM has not plausibly alleged that Defendants' conduct was targeted towards its religious practices and beliefs.  To the extent Defendants threatened any

enforcement action, YOM has not sufficiently alleged that they made the threats because of YOM's religious views. Accordingly, rational-basis review applies. YOM has not sufficiently alleged that Defendants' actions were not rationally related to a legitimate government interest. Defendants acted with the stated purpose of protecting patient safety and ensuring compliance with medical laws. See also Washington v. Glucksberg, 521 U.S. 702, 731 (1997) ("The State . . . has an interest in protecting the integrity and ethics of the medical profession."). Defendants issued communications reminding medical providers about their obligations under state laws and published public education materials warning pregnant patients about improper medical practices at PRCs. In doing so, they carried out the state legislature's directive to launch a "public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers and the centers' lack of medical services." Doc. No. 64 ¶ 90. Because these actions easily pass rational-basis review, the Court ALLOWS the motions to dismiss Count II.

### C.    Count III: Equal Protection Claim

Finally, YOM advances an Equal Protection Clause claim, arguing that "Defendants engaged in selective enforcement against pro-life PRCs while ignoring complaints against abortion providers . . . because of their religious and political speech." Doc. No. 80 at 27–28. To establish such a claim, the plaintiff must allege that "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 909–10 (1st Cir. 1995).

YOM has not plausibly alleged this claim. First, YOM has not identified a proper comparator. The basis of its selective enforcement claim is that "[s]imilarly situated entities that

do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants." Doc. No. 64 ¶ 333. However, clinics that provide abortion are not similarly situated to YOM "in all relevant aspects." <u>Fincher v. Town of Brookline</u>, 26 F.4th 479, 487 (1st Cir. 2022). "The 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result." <u>Tapalian v. Tusino</u>, 377 F.3d 1, 6 (1st Cir. 2004). PRCs, which do not provide abortions or refer patients to abortion providers, offer a limited set of medical services to pregnant patients. YOM has not alleged that abortion providers, too, refuse to provide certain pregnancy-related medical services. Furthermore, the majority of PRCs are unlicensed, precluding DPH from directly overseeing their operations and ensuring their compliance with state medical laws. The amended complaint does not allege that most abortion providers in Massachusetts are also unlicensed. These differences are material to this case, where the state launched a campaign for the precise purpose of educating the public about PRCs' limited scope of medical services and potential deviation from state medical laws and licensure requirements. In this context, abortion providers do not plausibly demand a like result. YOM has not identified any other comparators or comparable circumstances. To the extent YOM argues that it was disparately treated from similarly situated entities because of its religious beliefs, the more appropriate comparator would be non-religious PRCs. YOM notes that most, not all, PRCs are religiously affiliated. Doc. No. 80 at 10–11. However, nothing in the amended complaint indicates that the government treated non-religious PRCs more favorably than religious ones.

Even assuming for the sake of this discussion that abortion clinics are appropriate comparators, YOM has not sufficiently alleged that impermissible considerations drove Defendants' decisions and actions. DPH subjected YOM to one investigation based on a

complaint that facially suggested YOM's non-compliance with neutral medical standards. As explained above, there is no indication that this enforcement action was taken to suppress YOM's speech or to punish its religious beliefs. Beyond that single investigation, the complaint mentions no other enforcement actions taken by Defendants against YOM. The factual allegations do not plausibly suggest that Defendants have attempted to stifle YOM's speech, including its speech about medication abortion reversals. And, as detailed above, the complaint lacks allegations suggesting that Defendants created and coordinated the public education campaign based on their desire to silence YOM's protected speech or based on their hostility against its religious beliefs. Furthermore, YOM has alleged no facts indicating that Defendants launched the campaign out of bad faith or a malicious intent to injure. Rubinovitz, 60 F.3d at 911 (noting malice or bad faith cases are infrequent and "should be scrupulously met"). Finally, while YOM identifies complaints lodged against some clinics that provide abortions, it has not alleged that DPH failed to investigate these complaints or take action.[23]

---

[23] A plaintiff must do more than advance the conclusory allegation that someone else did not receive the same scrutiny. The plaintiff must advance some additional, non-conclusory factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Here, there are none. YOM alleges that DPH received more total complaints for abortion providers (eight) than for PRCs (two) between 2022 and 2024, but it does not allege that DPH ignored the complaints against abortion providers or handled these complaints with less scrutiny. YOM's only specific allegation is too insubstantial to cloak the claim in plausibility. Governing regulations direct DPH to inspect clinics every two years. Doc. No. 64 ¶ 191. YOM alleges that DPH has done so at each PRC but has not done so for one abortion clinic since 2018. Id. YOM does not allege that other abortion clinics have not been subjected to these two-year inspections. This narrow allegation about a single abortion provider, without more, fails to make plausible the assertion that DPH is targeting PRCs for enforcement action because of their religious views or protected speech. This is especially so in light of the fact that there are no allegations that DPH overreached in investigating YOM or engaged in any improper enforcement action against YOM. And as previously mentioned, the amended complaint does not seek any relief from pending or prospective enforcement action.

Because YOM has not plausibly alleged that Defendants engaged in actions based on an impermissible purpose, rational-basis review applies.  See also Wirzburger v. Galvin, 412 F.3d 271, 282 (1st Cir. 2005) ("Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection . . . claim based on the same facts.").  As the Court has already addressed, Defendants' actions survive rational-basis review.  Therefore, the Court ALLOWS the motions to dismiss Count III.

IV.  REMAINING ISSUES

Because the Court dismisses all three counts for failure to state a claim on the merits, the Court declines to address the other arguments advanced by Defendants, including but not limited to whether State Defendants are entitled to qualified immunity and whether Defendants REN and Holder acted under color of law.  There is one caveat to the foregoing.

At the motion hearing, counsel for YOM conceded that (1) without plausibly alleging that REN and Holder acted under color of law, YOM has not stated a claim against these Defendants; and that (2) these two Defendants, at most, acted under color of law only with respect to the state's media campaign, but not with respect to the exercise of any state regulatory authority. Given these concessions, REN and Holder's motion to dismiss is also ALLOWED because without state coercive authority, these particular Defendants did not (and could not) make any sort of threat to wield state authority against YOM.

V.    <u>CONCLUSION</u>

Accordingly, the motions to dismiss YOM's amended complaint, Doc. Nos. 70, 72, are

ALLOWED.  A separate judgment of dismissal with enter.  Each side shall bear its own costs

and fees.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge